John H. Maddock III (VSB No. 41044)
Aaron G. McCollough (VSB No. 71246)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

*Counsel for LBCMT 2007-C3 Sterling Retail, LLC, LBCMT
2007-C3 Pleasant Retail Limited Partnership, LBCMT 2007-
C3 Seminole Trail, LLC, LBCMT 2007-C3 W. Broad Street,
LLC, LBCMT 2007-C3 Snellville Retail Limited Partnership,
LBCMT 2007-C3 Pecanland, LLC, and LBCMT 2007-C3 RHL
Blvd. Limited Partnership*

## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WSG DULLES, L.P., <u>et al</u>. | ) | Case No. 12-11149-BFK |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| LBCMT 2007-C3 Sterling Retail, LLC, | ) | |
| LBCMT 2007-C3 Pleasant Retail Limited | ) | |
| Partnership, LBCMT 2007-C3 Seminole | ) | |
| Trail, LLC, LBCMT 2007-C3 W. Broad | ) | |
| Street, LLC, LBCMT 2007-C3 Snellville | ) | |
| Retail Limited Partnership, LBCMT 2007-C3 | ) | |
| Pecanland, LLC, and LBCMT 2007-C3 RHL | ) | |
| Blvd. Limited Partnership, | ) | |
| | ) | |
| Movants, | ) | |
| v. | ) | |
| | ) | |
| WSG DULLES, L.P., WSG DULLES | ) | |
| GL, LLC, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**MOTION OF LBCMT 2007-C3 STERLING RETAIL, LLC, LBCMT 2007-C3
PLEASANT RETAIL LIMITED PARTNERSHIP, LBCMT 2007-C3 SEMINOLE TRAIL,
LLC, LBCMT 2007-C3 W. BROAD STREET, LLC, LBCMT 2007-C3 SNELLVILLE
RETAIL LIMITED PARTNERSHIP, LBCMT 2007-C3 PECANLAND, LLC, AND
LBCMT 2007-C3 RHL BLVD. LIMITED PARTNERSHIP TO DISMISS BANKRUPTCY**

**CASES OF WSG DULLES, L.P AND WSG DULLES GL, LLC, OR, IN THE
ALTERNATIVE, FOR RELIEF FROM AUTOMATIC STAY
WITH RESPECT TO SUCH DEBTORS**

Movant LBCMT 2007-C3 Sterling Retail, LLC (the "Primary Lender"), together with co-movants LBCMT 2007-C3 Pleasant Retail Limited Partnership (the "ATL Lender"), LBCMT 2007-C3 Seminole Trail, LLC (the "Charlottesville Lender"), LBCMT 2007-C3 W. Broad Street, LLC (the "Short Pump Lender"), LBCMT 2007-C3 Snellville Retail Limited Partnership (the "Snellville Lender"), LBCMT 2007-C3 Pecanland, LLC (the "Monroe Lender"), and LBCMT 2007-C3 RHL Blvd. Limited Partnership (the "Trace Fork Lender," and collectively with the ATL Lender, Charlottesville Lender, Short Pump Lender, Snellville Lender, and Monroe Lender, the "Other LBCMT Lenders"), through undersigned counsel, hereby file this *Motion to Dismiss Bankruptcy Cases of WSG Dulles, L.P. and WSG Dulles GL, LLC, or, in the Alternative, for Relief from the Automatic Stay with Respect to Such Debtors* (the "Motion"). In support of the Motion, the Primary Lender and the Other LBCMT Lenders respectfully state as follows:

**PRELIMINARY STATEMENT**

Debtors WSG Dulles, L.P ("Dulles LP") and WSG Dulles GL, LLC ("Dulles GL," and together with Dulles LP, the "Dulles Debtors") are single-asset real estate debtors that own a two-tenant retail property in Loudoun County, Virginia (as defined herein, the "Real Property").[1] By various assignments, the Primary Lender is the holder of the note and other loan documents relating to the Real Property. The Dulles Debtors' obligations under the various loan documents are secured by all or substantially all of the Dulles Debtors' assets, including, without limitation, their interests in the Real Property. In addition, through the loan documents, Dulles GL

---

[1]    Dulles LP is the sole member in Dulles GL. Dulles GL is the fee owner of the Real Property. Pursuant to a ground lease, Dulles LP leases the Real Property from Dulles GL. In turn, Dulles LP leases the improved retail space to two tenants: Men's Wearhouse and Vitamin Shoppe.

guaranteed the separate loan obligations of six of its affiliates, each of which owns a separate retail parcel (collectively with the Dulles Debtors, the "WSG Affiliated Borrowers"),[2] and these affiliate guaranty obligations of the Dulles Debtors are also secured by the Dulles Debtors' Real Property and other collateral. Accordingly, the Dulles Debtors' interests in the Real Property secure all of the loan obligations of all of the WSG Affiliated Borrowers owed to the Primary Lender and the Other LBCMT Lenders.

There can be no real dispute that the Real Property is hopelessly underwater. The Dulles Debtors value the Real Property at $4 million in their Schedules of Assets and Liabilities (though the Primary Lender's own appraisal indicates a value of $3.4 million). The Real Property, however, secures debt under the loan documents *in excess* of $18 million. In light of the gross disparity between the value of the Real Property and the secured debt, and in light of the Dulles Debtors' limited cash flows and negligible third-party debt, there is simply no prospect of a confirmable chapter 11 plan in these cases. Accordingly, the continuation of these cases does not serve any reorganizational purpose.

In addition, the background facts overwhelmingly support the conclusion that the Dulles Debtors filed these cases in bad faith, including, *inter alia*, that:

- The Dulles Debtors ceased making any debt service payments to the Lender (or its predecessors) in early 2011, and, instead of holding rental payments received from the tenants in accordance with the loan documents (or escrowing debt service payments), the Dulles Debtors systematically

---

[2]      The additional WSG Affiliated Borrowers are WSG Trace Fork, LP ("WSG Trace Fork"), WSG Charlottesville, LLC ("WSG Charlottesville"), WSG Short Pump, LLC ("WSG Short Pump"), WSG Snellville, LLC ("WSG Snellville"), ATL 2130, Limited Partnership ("WSG ATL"), and WSG Monroe, LLC ("WSG Monroe"). WSG Trace Fork and WSG Charlottesville are debtors in chapter 11 proceedings pending before this Court (Case Nos. 12-11756-BFK and 12-12785-BFK), and WSG ATL is a debtor in a chapter 11 proceeding in the U.S. Bankruptcy Court for the Northern District of Georgia (Case No 11-76017-PWB (Bankr. N.D. Ga.)). The properties owned by WSG Short Pump and WSG Snellville have been foreclosed outside of any bankruptcy proceedings, and WSG Monroe's property is currently in the process of foreclosure. Each Other LBCMT Lender is primary lender to the applicable WSG Affiliated Borrower.

misappropriated hundreds of thousands of dollars in rents by transferring all excess cash to an insider management company;[3]

- The Dulles Debtors failed to disclose these improper prepetition transfers to the insider management company (or even the identity of the management company) in their sworn Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("SOFAs"), and, upon being directed to file corrected versions of these documents *nearly three months ago* by the U.S. Trustee's office, have failed to amend the Schedules and SOFAs to disclose these transfers and relationships;

- The Dulles Debtors have not paid required fees to the Virginia State Corporation Commission, resulting in the cancellation of their organizational status and ability to conduct business in Virginia;

- The Dulles Debtors' bankruptcy cases are two-party disputes with the Primary Lender and Other LBCMT Lenders, which cases were commenced on February 23, 2012 *less than one hour* before the Primary Lender's scheduled foreclosed sale in a clear effort to frustrate the Lender's remedies;

- To date, the Dulles Debtors have failed to timely pay when due *each and every one* of the required payments under the Cash Collateral Order (as defined below), resulting in numerous defaults, only certain of which have been cured; and

- The Dulles Debtors' authority to use cash collateral expires on June 30, 2012, and the Dulles Debtors failed to file a plan within 120 days of commencing their bankruptcy cases, confirming the lack of any legitimate effort to reorganize.

Considering the lack of any reorganizational purpose in the cases and the Dulles Debtors' bad faith, there is simply no reason to provide the Dulles Debtors any further opportunity to frustrate and delay the Lender's exercise of its remedies.  Accordingly, for the reasons set forth herein, this Court should dismiss these bankruptcy cases.  Alternatively, in light of the indisputable lack of equity in the Real Property and the inability of the Dulles Debtors to confirm a chapter 11 plan, this Court should grant the Lender relief from the automatic stay to foreclose on the Dulles Debtors' interests in the Real Property.

---

[3]     Each of the other WSG Affiliated Borrowers likewise ceased making debt service payments to the applicable Other LBCMT Lender in early 2011 and instead misappropriated all rents collected during the ensuing year by transferring them to the common insider management company.

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §

1334(b).

2.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C.

§§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 1112 and 362 of

title 11 of the United States Code (the "Bankruptcy Code") and Rules 1017 and 4001 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

*A.      DESCRIPTION OF LOAN DOCUMENTS.*

5.      Dulles GL is obligated as borrower under that certain Promissory Note dated July

12, 2007 in the original principal amount of $3,280,000.00 (the "Note") in favor of Lehman

Brothers Bank, FSB ("Original Lender").  A true and correct copy of the Note is attached hereto

as Exhibit A.

6.      Dulles GL is further obligated as guarantor pursuant to that certain Guaranty of

Payment dated July 12, 2007 (the "Guaranty"), under which Dulles GL unconditionally

guaranteed the obligations of the six (6) other WSG Affiliated Borrowers to Original Lender

under their respective notes and loan documents in the initial aggregate principal amount of

$13,340,000.00.  A true and correct copy of the Guaranty is attached hereto as Exhibit B.

7.      Dulles GL's obligations under the Note and Guaranty are secured by, among

other things, that certain Fee and Leasehold Deed of Trust, Fixture Filing and Security

Agreement dated July 12, 2007, recorded as Instrument No. 20070720-0054264 with the Clerk's

Office in Loudoun County, Virginia (the "Deed of Trust").  A true and correct copy of the Deed

of Trust is attached hereto as Exhibit C.  Collectively, the Note, Guaranty, Deed of Trust, and

any other document or instrument that secures the obligations under the Note or Guaranty, or

was otherwise executed in connection with the Note and Guaranty, are referred to hereinafter

collectively the "Loan Documents."

8.      Pursuant to the Deed of Trust, Dulles GL granted a lien on, among other things,

certain real estate, improvements and other related property (as more particularly described in the

Deed of Trust, the "Real Property"), to secure Dulles GL's obligations under the Note and

Guaranty in the aggregate initial principal amount of $16,620,000.  Under the Deed of Trust, to

further secure the obligations under the Note and Guaranty, Dulles LP granted a lien on, among

other things, its leasehold interests relating to the Real Property.

9.      Pursuant to Section 1.2 of the Deed of Trust, the Dulles Debtors granted Original

Lender an unconditional assignment of all rents, leases, and other amounts received in

connection with the Real Property ("Rents and Leases Collateral").  In turn, pursuant to the Deed

of Trust, the Original Lender granted the Dulles Debtors a conditional license to collect the Rents

and Leases Collateral until the occurrence of an Event of Default (as defined in the Deed of

Trust).  Upon the occurrence of an Event of Default, the Dulles Debtors' license to collect Rents

and Leases Collateral terminated automatically, and Dulles Debtors were obligated to hold any

collected Rents and Leases Collateral to satisfy the obligations under the Loan Documents.

10.     The Dulles Debtors also granted Original Lender a security interests in and on

certain personal property and fixtures (as more particularly described in the Deed of Trust, the

"Personal Property").  The security interests in the Personal Property were perfected by the

Original Lender through the filing of UCC Financing Statements, which were recorded on

6

August 30, 2007, at Instrument No. 20070830-0064174 with the Clerk's Office in Loudoun

County, Virginia.  The Dulles Debtors' interests in the Real Property, Rents and Leases

Collateral, Personal Property, and any and all other collateral securing the obligations owed by

the Dulles Debtors under the Loan Documents are referred to hereinafter collectively as the

"Collateral."

11.     Subject to certain exceptions, the Dulles Debtors' obligations under the Loan

Documents are non-recourse.

**B.     *ASSIGNMENT OF LOAN DOCUMENTS TO THE LENDER.***

12.     In 2007, all of Original Lender's right, title and interest under the Loan

Documents were transferred to LaSalle Bank National Association as Trustee for the Registered

Holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through

Certificates, Series 2007-C3 ("Assignee #1"), pursuant to, among other documents, (i) allonge

affixed to the Note, a true and correct copy of which is attached hereto as Exhibit D, and (ii) that

certain Assignment of Fee and Leasehold Deed of Trust, Fixture Filing and Security Agreement

recorded on November 27, 2007 as Instrument No. 20071127-0082481 with the Clerk's Office in

Loudoun County, Virginia, a true and correct copy of which is attached hereto as Exhibit E.

13.     In 2011, as successor by merger to Assignee #1, Bank of America, N.A., as

Trustee for the Registered Holders of LB Commercial Mortgage Trust 2007-C3, Commercial

Mortgage Pass-Through Certificates, Series 2007-C3, assigned the Loan Documents to U.S.

Bank National Association as Trustee for the Registered Holders of LB Commercial Mortgage

Trust 2007-C3, Commercial Pass-Through Certificates, Series 2007-C3 ("Assignee #2"),

pursuant to, among other documents, (i) allonge affixed to the Note, a true and correct copy of

which is attached hereto as Exhibit F, and (ii) that certain Omnibus Assignment of Loan

Documents dated as of April 29, 2011, a true and correct copy of which is attached hereto as Exhibit G, as reflected by that certain Certificate of Transfer, recorded on September 16, 2011 at Instrument No. 20110916-0056566 with the Clerk's Office in Loudoun County, Virginia, a true and correct copy of which is attached hereto as Exhibit H.

14.     Assignee #2's rights, title and interest under the Loan Documents were subsequently assigned by Assignee #2 to the Lender pursuant to, among other documents, (i) allonge affixed to the Note, a true and correct copy of which is attached hereto as Exhibit I, and (ii) that certain Omnibus Assignment of Loan Documents dated as of October 13, 2011, a true and correct copy of which is attached hereto as Exhibit J, as reflected by that certain Certificate of Transfer, recorded on October 28, 2011 at Instrument No. 20111028-0066661 with the Clerk's Office in Loudoun County, Virginia, a true and correct copy of which is attached hereto as Exhibit K.

15.     The note obligations owing from the other WSG Affiliated Borrowers were similarly assigned to Assignee #1 and Assignee #2, before being assigned to the Other LBCMT Lenders.  Through these assignments, each of the Other LBCMT Lenders holds a secured claim against the Dulles Debtors pursuant to the Deed of Trust and the Guaranty.

16.     As of April 11, 2012, the total amount outstanding to the Primary Lender under the Note, including interests, fees, and other amounts payable pursuant to the terms of the Note, was $4,661,669.73.

17.     As of April 11, 2012, the aggregate amount necessary to payoff the Note and the obligations under Guaranty was approximately $18,218,390.43.

18.     The proofs of claim filed by the Primary Lender and the Other LBCMT Lenders in the Dulles Debtors' bankruptcy cases are available at Claim Nos. 5-11 (Case No. 12-11149-BFK) and Claim No. 1-7 (Case No. 12-11151-BFK).

### C.     NOTICES OF DEFAULT AND FORECLOSURE PROCEEDINGS.

19.     By letter dated March 31, 2011 (the "Default Letter"), the Dulles Debtors received notice of default under the Note as a result of failure to make payment under the Note for two consecutive months.  A true and correct copy of the Default Letter is attached hereto as Exhibit L.

20.     By letter dated January 17, 2012 (the "Demand Letter"), counsel for the Primary Lender notified the Dulles Debtors that Events of Default had occurred and were continuing under the Loan Documents, that the amounts due under the Loan Documents had been accelerated, and that demand for payment of all amounts due was being made.  As set forth in the Demand Letter, the Dulles Debtors were also obligated to remit to the Primary Lender all Rents and Leases Collateral collected after the original payment default.  A true and correct copy of such demand letter is attached hereto as Exhibit M.

21.     By letter dated January 31, 2012 (the "Foreclosure Notice"), the substitute trustee under the Deed of Trust gave notice to the Dulles Debtors that, absent payment in full, the Real Estate would be sold at foreclosure sale on February 23, 2012 at 11:30 a.m. at the Loudoun County Circuit Courthouse.  A copy of the Foreclosure Notice is attached hereto as Exhibit N.

### D.     COMMENCEMENT OF AND PROCEEDINGS IN BANKRUPTCY CASES.

22.     On February 23, 2012 (the "Petition Date"), just after 10:30 a.m. (less than one hour before the scheduled foreclosure sale), the Dulles Debtors filed their petitions under chapter 11 of the Bankruptcy Code commencing the Dulles Debtors' bankruptcy cases (the "Bankruptcy

Cases") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

23.    No trustee or committee has been appointed in these cases.

24.    On March 8, 2012, each of the Dulles Debtors filed its Schedule of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs ("SOFA").

25.    The Dulles Debtors' Schedules indicate that, other than their interests in the Real Property, the Dulles Debtors' sole asset on the Petition Date was $80.00 in cash in an account owned by Dulles LP.

26.    The Schedules assert that the value of the Real Property is $4,000,000.[4]  During the 341 meeting, the Dulles Debtors' representative indicated that this value is based on an internal valuation of projected rent streams, and is not premised upon a third party appraisal of the Real Property.

27.    The Schedules include the Primary Lender's claims under the Loan Documents as a disputed claim in the amount of $3,280,000, which is more than a million dollars less than the Primary Lender's actual claim under the Note.  The Schedules do not list *any* amounts outstanding under the Guaranty to the Other LBCMT Lenders, notwithstanding Dulles GL's guaranty of more than $14 million in additional amounts.[5]

28.    The Schedules of Dulles GL indicate that this entity has zero debt other than its obligations to the Primary Lender under the Loan Documents.  Dulles LP's Schedules list an aggregate amount of approximately $8,000 in priority claims and general unsecured claims.

---

[4]    While each of Dulles LP and Dulles GL included on its Schedules a value of $4,000,000 for its respective interests in the Property, the Dulles Debtors indicated during the 341 meeting that these amounts are duplicative. The Dulles Debtors assert that their collective interests in the Property should be valued at $4,000,000 in the aggregate.

[5]    The Dulles Debtors were made aware of this deficiency in their Schedules during the 341 meeting and represented to the U.S. Trustee that the Schedules would be amended to correct this omission.  Nearly three months later, no such amendment has been made.

29.     The Schedules fail to include any reference to the Dulles Debtors' management

agreement with WSG Development Co. ("WSG Development"), an insider entity that manages

the Dulles Debtors and provides all operating functions of the Dulles Debtors, including

receiving and processing rental payments from tenants and making disbursements.

30.     The SOFAs fail to include any reference to the hundreds of thousands of dollars

wrongfully paid by the Dulles Debtors to WSG Development in the year prior to the Petition

Date.[6]

31.     On April 20, 2012, this Court entered the *Agreed Order Pursuant to Bankruptcy*

*Code Sections 105(a), 361 and 363 and Bankruptcy Rules 2002 and 4001 (I) Authorizing Debtor*

*to Use Cash Collateral, (II) Authorizing Debtor to Provide Adequate Protection, and (III)*

*Granting Certain Related Relief* (the "Cash Collateral Order").

32.     Pursuant to the Cash Collateral Order, the Dulles Debtors were required to make

certain Adequate Protection Payments (as defined in the Cash Collateral Order) to the Primary

Lender within three (3) business days of entry of the Cash Collateral Order, or April 25, 2012.

33.     Pursuant to the Cash Collateral Order, the Dulles Debtors were required to make

an additional Adequate Protection Payment to the Primary Lender on May 1, 2012 and June 1,

2012.

34.     None of these payments under the Cash Collateral Order was made timely, though

the Primary Lender subsequently received these payments after issuing a notice of default.

35.     Pursuant to the Budget attached as Exhibit A to the Cash Collateral Order, the

Dulles Debtors are projected to collect $32,187 per month from tenants in the Real Property.  Of

this amount, the Budget states that $8,409 per month is to be used to pay expenses, management

---

[6]     At the 341 meeting held in March 2012, the U.S. Trustee's office instructed the Dulles Debtors to amend
their Schedules and SOFAs to correct these material errors.  Nearly three months' later, no amendments have been
made.

fees, and escrows for tax, insurance, and reserves.  Accordingly, under the Budget, the Dulles

Debtors have a maximum of $23,778 each month in cash flow that could be applied to payment

of principal, interest, and other obligations under the Loan Documents.

## RELIEF REQUESTED

The Court should dismiss the Bankruptcy Cases because they were filed in bad faith.

Under Fourth Circuit precedent, a bankruptcy case should be dismissed for bad faith if it is

objectively futile and was filed with subjective bad faith.  Both of these elements are present in

abundance here.  Alternatively, the Court should grant the Primary Lender and Other LBCMT

Lenders relief from the automatic stay to foreclose on the Real Property and other Collateral

either (i) pursuant to section 362(d)(1) because of the Dulles Debtors' bad faith filing, or (ii)

pursuant to section 362(d)(2) because there is no equity in the Real Property and the Dulles

Debtors have no possibility of successful reorganization.  In all events, these futile and wasteful

Bankruptcy Cases should be brought to conclusion expeditiously, and the Dulles Borrowers

should not be permitted to further misuse the bankruptcy process to avoid the consequences of

their wrongful conduct.

## ARGUMENT

### A.    *"CAUSE" EXISTS TO DISMISS THE BANKRUPTCY CASES.*

Pursuant to Section 1112(b) of the Bankruptcy Code, this Court *shall* dismiss or convert a

case under chapter 11 if "cause" is found to exist.  11 U.S.C. § 1112(b).  It is well established in

the Fourth Circuit that a debtor's lack of "good faith" in filing its chapter 11 petition constitutes

"cause" for purposes of dismissal under section 1112(b) of the Bankruptcy Code.  *See* Carolin

Corp. v. Miller, 886 F.2d 693, 699 (4th Cir. 1989) ("[T]he broad language of § 1112(b) 'supports

the construction that a debtor's lack of "good faith" may constitute cause for dismissal of a

petition.'") (quoting <u>In re Albany Partners, Ltd.</u>, 749 F.2d 670, 674 (11th Cir. 1984)).  As the

Fourth Circuit has noted, "[t]he right to file a Chapter 11 bankruptcy petition is conditioned upon

the debtor's good faith—the absence of which is cause for summary dismissal."  <u>Maryland Port</u>

<u>Admin. v. Premier Auto. Serv., Inc. (In re Premier Auto. Serv., Inc.)</u>, 492 F.3d 274, 279 (4th Cir.

2007) (citations omitted).  "The good faith standard also 'protects the jurisdictional integrity of

the bankruptcy courts by rendering their powerful equitable weapons . . .  available only to those

debtors and creditors with clean hands.'"  <u>Id.</u>

In the Fourth Circuit, to establish "cause" for dismissal based on the bad faith of the

debtor, the movant must establish (i) the objective futility of the debtor's reorganization

proceedings and (ii) the debtor's subjective bad faith in filing its bankruptcy petition.  <u>Carolin</u>,

886 F.2d at 701.  Here, both of these elements are met.

### 1.    *Objective Futility*

"The objective test focuses on whether 'there exists the realistic possibility of an effective

reorganization.'" <u>Premier Auto. Servs.</u>, 492 F.3d at 280 (quoting <u>Carolin</u>, 886 F.2d at 698).  As

noted above, the value of the Real Property is at most $4 million (the Dulles Debtors' scheduled

value).[7]  The Real Property, however, secures over $18 million in obligations under the Note and

Guaranty.  Given the circumstances of these Bankruptcy Cases, for the reasons set forth below,

confirmation of a chapter 11 plan is not possible here.[8]

---

[7]      A more realistic value of the Real Property is $3.4 million, which is the value determined by a third-party appraiser shortly before the Petition Date.

[8]      For purposes of this Motion only, the Primary Lender and Other LBCMT Lenders treat the Dulles Debtors as a consolidated estate, though the movants do not waive and expressly preserves all rights to object to any proposed substantive consolidation of the Dulles Debtors' estates.  To the extent the Dulles Debtors are not substantively consolidated, their prospects for reorganization are even bleaker, as Dulles GL (the fee owner of the property) has *no* income, as it apparently has never received payment from Dulles LP under the ground lease.

a.    <u>Unimpairment Not Available</u>

Considering the Dulles Debtors' mismanagement of the Real Property and failure by the

Dulles Debtors and the other WSG Affiliated Borrowers to pay any debt service for a year prior

to the Petition Date, the Primary Lender and the Other LBCMT Lenders are likely to object to

any plan proposed by the Dulles Debtors that would seek to provide continued ownership of the

Real Property by the reorganized Dulles Debtors after the plan effective date.  Accordingly,

unless the Lender and the Other LBCMT Lenders are unimpaired pursuant to section 1124 of the

Bankruptcy Code (and thus deemed to accept the plan pursuant to section 1126(f) of the

Bankruptcy Code), the Dulles Debtors will be required to confirm a plan over the movants'

objections.  Unimpairment, however, will not be possible in these cases.

Section 1124 of the Bankruptcy Code provides:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests
is impaired under a plan unless, with respect to each claim or interest of such
class, the plan –
(1) leaves unaltered the legal, equitable, and contractual rights to which such
claim or interest entitles the holder of such claim or interest; or
(2) notwithstanding any contractual provision or applicable law that entitles the
holder of such claim or interest to demand or receive accelerated payment of such
claim or interest after the occurrence of a default –
    (A) *cures any such default that occurred before or after the*
    *commencement of the case under this title*, other than a default of a kind
    specified in section 365(b)(2) of this title or of a kind that section 365(b)(2)
    expressly does not require to be cured;
    (B) reinstates the maturity of such claim or interest as such maturity existed
    before such default;
    (C) compensates the holder of such claim or interest for any damages
    incurred as a result of any reasonable reliance by such holder on such
    contractual provision or such applicable law;
    (D) if such claim or such interest arises from any failure to perform a
    nonmonetary obligation, other than a default arising from failure to operate
    a nonresidential real property lease subject to section 365(b)(1)(A),
    compensates the holder of such claim or such interest (other than the debtor
    or an insider) for any actual pecuniary loss incurred by such holder as a
    result of such failure; and

(E) ***does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest***.

11 U.S.C. § 1124 (emphasis added).  Thus, Pursuant to section 1124 of the Bankruptcy Code, "[a] claim is not impaired by a plan if the plan 'leaves unaltered the legal, equitable, and contractual rights to which such a claim or interest entitles the holder of such claim or interest' or if the plan cures or compensates for past default."  <u>Schwarzmann v. First Union Nat'l Bank (In re Schwarzmann)</u>, 1996 U.S. App. LEXIS 31262, *9 (4th Cir. Dec. 6, 1996).

While the Dulles Debtors presently generate sufficient cash to pay the Primary Lender its non-default debt service under the Note on a monthly basis, far more would be required before the Dulles Debtors could cure prepetition defaults and unimpair the Primary Lender and the Other LBCMT Lenders pursuant to Bankruptcy Code section 1124.  As an initial matter, as indicated previously, the Dulles Debtors ceased making any debt service payments to the Primary Lender beginning in early 2011.  Thus, to cure the defaults under the Note, the Dulles Debtors would be required to pay the Primary Lender, ***on the effective date of any plan,*** all principal curtailment, accrued interest, legal fees and costs, late fees, taxes advanced, and all other defaults and other amounts and penalties owing as a result of the default in the period from and after that period, including the "make-whole" amount.  *See* <u>In re Cottonwood Corners Phase V, LLC</u>, 2012 Bankr. LEXIS 550, *36 (Bankr. D.N.M. Feb. 17, 2012) ("Bankruptcy courts that have addressed cure amounts under 11 U.S.C. § 1124(2)(A) appear to be virtually uniform in their opinion that the cure 'must occur, in full, prior to or on the effective date of the plan in order to restore of the parties to their pre-default state.'").

The foregoing, however, addresses only the cure of defaults under the Note owing to the Primary Lender.  In light of the Dulles Debtors' obligations under the Loan Documents here, before the Other LBCMT Lenders could be deemed to be unimpaired, the Dulles Debtors are

required to cure *all* defaults under *all* of the Loan Documents, including the Guaranty. The

obligations under the Guaranty, however, cannot be "reinstated" under section 1124, as the

defaults under the Guaranty involve defaults by third parties—the Affiliated WSG Borrowers—

and, in certain circumstances, real properties that have already been foreclosed by the Other

LBCMT Lenders. There is simply no way for the Dulles Debtors to "cure" deficiencies under

the Guaranty without satisfying in full all of the claims of the Other LBCMT Lenders under the

Guaranty, which exceed $14 million (exclusive of the Note obligations). Clearly, the Dulles

Debtors lack capacity to cure this amount on the effective date of any plan. Thus, reinstatement

is not possible here, and the Dulles Debtors will be unable to rely upon unimpairment of the

claims of the Primary Lender and the Other LBCMT Lenders under section 1124 of the

Bankruptcy Code to confirm a plan. Instead, the Dulles Debtors will be required to confirm a

plan over their objections.

b.    <u>Cram-Down Not Available</u>

The Primary Lender's claims and the claims of the Other LBCMT Lenders under the

Guaranty against the Dulles Debtors exceed $18 million, but the Collateral securing such claim

has a value of at most $4 million. The Primary Lender's and the Other LBCMT Lenders'

potential deficiency claim will thus dwarf any other unsecured debt in the case, which, according

to the Schedules, does not exceed $10,000 in the aggregate. Accordingly, absent an election by

the Primary Lender and the Other LBCMT Lenders under section 1111(b) of the Bankruptcy

Code to treat their claims as fully secured, the Primary Lender and the Other LBCMT Lenders

will control the class of unsecured creditors. In the event the Primary Lender and the Other

LBCMT Lenders vote against the plan, which is likely, the Dulles Debtors will be unable to

16

obtain a consenting, impaired class of non-insider claims as required to confirm a plan under

section 1129(a)(10).[9]

On the other hand, if the Primary Lender and the Other LBCMT Lenders elect to treat

their claims as fully secured under section 1111(b) of the Bankruptcy Code, the Dulles Debtors

will be unable to propose a plan that provides deferred cash payments to the Primary Lender and

the Other LBCMT Lenders of a value, as of the effective date, of the allowed amount of the their

claims.  *See* 11 U.S.C. §§ 1129(a)(7)(B) and 1129(b)(2)(A)(i).  According to the Budget attached

to the Cash Collateral Order, the Dulles Debtors receive $32,187 each month in rental income.

After paying ordinary property expenses and escrows for insurance and taxes (but excluding any

principal and interest to the Primary Lender), the Dulles Debtors generate $23,778 per month

that can be applied to payment of secured debt.  Even if all of this cash were applied to payment

of amounts outstanding under the Loan Documents *for 100 years*, the present value of such

income stream using the non-default interest rate under the Note would never come close to the

$18 million or more necessary to satisfy the Primary Lender's and the Other LBCMT Lenders'

claims.  Considering the Dulles Debtors' limited cash flows and the substantial secured debt

outstanding, the Dulles Debtors cannot confirm a plan in these Bankruptcy Cases.

Because confirmation will be impossible in these cases, no legitimate reorganizational

purpose is served by continuation of the Bankruptcy Cases.  Thus, the cases are objectively

futile, and the first requirement for dismissal is present.

---

[9] Moreover, by operation of the absolute priority rule, Dulles LP could not retain its equity interest in Dulles GL, nor could any equity owner of Dulles LP retain its ownership interest, unless the Primary Lender and the Other LBCMT Lenders are paid in full.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).  Thus, the existing ownership of the Dulles Debtors would be unable to remain in place upon emergence from bankruptcy even if such confirmation were somehow available (though it is not).

## 2.    *Subjective Bad Faith*

In addition to being objectively futile, these Bankruptcy Cases were filed in subjective

bad faith.  The Dulles Debtors commenced these cases solely to delay and frustrate the Primary

Lender's proper exercise of remedies in this two-party suit, which is an abuse of the

reorganization process.  *See* Carolin, 492 F.3d at 280; *see also* 7 COLLIER ON BANKRUPTCY §

1112.07[3] (noting "the fundamental policy that bankruptcy relief is generally limited to the

'honest but unfortunate debtor'" and that "Congress has never intended that bankruptcy be a

refuge for the irresponsible, unscrupulous or cunning individual.") (internal citations and

quotation marks omitted).

Here, as noted above, the background facts overwhelmingly support the conclusion that

the Dulles Debtors filed these cases in subjective bad faith, including, *inter alia*, that:

- The Dulles Debtors ceased making payments to the Primary Lender more than a year before the Petition Date, and, instead of holding rental payments received from the tenants in accordance with the Loan Documents (or escrowing debt service payments), the Dulles Debtors systematically misappropriated hundreds of thousands of dollars of the Primary Lender's Rents and Leases Collateral by transferring all excess rents to an insider management company;
- The Dulles Debtors failed to disclose these prepetition payments to the insider management company (or even identify the management company) in their Schedules and SOFAs, and upon being directed to file amended Schedules and SOFAs by the U.S. Trustee to correct these omissions, failed to file amended Schedules and SOFAs;
- The Dulles Debtors have not paid required fees to the Virginia State Corporation Commission, resulting in the cancellation of their organizational status and termination of authority to conduct business in Virginia;
- The Dulles Debtors' bankruptcy cases are two-party disputes with the Primary Lender and the Other LBCMT Lenders, which cases were commenced on February 23, 2012, *less than one hour* before the Primary Lender's scheduled foreclosed sale in a clear effort to frustrate the Lender's remedies;
- To date, the Dulles Debtors have failed to timely pay when due *each and every one* of the required payments under the Cash Collateral Order, resulting in numerous defaults, not all of which have been cured; and
- The Dulles Debtors' authority to use cash collateral expires on June 30, 2012, and the Dulles Debtors failed to file a plan within 120 days of commencing

their bankruptcy cases, confirming a lack of any legitimate desire to reorganize.

Considering the foregoing, allowing the Dulles Debtors' futile Bankruptcy Cases to continue would effectively endorse the Dulles Debtors' bad acts and misuse of the bankruptcy process. The additional factors courts typically consider in evaluating bad faith also support dismissal here. In <u>C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)</u>, 113 F.3d 1304 (2d Cir. 1997), the United States Court of Appeals for the Second Circuit addressed and analyzed commonly accepted indicia of bad faith, which include:

(1) the debtor has only one asset;

(2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditor[];

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

<u>Id</u>. at 1311. Here, every single one of these indicators of bad faith supports the conclusion that the Dulles Debtors commenced these Bankruptcy Cases in bad faith.

The Dulles Debtors' only true assets are their interests in the Real Property, thus satisfying the first indicator. The second and fourth indicators are also satisfied: the Dulles

Debtors have no meaningful unsecured debt, and these Bankruptcy Cases are essentially a two-party dispute with the Primary Lender and the Other LBCMT Lenders.  The third and fifth indicia are satisfied considering the Dulles Debtors filed these Bankruptcy Cases *less than one hour before* the scheduled foreclosure sale, confirming that the Dulles Debtors' intent in filing the Bankruptcy Cases was to delay and frustrate the legitimate efforts of the Primary Lender to enforce its rights under the Loan Documents.

 As evidenced by the Budget attached to the Cash Collateral Order, the Dulles Debtors have negligible cash flow when compared with the magnitude of the secured debt outstanding. The Budget projects that the Dulles Debtors will have approximately $23,778 per month in cash after payment of non-loan related expenses and escrows.  To pay the secured claims of the Primary Lender and Other LBCMT Lenders in excess of $18 million within any reasonable period of time, the Dulles Debtors would be required to pay far in excess of $23,778 in debt service per month.  Accordingly, the Dulles Debtors cannot be considered to have positive cash flow for purposes of the sixth indicia of bad faith

 Finally, the Dulles Debtors have no employees, so there is no reorganizational benefit to the community.  Indeed, instead of employees, the Dulles Debtors rely on an insider management company to perform all functions of the Dulles Debtors.  This is the same insider that misappropriated millions of dollars of rents from the Primary Lender and the Other LBCMT Lenders after causing the Dulles Debtors and the other WSG Affiliated Borrowers to cease making any debt service payments in early 2011.  The eighth and final indicator of bad faith is present as well.

 Accordingly, because the Dulles Debtors have no prospect at reorganizing and the Bankruptcy Cases are objectively futile, and because the Dulles Debtors plainly commenced

these cases in subjective bad faith, "cause" exists, and the Court is required to dismiss the

Bankruptcy Cases pursuant to section 1112(b) of the Bankruptcy Code.

###### B.     ALTERNATIVELY, THE COURT SHOULD GRANT RELIEF FROM THE AUTOMATIC STAY.

If the Court does not dismiss the Bankruptcy Cases altogether, the Court should grant the

Primary Lender and the Other LBCMT Lenders relief from the automatic stay pursuant to

sections 362(d)(1) and (2) of the Bankruptcy Code.  For all of the same reasons set forth above

regarding the existence of "cause" for purposes dismissal pursuant to section 1112(b), the Court

should find that "cause" also exists for purposes of relief from the automatic stay pursuant to

section 362(d)(1).  *See* Carolin, 886 F.2d at 699 (equating the "cause" standard under section

1112(b) to the "cause" requirement under section 362(d)(1) of the Bankruptcy Code).

In addition, absent dismissal, the Court should grant the Primary Lender and the Other

LBCMT Lenders relief from the automatic stay pursuant to Bankruptcy Code section 362(d)(2)

because there is no equity in the Real Property and such property is not necessary for an effective

reorganization.  *See* 11 U.S.C. § 362(d)(2).  As the legislative history to section 362(d)(2)

indicates, "[i]n cases where the single asset of the debtor is real property, the court *shall* grant

relief from the stay if the debtor has no equity in the collateral, thereby allowing the creditor to

proceed with [its] foreclosure."  S. Rep. No. 989, 95th Cong., 1st Sess. 5, *reprinted in* 1978 U.S.

Code Cong. & Ad. News, 5787, 5791 (emphasis added).

Such is the case here.  The Dulles Debtors have only one asset between them—the Real

Property.  Notwithstanding the misleading and deficient Schedules, it is undisputable here that

the Dulles Debtors have no equity in the Real Property.  The Real Property is worth at most $4

million (according to the Dulles Debtors' internal valuation), but the obligations under the Loan

Documents secured by the Real Property exceed $18 million.

Section 362(g) of the Bankruptcy Code provides that the movant seeking relief pursuant to section 362(d)(2) has the burden of proof as to whether the debtor has equity in the subject property, whereas the party opposing the motion has the burden of proof on "all other issues." 11 U.S.C. § 362(g); *see also* In re George, 315 B.R. 624, 627 (Bankr. S.D. Ga. 2004) ("The burden of proof is on the movant to show the debtor's lack of equity in the property; however, once the movant sustains its burden, the burden shifts to the debtor to prove that the property is necessary for an effective reorganization.") (citing United Sav. Ass'n v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 375–76 (1988)).

In order to meet their burden to prove that the Real Property is necessary for an effective reorganization within the meaning of Bankruptcy Code section 362(d)(2)(B), the Dulles Debtors must demonstrate "that an effective reorganization is realistically possible." In re Albany Partners, Ltd., 749 F.2d 670, 673 n.7 (11th Cir. 1984). "[T]he mere fact that the property is indispensable to the debtor's survival is insufficient." Id. For all of the reasons described above, confirmation of a chapter 11 plan is not possible in these cases. Accordingly, in the event the Court does not dismiss the Dulles Debtors' Bankruptcy Cases, the Court should grant the Primary Lender and the Other LBCMT Lenders relief from stay to foreclose on their Collateral.

## CONCLUSION

WHEREFORE, the Primary Lender and the Other LBCMT Lenders respectfully request that the Court enter an order substantially in the form attached hereto (i) granting the relief sought in the Motion and dismissing the Bankruptcy Cases pursuant to section 1112(b) of the Bankruptcy Code, or (ii) in the alternative, granting relief from the automatic stay so that the Primary Lender and the Other LBCMT Lenders may pursue their remedies against the Dulles

22

Debtors under applicable non-bankruptcy law, and (iii) granting such other and further relief as

may be just and proper.

Dated: June 26, 2012                                    Respectfully submitted,


                                                        ____/s/ John H. Maddock III_____
                                                        John H. Maddock III (VSB No. 41044)
                                                        Aaron G. McCollough (VSB No. 71246)
                                                        McGUIREWOODS LLP
                                                        One James Center
                                                        901 East Cary Street
                                                        Richmond, Virginia 23219-4030
                                                        (804) 775-1000

                                                        *Counsel for LBCMT 2007-C3 Sterling Retail, LLC,
                                                        LBCMT 2007-C3 Pleasant Retail Limited
                                                        Partnership, LBCMT 2007-C3 Seminole Trail, LLC,
                                                        LBCMT 2007-C3 W. Broad Street, LLC, LBCMT
                                                        2007-C3 Snellville Retail Limited Partnership,
                                                        LBCMT 2007-C3 Pecanland, LLC, and LBCMT
                                                        2007-C3 RHL Blvd. Limited Partnership*

**(Proposed Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WSG DULLES, L.P., <u>et al</u>. | ) | Case No. 12-11149-BFK |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| LBCMT 2007-C3 Sterling Retail, LLC, | ) | |
| LBCMT 2007-C3 Pleasant Retail LP, | ) | |
| LBCMT 2007-C3 Seminole Trail, LLC, | ) | |
| LBCMT 2007-C3 W. Broad Street, LLC, | ) | |
| LBCMT 2007-C3 Snellville Retail LP, | ) | |
| LBCMT 2007-C3 Pecanland, LLC, and | ) | |
| LBCMT 2007-C3 RHL Blvd. LP, | ) | |
| | ) | |
| Movants, | ) | |
| v. | ) | |
| | ) | |
| WSG DULLES, L.P., WSG DULLES | ) | |
| GL, LLC, | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER GRANTING MOTION OF LBCMT 2007-C3 STERLING RETAIL, LLC, LBCMT 2007-C3 PLEASANT RETAIL LIMITED PARTNERSHIP, LBCMT 2007-C3 SEMINOLE TRAIL, LLC, LBCMT 2007-C3 W. BROAD STREET, LLC, LBCMT 2007-C3 SNELLVILLE RETAIL LIMITED PARTNERSHIP, LBCMT 2007-C3 PECANLAND, LLC, AND LBCMT 2007-C3 RHL BLVD. LIMITED PARTNERSHIP TO DISMISS BANKRUPTCY CASES OF WSG DULLES, L.P AND WSG DULLES GL, LLC, OR, IN THE ALTERNATIVE, FOR RELIEF FROM AUTOMATIC STAY <u>WITH RESPECT TO SUCH DEBTORS</u>

Upon the motion of *Motion to Dismiss Bankruptcy Cases of WSG Dulles, L.P. and WSG Dulles GL, LLC, or, in the Alternative, for Relief from the Automatic Stay with Respect to Such Debtors* (the "<u>Motion</u>") filed by LBCMT 2007-C3 Sterling Retail, LLC, LBCMT 2007-C3 Pleasant Retail Limited Partnership, LBCMT 2007-C3 Seminole Trail, LLC, LBCMT 2007-C3 W. Broad Street, LLC, LBCMT 2007-C3 Snellville Retail Limited Partnership, LBCMT 2007-

1

C3 Pecanland, LLC, and LBCMT 2007-C3 RHL Blvd. Limited Partnership,[1] and this Court

having jurisdiction to consider the Motion and the relief sought therein pursuant to 28 U.S.C. §

1334; and due notice of the Motion having been provided, and it appearing that no other and

further notice need be provided; and the Court having found that "cause," as that term is used in

11 U.S.C. § 1112(b), exists because the Bankruptcy Cases are objectively futile and were filed in

subjective bad faith; and after due deliberation and sufficient cause appearing therefore, it is

hereby

    **ORDERED, ADJUDGED, and DECREED that:**

   1.  The Motion is GRANTED.

   2.  The Bankruptcy Cases are dismissed pursuant to 11 U.S.C. § 1112(b).

   3.  The Primary Lender and the Other LBCMT Lenders are entitled exercise all of

their rights and remedies under the Loan Documents.

   4.  The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

Dated: Alexandria, Virginia
   _____, 2012

       _____
       UNITED STATES BANKRUPTCY JUDGE

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2

WE ASK FOR THIS:

_____
John H. Maddock III (VSB No. 41044)
Aaron G. McCollough (VSB No. 71246)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

*Counsel for LBCMT 2007-C3 Sterling
Retail, LLC, LBCMT 2007-C3 Pleasant
Retail Limited Partnership, LBCMT 2007-
C3 Seminole Trail, LLC, LBCMT 2007-C3
W. Broad Street, LLC, LBCMT 2007-C3
Snellville Retail Limited Partnership,
LBCMT 2007-C3 Pecanland, LLC, and
LBCMT 2007-C3 RHL Blvd. Limited
Partnership*

## CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

Pursuant to Local Rule 9022-1(C), I hereby certify that the foregoing proposed order has been served upon all necessary parties.

/s/ John H. Maddock III
John H. Maddock III

38913093

3