# EXHIBIT A
# NOTE

## PROMISSORY NOTE

$3,280,000.00                                                                    July 12, 2007

**FOR VALUE RECEIVED**, the undersigned Borrower (as defined in Schedule 1 attached hereto), as maker, having its principal place of business c/o WSG Development Company, 400 Arthur Godfrey Road, Suite 200, Miami Beach, Florida 33140, hereby unconditionally promises to pay to the order of **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801 ("Lender"), or at such other place as the holder hereof may from time to time designate in writing, the Principal Sum (as defined in Schedule 1 attached hereto), in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate (defined below), and to be paid in installments as provided herein.

1.    **CERTAIN DEFINED TERMS**

As used herein the following terms shall have the meanings set forth below:

(a)    "Accrual Period" means the period commencing on the eleventh (11th) day of a calendar month and ending on the tenth (10th) day of the succeeding calendar month; provided that if this Note is dated as of any date other than the eleventh (11th) day of a month, the first Accrual Period shall (i) consist of only the date hereof, if the date hereof is the tenth (10th) day of a month, or (ii) commence on the date hereof and shall end on the next tenth (10th) day of a calendar month to occur after the date hereof.

(b)    "Applicable Interest Rate" shall mean an interest rate equal to 6.47% per annum.

(c)    "Loan" shall mean the loan evidenced by this Note.

(d)    "Loan Agreement" shall mean that certain Loan Agreement executed by Borrower and the Other Borrowers (as defined in the Security Instrument) and Lender as of the date herewith.

(e)    "Loan Documents" shall mean this Note, the Guaranty (as defined in the Security Instrument), the Security Instrument, and any other documents or instruments which now or shall hereafter wholly or partially secure or guarantee payment of this Note or which have otherwise been executed by Borrower and/or any other person in connection with the Loan.

(f)    "Lockout Period Expiration Date" shall mean the earlier of (a) the fourth (4th) anniversary of the date hereof and (b) two years and one day from the "startup day" of any "real estate mortgage investment conduit (as such terms are defined in Sections 860G and 860D, respectively, of the Internal Revenue Code of 1986, as amended or any successor statute thereto) which may acquire the Loan.

(g)    "Maturity Date" shall mean July 11, 2017.

(h)    "Monthly Payment" shall have the meaning set forth in Schedule 1 attached hereto.

(i)    "Monthly Payment Date" shall mean the eleventh (11th) day of each calendar month prior to the Maturity Date commencing on (i) the eleventh (11th) day of the next succeeding calendar month after the date hereof if this Note is dated on or prior to the eleventh (11th) day of a month, or (ii) the eleventh (11th) day of the second succeeding calendar month after the date hereof if this Note is dated after the eleventh (11th) day of a month.

(j)    "Security Instrument" shall have the meaning set forth in Schedule 1 attached hereto.

2.    **PAYMENT TERMS**

(a)    If this Note is dated as of a date other than the eleventh (11th) day of a calendar month, a payment shall be due from Borrower to Lender on the date hereof on account of all interest scheduled to accrue on the principal sum from and after the date hereof through and including the last day of the current Accrual Period. The Monthly Payment shall be due from Borrower to Lender on each Monthly Payment Date, with each Monthly Payment to be applied as follows: (i) first, to the payment of interest which has accrued during the preceding Accrual Period computed at the Applicable Interest Rate, and (ii) the balance toward the reduction of the principal sum. The balance of the principal sum and all interest thereon shall be due and payable on the Maturity Date. Interest on the principal sum of this Note shall be calculated by multiplying the actual number of days elapsed in the period for which interest is being calculated by a daily rate based on a 360-day year.

(b)    Unless payments are made in the required amount in immediately available funds at the place where this Note is payable, remittances in payment of all or any part of the Debt (defined below) shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where this Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.

3.    **DEFAULT AND ACCELERATION**

(a)    The whole of the principal sum of this Note, (b) interest, default interest, late charges and other sums, as provided in this Note, the Security Instrument or the other Loan Documents, (c) all other monies agreed or provided to be paid by Borrower in this Note, the Security Instrument or the other Loan Documents, (d) all sums advanced pursuant to the Security Instrument to protect and preserve the Property and the lien and the security interest created thereby, and (e) all sums advanced and costs and expenses incurred by Lender in connection with the Debt (defined below) or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender (all the sums referred to in (a) through (e) above shall collectively be referred to as the "Debt") shall without notice become immediately due and payable at the option of Lender if any payment required in this Note prior to the Maturity Date is not paid on the date when due or on the happening of any other default, after the expiration of any applicable notice and grace periods herein or under the terms of the Security Instrument or any of the other Loan Documents (collectively, an "Event of Default").

4.    **DEFAULT INTEREST**

Borrower does hereby agree that upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum at a rate (the "Default Rate") equal to (i) the greater of (a) the Applicable Interest Rate plus three percent (3%) and (b) the Prime Rate (as hereinafter defined) plus four percent (4%) or (ii) the maximum interest rate that Borrower may by law pay, whichever is lower. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full. Interest calculated at the Default Rate shall be added to the Debt, and shall be deemed secured by the Security Instrument. This provision, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

The "Prime Rate" shall mean the annual rate of interest publicly announced by Citibank, N.A. in New York, New York, as its base rate, as such rate shall change from time to time. If Citibank, N.A. ceases to announce a base rate, Prime Rate shall mean the rate of interest published in The Wall Street Journal from time to time as the Prime Rate. If more than one Prime Rate is published in The Wall Street Journal for a day, the average of the Prime Rates shall be used, and such average shall be rounded up to the nearest one-quarter of one percent (.25%). If The Wall Street Journal ceases to publish the "Prime

SSL-MIA1 30157129v3

Rate", the Lender shall select an equivalent publication that publishes such "Prime Rate", and if such prime rates are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index.

## 5.   PREPAYMENT; DEFEASANCE

(a)   Borrower shall not have the right or privilege to prepay all or any portion of the principal amount of this Note prior to the Maturity Date.

(b)   Simultaneously with each Default Repayment (defined herein) occurring prior to the Maturity Date, Borrower shall pay to Lender an amount equal to the greater of: (A) three (3%) percent of the principal amount of this Note being prepaid; and (B) the present value of a series of payments each equal to the Payment Differential (hereinafter defined) and payable on each Monthly Payment Date over the remaining original term of this Note and on the Maturity Date discounted at the Reinvestment Yield (hereinafter defined) for the number of months remaining from the date of the Default Repayment (the "Repayment Date") to each such Monthly Payment Date and the Maturity Date. The term "Reinvestment Yield" as used herein shall be equal to the lesser of (a) the (i) yield on the U.S. Treasury issue (primary issue) with the same maturity date as the Maturity Date; or (ii) if no such U.S. Treasury issue is available, then the interpolated yield on the two U.S. Treasury issues (primary issues) with maturity dates (one prior to and one following) that are closest to the Maturity Date; or (b) the (i) yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the Debt, or (ii) if no such U.S. Treasury issue is available, then the interpolated yield on the two U.S. Treasury issues (primary issues) with terms (one prior to and one following) that are closest to the remaining average life of the Debt, with each such yield being based on the bid price for such issue as published in The Wall Street Journal on the date that is 14 days prior to the Repayment Date (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield. The term "Payment Differential" as used herein shall be equal to (x) the Applicable Interest Rate minus the Reinvestment Yield, divided by (y) 12 and multiplied by (z) the principal sum being repaid on such Repayment Date after application of the Monthly Payment (if any) due on the date of the Default Repayment, provided that the Payment Differential shall in no event be less than zero. In no event, however, shall Lender be required to reinvest any repayment proceeds in U.S. Treasury obligations or otherwise.

For purposes of this Note, the term "Default Repayment" shall mean a repayment of all or any portion of the principal amount of this Note made during the continuance of any Event of Default or after an acceleration of the Maturity Date under any circumstances, including, without limitation, a repayment occurring in connection with reinstatement of the Security Instrument provided by statute under foreclosure proceedings or exercise of a power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or prevent foreclosure, any sale in foreclosure or under exercise of a power of sale or otherwise.

## 6.   SECURITY

This Note is secured by the Security Instrument and the other Loan Documents. The Security Instrument is intended to be duly recorded in the public records of the county where the Property is located. All of the terms, covenants and conditions contained in the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

## 7.   SAVINGS CLAUSE

This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance due hereunder at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a

rate in excess of such maximum rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.

## 8.   LATE CHARGE

If any sum payable under this Note is not paid within a period of seven (7) calendar days after the date on which it is due, regardless of whether such failure shall constitute an Event of Default, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of the unpaid sum or the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing the delinquent payment and to compensate Lender for the loss of the use of the delinquent payment and the amount shall be secured by the Security Instrument and the other Loan Documents.

## 9.   NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## 10.   JOINT AND SEVERAL LIABILITY

If Borrower consists of more than one person or party, the obligations and liabilities of each person or party shall be joint and several.

## 11.   WAIVERS, ETC.

All payments required hereunder shall be made irrespective of, and without any deduction for, any setoff, defense or counterclaim. Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, other than notices specifically required by the terms of this Note, the Security Instrument and the other Loan Documents. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Security Instrument or the other Loan Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the Debt, under this Note, the Security Instrument or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Security Instrument or the other Loan Documents. In addition, acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default. If Borrower is a partnership, the agreements herein contained shall remain in force and applicable, notwithstanding any changes in the individuals comprising the partnership, and the term "Borrower," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If Borrower is a corporation or limited liability company, the agreements contained herein shall remain in full force and applicable notwithstanding any changes in the shareholders or members comprising, or the officers and directors or managers relating to, the corporation or limited liability company, and the term "Borrower" as used herein, shall include any alternative or successor corporation or limited liability company, but any predecessor corporation or limited liability company

4

shall not be relieved of liability hereunder. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in a partnership, corporation or limited liability company which may be set forth in the Security Instrument or any other Loan Document.)

**12.    TRANSFER**

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Security Instrument and the other Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter, but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

**13.    WAIVER OF TRIAL BY JURY**

**BORROWER AND LENDER, BY ITS ACCEPTANCE HEREOF, HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

**14.    EXCULPATION**

(a)    Except as otherwise provided herein, in the Security Instrument or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note or the Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may sell the Property under any power of sale or right of non-judicial foreclosure or bring a foreclosure action, confirmation action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents (as defined in the Security Instrument) and any other collateral given to Lender created by this Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting this Note and the Security Instrument, agrees that it shall not, except as otherwise provided in Section 10.10 of the Security Instrument, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Note, the other Loan Documents or the Security Instrument. The provisions of this Article shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Note, the other Loan Documents or the Security Instrument; (ii) impair the right of Lender to enforce any of its rights or remedies under the Other Security Instruments, Other Notes or any documents or instruments executed and delivered to Lender in connection with the Other Loans (collectively, the "Other Properties' Loan Documents"); (iii) without limiting the provisions of clause (ii) immediately above, impair the right of Lender to obtain a deficiency judgment in any action or proceeding with respect to the Loan Documents in order to preserve its rights and remedies, including, without limitation, foreclosure, non-judicial foreclosure, or the exercise of a power of sale, under the Other Guarantees or the Other Security Instruments; however, Lender agrees that it shall not enforce such deficiency judgment against any assets of Borrower other than in connection with the exercise of its rights and remedies under the Other Guarantees or the Other Security Instruments; (iv) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (v) affect the validity or enforceability of the Guaranty, any Other Guaranty or any indemnity, master lease or similar instrument made in connection with this Note, the Security Instrument, or the other Loan

5

Documents; (vi) impair the right of Lender to obtain the appointment of a receiver; (vii) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (viii) impair the right of Lender to obtain a deficiency judgment or judgment on the Note against Borrower if necessary to obtain any insurance proceeds or condemnation awards to which Lender would otherwise be entitled under the Security Instrument; provided however, Lender shall only enforce such judgment against the insurance proceeds and/or condemnation awards; or (ix) impair the right of Lender to enforce the provisions of Sections 10.10, 11.2 and 11.3 of the Security Instrument.

(b)     Notwithstanding the provisions of this Article 14 to the contrary, Borrower shall be personally liable to Lender for the Losses (as defined in the Security Instrument) it incurs due to: (i) fraud or intentional misrepresentation by Borrower, its agents or principals, (ii) Borrower's misapplication or misappropriation of (A) Rents received by Borrower after the occurrence of an Event of Default, (B) tenant security deposits or Rents collected in advance, or (C) insurance proceeds or condemnation awards, (iii) Borrower's failure to pay Taxes (as defined in the Security Instrument), Insurance Premiums (as defined in the Security Instrument), Other Charges (as defined in the Security Instrument) (except to the extent that sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms of the Security Instrument), charges for labor or materials or other charges that can create liens on the Property, provided that Borrower's liability under this clause (iii) shall not exceed an amount equal to the net operating income of the Property for the twelve (12) month period preceding the related failure to pay, less the amount of all Monthly Payments and required reserve payments made by Borrower in accordance with this Note, the Security Instrument and the other Loan Documents during such twelve (12) month period, (iv) Borrower's failure to comply with the provisions of Sections 3.10, 5.9 or 16.1 or Article 21 of the Security Instrument, or (v) Borrower's or any other Indemnitor's failure to comply with the provisions of the Environmental Indemnity (as defined in the Security Instrument).

(c)     Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) in the event of Borrower's default under Section 4.2, in any material respect, or Article 8 of the Security Instrument, (ii) if the Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding, or (2) an involuntary bankruptcy or insolvency proceeding (A) which is commenced by any party controlling, controlled by or under common control with Borrower (which shall include, but not be limited to, any creditor or claimant acting in concert with Borrower or any of the foregoing parties) (the "Borrowing Group") or (B) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of the Security Instrument or any other remedial action permitted hereunder or under the Security Instrument or the other Loan Documents or (iii) if a court of competent jurisdiction holds that the granting, execution or delivery of the Security Instrument or any other Loan Documents is or constitutes a fraudulent conveyance under any bankruptcy, insolvency or fraudulent conveyance law or is otherwise voidable under any such laws.

(d)     Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with this Note, the Security Instrument and the other Loan Documents.

15.     **AUTHORITY**

Borrower (and the undersigned representative of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note, the Security Instrument and the other Loan Documents and that this Note, the Security Instrument and the other Loan Documents constitute valid and binding obligations of Borrower.

16.     **APPLICABLE LAW**

This Note shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and the applicable laws of the United States of America.

6

SSL-MIA1 30157129v3

17.    **COUNSEL FEES**

In the event that it should become necessary to employ counsel to collect the Debt or to protect or foreclose the security therefor, Borrower also agrees to pay all reasonable fees and expenses of Lender, including, without limitation, reasonable attorney's fees for the services of such counsel whether or not suit be brought.

18.    **NOTICES**

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| If to Borrower: | Borrower |
| | c/o WSG Development Company |
| | 400 Arthur Godfrey Road, Suite 200 |
| | Miami Beach, Florida 33140 |
| | Attention: Jeffrey Graff |
| | |
| With a copy to: | Berman Rennert Vogel & Mandler |
| | 100 S.E. 2nd Avenue, 2900 Floor |
| | Miami, Florida 33131 |
| | Attention: Wendy Beck, Esq. |
| | |
| If to Lender: | Lehman Brothers Bank, FSB |
| | 399 Park Avenue, 8th Floor |
| | New York, New York 10022 |
| | Attention: John Herman |
| | |
| With a copy to: | Stroock & Stroock & Lavan LLP |
| | 180 Maiden Lane |
| | New York, New York 10038-4982 |
| | Attention: William Campbell, Esq. |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

"Business Day" shall mean a day upon which commercial banks are not authorized or required by law to close in New York, New York.

19.    **MISCELLANEOUS**

(a)    Wherever pursuant to this Note (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

7

(b)    Whenever used, the singular shall include the plural, the plural shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors and administrators.

(c)    Borrower hereby represents and warrants that the Loan secured by the Security Instrument was made and transacted solely for the purpose of carrying on business or investment activity, and that the proceeds of the Loan were not used for personal, family or household purposes.

*[Remainder of Page Intentionally Left Blank]*

8

**IN WITNESS WHEREOF,** Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

**WSG DULLES GL, LLC,**
a Virginia limited liability company

By: _____
Philip Wolman, Manager

## SCHEDULE 1
## TO PROMISSORY NOTE

As used in the foregoing document, each of the following terms shall have the corresponding meaning:

1. "Borrower" shall mean **WSG DULLES GL, LLC**, a Virginia limited liability company

2. "Principal Sum" shall mean $3,280,000.00

3. "Monthly Payment" shall mean (i) for each Monthly Payment Date through and including July 11, 2009, a payment equal to all interest that has accrued on the principal sum of this Note during the preceding Accrual Period, and (ii) for each Monthly Payment Date thereafter, a payment equal to $20,667.16.

4. "Security Instrument" shall mean the Leasehold Deed of Trust, Fixture Filing and Security Agreement dated the date hereof in the principal sum of $16,620,000.00 given by Borrower to (or for the benefit of) Lender covering the fee estate of Borrower in certain premises located in the Sterling, Virginia, and other property, as more particularly described therein (collectively, the "Property").

**EXHIBIT B**
**GUARANTY**

## GUARANTY OF PAYMENT

**THIS GUARANTY OF PAYMENT** ("this Guaranty") dated as of July 12, 2007, made by Borrower (as defined in Schedule 1 attached hereto) (the "Guarantor") in favor of **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank (the "Lender").

<u>PRELIMINARY STATEMENT</u>

A.      Pursuant to that certain Loan Agreement (the "Loan Agreement") dated the date hereof, by and among the Lender, as lender, Guarantor, as a borrower, and certain other borrowers (the "Other Borrowers"), Lender has agreed to make a loan (the "Loan") to Guarantor. The Loan is to be evidenced by, a certain promissory note dated the date hereof made by Guarantor to Lender in the principal amount of the Loan (the "Note") and secured by, among other things, a first priority mortgage, deed of trust or deed to secure debt and security agreement (the "Security Instrument") encumbering the Property.

B.      Pursuant to the Loan Agreement, Lender has also agreed to make certain other loans (the "Other Loans") to the Other Borrowers as more particularly described on Schedule A attached hereto and by this reference made a part hereof, each evidenced by a separate promissory note (the "Other Notes").

C.      Lender has required, as a condition precedent to making the Loan and the Other Loans, that Guarantor execute and deliver this Guaranty with respect to the Other Loans.

D.      It is intended that the liens and Security interests provided by the Security Instrument and the other Loan Documents (as defined in the Security Instrument) shall also secure the Guarantor's obligations under this Guaranty.

**NOW THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor covenants as follows:

1.      Any capitalized terms not defined herein shall have the meanings ascribed to them in the Security Instrument.

2.      Guarantor, as a primary obligor and not merely as a surety, for consideration received, and at the request of the Other Borrowers, hereby absolutely, unconditionally and irrevocably guarantees to the Lender, the prompt, unconditional and complete payment when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"): (i) the principal sum evidenced by the Other Notes, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Other Notes and the Loan Agreement and all other sums, other than principal or interest, which may or shall become due and payable pursuant to the provisions of the Other Notes and the Loan Agreement and (ii) all other obligations and liabilities of the Other Borrowers under the Other Properties' Loan Documents.

3.      It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Other Properties' Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

4.      Any indebtedness of the Other Borrowers to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Guaranteed Obligations.  Until payment in full of the Guaranteed Obligations (and including interest accruing on the Other Notes after the commencement of a proceeding by or against any of the Other Borrowers under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the "Bankruptcy Code") which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of the Other Borrowers to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization.  Further, if Guarantor shall comprise more than one person, firm or corporation, Guarantor agrees that until such payment in full of the Guaranteed Obligations, (a) Guarantor shall not accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) Guarantor will not take any action to exercise or enforce any rights to such contribution, and (c) if Guarantor should receive any payment, satisfaction or security for any indebtedness of the Other Borrowers to Guarantor or for any contribution by the others of Guarantor for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Guaranteed Obligations and until so delivered, shall be held in trust for Lender as security for the Guaranteed Obligations.

5.      Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by the Other Borrowers, for all expenses (including counsel fees) incurred by Lender in connection with the collection against the Other Borrowers of the Guaranteed Obligations or any portion thereof or with the enforcement of this Guaranty.

6.      All moneys available to Lender for application in payment or reduction of the Guaranteed Obligations may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Guaranteed Obligations as Lender may elect.

7.      Guarantor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor.

8.      Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to the Loan Documents or the Other Properties' Loan Documents, against any person obligated thereunder or against the owner of the Property or any of the Other Properties, or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release or discharge of any Other Borrower or other party of any of its obligations under the Other Properties' Loan Documents or (d) by reason of the release or exchange of any of the Property covered by the Security

-2-

Instrument, other collateral for this Guaranty, or collateral for the Other Loans, or (e) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (f) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Loan Documents or the Other Properties' Loan Documents, or (g) by reason of any payment made on the Guaranteed Obligations or any other indebtedness arising under the Loan Documents or the Other Properties' Loan Documents, whether made by the Other Borrowers or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Guaranteed Obligations, nor shall it have the effect of reducing the liability of Guarantor hereunder. It is further understood, that if any of the Other Borrowers shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against any of the Other Borrowers, including the exercise of any option Lender has to declare the Guaranteed Obligations due and payable on the happening of any default or event by which, under the terms of the Loan Documents, the Guaranteed Obligations shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Guaranteed Obligations due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

9.     Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of any of the Other Properties' Loan Documents, that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the other Security Instruments or other such collateral, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

10.     This Agreement shall be governed by, and construed in accordance with, the internal laws of the state in which the Property is located, without regard to choice of law rules.

11.     This is a guaranty of payment and not of collection and upon any default of any of the Other Borrowers under any of the Other Properties' Loan Documents, Lender may, at its option, proceed directly and at once, without notice, against the Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against the Other Borrowers or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against any of the other Properties or other collateral for the Other Loans. Guarantor hereby waives the pleading of any statute of limitations as a defense to its obligations hereunder.

12.     Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

13.     If Guarantor is a partnership, the agreements herein contained shall remain in force and applicable, notwithstanding any changes in the individuals comprising the partnership, and the term "Guarantor," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If Guarantor is a corporation or limited liability company, the agreements

contained herein shall remain in full force and applicable notwithstanding any changes in the shareholders or members comprising, or the officers and directors or managers relating to, the corporation or limited liability company, and the term "Guarantor" as used herein, shall include any alternative or successor corporation or limited liability company, but any predecessor corporation or limited liability company shall not be relieved of liability hereunder.

14.    Notwithstanding anything to the contrary contained herein, (a) following a transfer of the Property approved by Lender, other than in connection with a Portfolio Transfer (as defined in the Security Instrument), and the satisfaction of all of the requirements set forth in Section 8.3 or 8.4 of the Security Instrument with respect to such transfer, as applicable, or (b) following a defeasance of the Loan pursuant to the terms of the Loan Agreement and satisfaction of all of the requirements set forth in the Loan Agreement, Guarantor shall be released from all liability accruing after said transfer. The terms of this Section 14 shall not be release Guarantor from any liability under this Guaranty in connection with a Portfolio Transfer.

15.    Guarantor and its representative executing below has full power, authority and legal right to execute this Guaranty and to perform all its obligations under this Guaranty.

16.    All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

17.    This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall constitute a single agreement of Guaranty. The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

18.    This Guaranty may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Other Borrowers, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

19.    This Guaranty shall be secured by the liens, assignments and security interests granted under the Security Instrument and the other Loan Documents.

20.    The obligations of Guarantor hereunder are subject to the Article 13 of the Security Instrument.

*[Remainder of Page Intentionally Left Blank]*

-4-

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the date first above set forth.

**BORROWER:**

**WSG DULLES GL, LLC,**
a Virginia limited liability company

By: _____
     Eric D. Sheppard, Manager

GtyP

## SCHEDULE A

1.    Loan from Lender to WSG CHARLOTTESVILLE, LLC, in the original principal amount of $2,480,000.00 evidenced by that certain promissory note executed by WSG CHARLOTTESVILLE, LLC in favor of Lender as of even date herewith in such original principal amount.

2.    Loan from Lender to WSG MONROE, LLC, in the original principal amount of $1,240,000.00 evidenced by that certain promissory note executed by WSG MONROE, LLC in favor of Lender as of even date herewith in such original principal amount.

3.    Loan from Lender to WSG SHORT PUMP, LLC, in the original principal amount of $2,160,000.00 evidenced by that certain promissory note executed by WSG SHORT PUMP, LLC in favor of Lender as of even date herewith in such original principal amount.

4.    Loan from Lender to WSG TRACE FORK L.P., in the original principal amount of $2,160,000.00 evidenced by that certain promissory note executed by WSG TRACE FORK L.P. in favor of Lender as of even date herewith in such original principal amount.

5.    Loan from Lender to ATL2130 LIMITED PARTNERSHIP, in the original principal amount of $2,860,000.00 evidenced by that certain promissory note executed by ATL2130 LIMITED PARTNERSHIP in favor of Lender as of even date herewith in such original principal amount.

6.    Loan from Lender to WSG SNELLVILLE LP, in the original principal amount of $2,440,000.00 evidenced by that certain promissory note executed by WSG SNELLVILLE LP in favor of Lender as of even date herewith in such original principal amount.

## SCHEDULE 1
## TO GUARANTY OF PAYMENT

As used in the foregoing document, each of the following terms shall have the corresponding meaning:

3. "Borrower" shall mean **WSG DULLES GL, LLC,** a Virginia limited liability company

# EXHIBIT C
# DEED OF TRUST

TAX PARCEL NO: 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-000

20070720-0054264
Loudoun County, VA          Pgs: 60
07/20/2007 12:56:26PM
Gary M. Clemens , Clerk

**WSG DULLES GL, LLC**, as trustor
(Borrower)
(Grantor)

To

**WSG DULLES, L.P.**, as trustor
(Co-Mortgagor)
(Grantor)

**R. DENNIS MCARVER**, as trustee
(Trustee)
(Grantee)

for the benefit of

**LEHMAN BROTHERS BANK, FSB**, as beneficiary
(Lender)
(Grantee)

**FEE AND LEASEHOLD DEED OF TRUST, FIXTURE FILING
AND SECURITY AGREEMENT**

Dated:          July 12, 2007

Location:          Sterling, Virginia

UPON RECORDATION RETURN TO:
**WHEN RECORDED RETURN TO:
MARGIE POOLE/NTS NO.** Lehman
**FIDELITY NATIONAL TITLE
1800 PARKWAY PLACE, STE 700
MARIETTA, GA 30067**

This document prepared outside the Commonwealth of Virginia.

SEE "EXHIBIT D" ON PAGE 59
FOR COUNTY TAX COLLECTION
PERCENTAGES.

SSL-MIA1 30157127v2

## TABLE OF CONTENTS

1 - GRANTS OF SECURITY ................................................................................. 2
    1.1     PROPERTY GRANTED ..................................................................... 2
    1.2     ASSIGNMENT OF RENTS ................................................................ 3
    1.3     SECURITY AGREEMENT ................................................................. 4
    1.4     PLEDGE OF MONIES HELD ............................................................ 4

2 - DEBT AND OBLIGATIONS SECURED ..................................................... 4
    2.1     DEBT AND OBLIGATIONS SECURED ........................................ 4

3 - BORROWER COVENANTS ............................................................................ 4
    3.1     PAYMENT OF DEBT ........................................................................ 4
    3.2     INSURANCE ....................................................................................... 5
    3.3     PAYMENT OF TAXES, ETC. ........................................................... 7
    3.4     RESERVES .......................................................................................... 7
    3.5     CONDEMNATION ............................................................................. 8
    3.6     LEASES AND RENTS ....................................................................... 8
    3.7     MAINTENANCE OF PROPERTY .................................................. 10
    3.8     WASTE ............................................................................................... 10
    3.9     COMPLIANCE WITH LAWS ......................................................... 10
    3.10    BOOKS AND RECORDS ................................................................. 10
    3.11    PAYMENT FOR LABOR AND MATERIALS ............................. 11
    3.12    MANAGEMENT ............................................................................... 11
    3.13    PERFORMANCE OF OTHER AGREEMENTS .......................... 12
    3.14    CHANGE OF NAME, IDENTITY OR STRUCTURE ................. 12
    3.15    EXISTENCE ...................................................................................... 12
    3.16    OFAC ................................................................................................. 12

4 - SPECIAL COVENANTS ............................................................................... 13
    4.1     PROPERTY USE ............................................................................... 13
    4.2     SINGLE PURPOSE ENTITY .......................................................... 13
    4.3     RESTORATION ................................................................................ 13
    4.4     LOCK BOX ACCOUNT .................................................................. 16

5 - REPRESENTATIONS AND WARRANTIES .......................................... 17
    5.1     WARRANTY OF TITLE .................................................................. 17
    5.2     AUTHORITY ..................................................................................... 17
    5.3     LEGAL STATUS AND AUTHORITY ......................................... 17
    5.4     VALIDITY OF DOCUMENTS ....................................................... 17
    5.5     LITIGATION ..................................................................................... 17
    5.6     STATUS OF PROPERTY ................................................................ 17
    5.7     NO FOREIGN PERSON .................................................................. 18
    5.8     SEPARATE TAX LOT .................................................................... 18
    5.9     ERISA COMPLIANCE .................................................................... 18
    5.10    LEASES ............................................................................................. 18
    5.11    FINANCIAL CONDITION ............................................................. 18
    5.12    BUSINESS PURPOSES ................................................................... 18
    5.13    TAXES ............................................................................................... 18
    5.14    MAILING ADDRESS ...................................................................... 19
    5.15    NO CHANGE IN FACTS OR CIRCUMSTANCES ................... 19

5.16   DISCLOSURE ............................................................................ 19
5.17   THIRD PARTY REPRESENTATIONS ........................................ 19
5.18   ILLEGAL ACTIVITY ................................................................... 19
5.19   OFAC .......................................................................................... 19

6 - OBLIGATIONS AND RELIANCES ............................................................. 19
6.1   RELATIONSHIP OF BORROWER AND LENDER ..................... 19
6.2   NO LENDER OBLIGATIONS ...................................................... 19

7 - FURTHER ASSURANCES ........................................................................... 20
7.1   RECORDING OF SECURITY INSTRUMENT, ETC .................... 20
7.2   FURTHER ACTS, ETC. ................................................................ 20
7.3   CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS ............ 20
7.4   ESTOPPEL CERTIFICATES ....................................................... 20
7.5   REPLACEMENT DOCUMENTS ................................................. 21

8 - DUE ON SALE/ENCUMBRANCE ............................................................... 21
8.1   LENDER RELIANCE ................................................................... 21
8.2   NO SALE/ENCUMBRANCE ....................................................... 21
8.3   SALE/ENCUMBRANCE DEFINED ............................................ 21
8.4   LENDER'S RIGHTS .................................................................... 24

9 - DEFAULT ................................................................................................... 25
9.1   EVENTS OF DEFAULT .............................................................. 25

10 - RIGHTS AND REMEDIES ........................................................................ 26
10.1   REMEDIES .................................................................................. 26
10.2   APPLICATION OF PROCEEDS .................................................. 27
10.3   RIGHT TO CURE DEFAULTS .................................................... 27
10.4   ACTIONS AND PROCEEDINGS ................................................ 27
10.5   RECOVERY OF SUMS REQUIRED TO BE PAID ...................... 27
10.6   EXAMINATION OF BOOKS AND RECORDS ........................... 27
10.7   OTHER RIGHTS, ETC ................................................................ 27
10.8   RIGHT TO RELEASE ANY PORTION OF THE PROPERTY ...... 28
10.9   VIOLATION OF LAWS ............................................................... 28
10.10   RECOURSE AND CHOICE OF REMEDIES ................................ 28
10.11   RIGHT OF ENTRY ...................................................................... 28
10.12   DEFAULT INTEREST AND LATE CHARGES ........................... 28

11 - INDEMNIFICATION ................................................................................. 29
11.1   GENERAL INDEMNIFICATION ................................................ 29
11.2   MORTGAGE AND/OR INTANGIBLE TAX ................................ 29
11.3   ERISA INDEMNIFICATION ....................................................... 29
11.4   DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES ........ 29

12 - WAIVERS ................................................................................................. 30
12.1   WAIVER OF COUNTERCLAIM ................................................. 30
12.2   MARSHALLING AND OTHER MATTERS ................................. 30
12.3   WAIVER OF NOTICE ................................................................. 30
12.4   SOLE DISCRETION OF LENDER .............................................. 30
12.5   SURVIVAL .................................................................................. 30

ii

12.6    WAIVER OF TRIAL BY JURY .......................................................... 30

13 - EXCULPATION .......................................................................................... 31
  13.1    EXCULPATION .......................................................................... 31
  13.2    RESERVATION OF CERTAIN RIGHTS ...................................... 31
  13.3    EXCEPTIONS TO EXCULPATION ............................................. 31
  13.4    RECOURSE ................................................................................ 32
  13.5    BANKRUPTCY CLAIMS ............................................................ 32

14 - NOTICES ................................................................................................... 32
  14.1    NOTICES .................................................................................... 32

15 - APPLICABLE LAW ..................................................................................... 33
  15.1    CHOICE OF LAW ....................................................................... 33
  15.2    USURY LAWS ............................................................................ 33
  15.3    PROVISIONS SUBJECT TO APPLICABLE LAW ......................... 33

16 - SECONDARY MARKET .............................................................................. 33
  16.1    TRANSFER OF LOAN ................................................................ 33

17 - COSTS ....................................................................................................... 34
  17.1    PERFORMANCE AT BORROWER'S EXPENSE ......................... 34
  17.2    ATTORNEY'S FEES FOR ENFORCEMENT ............................... 34

18 - DEFINITIONS ........................................................................................... 34
  18.1    GENERAL DEFINITIONS .......................................................... 34

19 - MISCELLANEOUS PROVISIONS .............................................................. 35
  19.1    NO ORAL CHANGE ................................................................... 35
  19.2    LIABILITY ................................................................................. 35
  19.3    INAPPLICABLE PROVISIONS ................................................... 35
  19.4    HEADINGS, ETC. ...................................................................... 35
  19.5    DUPLICATE ORIGINALS; COUNTERPARTS .............................. 35
  19.6    NUMBER AND GENDER ........................................................... 35
  19.7    SUBROGATION ......................................................................... 35
  19.8    BROKERS .................................................................................. 35
  19.9    ENTIRE AGREEMENT ............................................................... 36
  19.10   SUBSTITUTION OF TRUSTEE ................................................. 36
  19.11   THE TRUSTEE'S FEES .............................................................. 36
  19.12   CERTAIN RIGHTS ..................................................................... 36
  19.13   RETENTION OF MONEY ........................................................... 37
  19.14   PERFECTION OF APPOINTMENT ............................................ 37
  19.15   SUCCESSION INSTRUMENTS ................................................. 37
  19.16   RELIANCE OF TRUSTEE .......................................................... 37

20 - CROSS-COLLATERALIZATION ................................................................ 37
  20.1    CROSS-COLLATERALIZATION ................................................ 37

21 - ADDITIONAL PROVISIONS REGARDING CO-MORTGAGOR ........................ 38
  21.1    REPRESENTATIONS AND COVENANTS OF CO-MORTGAGOR .... 40
  21.2    UNIMPAIRED OBLIGATIONS ................................................... 41

iii

21.3    WAIVER OF DEFENSES...................................................................................... 41
21.4    WAIVER OF SUBROGATION .............................................................................. 41

22 - STATE SPECIFIC PROVISIONS .................................................................................. 42
      22.1    CONSTRUCTION OF THIS SECURITY INSTRUMENT............................... 42
      22.2    CONFLICTING PROVISIONS ............................................................................ 42
      22.3    PURPOSE OF LOAN............................................................................................ 42

iv

THIS FEE AND LEASEHOLD DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT (this "Security Instrument") is made as of the __ day of July, 2007, by Borrower (as defined in Schedule 1 attached hereto), having its principal place of business c/o WSG Development Company, 400 Arthur Godfrey Road, Suite 200, Miami Beach, Florida 33140, as trustor (to be indexed as "Grantor") to R. DENNIS MCARVER, having an address at 1750 Tysons Boulevard, Suite 1800, McLean, Virginia 22102, as trustee ("Trustee") (to be indexed as "Grantee") for the benefit of LEHMAN BROTHERS BANK, FSB, a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801, as beneficiary ("Lender") (to be indexed as "Grantee") and is joined in by WSG DULLES, L.P., a Delaware limited partnership, having its principal place of business c/o WSG Development Company, 400 Arthur Godfrey Road, Suite 200, Miami Beach, Florida 33140, as co-mortgagor ("Co-Mortgagor" and together with Borrower, "Mortgagor") (to be indexed as "Grantor") for purposes of encumbering all right, title and interest of Co-Mortgagor in the Property (as hereinafter defined).

## RECITALS:

Co-Mortgagor is the owner of the fee simple estate and Borrower is the owner of the leasehold estate in the Land (defined in Section 1.1) as more particularly described in Exhibit A hereto.

Pursuant to a Loan Agreement (the "Loan Agreement") of even date herewith between Borrower, certain other parties (individually an "Other Borrower" and collectively, the "Other Borrowers") and Lender, Lender has agreed to make a loan to Borrower in the Principal Sum (as defined in Schedule 1 attached hereto) (the "Loan"), which Loan is evidenced by that certain promissory note of even date herewith given by Borrower to Lender in such amount in lawful money of the United States of America (the note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note".)

Pursuant to the Loan Agreement, Lender has also agreed to make certain additional loans in the Additional Aggregate Principal Sum (as defined in Schedule 1 attached hereto) to the Other Borrowers (each, an "Other Loan" and collectively, the "Other Loans"). Each Other Borrower has evidenced its respective Other Loan by a promissory note in the principal amount thereof (each, an "Other Note" and collectively, the "Other Notes"). Each Other Note is secured by, among other things, a first priority lien pursuant to a mortgage and security agreement, a deed of trust and security agreement, or two or more mortgages or deeds of trust which have been consolidated and restated pursuant to a consolidation, modification, spreader and extension agreement, as the case may be (each, an "Other Security Instrument" and collectively, the "Other Security Instruments"), on certain real property and improvements owned by the related Other Borrower (each, an "Other Property" and collectively, the "Other Properties").

Pursuant to the Loan Agreement, Borrower has guaranteed the prompt payment in full of the principal sum, interest and other sums due on each of the Other Loans pursuant to a Guaranty of Payment of even date herewith made by Borrower to Lender (the "Guaranty"), and each Other Borrower has guaranteed the prompt payment in full of the Loan and each Other Loan not made to such Other Borrower pursuant to a separate Guaranty of Payment of such Other Borrower of even date herewith to the Lender (each, an "Other Guaranty" and collectively, the "Other Guarantees").

Borrower desires to secure the payment of the Debt (as defined in Article 2), the performance of all Other Obligations (as defined in Article 2), and the Guaranty, in the Aggregate Principal Sum (as defined in Schedule 1 attached hereto).

All capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Agreement.

SSL-MIA1 30157127v2

6

# 1 - GRANTS OF SECURITY

1.1   PROPERTY GRANTED.   Mortgagor, for and in consideration of the sum of Ten ($10.00) Dollars and other valuable consideration in hand paid, the receipt of which hereby is acknowledged, and the further consideration, uses, purposes and trusts herein set forth and declared, has granted, bargained, transferred, assigned, set-over and conveyed and by these presents does grant, bargain, transfer, assign, set over and convey unto Trustee, and unto his or its successors in the trust hereby created and his or its assigns, forever, all of the Mortgagor's right, title and interest in and to the following property, rights, interests and estates now owned, or hereafter acquired by Mortgagor (collectively, the "Property"):  (a) all right, title and interest of Mortgagor in the real property described in Exhibit A attached hereto and made a part hereof (the "Land") and all right, title and interest of Borrower as lessee under the Deed of Ground Lease dated of June 1, 2001 by and between AIG Baker Dulles, L.L.C., a Delaware limited liability company ("Original Landlord") and Borrower, a memorandum of which was recorded on March 19, 2002 in the Public Records of Louden County, as assigned by Original Landlord to Co-Mortgagor pursuant to that certain Assignment and Assumption of Lease, dated March 19, 2002 (the "Ground Lease") of the real property described in Exhibit A hereto and made a part hereof; (b) all additional lands, estates and development rights hereafter acquired by Mortgagor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument; (c) the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements"); (d) all easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto; (e) all furnishings, machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above; (f) all leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, whether before or after the filing by or against Mortgagor of any petition for relief under 11 U.S.C. § 101 et seq., as the same may be amended from time to time (the "Bankruptcy Code") (the "Leases") and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues (including, but not limited to, any payments made by tenants under the Leases in connection with the termination of any Lease), issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under the Bankruptcy Code (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt (as hereinafter defined); (g) any and all lease guaranties, letters of credit and any other credit support (individually, a "Lease Guaranty" and collectively, the "Lease Guaranties") given by any guarantor in connection with any of the Leases (individually, a "Lease Guarantor" and collectively, the "Lease Guarantors"); (h) all rights, powers, privileges, options and other benefits of Mortgagor as lessor under the Leases and beneficiary under all Lease Guaranties; (i) all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent

domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property; (j) all proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;  (k) all refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction; (l) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims; (m) the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property; (n) all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Mortgagor thereunder; (o) all tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property; (p) any contract right, option or right of first refusal, now owned or hereafter acquired by Borrower, to purchase or otherwise acquire the interest of Co-Mortgagor under the Ground Lease or any other estate, title or interest in or to the property subject to the Ground Lease; (q) any right of Mortgagor to reject or terminate, or to agree to or acquiesce in any rejection or termination of the Ground Lease, whether made with respect to any election under Sections 363 or 365 of the Bankruptcy Code (or any successor provisions) or under any similar law or right of any nature, or otherwise; and (r) all other rights and privileges (including but not limited to any credit, security, deposit and offset) of the Borrower as lessee or Co-Mortgagor as lessor under the Ground Lease and all rights, privileges and prerogatives to terminate, cancel, modify, change, supplement, alter, amend or renew the Ground Lease; and (s) any and all other rights of Mortgagor in and to the items set forth in Subsections (a) through (r) above.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto Trustee, as trustee for the benefit of Lender, to its successors in the trust created by this Security Instrument and to its or their respective assigns, forever, in trust, upon the terms and conditions set forth herein;

IN TRUST, WITH THE POWER OF SALE, to secure payment to Lender of the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall well and truly perform the Other Obligations (as defined in Section 2.1 hereof) as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note and, except in the case of any Other Borrower who shall have received a release of its Property from the cross-default and cross-collateralization provisions of the Loan Documents in connection with (i) a Transfer (as hereinafter defined) of the Property (other than in connection with a Portfolio Transfer (as hereinafter defined)) pursuant to Article 8 hereof, or (ii) a Release (as defined in the Loan Agreement) pursuant to the terms of the Loan Agreement, each Other Borrower shall well and truly pay to Lender the Debt (as defined in each Other Security Instrument) at the time and in the manner provided in each Other Note and each Other Security Instrument, shall well and truly perform the Other Obligations (as defined in each Other Security Instrument) and shall well and truly abide by and comply with each and every covenant set forth in each Other Note and each Other Security Instrument, these presents and the estate hereby granted shall cease, terminate and be void.

1.2    ASSIGNMENT OF RENTS.  Mortgagor hereby absolutely and unconditionally assigns to Lender Mortgagor's right, title and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 1.2 and Section 3.6, Lender grants to Mortgagor a

3

revocable license to collect and receive the Rents, which license shall be automatically revoked upon the occurrence and during the continuance of an Event of Default (as hereinafter defined). Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

   1.3  SECURITY AGREEMENT. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Property. By executing and delivering this Security Instrument, Mortgagor hereby grants to Lender, as security for the Obligations, a security interest in the Property to the full extent that the Property may be subject to the Uniform Commercial Code.

   1.4  PLEDGE OF MONIES HELD. Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (as defined in Section 3.4), the Deferred Maintenance Deposit (as defined on Exhibit B attached hereto and made a part hereof), the Reserve (as defined on Exhibit B), Net Proceeds (as defined in Section 4.3), the Lock-Box Account (as defined in Section 4.4) and condemnation awards or payments described in Section 3.5 (collectively, "Deposits"), as additional security for the Obligations until expended or applied as provided in this Security Instrument.

## 2 - DEBT AND OBLIGATIONS SECURED

   2.1  DEBT AND OBLIGATIONS SECURED. This Security Instrument and the grants, assignments and transfers made in Article 1 hereof are given for the purpose of securing the payment of the Debt and the performance of the Other Obligations, in such order of priority as Lender may determine in its sole discretion. For purposes hereof, the term "Debt" shall mean the aggregate of the indebtedness evidenced by the Note in lawful money of the United States of America, interest, default interest, late charges, prepayment premiums and other sums, as provided in the Note, this Security Instrument or the other Loan Documents (defined below), all moneys agreed or provided to be paid by Borrower in the Guaranty, all other moneys agreed or provided to be paid by Borrower in the Note, this Security Instrument or the other Loan Documents, all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby. For purposes hereof, the term "Other Obligations" shall mean the obligations of Borrower (other than the obligation to repay the Debt) contained in this Security Instrument, the Note and the other Loan Documents (as hereinafter defined). For purposes hereof, the term "Loan Documents" shall mean the Note, this Security Instrument, the Loan Agreement and any other documents or instruments which now or shall hereafter wholly or partially secure or guarantee payment of the Note or which have otherwise been executed or are hereafter executed by Borrower and/or any other person or entity in connection with the Loan, the Guaranty and any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of any of the foregoing. Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively below as the "Obligations." All the covenants, conditions and agreements contained in the Note and the other Loan Documents are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. Anything to the contrary herein or in any other Loan Document notwithstanding, the obligations of any guarantor under the Guaranty of Recourse Obligations of Borrower or any Guarantor or Indemnitor under any other separate guaranty or indemnity accepted by Lender shall not be secured by this Security Instrument, any separate assignment of leases or assignment of rents, or any other lien encumbering the Property; provided however that (i) this sentence shall not apply to Borrower's obligations under the Guaranty and (ii) the obligations of Borrower under the Environmental Indemnity Agreement and under any separate indemnity of Borrower shall be so secured, subject to the rights of Lender to proceed on an unsecured basis thereunder pursuant to applicable law.

## 3 - BORROWER COVENANTS

Borrower covenants and agrees that:

   3.1  PAYMENT OF DEBT. Borrower will pay the Debt at the time and in the manner provided in the Note, the Loan Agreement, the Guaranty, this Security Instrument and the other Loan Documents.

4

3.2   <u>INSURANCE.</u>

(a)     Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the coverages set forth herein:

(i)     comprehensive all risk insurance on the Improvements and the Personal Property, in each case (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Security Instrument shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing either an agreed amount endorsement or a waiver of all co-insurance provisions; (C) providing for a deductible of not greater than $25,000; and (D) if any of the Improvements or the use of the Property shall at any time constitute a legal non-conforming structure or use, Borrower shall obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement, which shall include sufficient coverage for (1) costs to comply with building and zoning codes and ordinances, (2) demolition costs, and (3) increased costs of construction.  If any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", Borrower shall obtain flood hazard insurance in such an amount as Lender shall require, but in no event less than the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended.  In addition, in the event the Property is located in the State of California or in a "seismic zone" 3 or 4 (as defined in the Uniform Building Code published by the International Conference of Building Officials), Borrower shall obtain earthquake insurance in amounts and in form and substance satisfactory to Lender;

(ii)     commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the "occurrence" form with a combined single limit (including "umbrella" coverage in place) of not less than (1) $3,000,000 and a general aggregate limit of not less than $4,000,000; or (2) if any of the Improvements contain elevators, a combined single limit of not less than $5,000,000 and a general aggregate limit of $6,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all written and oral contracts, to the extent the same is available;

(iii)     business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Subsection 3.2(a)(i); (C) on an agreed value actual loss sustained basis in an amount equal to 100% of the projected gross income from the Property for a period of twelve (12) months; and (D) if the Borrower is required to obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement pursuant to Subsection 3.2(a)(i)(D), coverage for the increased period of restoration.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twelve (12) month period.  All insurance proceeds payable to Lender pursuant to this Subsection shall be held by Lender and shall be applied to the obligations secured hereunder from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)     (A) at all times during which structural construction, material repairs or alterations are being made with respect to the Improvements, owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) during new construction, the insurance provided for in Subsection 3.2(a)(i) written in a so-called builder's risk completed value form on a non-reporting basis;

(v)     if Borrower has employees, workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least

5

$1,000,000 per accident and per disease per employee, and $1,000,000 aggregate coverage for disease in respect of any work or operations on or about the Property, or in connection with the Property or its operation;

(vi)     if the Property contains HVAC or other equipment not covered by the comprehensive all risk insurance, comprehensive boiler and machinery insurance, in amounts as shall be reasonably required by Lender;

(vii)     if Borrower owns or operates motor vehicles, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits reasonably acceptable to Lender; and

(viii)     such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)     All insurance provided for in Subsection 3.2(a) hereof shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), and shall be subject to the reasonable approval of Lender as to insurance companies, policy limits and any sub-limits thereof, forms (including exclusions and exceptions), deductibles, loss payees and insureds. Whether or not covered by the express terms of any Policy, Borrower shall not decline, elect not to accept, allow to lapse or fail to pay the required premium for any insurance coverage required to be extended or offered by any insurer by applicable law, rule or regulation without Lender's prior written consent. The insurance companies must be approved, authorized or licensed to provide insurance in the state in which the Property is located and have a rating of "A" or better for claims paying ability assigned by Moody's Investors Service, Inc. and Standard & Poor's Rating Group or a general policy rating of "A-" or better and a financial class of VIII or better assigned by A.M. Best Company, Inc. Each such insurer shall be referred to herein as a "Qualified Insurer".

(c)     Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Security Instrument and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Subsection 3.2(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Subsection 3.2(e). Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Subsection 3.2(a).

(d)     All Policies of insurance provided for or contemplated by Subsection 3.2(a), except for the Policy referenced in Subsection 3.2(a)(v), shall name Lender and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a "mortgagee clause" in form acceptable to Lender providing, among other things, that Lender shall receive at least thirty (30) days prior written notification of any termination, cancellation or reduction of insurance and that the loss thereunder shall be payable to Lender.

(e)     If not previously delivered to Lender, Borrower shall deliver to Lender no later than thirty (30) days after the date hereof certified copies of the existing Policies providing the insurance coverage required under Section 3.2(a) marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums") annually in advance. In addition, no later than thirty (30) days prior to the expiration dates of the Policies which Borrower is now or hereafter required to maintain hereunder, Borrower shall deliver to Lender certified copies of new or renewal Policies (also marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the Insurance Premiums due thereunder annually in advance), together with certificates of insurance therefor, setting forth, among other things, the amounts of insurance maintained, the risks covered by such insurance and the insurance company or companies which carry such insurance. If requested by Lender, Borrower shall furnish verification of the

6

adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender. Under no circumstances shall Borrower be permitted to finance the payment of any portion of the Insurance Premiums.

(f)  If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems reasonably necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by this Security Instrument and shall bear interest in accordance with Section 10.3 hereof. Lender shall exercise good faith, commercially reasonable efforts to provide five (5) days prior written notice to Borrower of any action proposed to be taken by Lender pursuant to this Section 3.2(f), during which period Borrower may cure any failure to comply with the provisions of this Section 3.2, except that Lender shall not be under any obligation to provide any prior written notice to Borrower of any proposed action to the extent that Lender reasonably determines that immediate action is necessary to avoid an actual lapse in coverage.

(g)  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such fire or other casualty, with such alterations as may be approved by Lender (the "Restoration") and otherwise in accordance with Section 4.3 of this Security Instrument, except in instances where Lender has failed or elected not to disburse Net Proceeds to Borrower under such Section 4.3 (provided that such exception shall not apply if the failure to disburse is attributable to Borrower's failure to comply with the conditions set forth in Clauses (A), (D) or (I) of Subsection 4.3(b)(i) or in Subsection 4.3(b)(ii) or any other conditions set forth in Section 4.3 which Borrower has the practical ability to satisfy). Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.

(h)  In the event of foreclosure of this Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to such policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

3.3  PAYMENT OF TAXES, ETC.  Borrower shall promptly pay all taxes, assessments, water rates, sewer rents, governmental impositions, and other charges, including without limitation vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes"), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges"), and all charges for utility services provided to the Property prior to the time same become delinquent. Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property. Except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument, Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.

3.4  RESERVES.  (a) Borrower shall pay to Lender on each date that a regularly scheduled payment of principal or interest is due under the Note (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has obtained knowledge and authorizes Lender or its agent to obtain the bills for Taxes and Other Charges directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Escrow

7

Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 3.2 and 3.3 hereof. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.2 and 3.3 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall estimate as sufficient to make up the deficiency. The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. No earnings or interest on the Escrow Fund shall be payable to Borrower.

(a)   Borrower shall comply with the Replacement and Leasing Reserve Requirements set forth on Exhibit "B" attached hereto and made a part hereof.

3.5   CONDEMNATION. Mortgagor shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding promptly following Borrower becoming aware of any such proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Mortgagor shall from time to time deliver to Lender all instruments requested by it to permit such participation. Mortgagor shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note, the Loan Agreement, the Guaranty and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note and Other Notes. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 4.3 of this Security Instrument, except in instances where Lender has failed or elected not to disburse Net Proceeds to Borrower under such Section 4.3 (provided that such exception shall not apply if the failure to disburse is attributable to Borrower's failure to comply with the conditions set forth in Clauses (A), (D) or (I) of Subsection 4.3(b)(i) or in Subsection 4.3(b)(ii) or any other conditions set forth in Section 4.3 which Borrower has the practical ability to satisfy). If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt. Lender shall apply Net Proceeds to the Debt promptly following the final determination that such Net Proceeds shall not be applied to the cost of Restoration as hereinafter defined.

3.6   LEASES AND RENTS. (a) All Leases shall be written on the standard form of lease which shall have been approved by Lender, which approval shall not be unreasonably withheld, or another commercially reasonable form reasonably acceptable to Lender. Upon request, Borrower shall furnish Lender with executed copies of all Leases. No material changes may be made to the Lender-approved standard lease without the prior written consent of Lender, which approval shall not be unreasonably withheld, conditioned or delayed. In addition, all renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and terms and shall be arms-length transactions with bona fide, independent third party tenants, except as otherwise approved by Lender. All proposed leases and renewals of existing Leases, other than Minor Leases (hereinafter defined), shall be subject to the prior approval of Lender and its counsel, at Borrower's expense, which approval shall not be unreasonably withheld or delayed if the proposed Lease or renewal Lease (i) is on the Lender-approved form, subject only to commercially reasonable variations therefrom, (ii) is negotiated in an arms-length transaction with an independent third party tenant and (iii) provides for rental rates and terms comparable to existing local market terms. All Leases entered into after the date hereof shall provide that they are subordinate to this Security Instrument and that the lessee agrees to attorn to Lender. Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Obligations; (ii) shall promptly send copies to Lender of all notices of default which Borrower shall send or

8

receive thereunder; (iii) shall enforce all of the material terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; Borrower may terminate, however, Minor Leases as the result of a default by lessee thereunder; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents; (vi) shall not alter, modify or change the material terms of the Leases without the prior written consent of Lender, or cancel or terminate the Leases or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the Land or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder; (vii) shall not alter, modify or change the material terms of any guaranty, letter of credit or other credit support with respect to the Leases (the "Lease Guaranty") or cancel or terminate such Lease Guaranty without the prior written consent of Lender; and (viii) shall not consent to any assignment of or subletting under the Leases not in accordance with their terms, without the prior written consent of Lender.  For purposes of this Subsection 3.6(a), any failure of Lender to respond to Borrower's written request for consent or approval within thirty (30) days of the date of said request shall be deemed to constitute Lender's consent or approval, provided that Borrower's request (i) is made in accordance with the notice provisions of this Security Instrument; (ii) is accompanied by a copy of the lease, memorandum, modification or other document or instrument for which consent is being requested together with Borrower's certification to Lender that the same constitutes a true and complete copy thereof; and (iii) states prominently in bold capital letters on the face thereof: **WE HEREBY NOTIFY YOU THAT, PURSUANT TO SUBSECTION 3.6(a) OF THE DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT, IF WSG DULLES GL, LLC DOES NOT RECEIVE A RESPONSE FROM LENDER TO THIS REQUEST FOR CONSENT WITHIN THIRTY (30) DAYS AFTER RECEIPT BY LENDER OF THIS REQUEST, THE REQUEST REFERRED TO HEREIN SHALL BE DEEMED APPROVED.** Notwithstanding anything contained herein to the contrary, Borrower may amend the provisions of any Lease without Lender's prior written consent, provided such amendment does not reduce the amount or change the timing of payment of rent, change the term of the Lease (except for renewals or extensions otherwise permitted hereunder), release any party responsible for the obligations of the lessee under the lease, or materially increase the lessor's or materially decrease the lessee's financial obligations with respect to the Property.  Borrower shall deliver to Lender a copy of all such amendments entered into pursuant to the foregoing together with Borrower's certification that the amendment satisfies the requirements of the preceding sentence within thirty (30) days after the execution of such amendment

(b)    Notwithstanding the provisions of Subsection 3.6(a) above, renewals of existing commercial Leases and proposed leases for commercial space covering less than twenty percent (20%) of the total rentable space for the Property and accounting for rental income which in the aggregate is less than twenty percent (20%) of the total rental income for the Property shall not be subject to the prior approval of Lender provided that  (i) the renewal Lease or proposed lease shall have a lease term not to exceed ten (10) years excluding options to renew, (ii) the renewal Lease or proposed lease shall provide for rental rates and terms comparable to existing local market rates and terms, and (iii) the renewal Lease or proposed lease shall be an arms-length transaction with a bona fide, independent third party tenant (leases meeting the foregoing requirements shall be referred to herein as "Minor Leases").  Borrower shall deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within thirty (30) days after the execution of the Lease.

(c)    Any payment payable by a tenant under a Lease in connection with the termination of said Lease (hereafter, a "Termination Payment") shall be deposited in the Leasing Account.  Simultaneously herewith, Borrower and Lender have entered into the Reserve Letter (as defined in Exhibit B) which, among other things, sets forth an amount (the "Leasing Account Cap") which serves as a limit to further contributions to the Leasing Account from Monthly Deposits.  Termination Payments contributed to the Leasing Account shall not be counted towards the calculation of the balance in the Leasing Account subject to the Leasing Account Cap.  Termination Payments so contributed to the Leasing Account shall be disbursed to Borrower subject to and in accordance with the terms of Exhibit B attached hereto.

(d)    All security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at such commercial or savings bank or banks as may be reasonably satisfactory to Lender.  Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing.  Following the

9

occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

     3.7    MAINTENANCE OF PROPERTY.  Borrower shall cause the Property to be maintained in a good and safe condition and repair.  The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property and tenant improvements made in connection with a Lease which has been entered into by Borrower in accordance with the terms hereof) without the consent of Lender, such consent not to be unreasonably withheld or delayed, provided that (1) the making of such alterations or additions shall not adversely affect the use, value or cash flow of the Property and (2) Borrower shall at all times during the course of such addition or alteration for which the cost of completion as reasonably determined by Lender shall exceed $100,000 maintain on deposit with Lender cash or a letter of credit (in form and from an issuer acceptable to Lender) in the amount reasonably estimated by Lender to equal the cost of completing such alteration or addition.  Such cash or letter of credit shall constitute additional security for the Debt.  Provided no Event of Default or event which, with the passage of time, the provision of notice, or both shall give rise to an Event of Default shall have occurred and be continuing, Lender shall return such cash or letter of credit to Borrower upon the lien-free completion of such additions or alterations in accordance with the terms of this Security Instrument.  Lender shall be entitled to draw upon any such letter of credit if a replacement or extension thereof is not received by Lender at least thirty (30) days prior to its expiration date and hold the proceeds of such draw in accordance with the above provisions.  The expiration of any letter of credit delivered to Lender in accordance with this Section 3.7 shall constitute an Event of Default.  Lender shall not be obligated to draw upon any letter of credit in order to prevent such Event of Default from occurring, and shall not have any liability to Borrower or any other party due to its failure or delay in making any draw thereon, including as a result of the insolvency of the issuer of the letter of credit.  Subject to the provisions of Subsection 3.2(g) and Section 3.5, Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 3.5 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Land.  Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender.

     3.8    WASTE.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument.

     3.9    COMPLIANCE WITH LAWS.  Borrower shall (i) promptly comply, in all material respects, with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, or the use thereof including, but not limited to, the Americans with Disabilities Act ("ADA") (collectively, the "Applicable Laws"), (ii) from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws, (iii) give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Applicable Laws and of the commencement of any proceedings or investigations which relate to compliance with Applicable Laws, and (iv) take commercially reasonable and appropriate measures to prevent and will not engage in or knowingly permit any illegal activities at the Property.

     3.10    BOOKS AND RECORDS.  (a) Borrower shall keep adequate books and records of account in accordance with methods of accounting reasonably acceptable to Lender and furnish to Lender:

     (i)    quarterly operating statements of the Property, prepared and certified by Borrower in the form required by Lender, detailing the revenues received, the expenses incurred and the net operating

10

income before and after debt service (principal and interest) and major capital improvements for that quarter and containing appropriate year to date information, within thirty (30) days after the end of each fiscal quarter;

(ii)    certified rent rolls for the last month of each fiscal quarter signed and dated by Borrower, detailing the names of all tenants of the Improvements, the portion of Improvements occupied by each tenant, the base rent and any other charges payable under each Lease and the term of each Lease, including the expiration date, and any other information as is reasonably required by Lender, within sixty (60) days after the end of each fiscal quarter;

(iii)    an annual operating statement of the Property detailing the total revenues received, total expenses incurred, total cost of all capital improvements, total debt service and total cash flow, to be prepared and certified by Borrower in the form required by Lender, within ninety (90) days after the close of each fiscal year of Borrower and if available, any operating statements prepared by an independent certified public accountant within thirty (30) days of the date the same are made available to Borrower;

(iv)    an annual balance sheet and profit and loss statement of Borrower in the form required by Lender, to be prepared and certified by Borrower within ninety (90) days after the close of each fiscal year of Borrower, and, if available, any financial statement prepared by an independent certified public accountant with respect to Borrower within sixty (60) days of the date the same are made available to any such persons; and

(v)    copies of Borrower's federal income tax returns within thirty (30) days of the date such returns are filed.

(b)    Upon Lender's request, Borrower shall cause each Guarantor (as hereinafter defined) and each Indemnitor other than Borrower (an "Indemnitor") under the Environmental Indemnity (as hereinafter defined) to furnish to Lender, no later September 30 of each year, a financial statement, for the preceding fiscal year for the applicable Guarantor or Indemnitor, certified to Lender and prepared on a form reasonably acceptable to Lender.

(c)    Borrower, its affiliates, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information as may, from time to time, be reasonably required by Lender in form and substance reasonably satisfactory to Lender. Lender may commission new or updated appraisals, phase I and phase II environmental reports, property condition surveys and (if the Property is located in an area with a high degree of seismic activity) seismic risk assessments of the Property to be prepared by third parties (each a "Third Party") designated by Lender after the date hereof (each, a "Third Party Report"). Borrower shall cooperate with each Third Party and Lender in the preparation of the Third Party Reports and shall reimburse Lender within ten (10) days of Lender's demand for all costs incurred by Lender in connection with such Third Party Reports, provided that Borrower shall not be obligated to reimburse Lender for more than the cost of one appraisal, one phase I environmental report, one phase II environmental report, one property condition survey and one seismic risk assessment following the date hereof.

3.11    PAYMENT FOR LABOR AND MATERIALS. Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below).

3.12    MANAGEMENT. If the Debt Service Coverage Ratio (as hereinafter defined) shall fall below 1.20:1.00, then Lender, at its option, may require Borrower to engage a bona-fide, independent third party management agent approved by Lender in its reasonable discretion (the "New Manager") to manage the Property. The New Manager shall be engaged by Borrower pursuant to a written management agreement that complies with the terms hereof and is otherwise satisfactory to Lender in all material respects.

11

3.13    PERFORMANCE OF OTHER AGREEMENTS.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an obligation secured hereby and any amendments, modifications or changes thereto.

3.14    CHANGE OF NAME, IDENTITY OR STRUCTURE.  Borrower will not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, limited liability company, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, which consent shall not be unreasonably withheld by Lender so long as Borrower shall at all times comply with the requirements of Section 4.2 and Section 5.9 of this Security Instrument. Borrower will execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein, and to the extent permitted by applicable law, hereby authorizes Lender to file any such financing statement on Borrower's behalf. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

3.15    EXISTENCE.  Borrower will continuously maintain its existence and its rights to do business in the state where the Property is located together with its franchises and trade names.

3.16    OFAC.  At all times throughout the term of the Loan, Borrower and all of its respective Affiliates shall (i) not be a Prohibited Person (defined below) and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury.

The term "Prohibited Person" shall mean any person or entity;

(a)    listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order.

(c)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate of or affiliated with a person or entity listed above.

The term "Affiliate", as used herein, shall mean, as to any person or entity, any other person or entity that, directly or indirectly, is in control of, is controlled by or is under common control with such person or entity or is a director or officer of such person or entity or of an Affiliate of such person or entity. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.

12

## 4 - SPECIAL COVENANTS

Borrower covenants and agrees that:

4.1    <u>PROPERTY USE</u>. The Property shall be used only for a shopping center and retail uses, and for no other use without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

4.2    <u>SINGLE PURPOSE ENTITY</u>. It has not and shall not: (a) engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property; (c) merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent; (d) fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's partnership agreement, articles or certificate of incorporation , articles of organization, operating agreement, or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations hereunder, under the Note or under the other Loan Documents; (e) own any subsidiary or make any investment in, any person or entity without the consent of Lender; (f) commingle its assets with the assets of any of its general partners, managing members, shareholders, affiliates, principals or of any other person or entity; (g) incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation, except pursuant to the Guaranty), other than the Debt, except with respect to trade payables incurred in the ordinary course of its business of owning and operating the Property, provided that such debt is paid when due; (h) fail to maintain its records, books of account and bank accounts separate and apart from those of the general partners, managing members, shareholders, principals and affiliates of Borrower, the affiliates of a general partner or managing member of Borrower, and any other person or entity; (i) enter into any contract or agreement with any general partner, managing member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, managing member, shareholder, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any general partner, managing member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, managing member, shareholder, principal or affiliate thereof; (j) seek the dissolution or winding up in whole, or in part, of Borrower; (k) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof or any other person; (l) hold itself out to be responsible for the debts of another person; (m) make any loans to any third party; (n) fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof, except pursuant to the Guaranty); (o) intentionally deleted; or (p) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors.

4.3    <u>RESTORATION</u>. The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds shall be less than the Net Proceeds Disbursement Threshold (as defined in Schedule 1 attached hereto) and the costs of completing the Restoration shall be less than the Net Proceeds Disbursement Threshold, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Subsection 4.3(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Security Instrument.

13

(b)     If the Net Proceeds are equal to or greater than the Net Proceeds Disbursement Threshold or the costs of completing the Restoration is equal to or greater than the Net Proceeds Disbursement Threshold, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Subsection 4.3(b). The term "Net Proceeds" for purposes of this Section 4.3 shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Subsections 3.2(a)(i), (iv), (vi) and (viii) of this Security Instrument as a result of such damage or destruction (or any proceeds of self-insurance maintained in lieu of such insurance policies), after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Insurance Proceeds"), or (ii) the net amount of all awards and payments received by Lender with respect to a taking referenced in Section 3.5 of this Security Instrument, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Condemnation Proceeds"), whichever the case may be.

(i)     The Net Proceeds shall be made available to Borrower for the Restoration provided that each of the following conditions are met: (A) no Event of Default shall have occurred and be continuing under the Note, this Security Instrument or any of the other Loan Documents; (B) (1) in the event of the Net Proceeds are Insurance Proceeds, less than fifty percent (50%) of the total floor area of the Improvements has been damaged, destroyed, or rendered unusable as a result of such fire or other casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than twenty percent (20%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property; (C) Leases demising in the aggregate a percentage amount equal to or greater than fifty percent (50%) (with respect to casualties) or eighty percent (80%) (with respect to condemnation) of the total net rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such fire or other casualty, as the case may be, shall remain in full force and effect during and after the completion of the Restoration; (D) Borrower shall have commenced the Restoration as soon as reasonably practicable (but in no event later than ninety (90) days after such damage or destruction or taking, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion; (E) Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note at the Applicable Interest Rate (as defined in the Note), which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Subsection 3.2(a)(iii), if applicable, or (3) by other funds of Borrower; (F) Lender shall be satisfied that following the completion of the Restoration, the ratio of sustainable net cash flow for the Property (after deduction for underwritten reserves) to debt service payable under the Note shall be at least 1.20 to 1.00; (G) Lender shall be reasonably satisfied that the Restoration will be completed on or before the earliest to occur of (1) twelve (12) months prior to the Maturity Date (as defined in the Note), (2) twelve (12) months after the occurrence of such fire or other casualty or taking, whichever the case may be, (3) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Subsection 4.3(b) to remain in effect subsequent to the occurrence of such fire or other casualty or taking, whichever the case may be, and the completion of the Restoration or (4) such time as may be required under any applicable zoning laws, ordinances, rules or regulations in order to repair and restore the Property to the condition it was in immediately prior to such fire or other casualty or to as nearly as possible the condition it was in immediately prior to such taking, as applicable; (H) the Property and the use thereof after the Restoration will be in compliance, in all material respects, with and permitted under all applicable zoning laws, ordinances, rules and regulations; (I) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable laws, rules and regulations; and (J) such fire or other casualty or taking, as applicable, does not result in the loss of access to the Property or the Improvements.

(ii)     The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Subsection 4.3(b), shall constitute additional security for the Obligations. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any

14

other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company insuring the lien of this Security Instrument.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior review and approval in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant"), which approval shall not be unreasonably withheld or delayed. Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which approval shall not be unreasonably withheld or delayed. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "Casualty Retainage" as used in this Subsection 4.3(b) shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Subsection 4.3(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.3(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage, provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of this Security Instrument. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Subsection 4.3(b) shall constitute additional security for the Obligations. With respect to Restorations following a casualty in which the Improvements are restored to substantially the same condition as they existed prior to the casualty, the excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.3(b), and the receipt by Lender of evidence reasonably satisfactory to Lender that all costs incurred in connection with

15

the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Security Instrument or any of the other Loan Documents.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 4.3(b)(vi) may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its discretion. Provided no Event of Default exists under the Note, this Security Instrument or the other Loan Documents, Borrower shall not be obligated to pay any prepayment premium or other prepayment consideration in connection with a prepayment resulting from the application of Net Proceeds to the Debt pursuant to the preceding sentence. Any such prepayment shall be applied to the principal last due under the Note and shall not release Borrower from the obligation to pay the Monthly Payments (as defined in the Note) next becoming due under the Note and the Monthly Payment shall not be adjusted or recalculated as a result of such partial prepayment. If Lender shall receive and retain Net Proceeds, the lien of this Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

4.4     LOCK BOX ACCOUNT. (a) (i) Upon the occurrence of an Event of Default, or (ii) during any period that the Debt Service Coverage Ratio (as defined in Exhibit C attached hereto and made a part hereof) for the Property shall be below 1.0:1.0, provided a lock box procedure has not otherwise been instituted under any other provision of the Loan Documents, Lender shall have the right, upon written notice to Borrower to require that, from and after the next succeeding date of payment of an installment of principal and interest under the Note, all Rents with respect to the Property, at Lender's discretion, be paid directly to the property manager for the Property (the "Manager") and deposited daily by the Manager in the name designated by Lender directly to a designated lock-box account (the "Lock-Box Account"), opened by Lender at a bank (the "Lock-Box Bank"), which account shall be within the exclusive control of Lender.

(b)     Upon receipt of notice from Lender as set forth in Subsection (a) above, Borrower shall enter into and shall cause Manager to enter into a lock-box agreement with Lender in a form reasonably satisfactory to Lender, which form shall substantially reflect the provisions of this Section (provided, however, that Borrower's obligations under this Section 4.4 (including Borrower's obligation to cause Manager to deposit Rents in the Lock-Box Account in accordance with Section 4.4(a) above) shall not be dependent upon the execution of any such lock-box agreement). If, in Lender's judgment, the Manager's performance in collecting Rents shall decline, Borrower shall irrevocably instruct and otherwise cause each party paying such Rents (including each tenant under any Lease) to make all payments (A) if by wire transfer, to the Lock Box Account, and (B) if by check, money order or similar manner of payment, by mail to a designated lock box (the "Lock Box") within the exclusive control of Lender. Amounts deposited into the Lock-Box shall be collected and deposited daily by the Lock-Box Bank into the Lock-Box Account. Borrower agrees that if any Rents required to be deposited in the Lock-Box Account shall be received by it or any affiliate or any manager of all or any portion of the Property, Borrower shall deposit or cause such Rents to be deposited in the Lock Box Account within one (1) Business Day of the receipt of such Rents by Borrower, any affiliate or any manager.

(c)     Amounts on deposit in the Lock-Box Account on any date of payment of an installment of principal and interest under the Note shall be applied in the following order of priority: (i) to pay any Taxes, Other Charges or Insurance Premiums then due and payable; (ii) to pay the Lock-Box Bank's fees; (iii) to pay interest and principal due on such date with respect to the Note; (iv) to replenish all reserves and escrow funds required to be paid by Borrower to Lender under the Note, this Security Instrument and the other Loan Documents; (v) to pay normal and customary operating expenses of the Property which have been approved by Lender (which approval, if no Event of Default shall exist at the time, shall not be unreasonably withheld); and (vi) unless the Property is a multi-family, hotel, self-storage facility or nursing home property, provided no Event of Default shall exist at the time, to the Leasing Account (as defined in Exhibit B). None of the sums contributed to the Leasing Account in accordance with (vi) above shall be counted towards any balance in the Leasing Account which serves to limit future contributions to the Leasing Account from Monthly Deposits.

16

(d)     In the event that Lender shall have the right to institute lock box procedures pursuant to any other provision of the Loan Documents, the terms and provisions of such provision shall supersede the provisions of this Section 4.4.

## 5 - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

5.1     WARRANTY OF TITLE. Borrower has paid for and has good title to its interest in the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, set over, transfer and convey the same and that Borrower is lawfully seized and possessed of a valid, subsisting and indefeasible leasehold estate in the Land and the Improvements and that Borrower owns its interest in the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions"). Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

5.2     AUTHORITY. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, set-over, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

5.3     LEGAL STATUS AND AUTHORITY. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the State where the Property is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, this Security Instrument and the other Loan Documents.

5.4     VALIDITY OF DOCUMENTS. (a) The execution, delivery and performance of the Note, this Security Instrument and the other Loan Documents and the borrowing evidenced by the Note (i) are within the corporate, partnership, trust or limited liability company (as the case may be) power of Borrower; (ii) have been authorized by all requisite corporate, partnership, trust or limited liability company (as the case may be) action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership, trust, operating agreement or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby); and (b) the Note, this Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower.

5.5     LITIGATION. There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against, or affecting, Borrower, a Guarantor, if any, an Indemnitor, if any, or the Property that has not been disclosed to Lender or is not adequately covered by insurance, as determined by Lender in its sole and absolute discretion.

5.6     STATUS OF PROPERTY. (a) No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973,

17

as amended, or any successor law, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in Section 3.2 hereof; (b) Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification; (c) the Property and the present and contemplated use and occupancy thereof are in full compliance with all Applicable Laws, including, without limitation, zoning ordinances, building codes, land use and environmental laws, laws relating to the disabled (including, but not limited to, the ADA) and other similar laws; (d) the Property is served by all utilities (including, but not limited to, public water and sewer systems) required for the current or contemplated use thereof; (e) all utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service; (f) all public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public; (g) the Property is, to the best of Borrower's knowledge, free from damage caused by fire or other casualty; (h) all costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full; (i) all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws; and (j) all Improvements lie within the boundary of the Land.

5.7     NO FOREIGN PERSON.  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

5.8     SEPARATE TAX LOT.  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements are assessed and taxed together with the Property or any portion thereof.

5.9     ERISA COMPLIANCE.  As of the date hereof and throughout the term of this Security Instrument, (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA; (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.  Borrower shall deliver to Lender such certifications or other evidence as requested by Lender from time to time of Borrower's compliance with the foregoing representations and covenants.

5.10     LEASES.  (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable; (c) the material terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (d) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (e) none of the Rents have been collected for more than one (1) month in advance; (f) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (g) there exist no offsets or defenses to the payment of any portion of the Rents; (h) no Lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; and (i) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease.

5.11     FINANCIAL CONDITION.  (a) Borrower is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated, and (b) it has received reasonably equivalent value for the granting of this Security Instrument.

5.12     BUSINESS PURPOSES.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

5.13     TAXES.  Borrower has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have

18

become due pursuant to such returns or pursuant to any assessments received by them. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

5.14    MAILING ADDRESS. Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

5.15    NO CHANGE IN FACTS OR CIRCUMSTANCES. All information submitted in connection with Borrower's application for the loan and Lender's issuance of a commitment for the Loan (collectively, the "Loan Application") and the satisfaction of the conditions thereof, including, but not limited to, all financial statements, rent rolls, reports, certificates and other documents, are accurate, complete and correct in all respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

5.16    DISCLOSURE. To Borrower's best knowledge, Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

5.17    THIRD PARTY REPRESENTATIONS. Each of the representations and the warranties made by each Guarantor and Indemnitor herein or in any other Loan Document(s) is true and correct in all material respects.

5.18    ILLEGAL ACTIVITY. No portion of the Property has been or will be purchased with proceeds of any illegal activity.

5.19    OFAC. Borrower represents and warrants that neither Borrower or any of its respective Affiliates is a Prohibited Person and Borrower and all of its respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

Borrower acknowledges that in accepting the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth above notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in making the Loan and that Lender would not make the Loan in the absence of such warranties.

## 6 - OBLIGATIONS AND RELIANCES

6.1    RELATIONSHIP OF BORROWER AND LENDER. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower and no term or condition of any of the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor. Borrower is not relying on Lender's expertise business acumen or advice in connection with the Property.

6.2    NO LENDER OBLIGATIONS. (a) Notwithstanding the provisions of Subsections 1.1(f) and (l) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the other Loan Documents, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

19

## 7 - FURTHER ASSURANCES

7.1   <u>RECORDING OF SECURITY INSTRUMENT, ETC.</u>   Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Except where prohibited by law, Borrower will pay all taxes, duties, imposts, assessments, filing, registration and recording fees, and any and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Loan Documents and any amendment or supplement thereto.

7.2   <u>FURTHER ACTS, ETC.</u> Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, deeds to secure debt and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Applicable Laws. Borrower, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, and to file in the appropriate filing or recording offices, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this Section 7.2.

7.3   <u>CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS.</u> (a) If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable, without prepayment premium or penalty.

(b)   Borrower will not claim or demand or be entitled to any credit or credits against the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable, without prepayment premium or penalty.

(c)   If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

7.4   <u>ESTOPPEL CERTIFICATES.</u> (a) After request by Lender, Borrower, within fifteen (15) Business Days, shall furnish Lender or any proposed assignee an estoppel certificate in form and content as may be requested by Lender with respect to the status of the Loan and/or the Loan Documents.

(b)   Borrower shall use good faith and diligent commercially reasonable efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees as required by Lender attesting to such facts regarding the Lease as Lender may reasonably require, <u>provided that</u> (i) Borrower

20

shall not be required to honor more than one request made by Lender in any twelve month period and (ii) in no event shall Borrower be required to obtain estoppel certificates from lessees containing more information than that required to be certified pursuant to the terms of the related Lease.

7.5    REPLACEMENT DOCUMENTS.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## 8 - DUE ON SALE/ENCUMBRANCE

8.1    LENDER RELIANCE.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, managing members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for payment and performance of the Obligations.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the payment or the performance of the Obligations, Lender can recover the Debt by a sale of the Property.  NOTICE - THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

8.2    NO SALE/ENCUMBRANCE.  Borrower agrees that Borrower shall not, without the prior written consent of Lender, sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or otherwise transfer the Property or any part thereof or permit the Property or any part thereof to be sold, conveyed, mortgaged, granted, bargained, encumbered, pledged, assigned, or otherwise transferred.

8.3    SALE/ENCUMBRANCE DEFINED.  (a) A sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Article 8 shall be deemed to include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower, any Guarantor, any Indemnitor, or any general partner or managing member of Borrower, Guarantor or Indemnitor is a corporation, the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock by which an aggregate of more than 49% of such corporation's stock shall become vested in another party; (iv) if Borrower, any Guarantor or Indemnitor or any general partner or managing member of Borrower, any Guarantor or Indemnitor is a limited or general partnership or joint venture, the change, removal or resignation of a general partner or managing partner, or the transfer or pledge of the partnership interest of any general partner or managing partner of such partnership or any profits or proceeds relating to such partnership interest or the transfer or pledge of more than 49% in the aggregate of any limited partnership interests in such partnership or any profits or proceeds related to such interests whether in one transfer or pledge or a series of transfers or pledges; (v) if Borrower, any Guarantor or Indemnitor or any general partner or managing member of Borrower, any Guarantor or Indemnitor is a limited liability company, the change, removal or resignation of the managing member of such company, or the transfer or pledge of the membership interest of the managing member of such company or any profits or proceeds relating to such membership interest or the transfer or pledge of more than 49% in the aggregate of any membership interests in such company or any profits or proceeds related to such interests whether in one transfer or pledge or a series of transfers or pledges; and (vi) without limitation to the foregoing, any voluntary or involuntary sale, transfer, conveyance or pledge by any person or entity which directly or indirectly controls Borrower (by operation of law or otherwise) (a "Principal") of its direct or indirect controlling interest in Borrower.  Notwithstanding the foregoing, the following transfers shall not be deemed to be a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer within the meaning of this Article 8: (A) transfer by devise or descent or by operation of law upon the death of a partner, member or stockholder of Borrower or any general

21

partner thereof, and (B) a sale, transfer or hypothecation of a partnership, shareholder or membership interest in Borrower, whichever the case may be, by the current partner(s), shareholder(s) or member(s), as applicable, to an immediate family member (i.e., parents, spouses, siblings, children or grandchildren) of such partner, shareholder or member (or a trust for the benefit of any such persons).

(b)    Subject to the provisions of Section 8.3(c), following the sale of the Loan in a securitization, Lender's consent to a one-time sale, assignment, or other transfer of the Property shall not be withheld provided that Lender receives sixty (60) days prior written notice of such transfer and no Event of Default has occurred and is continuing, and further provided that, the following additional requirements are satisfied:

(i)    Borrower shall pay Lender a transfer fee equal to 0.5% of the outstanding principal balance of the Loan at the time of such transfer;

(ii)    Borrower shall pay any and all out-of-pocket costs actually incurred in connection with the transfer of the Property (including, without limitation, Lender's reasonable counsel fees and disbursements and all recording fees, title insurance premiums and mortgage and intangible taxes and the fees and expenses of the Rating Agencies pursuant to clause (x) below);

(iii)    The proposed transferee (the "Transferee") or Transferee's Principals (hereinafter defined) must have demonstrated expertise in owning and operating properties similar in location, size and operation to the Property, which expertise shall be reasonably determined by Lender. The term "Transferee's Principals" shall include Transferee's (A) managing members, general partners or principal shareholders and (B) such other members, partners or shareholders which directly or indirectly shall own a 15% or greater interest in Transferee;

(iv)    Transferee and Transferee's Principals shall, as of the date of such transfer, have an aggregate net worth and liquidity reasonably acceptable to Lender;

(v)    Transferee, Transferee's Principals and all other entities which may be owned or controlled directly or indirectly by Transferee's Principals ("Related Entities") must not have been a party to any bankruptcy proceedings, voluntary or involuntary, made an assignment for the benefit of creditors or taken advantage of any insolvency act, or any act for the benefit of debtors within seven (7) years prior to the date of the proposed transfer of the Property;

(vi)    Transferee shall assume all of the obligations of Borrower under the Loan Documents in a manner satisfactory to Lender in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender and one or more Transferee's Principals having an aggregated net worth and liquidity reasonably acceptable to Lender shall execute in favor of Lender a Guaranty of Recourse Obligations and Environmental Indemnity Agreement in form acceptable to Lender;

(vii)    There shall be no material litigation or regulatory action pending or threatened against Transferee, Transferee's Principals or Related Entities which is not reasonably acceptable to Lender;

(viii)    Transferee, Transferee's Principals and Related Entities shall not have defaulted under its or their obligations with respect to any other indebtedness in a manner which is not reasonably acceptable to Lender;

(ix)    Transferee and Transferee's Principals must be able to satisfy all the covenants set forth in Sections 4.2 and 5.9 hereof. Without limiting the generality of the foregoing, (A) the Property shall be conveyed to the Transferee pursuant to a deed of conveyance delivered in connection with an arms-length

22

transaction and (B) Borrower shall furnish Lender with a letter countersigned by a title insurance company acknowledging receipt of such deed and agreeing to record such deed in the real estate records for the county in which the Property is located;

(x)    No Event of Default or event which, with the giving of notice, passage of time or both, shall constitute an Event of Default, shall otherwise occur as a result of such transfer, and Transferee and Transferee's Principals shall deliver (A) all organizational documentation reasonably requested by Lender, which shall be reasonably satisfactory to Lender, and (B) all certificates, agreements and covenants reasonably required by Lender;

(xi)    The Rating Agencies selected by Lender shall confirm in a manner acceptable to Lender that such transfer shall not result in the downgrade, qualification or withdrawal of any ratings then assigned by such Rating Agencies to any class of Securities; and

(xii)    Borrower shall deliver, at its sole cost and expense, an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any additional exceptions or liens other than those contained in the title policy issued on the date hereof.

Immediately upon a transfer of the Property to such Transferee and the satisfaction of all of the above requirements and the Additional Assumption Conditions (as hereinafter defined), if applicable, (A) the named Borrower herein shall be released from all liability under this Security Instrument, the Note, the Guaranty and the other Loan Documents accruing after such transfer, (B) the Loan and any Other Loan(s) with respect to which the Other Loan Assumption Conditions (as hereinafter defined) are satisfied, shall be released from the effect of the cross-default and cross-collateralization provisions of the Loan Documents and the Other Properies' Loan Documents (as hereinafter defined), and (C) each Guarantor and Indemnitor shall be released from all liability under this Security Instrument, the Note, the Guaranty and the other Loan Documents accruing after such transfer. The foregoing releases shall be effective upon the date of such transfer, but Lender agrees to provide written evidence thereof reasonably requested by Borrower.

(c)    Notwithstanding anything to the contrary contained herein, Lender shall not be obligated to consent to any Transfer of the Property (other than a Portfolio Transfer) pursuant to Section 8.3(b) unless the following conditions (the "Additional Assumption Conditions") are satisfied in connection with such Transfer:

(i)    After giving effect to the Transfer, (A) the aggregate Adjusted Debt Service Coverage Ratio with respect to the Other Loans shall be equal to or greater than 1.20 to 1.00, (B) the Adjusted Debt Service Coverage Ratio with respect to the Loan shall be equal to or greater than 1.30 to 1.00, (C) the LTV with respect to the Other Loans shall be no greater than 80% and (D) the LTV with respect to the Loan shall be no greater than 70%.

(ii)    Borrower and Lender shall enter into such modifications, releases and replacements of Loan Documents that are reasonably required to effectuate the Transfer and the termination of the cross-collateralization and cross-defaulting between the Loan and the Other Loans; and

(iii)    The transactions contemplated by this Section shall not constitute a prohibited transaction for or a contribution after the start up day to a "REMIC Trust" which shall own the Loan and will not disqualify such REMIC Trust as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code, and the Loan shall continue to constitute a "qualified mortgage" within the meaning of Sections 860D and 860G(a)(3) of the Code and Lender shall have received an opinion in form and from counsel acceptable to Lender with respect to the matters described in this clause (15).

23

(d)    As used herein, the following terms shall have the following meanings:

(i)    "Adjusted Debt Service Coverage Ratio" shall mean the Debt Service Coverage Ratio, adjusted as follows: (A) "Gross Income" shall not include (1) the Rents paid by any tenant that is a debtor in bankruptcy or in default under its Lease, that is not conducting normal business operations at its leased premises (or has notified Borrower of its intent to discontinue operations) or whose Lease has expired on or prior to, or is scheduled to expire within six (6) months after, the date of calculation or (2) Rents that are in excess of market rents for comparable space at the time of the Transfer (but only to the extent of such excess), as reasonably determined by Lender, or (3) reimbursements in excess of Expenses for the previous (12) month period, or (4) a vacancy and credit loss allowance equal to the greater of (y) actual in place vacancy, and (z) 5% of Gross Income, or (5) Rents payable by month to month tenants or that Lender otherwise determines are not sustainable income; and (B) "Gross Income" shall include the annualized Rents of any tenant who commenced the payment of full base rent within twelve (12) months prior to the date of calculation or who is conducting normal business operations.

(ii)    "Appraisal" shall mean an appraisal of the Property and/or any of the Other Properties, as applicable, prepared in accordance with the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended ("FIRREA"), prepared by an independent third party appraiser selected by Lender holding a MAI designation, who is state licensed or state certified if required under the laws of the state where the Property is located, who meets the requirements of FIRREA.

(iii)    "LTV" shall mean the ratio of the outstanding principal balance of the Loan, and/or the Other Loans, as applicable, to the then current fair market value of the Property and/or the Other Properties, as applicable, as determined by an Appraisal acceptable to Lender, dated within sixty (60) days prior to the Transfer, and performed by an appraiser acceptable to Lender.

(iv)    "Other Loan Assumption Conditions" shall mean the Additional Assumption Conditions, as defined in the Other Security Instruments.

(v)    "Portfolio Transfer" shall mean a transfer of the Property and all of the Other Properties encumbered by Other Security Instruments securing Other Loans that are cross-collateralized and cross-defaulted with the Loan.

(vi)    "Property Transfer" shall mean the transfer of the Property or any Other Property other than in connection with a Portfolio Transfer.

8.4    LENDER'S RIGHTS.    Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of the Note, this Security Instrument and the other Loan Documents as so modified by the proposed transferee, payment of a transfer fee of one-half percent (0.5%) of the principal balance of the Note and all of Lender's reasonable and actual expenses incurred in connection with such transfer, the approval by Lender of the proposed transferee, the proposed transferee's continued compliance with the representations, warranties and covenants set forth in Sections 4.2 and 5.9 hereof, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property without Lender's consent. This provision shall apply to every sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property.

24

## 9 - DEFAULT

9.1     EVENTS OF DEFAULT. The occurrence of any one or more of the following events shall constitute an "Event of Default": (a) if any portion of the Debt is not paid on the date the same is due or if the entire Debt is not paid on or before the Maturity Date; (b) if any of the Taxes or Other Charges is not paid prior to the date the same becomes delinquent except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument; (c) if (i) the Policies are not kept in full force and effect, or (ii) the Policies are not delivered to Lender upon request or Borrower has not delivered evidence of the renewal of the Policies thirty (30) days prior to their expiration as provided in Section 3.2(e), and such failure remains uncured beyond five (5) days after Lender delivers notice of Borrower's failure to Borrower; (d) if Borrower violates or does not comply with any of the provisions of Sections 3.6 or 4.2 or Articles 8, 11 or 21; (e) if any representation or warranty of Borrower, Indemnitor or any person guaranteeing payment or performance of the Obligations or any portion thereof (a "Guarantor"), or any general partner, principal or beneficial owner of any of the foregoing, made herein or in the Environmental Indemnity (defined below) or any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made; (f) if (i) Borrower or any general partner or managing member of Borrower shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, adjustment, liquidation, dissolution or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Borrower or any general partner or managing member of Borrower shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any general partner or managing member of Borrower any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of ninety (90) days; or (iii) there shall be commenced against Borrower or any general partner or managing member of Borrower any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or (iv) Borrower or any general partner or managing member of Borrower shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or any general partner or managing member of Borrower shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (g) if Borrower shall be in default beyond any applicable notice or cure period under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument; (h) if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for local real estate taxes and assessments not then delinquent and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower has first received notice thereof; (i) if any federal tax lien is filed against the Property and same is not discharged of record within thirty (30) days after Borrower has first received notice thereof; (j) if within ten (10) days of Lender's demand therefor Borrower fails to provide Lender with the written certification and evidence referred to in Section 5.9 hereof or Borrower fails to comply with its obligations under Section 16.1; (k) if Borrower or any other Indemnitor shall fail to perform any of its obligations under that certain environmental indemnity agreement of even date herewith (the "Environmental Indemnity") after the expiration of applicable notice and grace periods, if any; (l) if any default beyond any applicable notice or cure period occurs under any guaranty or indemnity executed in connection herewith and such default continues after the expiration of applicable grace periods, if any; (m) if for more than ten (10) days after notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Security Instrument or the other Loan Documents in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of ninety (90) days; or (n) if an Event of Default (as defined in each Other Security Instrument) occurs under any such Other Security Instrument.

25

## 10 - RIGHTS AND REMEDIES

10.1    REMEDIES.    Upon the occurrence of any Event of Default, Mortgagor agrees that Trustee or Lender may take such action, without notice or demand, as Lender deems advisable to protect and enforce Trustee's or Lender's rights against Mortgagor in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Trustee or Lender: (a) declare the entire unpaid Debt to be immediately due and payable; (b) with or without entry, institute proceedings, judicial or otherwise, for the complete or partial foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner, any partial foreclosure to be subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority; (c) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to power of sale, judicial decree or otherwise, at one or more sales, as an entirety or in one or more parcels; (d) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the other Loan Documents; (e) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents; (f) apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Mortgagor, any Guarantor, Indemnitor or of any person, firm or other entity liable for the payment of the Debt; (g) enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may exercise all rights and powers of Mortgagor with respect to the Property including, without limitation, (1) the right to use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (2) the right to make or complete any construction, alterations, additions, renewals, replacements and improvements to or on the Property as Lender deems advisable; (3) the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (h) require Mortgagor to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Mortgagor; (i) require Mortgagor to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; (j) apply the receipts from the Property, any Deposits and interest thereon and/or any unearned Insurance Premiums paid to Lender upon the surrender of any Policies maintained pursuant to Article 3 hereof (it being agreed that Lender shall have the right to surrender such Policies upon the occurrence of an Event of Default), to the payment of the Obligations, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion; (k) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (1) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (2) request Mortgagor at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender; or (l) require a Lock-Box Account pursuant to Section 4.4 and apply all sums in the Lock-Box Account to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its discretion.  Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Mortgagor in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Mortgagor.  Upon any foreclosure or other sale of the Property pursuant to the terms hereof, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the secured indebtedness as a credit against the purchase price.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.  Notwithstanding the provisions of this Section 10.1 to the contrary, if

26

any Event of Default as described in clause (i) or (ii) of Subsection 9.1(f) shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

10.2    APPLICATION OF PROCEEDS.  The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

10.3    RIGHT TO CURE DEFAULTS.  Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Mortgagor and without releasing Mortgagor from any obligation hereunder or curing or being deemed to have cured any default hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 10.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate (as defined in the Note), for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

10.4    ACTIONS AND PROCEEDINGS.  Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

10.5    RECOVERY OF SUMS REQUIRED TO BE PAID.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

10.6    EXAMINATION OF BOOKS AND RECORDS.  Lender, its agents, accountants and attorneys shall have the right, upon reasonable notice, to examine the records, books, management and other papers of Borrower and its affiliates or of any Guarantor or Indemnitor which reflect upon their financial condition, at the Property or at any office regularly maintained by Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located. Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers. In addition, upon reasonable notice, Lender, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Borrower and its affiliates or of any Guarantor or Indemnitor pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located. This Section 10.6 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing, provided that, prior to the occurrence of an Event of Default, Lender agrees not to exercise its rights hereunder more than once in any consecutive 12 month period.

10.7    OTHER RIGHTS, ETC.  (a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof,

27

32

or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)  It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)  Trustee or Lender may resort for the payment of the Debt to any other security for the debt held by Trustee or Lender in such order and manner as Trustee or Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Trustee or Lender thereafter to foreclose this Security Instrument. The rights of Lender and Trustee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Trustee or Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender and Trustee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

10.8  RIGHT TO RELEASE ANY PORTION OF THE PROPERTY. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

10.9  VIOLATION OF LAWS. If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

10.10  RECOURSE AND CHOICE OF REMEDIES. Notwithstanding any other provision of this Security Instrument, including but not limited to Article 13 hereof, Lender and other Indemnified Parties (defined in Section 11.1 below) are entitled to enforce the obligations of Borrower contained in Sections 11.2 and 11.3 without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower. The provisions of Sections 11.2 and 11.3 are exceptions to any non-recourse or exculpation provisions in the Note, this Security Instrument or the other Loan Documents, and Borrower is fully and personally liable for the obligations pursuant to Sections 11.2 and 11.3. The liability of Borrower is not limited to the original principal amount of the Note. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing pursuant to this Security Instrument or exercising any other rights and remedies pursuant to the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Borrower, whether or not action is brought against any other person or entity or whether or not any other person or entity is joined in the action or actions.

10.11  RIGHT OF ENTRY. Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

10.12  DEFAULT INTEREST AND LATE CHARGES. Borrower acknowledges that, without limitation to any of Lender's rights or remedies set forth in this Security Instrument, Lender has the right following an Event of Default to demand interest on the principal amount of the Note at the Default Rate and late payment charges in accordance with the terms of the Note.

28

## 11 - INDEMNIFICATION

11.1    GENERAL INDEMNIFICATION.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties for, from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense) (the "Losses") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following, except to the extent the following relate solely to an Indemnified Party's gross negligence or willful misconduct:  (a) any Event of Default; (b) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Security Instrument or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, any Guarantor or Indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (c) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any use, nonuse or condition in, on or about the Property or any part thereof; (e) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Security Instrument; (f) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with the Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (g) any failure of the Property to be in compliance with any Applicable Laws; (h) the enforcement by any Indemnified Party of the provisions of this Article 11; (i) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan; (j) any misrepresentation made by Borrower in this Security Instrument or any other Loan Document; or (k) any other transaction arising out of or in any way connected with the Property or the Loan.  Any amounts payable to Lender by reason of the application of this Section 11.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.  For purposes of this Article 11, the term "Indemnified Parties" means Trustee and Lender and any person or entity who is or will have been involved in the origination of the Loan, any person or entity who is or will have been involved in the servicing of the Loan, any person or entity in whose name the encumbrance created by this Security Instrument is or will have been recorded and persons and entities who may hold or acquire or will have held a full or partial interest in the Loan, including, but not limited to, custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan.

11.2    MORTGAGE AND/OR INTANGIBLE TAX.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents.

11.3    ERISA INDEMNIFICATION.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 5.9.

11.4    DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding.  Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for

29

34

the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

## 12 - WAIVERS

12.1     WAIVER OF COUNTERCLAIM.  Mortgagor hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the other Loan Documents, or the Obligations. Any assignee of Lender's interest in this Security Instrument and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Mortgagor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Mortgagor in any action or proceeding brought by any such assignee upon such documents, and any such rights to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Mortgagor.

12.2     MARSHALLING AND OTHER MATTERS.  Mortgagor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law.

12.3     WAIVER OF NOTICE.  Mortgagor shall not be entitled to any notices of any nature whatsoever from Trustee or Lender except with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Mortgagor and except with respect to matters for which Trustee or Lender is required by applicable law to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Trustee or Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Trustee or Lender to Mortgagor.

12.4     SOLE DISCRETION OF LENDER.  Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the reasonable discretion of Lender. Notwithstanding the foregoing, all decisions or determinations made by Lender pursuant to this Security Instrument (1) following an Event of Default; or (2) under Sections 3.2, 3.7 or 4.2 or Article 8 of this Security Instrument, shall be made in the sole and absolute discretion of Lender and shall be final and conclusive.

12.5     SURVIVAL.  The indemnifications made pursuant to Article 11 shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by: any satisfaction or other termination of this Security Instrument, any assignment or other transfer of all or any portion of this Security Instrument or Lender's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto including but not limited to foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Mortgagor or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Security Instrument, the Note or the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Mortgagor from the obligations pursuant hereto.

12.6     **WAIVER OF TRIAL BY JURY.  BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS**

30

OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

## 13 - EXCULPATION

13.1    EXCULPATION. Except as otherwise provided herein, in the Note or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower or Co-Mortgagor to perform and observe the obligations contained in the Note or this Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower or Co-Mortgagor, except that Lender may sell the Property under any power of sale or right of non-judicial foreclosure or bring a foreclosure action, confirmation action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon the Note, this Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by the Note, this Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower or Co-Mortgagor only to the extent of Borrower's and or Co-Mortgagor's respective interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting the Note and this Security Instrument, agrees that it shall not, except as otherwise provided in Section 10.10, with respect to Borrower, sue for, seek or demand any deficiency judgment against Borrower or Co-Mortgagor in any such action or proceeding, under or by reason of or under or in connection with the Note, the other Loan Documents or this Security Instrument.

13.2    RESERVATION OF CERTAIN RIGHTS. The provisions of Section 13.1 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by the Note, the other Loan Documents or this Security Instrument; (b) impair the right of Lender to enforce any of its rights or remedies under any Other Security Instruments, Other Notes or any documents or instruments executed and delivered to Lender in connection with the Other Loans (collectively, the "Other Properties' Loan Documents"); (c) without limiting the provisions of clause (b) immediately above, impair the right of Lender to obtain a deficiency judgment in any action or proceeding with respect to the Loan Documents in order to preserve its rights and remedies, including, without limitation, foreclosure, non-judicial foreclosure, or the exercise of a power of sale, under the Other Guarantees or the Other Security Instruments; however, Lender agrees that it shall not enforce such deficiency judgment against any assets of Borrower other than in connection with the exercise of its rights and remedies under the Other Guarantees or the Other Security Instruments; (d) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under this Security Instrument; (e) affect the validity or enforceability of the Guaranty, any Other Guaranty or any indemnity, master lease or similar instrument made in connection with the Note, this Security Instrument, or the other Loan Documents; (f) impair the right of Lender to obtain the appointment of a receiver; (g) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (h) impair the right of Lender to obtain a deficiency judgment or judgment on the Note against Mortgagor if necessary to obtain any insurance proceeds or condemnation awards to which Lender would otherwise be entitled under this Security Instrument, provided, however, Lender shall only enforce such judgment against the insurance proceeds and/or condemnation awards; or (i) impair the right of Lender to enforce the provisions of Sections 10.10, 11.2 and 11.3 of this Security Instrument.

13.3    EXCEPTIONS TO EXCULPATION. Notwithstanding the provisions of this Article to the contrary, Mortgagor shall be personally liable to Lender for the Losses it incurs due to: (i) fraud or intentional misrepresentation by Borrower, its agents or principals; (ii) Borrower's misapplication or misappropriation of (A) Rents received by Borrower after the occurrence of an Event of Default, (B) tenant security deposits or Rents collected in advance, or (C) insurance proceeds or condemnation awards; (iii) Borrower's failure to pay Taxes, Insurance Premiums, Other Charges (except to the extent that sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms of this Security Instrument), charges for labor or materials or other charges that can create liens on the Property, provided that Borrower's liability under this clause (iii) shall not exceed an amount equal to the net operating income of the Property for the twelve (12) month period preceding the related failure to pay, less the amount of all Monthly Payments (as defined in the Note) and required reserve payments made by Borrower in accordance with the Note, this Security Instrument and the other Loan Documents during such twelve (12) month period; (iv) Borrower's failure to comply with the provisions of Sections 3.10, 5.9, or 16.1 or Article 21 of this Security Instrument; or (v) Borrower's or any other Indemnitor's failure to comply with the provisions of the Environmental Indemnity.

31

13.4    RECOURSE. Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Section 13.1 above SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) in the event of Borrower's default under Section 4.2, in any material respect, or Section 8.2 of this Security Instrument, (ii) if the Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding, or (2) an involuntary bankruptcy or insolvency proceeding (A) which is commenced by any party controlling, controlled by or under common control with Borrower (which shall include, but not be limited to, any creditor or claimant acting in concert with Borrower or any the foregoing parties) (the "Borrowing Group") or (B) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of this Security Instrument or any other remedial action permitted hereunder or under the Note or the other Loan Documents or (iii) if a court of competent jurisdiction holds that the granting, execution or delivery of this Security Instrument or any other Loan Documents is or constitutes a fraudulent conveyance under any bankruptcy, insolvency or fraudulent conveyance law or is otherwise voidable under any such laws.

13.5    BANKRUPTCY CLAIMS. Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Note, this Security Instrument and the other Loan Documents.

## 14 - NOTICES

14.1    NOTICES. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | Borrower<br>c/o WSG Development Company<br>400 Arthur Godfrey Road, Suite 200<br>Miami Beach, Florida 33140<br>Attention: Jeffrey Graff |
| With a copy to: | Berman Rennert Vogel & Mandler<br>100 S.E. 2nd Avenue, 2900 Floor<br>Miami, Florida 33131<br>Attention: Wendy Beck, Esq. |
| If to Borrower: | WSG Dulles, L.P.<br>c/o WSG Development Company<br>400 Arthur Godfrey Road, Suite 200<br>Miami Beach, Florida 33140<br>Attention: Jeffrey Graff |
| With a copy to: | Berman Rennert Vogel & Mandler<br>100 S.E. 2nd Avenue, 2900 Floor<br>Miami, Florida 33131<br>Attention: Wendy Beck, Esq. |
| If to Trustee: | R. Dennis McArver<br>1750 Tysons Boulevard, Suite 1800<br>McLean, Virginia 22102 |

32

If to Lender:          Lehman Brothers Bank, FSB
                    399 Park Avenue, 8th Floor
                    New York, New York  10022
                    Attention: John Herman

With a copy to:       Stroock & Stroock & Lavan LLP
                    180 Maiden Lane
                    New York, New York  10038-4982
                    Attention:  William Campbell, Esq.

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## 15 - APPLICABLE LAW

15.1    CHOICE OF LAW. This Security Instrument shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and the applicable laws of the United States of America.

15.2    USURY LAWS.  This Security Instrument and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Debt at a rate which could subject the holder of the Note to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay.  If by the terms of this Security Instrument or the Note, Borrower is at any time required or obligated to pay interest on the Debt at a rate in excess of such maximum rate, the rate of interest under the Security Instrument and the Note shall be deemed to be immediately reduced to such maximum rate and the interest payable shall be computed at such maximum rate and all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Note. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.

15.3    PROVISIONS SUBJECT TO APPLICABLE LAW.  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## 16 - SECONDARY MARKET

16.1    TRANSFER OF LOAN. Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any rating agency (a "Rating Agency") rating such Securities (all of the foregoing entities collectively referred to as the "Investor") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor and the Property, whether furnished by Borrower, any

33

Guarantor, any Indemnitor or otherwise, as Lender determines necessary or desirable. Borrower, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section, provided, however, Borrower shall not be responsible for any costs of Lender in connection with such cooperation, and shall only be obligated to incur minor administrative costs associated with providing information (i.e., reproduction, telecopy, overnight courier, etc.). Borrower shall also promptly furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or Rating Agency any and all available information concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be requested by Lender, any Investor or any prospective Investor or Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any sale, transfer or participation interest. In addition to any other obligations Borrower may have under this Section 16.1, Borrower shall execute such amendments to the Loan Documents and Borrower's organizational documents as may be requested by the holder of the Note or any Investor to effect the assignment of the Note and the other Loan Documents and/or issuance of Securities including (i) bifurcating the Note into two or more notes and/or splitting this Security Instrument into two or more mortgages, deeds of trust or deeds to secure debt (as the case may be) of the same or different priorities or otherwise as determined by and acceptable to Lender or (ii) dividing the Note into multiple components corresponding to tranches of certificates to be issued in a Securitization each having a notional balance and an interest rate determined by Lender; provided, however, that Borrower shall not be required to modify or amend any Loan Document if the overall effect of such modification or amendment would (y) change the initial weighted average interest rate, the maturity or the amortization of principal set forth in the Note, or (z) modify or amend any other material economic term of the Note or the other Loan Documents or otherwise increase Borrower's obligations or decrease Borrower's rights in any material respect.

## 17 - COSTS

17.1   <u>PERFORMANCE AT BORROWER'S EXPENSE</u>.   Borrower acknowledges and confirms that Lender shall be entitled to impose certain administrative processing and/or commitment fees in connection with: (a) extensions, renewals, modifications, amendments and terminations of the Loan Documents requested by Borrower, and (b) the release or substitution of collateral for the Loan requested by Borrower, and that Lender shall be entitled to reimbursement for its reasonable out-of-pocket costs and expenses associated with its provision of consents, waivers and approvals under the Loan Documents (the occurrence of any of the above shall be called an "Event"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, which are required by law, regulation or any governmental or quasi-governmental authority. Borrower hereby acknowledges and agrees to pay, immediately, upon demand, all such fees, costs and expenses.

17.2   <u>ATTORNEY'S FEES FOR ENFORCEMENT</u>.   (a) Borrower shall pay all reasonable legal fees incurred by Lender in connection with the preparation of the Note, this Security Instrument and the other Loan Documents, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal expenses and reasonable attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## 18 - DEFINITIONS

18.1   <u>GENERAL DEFINITIONS</u>. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Mortgagor" shall mean "each Mortgagor and any subsequent owner or owners of the Property or any part thereof or any interest therein, including but not limited to each of Borrower and Co-Mortgagor" the word "Lender" shall mean "Lender, its servicer and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees",

34

"legal fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder. The terms "include(s)" and "including" shall mean "include(s), without limitation" and "including, without limitation", respectively. The use of the phrase "upon and during the continuance of an Event of Default" and similar phrases in this Security Instrument shall not be deemed to grant Borrower any right to cure an Event of Default (provided that nothing contained herein shall be deemed to limit Borrower's right to cure defaults prior to the expiration of applicable notice and cure periods) and each Event of Default shall continue unless and until the same is waived by Lender in writing in accordance with the requirements of the Loan Documents.

## 19 - MISCELLANEOUS PROVISIONS

19.1   NO ORAL CHANGE.   This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

19.2   LIABILITY.   If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

19.3   INAPPLICABLE PROVISIONS.   If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

19.4   HEADINGS, ETC.   The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

19.5   DUPLICATE ORIGINALS; COUNTERPARTS.   This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

19.6   NUMBER AND GENDER.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

19.7   SUBROGATION.   If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the payment and performance of the Obligations.

19.8   BROKERS.   Borrower agrees to pay and to indemnify and hold Lender harmless from any all loss, cost or expense (including attorneys' fees and expenses) arising from the claims of any brokers or anyone claiming a right to any fees in connection with the financing of the Property, to the extent claiming by, through or under Borrower. Notwithstanding the foregoing, Borrower acknowledges that Lender or its affiliates may have a contractual relationship with the broker, if any, that arranged the Loan on Borrower's behalf, and that such broker may be entitled to fees from Lender or its affiliates in connection with the origination, closing or servicing of the Loan, which fees shall be in addition to any brokerage fees owed by Borrower to such broker.

35

Borrower shall not be responsible for any such additional fees. Borrower acknowledges and agrees that it has made and will make such inquiries of the broker, if any, that arranged the Loan with respect to the nature or existence of such arrangement. No agreement by Lender to pay any such fees or compensation to such broker (if any) shall be binding upon Lender unless it is set forth in separate written instrument that has been duly executed by Lender and such broker.

19.9   ENTIRE AGREEMENT.   The Note, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto. Borrower hereby acknowledges that, except as incorporated in writing in the Note, this Security Instrument and the other Loan Documents, there are not, and were not, and no persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, this Security Instrument and the other Loan Documents.

19.10   SUBSTITUTION OF TRUSTEE.   Lender shall have, and is hereby granted by Mortgagor with warranty of further assurances, the irrevocable power to appoint one or more persons or entities as a substitute Trustee hereunder, to be exercised at any time hereafter without specifying any reason therefor, by filing for record in the office where this Security Instrument is recorded a deed of appointment. Said power of appointment of one or more successor Trustees may be exercised as often and whenever Lender deems it advisable. The exercise of said power of appointment, no matter how often, shall not be an exhaustion thereof. Upon the recordation of such deed of appointment, the Trustee so appointed shall thereupon, without any further act or deed of conveyance, become fully vested with identically the same title and estate in and to the Property and with all the rights, powers, trusts and duties of their, his, hers or its predecessor in the trust hereunder with like effect as if originally named as Trustee. Whenever in this Security Instrument reference is made to Trustee, it shall be construed to mean each person or entity appointed as Trustee for the time being, whether original or successors or successor in trust. All title, estate, rights, powers, trusts and duties hereunder given or appertaining to or devolving upon Trustee shall be in each of the persons or entities appointed as Trustee so that any action hereunder or purporting to be hereunder of any one of the persons or entities appointed as Trustee shall for all purposes be considered to be, and as effective as, the action of Trustee.

19.11   THE TRUSTEE'S FEES.   Borrower shall pay all reasonable costs, fees and expenses incurred by the Trustee and the Trustee's agents and counsel in connection with the performance by the Trustee of the Trustee's duties hereunder and all costs, fees and expenses shall be secured by this Security Instrument.

19.12   CERTAIN RIGHTS.   With the approval of Lender, the Trustee shall have the right to take any and all of the following actions: i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the interpretation of the Note, this Security Instrument or the Other Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his agents or attorneys, iii) to select and employ, in and about the execution of his duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of the Trustee, and the Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for the Trustee's gross negligence or bad faith, and iv) any and all other lawful action as Lender may instruct the Trustee to take to protect or enforce Lender's rights hereunder. The Trustee shall not be personally liable in case of entry by the Trustee, or anyone entering by virtue of the powers herein granted to the Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. The Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by the Trustee hereunder, believed by the Trustee in good faith to be genuine. The Trustee shall be entitled to reimbursement for actual expenses incurred by the Trustee in the performance of the Trustee's duties hereunder and to reasonable compensation for such of the Trustees services hereunder as shall be rendered.

SSL-MIA1 30157127v2

4|

19.13   RETENTION OF MONEY.   All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder.

19.14   PERFECTION OF APPOINTMENT.   Should any deed, conveyance, or instrument of any nature be required from Mortgagor by any Trustee or substitute trustee to more fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Mortgagor.

19.15   SUCCESSION INSTRUMENTS.   Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his predecessor in the rights hereunder with like effect as if originally named as the Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

19.16   RELIANCE OF TRUSTEE.   As to all matters concerning the existence of defaults hereunder and the amount of indebtedness subject to the Note and secured hereby, as well as similar or related matters, the Trustee is hereby authorized by Borrower to rely conclusively upon, without further inquiry, the affidavit of any officer of Lender.

## 20 - CROSS-COLLATERALIZATION

20.1   CROSS-COLLATERALIZATION.   Upon the occurrence of an Event of Default, Lender shall have the right to institute a proceeding or proceedings for the total or partial foreclosure of this Security Instrument and/or the Other Security Instruments whether by court action, power of sale or otherwise, under any applicable provision of law, for all or any portion of the Debt, or any other indebtedness secured by the Other Security Instruments, and this Security Instrument shall continue in full force and effect without loss of priority as a lien and security interest securing the payment of that portion of the Debt then due and payable but still outstanding.   Mortgagor acknowledges and agrees that the Lender shall be permitted to enforce payment of the Debt and the performance of any term, covenant or condition of the Note, the Guaranty, the Other Security Instruments, or the Other Properties' Loan Documents and exercise any and all rights and remedies under the Note, the Guaranty, this Security Instrument, the Other Security Instruments, or the Other Properties' Loan Documents, or as provided by law or at equity, by one or more proceedings, whether contemporaneous, consecutive or both, to be determined by Lender, in its sole discretion, in any one or more of the States or counties in which the Property or any Other Property or Properties is or are located.   Neither the acceptance of the Loan Documents or the Other Properties' Loan Documents nor the enforcement thereof in any one State or county, whether by court action, foreclosure, power of sale or otherwise, shall prejudice or in any way limit or preclude enforcement by court action, foreclosure, power of sale or otherwise, of any of the Loan Documents through one or more additional proceedings in that State or county or in any other State or county.   Without limiting any of the foregoing, Mortgagor and Lender hereby agree that Lender may, in its sole and absolute discretion, elect to have the portion of the liens, claims and security interests provided for hereunder which secure the Primary Indebtedness (hereinafter defined) to constitute a first lien on the Property and the portion of the liens, claims and security interests provided for hereunder which secure the Guaranty Indebtedness (hereinafter defined) to constitute a second lien on the Property, subordinate to, and separate and distinct from, the first lien securing the Primary Indebtedness.   Mortgagor shall, promptly following Lender's request, at no cost or expense to Mortgagor prior to the occurrence of an Event of Default other than minor administrative costs associated with providing information (i.e., reproduction, telecopy, overnight courier, etc.) and Mortgagor's own attorney's fees, execute and deliver such documents, in recordable form, as may be reasonably requested by Lender to reflect such lien severance and priority arrangement, including substitute or replacement notes and mortgages or deeds of trust, which shall be effective as of the date hereof and enjoy the same priority as this Security Instrument notwithstanding the actual date of execution and delivery thereof; provided, however, that Mortgagor's failure to

37

do so shall not limit, affect or impair the provisions of the immediately preceding sentence. As used herein, "Guaranty Indebtedness" shall mean that portion of the Debt which is agreed to, or provided to, be paid under the Guaranty, and "Primary Indebtedness" shall mean the entire Debt and the Other Obligations, other than the Guaranty Indebtedness.

## 21 - ADDITIONAL PROVISIONS REGARDING GROUND LEASE

21.1    The Borrower shall promptly pay all rent, additional rent, contingent rent, taxes and all other sums and charges when due and payable under the terms of the Ground Lease, shall fully and promptly perform and observe all of the agreements, terms, covenants and conditions required to be performed and observed by the Borrower under the Ground Lease within the grace periods provided therein for the Borrower's performance (in contrast to any additional grace periods provided for therein or by any separate agreement for curative action by the Lender), and shall do all things necessary to preserve and keep unimpaired the Borrower's rights under the Ground Lease. Upon demand, the Borrower shall furnish to Lender proof of payment of all sums that the Ground Lease requires Borrower to pay.

21.2    The Borrower shall immediately notify Lender in writing of: (i) any default (or alleged default) by the Borrower in the performance or observance of any of the terms, covenants or conditions on the part of the Borrower to be performed or observed under the Ground Lease; (ii) the receipt by the Borrower of any notice or other writing or communication from the Co-Mortgagor noting or claiming any default by the Borrower in such performance or observance under the Ground Lease; and (iii) the receipt by the Borrower of any notice from the Co-Mortgagor of any termination of the Ground Lease pursuant to the terms thereof or otherwise. The Borrower shall immediately cause a copy of each such notice to be delivered to Lender.

21.3    If the Borrower fails to observe or perform any covenant or agreement to be observed or performed under the Ground Lease on the part of the Borrower, or if Lender receives from the Co-Mortgagor any notice of any default by the Borrower thereunder, Lender may rely on such notice and may take any action that Lender in its sole discretion deems necessary or advisable to cure such default, even if the existence of such default or the nature thereof is questioned or denied by the Borrower. Mortgagor hereby expressly grants to Lender the absolute and immediate right to enter in and upon the Land to such extent and as often as Lender in its sole discretion deems necessary or desirable to prevent or cure any default by the Borrower under the Ground Lease or this Security Instrument. Lender may pay and expend such sums of money as Lender in its sole discretion deems necessary for any such purpose, and upon so doing shall be subrogated to any and all rights of the Borrower, as lessee, and all such sums shall be secured by the lien of this Security Instrument, shall be added to the principal amount of the Debt and shall accrue interest at the Default Rate.

21.4    Without the prior written consent of the Lender, which Lender may grant or withhold in its sole discretion, the Borrower shall not: (i) surrender the Ground Lease or terminate, cancel or release, or assign the Ground Lease (nor permit any of the foregoing to occur), whether under Sections 363 or 365 of the Bankruptcy Code (or any successor provisions) or under any other law or right of any nature, or otherwise; nor (ii) modify, abridge, change, supplement, alter or amend the Ground Lease, either orally or in writing; nor (iii) waive any of its rights against the Co-Mortgagor under the Ground Lease; nor (iv) subordinate the Ground Lease to any other mortgage encumbering any portion of the Land; nor (v) agree to or acquiesce in any rejection or termination of the Ground Lease by the Co-Mortgagor or Co-Mortgagor's trustee in bankruptcy, whether under Sections 363 or 365 of the Bankruptcy Code (or any successor provisions) or under any other law or provision, and any such surrender, abandonment, termination, cancellation, release, modification, change, supplement, alteration, amendment, waiver, subordination, agreement or acquiescence without Lender's prior written consent shall be ineffective as against Lender, and shall constitute a default under this Security Instrument for which no grace or curative period shall apply.

21.5    In addition to the provisions of subsection 21.4:

(i)    If any action, proceeding, motion or notice shall be commenced or filed in respect of the Ground Lease by any party thereto, in connection with any case under the Bankruptcy Code, Lender shall have the option, to the exclusion of the Borrower, to conduct and control any such litigation with counsel of Lender's choice. Lender may proceed in its own name or in the name of Borrower in connection with

38

any such litigation, and Borrower agrees to execute any and all powers, authorizations, consents and other documents required by the Lender in connection therewith. Borrower shall, upon demand, pay to Lender all costs and expenses (including attorneys' fees and costs) paid or incurred by Lender in connection with the prosecution or conduct of any such proceedings. Any such costs and expenses not paid by Borrower as aforesaid shall be secured by the lien of this Security Instrument, shall be added to the principal amount of the Debt and shall accrue interest at the Default Rate. Borrower shall not commence any action, suit, proceeding or case, or file any application or make any motion, in respect of the Ground Lease, in any case under the Bankruptcy Code as amended from time to time without the prior written consent of Lender.

(ii)     Borrower shall promptly after obtaining knowledge thereof, notify Lender orally of any filing by or against the Borrower of a petition under the Bankruptcy Code. Borrower shall thereafter forthwith deliver written notice of such filing to Lender, setting forth any information available to Borrower as of the date of such filing, the court in which such petition was filed, and the relief sought therein. Upon its receipt thereof, Borrower shall promptly deliver to Lender any and all notices, summonses, pleadings, applications and other documents received by Borrower in connection with any such petition and any proceedings relating thereto.

(iii)     The lien of this Security Instrument attaches to all of the Borrower's rights and remedies at any time arising under or pursuant to Section 365 of the Bankruptcy Code (whether as Landlord or tenant under any lease), including, without limitation, all of the Borrower's rights to remain in possession of the Ground Leased Land and related Improvements in the event of the Co-Mortgagor's rejection of the Ground Lease. The Borrower shall not, without Lender's prior written consent, elect to treat the Ground Lease as terminated under Section 365 of the Bankruptcy Code. Any such election made without Lender's prior written consent shall be void.

(iv)     Borrower hereby unconditionally assigns, transfers and sets over to Lender all of Borrower's claims and rights to the payment of damages (including but not limited to the right to any offsets or credits) arising from any rejection of the Ground Lease by Co-Mortgagor under the Bankruptcy Code. Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of the Ground Lease or a 363 Sale, including, without limitation, the right to file and prosecute, to the exclusion of the Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case under the Bankruptcy Code. This assignment constitutes a present, irrevocable and unconditional assignment of the foregoing claims, rights and remedies, and shall continue in effect until all of the Debt shall have been satisfied and discharged in full. Any amounts received by Lender as damages arising out of the rejection of the Ground Lease as aforesaid shall be applied first to all costs and expenses of Lender (including, without limitation, attorneys' fees and costs) incurred in connection with the exercise of any of its rights or remedies under this Security Instrument. For the purposes of construing Section 365(h) of the Bankruptcy Code, the intention of the parties hereto is that the term "possession" shall mean the right to possession of all of the leased premises granted to the Borrower under the Ground Lease, whether or not all or part of the leased premises is covered by any of the Leases.

(v)     If there shall be filed by or against the Borrower a petition under the Bankruptcy Code, and the Borrower, as lessee under the Ground Lease or lessor under the Leases, shall determine to reject the Ground Lease or any of the Leases pursuant to Section 365 of the Bankruptcy Code, the Borrower shall give the Lender not less than ten days' prior written notice of the date on which the Borrower shall apply to the bankruptcy court for authority to reject the lease in question. The Lender shall have the right, but not the obligation, to serve upon the Borrower within such ten day period a notice stating that (A) the Lender demands that the Borrower assume and assign the lease in question to the Lender pursuant to Section 365 of the Bankruptcy Code and (B) the Lender covenants to cure (or provide adequate assurance of prompt cure of) all defaults and provide adequate assurance of future performance under such lease. If the Lender serves upon the Borrower the notice described in the preceding sentence, the Borrower shall not seek to reject such lease and shall comply with the demand provided for in clause (A) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by the Lender of the covenant provided for in clause (B) of the preceding sentence.

39

21.6    Borrower shall promptly notify Lender in writing of any claim, action or proceeding (including, but not limited to, any request for arbitration or institution of such arbitration) made by any party to the Ground Lease, and the progress thereof and any determination made by the court and/or arbitrators thereunder. Lender shall have the right to participate in any such claim, action or proceedings as an interested party.

21.7    Unless Lender shall otherwise consent in writing, the fee simple title to the Ground Leased Land shall not merge with the leasehold estate under the Ground Lease for so long as any obligations secured by the Security Instrument remain outstanding, but such estates shall always remain separate and distinct estates, notwithstanding the union of any thereof in any person whatsoever, whether by purchase or otherwise.

21.8    Nothing contained in this Article shall be deemed or construed to limit or affect the mortgage and security interest in the fee simple estate in the Property granted to Lender by Co-Mortgagor.

21.9    Borrower and Co-Mortgagor acknowledge and agree that the Ground Lease shall not be amended, modified or terminated without the written consent of the Lender and no amendment, modification or termination made without Lender's consent shall be binding upon Lender. In addition, for so long as this Security Instrument shall encumber the Land, or any portion thereof, each option to extend the term of the Ground Lease, if any, shall automatically be deemed to have been validly and timely exercised prior to the expiration of the time for the exercise thereof, anything to the contrary in the Ground Lease notwithstanding, and any notice delivered by Borrower purporting to waive a renewal or extension option under the Ground Lease, if any, shall be deemed null and void.

## 22 - ADDITIONAL PROVISIONS REGARDING CO-MORTGAGOR

22.1    <u>REPRESENTATIONS AND COVENANTS OF CO-MORTGAGOR</u>.  Co-Mortgagor represents to and covenants and agrees to and with Lender that:

(a)    Co-Mortgagor is the fee simple title owner of the Property and is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware, and Co-Mortgagor has all requisite power and authority to enter into this Security Instrument and perform the terms and covenants thereof and hereof.

(b)    Co-Mortgagor joins in this Security Instrument to grant and effectuate a first lien on the Property and all improvements constructed thereon, and Co-Mortgagor hereby agrees that the Ground Lease and all right, title and interest of Co-Mortgagor in and to the Property are now and shall at all times continue to be, unconditionally subject and subordinate in each and every respect to this Security Instrument and any and all renewals, modifications, extensions, substitutions, and replacements and/or consolidations thereof for so long as this Security Instrument is a lien on the Property; provided, however, Co-Mortgagor shall not be obligated to take any affirmative action of any kind, except as expressly provided herein.

(c)    Co-Mortgagor shall promptly provide Lender notice of any default on the part of Borrower as lessor under the Ground Lease. Notwithstanding anything in the Ground Lease to the contrary, Co-Mortgagor agrees that Lender shall have the option (but not the obligation) to cure any default of Borrower as lessee under the Ground Lease within thirty (30) days of receipt by Lender of notice of said default from Co-Mortgagor; provided, however, that if such default is not capable of being cured within such thirty (30) day period, and Lender has commenced to cure the default within said thirty (30) day period and thereafter diligently pursues its efforts to cure, then Co-Mortgagor shall extend such cure period and Co-Mortgagor shall not invoke any of its remedies under the Ground Lease or available at law or in equity during any period that Lender is proceeding to cure any such default on behalf of Borrower under the Ground Lease with due diligence or, if possession of the Property is necessary for such cure to be effectuated (during any period that Lender is taking steps with due diligence to obtain the legal right to enter the property and cure any such default).

(d)    Without the prior written consent of Lender, Co-Mortgagor shall not (i) amend or modify the Ground Lease; (ii) accept Borrower's waiver or release from the performance of any obligations under the Ground Lease; (iii) assign the lessor's interest in the Ground Lease; (iv) assign the lessor's interest in the Ground Lease as collateral security or mortgage or otherwise encumber any interest under the Ground Lease; (v) permit

40

any mortgage, lien or other encumbrance of any type to be filed or entered against the Property through or by virtue of Co-Mortgagor; or (vi) cause or permit any transfer of title to, beneficial interest in, or any estate or interest in, the Property or any part thereof. Any action in contravention of this paragraph shall be null and void of all effect.

(e)    Co-Mortgagor shall, upon the reasonable request of Lender, promptly furnish to Lender a certificate confirming that Co-Mortgagor is in compliance with its obligations under and is not in default of this Security Instrument and the Ground Lease, that Borrower is not in default of the Ground Lease and that the Ground Lease is in full force and effect.

By its acceptance of this Security Instrument, Lender agrees with Co-Mortgagor to give Co-Mortgagor notice at the address above of Borrower's default under this Security Instrument or the other Loan Documents, the failure to cure which might result in the acceleration of the maturity of the Debt, and Co-Mortgagor will have five (5) days after receipt of such notice to cure all monetary defaults and thirty (30) days after receipt of said notice within which time to cure all other defaults (subject in each cure, to paying all late charges, default interest and other sums payable by Borrower under the Loan Documents), if it elects to, but, Co-Mortgagor shall have no obligation to cure said default.

22.2    UNIMPAIRED OBLIGATIONS.  The lien and priority of this Security Instrument as an encumbrance of Co-Mortgagor's right, title and interest in the Property shall in no way be affected or impaired by reason of the occurrence, from time to time, of any of the following with respect to this Security Instrument or any of the other Loan Documents, or with respect to the Property, even though notice may not have been given to, or received from, or the further consent of the Co-Mortgagor thereto may not have been obtained:

(i)    The waiver of the performance or observance by Lender or any other person of any agreement, covenant, term or condition to be performed or observed by Borrower, any Guarantor or Indemnitor;

(ii)    The extension of the time for the payment or performance of any of the Obligations;

(iii)    The supplementing, modification or amendment (whether material or otherwise) of any of the Loan Documents;

(iv)    Any failure, omission, delay or lack on the part of Lender or any other person to enforce, assert or exercise any right, power or remedy conferred on such person in or by virtue of any of the Loan Documents, or any action on Lender's or such person's part granting indulgence or extension in any form;

(v)    The voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the Property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar application, action or proceeding affecting Borrower or any of its assets;

(vi)    The sale, transfer or conveyance of the Property or any interest therein to any party, whether now or hereafter having or acquiring an interest in the Property; and

(vii)    The release of Borrower or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in the Loan Documents by operation of law or otherwise.

22.3    WAIVER OF DEFENSES.  Co-Mortgagor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or, except as otherwise expressly required by the terms hereof, any and all notice of non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Co-Mortgagor therefor.

22.4    WAIVER OF SUBROGATION.  Co-Mortgagor understands that the exercise by the Lender of certain rights and remedies may affect or eliminate Co-Mortgagor's right of subrogation against

41

Borrower and that Co-Mortgagor may therefore incur partially or totally nonreimbursable liability hereunder. Nevertheless, Co-Mortgagor hereby authorizes and empowers the Lender to exercise in its sole discretion, any rights and remedies, or any combination thereof, which may then be available, it being the purpose and intent of Co-Mortgagor that the obligations of Co-Mortgagor hereunder shall be absolute, continuing, independent and unconditional under any and all circumstances. In the event that Co-Mortgagor shall advance any sums to protect its interest in the Property or in the event that Borrower is now or shall hereafter become indebted to Co-Mortgagor, Co-Mortgagor agrees that Co-Mortgagor shall have no right or claim against Borrower or the Property, including, but not limited to, any right of subrogation or reimbursement against Borrower, unless and until the Debt shall have been paid in full and all of the Other Obligations shall have been fully performed. To the extent Co-Mortgagor's waiver of any rights as set forth in this Article 22 are found by a court of competent jurisdiction to be void or voidable for any reason, Co-Mortgagor agrees that such rights against Borrower and the Property shall be junior and subordinate as to lien, time of payment and in all other respects to the Lender's rights against Borrower and to the Lender's right, title, liens and claims against the Property.

23 - STATE SPECIFIC PROVISIONS

23.1   <u>CONSTRUCTION OF THIS SECURITY INSTRUMENT</u>. Sections 55-59, 55-59.1, 55-59.2, 55-59.3, and 55-59.4 of the Code of Virginia, 1950, as amended, as they exist as of the date hereof, (the "Sections") are expressly incorporated herein by reference as if fully set forth and stated in the body of this Security Instrument, and shall be construed to impose and confer upon all parties all right, duties, and obligations prescribed therein, except as otherwise expanded or restricted herein (and to the extent that any term of this Security Instrument conflicts with any provision of the Sections, such that it would render the term ambiguous or unenforceable, then the applicable provision of the Section shall be deemed to control). The following complete provisions of Section 55-60 of the Code of Virginia, 1950, as amended, are expressly incorporated herein by reference to them in "short form":

Exemptions Waived;<br>
Subject to all upon default;<br>
Any Trustee may act;<br>
Renewal, Extension or Reinstatement permitted;<br>
Insurance Required - $3,280,000.00;<br>
Substitution of Trustee Permitted - for any reason and without prior notice to the Grantor; and<br>
Bidder's deposit required of not more than ten percent (10%) of the sale price.

23.2   <u>CONFLICTING PROVISIONS</u>. The provisions of this Article are intended to supplement, and not limit, the other provisions of this Security Instrument; <u>provided, however</u>, that in the event the provisions of this Article contradict any other provision of this Security Instrument, the provisions of this Article shall govern.

23.3   <u>PURPOSE OF LOAN.</u> Borrower hereby represents and warrants that the Loan secured by this Security Instrument was made and transacted solely for the purpose of carrying on a business or investment activity, and that the proceeds of the Loan were not used for personal, family or household purposes.

*[Remainder of Page Intentionally Left Blank]*

SSL-MIA1 30157127v2

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower as of the day and year first above written.

**BORROWER:**

**WSG DULLES GL, LLC,**
a Virginia limited liability company

By: _____

Eric D. Sheppard, Manager

STATE OF _Florida_ )
)ss:
COUNTY OF _Dade_ )

The foregoing instrument was acknowledged before me this ___ day of June, 2007 by Eric D. Sheppard, as Manager of **WSG DULLES GL, LLC**, a Virginia limited liability company, on behalf of said limited liability company. He is personally known to me or has produced a _____ as identification.

KELLIE RICHTER
Comm# DD0502042
Expires 5/4/2009
Florida Notary Assn., Inc

Print Name: _Kellie Richter_
Title: _____
Commission No. _DD0502042_
(if any)

My Commission Expires: _5-4-2009_

*[signature page continued]*

Deed

48

**CO-MORTGAGOR:**

**WSG DULLES, L.P.,**
a Delaware limited partnership

By:  WSG Dulles GP, L.L.C., a Delaware limited
liability company, its General Partner

By: _____
Eric D. Sheppard, Manager

STATE OF Florida )
                          )ss:
COUNTY OF Dade )

    The foregoing instrument was acknowledged before me this 29 day of June, 2007 by Eric D. Sheppard, as Manager of WSG Dulles, GP, L.L.C., a Delaware limited liability company, as General Partner of **WSG DULLES GL, LLC**, a Virginia limited liability company, on behalf of said limited liability company.   He is personally known to me or has produced a _____ as identification.

KELLIE RICHTER
Comm# DD0602042
Expires 5/4/2009
Florida Notary Assn., Inc

Print Name: Kellie Richter
Title: _____
Commission No. DD 0602042
                          (if any)

My Commission Expires: 5.4.2009

Deed

# EXHIBIT A

### (Description of Land)

ALL of that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate, lying and being in Louden County, Virginia and being more particularly described as follows:

SSL-MIA1 30157127v2

## WSG DULLES GL LLC
## LEGAL DESCRIPTION

ALL of that certain property, situate, lying and being in the County of Loudoun, Virginia, and being more particularly described as follows:

Lot PB, containing 55,794 square feet or 1.28086 acres, more or less, of Dulles Town Crossing, as shown on plat entitled "Preliminary/Record Plat on Lot A-1 Dulles Town Crossing" as recorded on December 18, 2001 in Deed Book 2070, at page 1592, among the land records of Loudoun County, Virginia.

TOGETHER WITH those certain non-exclusive easement granted in Declaration of Covenants, Conditions and Restrictions (Reciprocal Easement and Common Area Maintenance Agreement) dated July 23, 2001, and recorded in Deed Book 1867, page 1857, as supplemented by Supplement to Declaration of Covenants, Conditions, Restrictions and Easements (Reciprocal Easement and Common Area Maintenance Agreement) dated March 6, 2001, recorded in Deed Book 1888, page 1088, and amended by First Amendment to Declaration of Covenants, Conditions and Restrictions (Reciprocal Easement and Common Area Maintenance Agreement) dated September 6, 2001, recorded in Deed Book 2011, page 1594.

BEING the same property conveyed to WSG Dulles GL LLC by deed from AIG Baker Dulles, L.L.C., dated March 19, 2002, recorded March 19, 2002, in Deed Book 2135, page 396, in the Clerk's Office, Circuit Court, County of Loudoun, Virginia.

AND BEING the same property leased to WSG Dulles, L.P. by AIG Baker Dulles, L.L.C., by Deed of Ground Lease dated June 1, 2001, as evidenced by Memorandum of Deed of Ground Lease dated March 19, 2002, recorded in Deed Book 2135, page 409. By Assignment and Assumption of Lease Agreement dated March 19, 2002, between AIG Baker Dulles, L.L.C., Assignor, and WSG Dulles GL LLC, Assignee, recorded in Deed Book 2135, page 405, AIG Baker Dulles, L.L.C. assigned its interest as Landlord to WSG Dulles GL LLC.

## EXHIBIT B

## REPLACEMENT RESERVE AND LEASING RESERVE REQUIREMENTS

1.    Defined Terms.

All capitalized terms used herein and not defined in this Security Instrument shall have the meanings set forth in Section 7 of this Exhibit B. To the extent any Reserve Deposit is assigned the meaning "none" in the Reserve Letter, the provisions set forth in this Exhibit B specifically relating to the making or application of such Reserve Deposits shall be disregarded.

2.    Reserve Deposits.

(a)    Concurrently with the execution of this Security Instrument, Borrower shall deposit with Lender the Deferred Maintenance Deposit. The Deferred Maintenance Deposit shall be applied as provided in Section 4.1 of this Exhibit B.

(b)    On each date that a regularly scheduled payment of principal or interest is due under the Note, Borrower shall be required to make a Monthly Deposit.

(c)    Lender shall deposit each Monthly Deposit, as received, in an escrow account (the "Reserve"). Out of each Monthly Deposit, the Monthly Replacement Account Deposit shall be allocated to an account (the "Replacement Account") for the payment of Replacements and the Monthly Leasing Account Deposit shall be allocated to an account (the "Leasing Account") for the payment of Tenant Improvements and Leasing Commissions (as defined below) in conjunction with Leases (as hereinafter defined).

(d)    Lender shall maintain a record of all deposits into and withdrawals from the Reserve and their allocation to the Replacement Account and the Leasing Account. Lender or a designated representative of Lender shall have the sole right to make withdrawals from such account.

(e)    No interest shall be paid on the Deferred Maintenance Deposit. Provided Borrower pays the account fees set forth below, the Reserve shall be held in an interest bearing account. Lender shall have no responsibility or liability for the amount of interest earned on the Reserve. All interest earned on funds in the Reserve shall be added to and become part of the Reserve, shall be allocated pro rata to the Replacement Account and the Leasing Account, and shall be for the benefit of Borrower, subject to Lender's rights pursuant to the terms of this Security Instrument. In order for the Reserve to bear interest, Borrower shall be required to pay the following fees: a one-time set-up fee on the date hereof of $250 and an additional fee of $200 on January 2 of each calendar year after the date hereof.

3.    Disbursements.

(a)    Provided no Event of Default exists, Lender shall make disbursements of funds available in the Replacement Account to reimburse Borrower for Replacements.

(b)    Provided no Event of Default exists, Lender shall make disbursements of funds in the Leasing Account to reimburse Borrower for the cost of (i) tenant improvements required under any Lease (collectively, the "Tenant Improvements"); and (ii) leasing commissions incurred by Borrower in connection with any Lease, provided that (x) such leasing commissions are reasonable and customary for properties similar to the Property and the portion of the Property for which such leasing commission is due, (y) the amount of such leasing commissions are determined pursuant to arms length transactions between Borrower and any leasing agent to which a leasing commission is due, and excluding any leasing commissions which shall be due any general partner, or shareholder of Borrower or any affiliate of Borrower and (z) the Tenant under the related Lease shall have taken occupancy of its entire leased premises and commenced the payment of its entire base minimum rent (collectively, "Leasing Commissions").

52

(c)     Lender shall, upon written request from Borrower and satisfaction of the requirements set forth in this Section 3, disburse to Borrower amounts from the Reserve necessary to reimburse Borrower for the actual costs of (i) any Leasing Commissions and (ii) any work relating to Replacements or Tenant Improvements (collectively, "Work"). Notwithstanding the foregoing, provided no Event of Default shall exist at the time of Borrower's request for disbursement of the applicable funds, any Termination Payment paid in connection with the termination of a Lease and deposited in the Leasing Account shall be returned to Borrower once all of the space with respect to which the Termination Payment was paid has been re-leased pursuant to Lease(s) entered into in accordance with the terms of the Security Instrument and Lender has received an estoppel letter with respect to each new Lease confirming (i) the tenant thereunder has taken possession of all of its space and commenced payment of its full base minimum rent and (ii) all obligations of Borrower with respect to the construction of Tenant Improvements, and the payment of tenant improvement allowances and Leasing Commissions have been fully performed. There shall be deducted from the amount of any such Termination Payment returned to Borrower a sum equal to the aggregate amount of disbursements from the Leasing Account in connection with the re-leasing of the space with respect to which such Termination Payment was paid.

(d)     Each request for disbursement from the Reserve shall be in a form specified or approved by Lender, and shall be accompanied by evidence of the full performance of the obligations of the leasing agent or satisfactory completion of the Work, as the case may be, and such bills, invoices and other evidence of the incurrence of the related costs and expenses as Lender may reasonably request.

(e)     Borrower shall not make a request for disbursement from the Reserve more frequently than once in any calendar quarter.

(f)     Borrower shall not make a request for disbursement from the Reserve in an amount less than the lesser of (i) $5,000, and (ii) the total cost of the Replacement, Tenant Improvement or Leasing Commission for which the disbursement is requested.

4.     <u>Performance of Replacements.</u>

4.1.     <u>Deferred Maintenance.</u>   Notwithstanding anything contained herein to the contrary, Borrower agrees to perform all of the Scheduled Repairs within sixty (60) days after the date hereof or such other period of time, if any, set forth in the Reserve Letter. The Deferred Maintenance Deposit shall be used solely for the payment of the actual costs of the Scheduled Repairs. Upon completion of the Scheduled Repairs in accordance with the requirements hereof, the portion of the Deferred Maintenance Deposit remaining undisbursed, if any, shall be disbursed to Borrower. All conditions, covenants and agreements set forth herein with respect to a disbursement from the Replacement Account shall apply to the disbursements from the Deferred Maintenance Deposit.

4.2.     <u>Entry Onto Property: Inspections.</u>   Lender may inspect the Property in connection with any Work prior to disbursing funds from the Reserve with respect thereto. In connection with any Work that is (i) a structural repair or improvement, (ii) a replacement or repair of a major component or element of any part of the Property or (iii) Scheduled Repairs, Lender may require, at Borrower's expense, one or more inspections and/or certificates of completion by an appropriate independent, qualified professional (e.g., architect, engineer, consultant) approved by Lender. In addition to Lender's costs and expenses, Borrower shall pay Lender a reasonable inspection fee, provided, however, such fees shall not exceed $500, in the aggregate, in any calendar year.

5.     <u>Borrower's Records.</u>   Borrower shall furnish such financial statements, invoices, records, papers and documents relating to the Property as Lender may reasonably require from time to time to make the determinations permitted or required to be made by Lender with respect to disbursements of the Deferred Maintenance Deposit and/or the Reserve.

6.     <u>Insufficiency of Reserve Balances, Temporary Deferral of Monthly Deposits.</u>   The insufficiency of any balance in the Reserve or the Deferred Maintenance Deposit shall not abrogate Borrower's agreement to fulfill its obligations contained in this Security Instrument. In the event Lender determines that (i) the balance in the Reserve, plus the amount required to be deposited therein during the succeeding twenty-four (24) months, is

2

less than the current estimated cost to complete the Work and pay the Leasing Commissions which Borrower, in the prudent operation of the Property can reasonably be anticipated to incur during the succeeding twenty four (24) months, or (ii) the balance of the Deferred Maintenance Deposit is less than the amount necessary to complete the Scheduled Repairs, Borrower shall deposit the shortage within ten (10) days of request by Lender. In the event Lender reasonably determines from time to time based on Lender's inspections that the amount of the Monthly Deposit, plus the amount required to be deposited therein prior to the anticipated date on which a such shortfall shall arise, is insufficient to fund the cost of likely Work and Leasing Commissions and related contingencies that may arise during the remaining term of the Loan, Lender may require an increase in the amount of the Monthly Deposits upon thirty (30) days prior written notice to Borrower. Lender may approve a temporary deferral or a reduction in the amount of the Monthly Deposit; provided, however, that if Lender approves either a temporary deferral or reduction in the amount of the Monthly Deposit, such action by Lender shall not prevent Lender from requiring Borrower to resume payment of the Monthly Deposits on any date that Lender may deem appropriate.

7.   Certain Defined Terms. The following terms shall have the meanings assigned to them below:

(a)   "Deferred Maintenance Deposit" means the Deferred Maintenance Deposit set forth in the Reserve letter, if any.

(b)   "Leasing Account Cap" means the Leasing Account Cap set forth in the Reserve Letter.

(c)   "Monthly Deposit" means the sum of the Monthly Leasing Account Deposit and the Monthly Replacement Account Deposit.

(d)   "Monthly Leasing Account Deposit" means the Monthly Leasing Account Deposit set forth in the Reserve Letter, if any.

(e)   "Monthly Replacement Account Deposit" means the Monthly Replacement Account Deposit set forth in the Reserve Letter. If there is no Monthly Leasing Account Deposit, the Monthly Replacement Account Deposit shall have the same meaning as the Monthly Deposit.

(f)   "Replacements" means the costs of any repairs, improvements, equipment, alterations, additions, changes, replacements and other items which, under generally accepted accounting principles, consistently applied, are properly classified as capital expenditures or capital improvements (and, in the case of multifamily projects only shall include the costs of window treatments and carpeting, blinds, equipment and appliances, and painting of the exterior of the Property), but excluding (i) costs of routine maintenance to the Property; (ii) the costs of salaries, benefits and administrative expenses related to the employment of (A) officers and executives of Borrower, and of employees of Borrower above the level of building manager, and (B) employees of Borrower at or below the level of building manager, except in the case of those costs which Borrower can demonstrate to Lender's satisfaction to be properly allocable to the work performed by such employees in connection with Replacements; (iii) the cost of any items for which Borrower is reimbursed by insurance or otherwise; (iv) the cost of any landscaping work to the Property; (v) the cost of any material additions or material alterations to the Property after the date hereof; and (vi) Tenant Improvements.

(g)   "Reserve Deposits" shall mean the Deferred Maintenance Deposit and the Monthly Deposit.

(h)   "Reserve Letter" means a letter from Borrower to Lender of even date herewith confirming the amount of the Monthly Replacement Account Deposit, the Monthly Leasing Deposit Account Deposit (if any) and the Deferred Maintenance Deposit, if any, and the Scheduled Repairs, if any.

SSL-MIA1 30157127v2

54

(i)    "Scheduled Repairs" means the Scheduled Repairs described in the Reserve letter, if any.

4

## EXHIBIT C

The term "Debt Service Coverage Ratio" shall mean the ratio of (a) the NOI (hereinafter defined) produced by the operation of the Property during the twelve (12) calendar month period immediately preceding the calculation to (b) the Annual Debt Service.

The Term "NOI" shall mean the Gross Income (as hereinafter defined) derived from the operation of the Property, less Expenses (hereinafter defined).

The term "Annual Debt Service" shall mean an amount equal to twelve (12) times the Monthly Payment payable under the Note.

The term "Gross Income" means (and includes only) Rents (as defined in the Security Instruments) and such other income, including any rent loss or business interruption insurance proceeds, laundry, parking, vending or concession income, which are actually received by the Borrower or its agents or representatives. Notwithstanding the foregoing, Gross Income shall not include (a) condemnation or insurance proceeds (excluding rent or business interruption insurance proceeds); (b) any proceeds from the sale, exchange, transfer, financing or refinancing of all or any portion of the Property; (c) amounts received from tenants as a security deposit; (d) any other type of income otherwise includable in NOI but paid directly by any tenant to a person or entity other than Borrower or its agents or representatives; or (e) interest income.

The term "Expenses" shall mean the aggregate of the following items: (a) real estate taxes, general and special assessments or similar charges; (b) sales, use and personal property taxes; (c) management fees of not less than five percent (5%) of the gross income derived from the operation of the Property and disbursements for management services whether such services are performed at the Property or off-site; (d) wages, salaries, pension costs and all fringe and other employee-related benefits and expenses, up to and including (but not above) the level of the on-site manager, engaged in the repair, operation and maintenance of the Property and service to tenants and on-site personnel engaged in audit and accounting functions performed by Borrower; (e) insurance premiums including, but not limited to, casualty, liability, rent and fidelity insurance premiums; (f) cost of all electricity, oil, gas, water, steam, HVAC and any other energy, utility or similar item and overtime services, the cost of building and cleaning supplies, and all other administrative, management, ownership, operating, advertising, marketing and maintenance expenses incurred in connection with the operation of Property; (g) cost of necessary cleaning, repair, replacement, maintenance, decoration or painting of existing improvements on the Property (including, without limitation, parking lots and roadways), of like kind and quality or such kind or quality which is necessary to maintain the Property to the same standards as competitive properties of similar size and location of the Property, together with adequate reserves for the repair and replacement of capital improvements on the Property acceptable to Lender; (h) the cost of such other maintenance materials, HVAC repairs, parts and supplies, and all equipment to be used in the ordinary course of business, which is not capitalized in accordance with generally accepted accounting principles ("GAAP"); (i) cost of leasing commissions and tenants concessions payable by Borrower pursuant to Leases in effect for the Property; (j) legal, accounting and other professional expenses incurred in connection with the Property; (k) casualty losses to the extent not reimbursed by a third party; and (l) all amounts that should be reserved, as reasonably determined by the Borrower with approval by the Lender in its reasonable discretion, for repair or maintenance of the Property and to maintain the value of the Property including replacement reserves in amounts not less than those required in Exhibit B of this Security Instrument. The Expenses shall be based on the above-described items actually incurred or payable on an accrual basis in accordance with GAAP by Borrower during the twelve (12) month period ending one month prior to the date on which the NOI is to be calculated (except the capital expenses and reserves set forth in subsection (g) above), with customary adjustments for items such as taxes and insurance which accrue but are paid periodically, as adjusted by Lender to reflect projected adjustments for the subsequent twelve (12) month period beginning on the date on which the NOI is to be calculated.

Notwithstanding the foregoing, the term "Expenses" shall not include (i) depreciation, amortization or any other non-cash item of expense unless approved by Lender; (ii) interest, principal, fees, costs and expense reimbursements of Lender in administrating the Loan or exercising remedies under the Loan Documents; or (iii) any expenditure (other than leasing commissions and tenant concessions) properly treated as a

capital item under GAAP and such expenditure is treated by Borrower as a capital item in Borrower's financial statements.

SSL-MIA1 30157127v2

57

## SCHEDULE 1
## TO LEASEHOLD DEED OF TRUST, FIXTURE FILING
## AND SECURITY AGREEMENT

As used in the foregoing document, each of the following terms shall have the corresponding meaning:

1. "Borrower" shall mean **WSG DULLES GL, LLC,** a Virginia limited liability company

2. "Principal Sum" shall mean $3,280,000.00

3. "Aggregate Additional Principal Sum" shall mean $13,340,000.00

4. "Aggregate Principal Sum" shall mean $16,620,000.00

5. "Net Proceeds Disbursement Threshold" shall mean $164,000

SSL-MIA1 30157131v1

EXHIBIT D

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

On this the __12__ day of July, 2007, before me appeared, ERIC D. SHEPPARD, as Manager of WSG Charlottesville, LLC, a Virginia limited liability company, and as Manager of WSG Dulles, GP, LLC, a Florida limited liability company, the sole general partner of WSG Dulles, L.P., and as Manager of WSG Short Pump, LLC, a Virginia limited liability company, having first been duly sworn, hereby states that the following is true and correct:

1. The total amount of indebtedness secured by various credit line deeds of trust to be recorded in other clerk's offices in Virginia (the "Virginia Deeds of Trust"), and various other mortgages and deeds of trust to be recorded in various other states (the "Out of State Deed of Trust), is $16,620,000.00. A portion of the indebtedness is secured by, inter alia, mortgage liens on properties situate in Virginia located in Albemarle County, Fairfax County and Henrico County.

2. The amount of indebtedness allocated to the properties encumbered my mortgage liens is as follows:

| Location | Allocated Debt | Overall % | VA % |
|----------|----------------|-----------|------|
| Albemarle Co. | $2,480,000.00 | 15% | 31% |
| Loudoun Co. | $3,280,000.00 | 20% | 42% |
| Henrico Co. | $2,160,000.00 | 13% | 27% |
| TOTAL AMOUNT | $7,920,000.00 | 48% | 100% |

Pursuant to Section 58.1-803(B) of the Code of Virginia (1950), as amended, recordation tax is due on the Deed of Trust based only of the proportion of percentage of the Indebtedness that is equal to the portion or percentage that the value of the property located in Virginia bears to the value of the property secured collectively by the Virginia Deed of Trust and the Out of State Deeds of Trust. The properties described in the Virginia Deeds of Trust are valued at 48% of the total value of the properties secured by the Virginia Deeds of Trust and the Out of State Deeds of Trust, thus the recordation tax due is based upon 48% of the indebtedness, which is $7,920,000.00. (continued)

3. State recording fees have been paid at locality where deed of trust first recorded.

      Further affiant sayeth not.



ERIC D. SHEPPARD Manager of WSG Charlottesville, LLC, a Virginia limited liability company, and as Manager of WSG Dulles, GP, LLC, a Florida limited liability company, the sole general partner of WSG Dulles, L.P., and as Manager of WSG Short Pump, LLC, a Virginia limited liability company

The foregoing instrument was subscribed and sworn to before me this, 10th day of July, 2007 by Eric D. Sheppard as Manager of WSG Charlottesville, LLC, a Virginia limited liability company, and as Manager of WSG Dulles, GP, LLC, a Florida limited liability company, the sole general partner of WSG Dulles, L.P., and as Manager of WSG Short Pump, LLC, a Virginia limited liability company, who is personally known to me.

_____
Notary Public

My Commission Expires: 11|2|10

NOTARY SEAL

LISSETTE VARGAS
Comm# DD0611563
Expires 11/2/2010
Assn., Inc

**EXHIBIT D**
**ALLONGE**
**(Original Lender to Assignee #1)**

## ALLONGE

This Allonge forms a part of that certain Promissory Note dated July *12*, 2007, made by **WSG DULLES GL, LLC**, a Virginia limited liability company to **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank.

Pay to the order of  ＊ _____

_____

_____, its successors and/or assigns.

This endorsement is made without representation, recourse or warranty by the undersigned.

**LEHMAN BROTHERS BANK, FSB,**
a federal stock savings bank

By: _____
Name: ~~CHARLENE THOMAS~~
Title: ~~VICE PRESIDENT~~


＊
LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3.

# EXHIBIT E
# ASSIGNMENT OF FEE AND LEASEHOLD DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT
## (Original Lender to Assignee #1)



**20071127-0082481**
Loudoun County, VA   Pgs: 5
11/27/2007 11:23:26AM
Gary M. Clemens , Clerk



**20080509-0028073**
Loudoun County, VA   Pgs: 5
05/09/2008 9:27:34AM
Gary M. Clemens , Clerk

RECORD AND RETURN TO:
Edison Mortgage Decisioning Solutions LLC
P.O. Box 3980
Edison, NJ 08818-3980
Attn: Edward Drahos
File # 353-2581-000



## ASSIGNMENT OF FEE AND LEASEHOLD DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT
### (hereinafter the "Assignment")



In consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged **LEHMAN BROTHERS BANK, FSB,** a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801 (**"Assignor"**) does hereby grant, bargain, sell, convey, assign, transfer and set over unto **LaSalle Bank National Association, in its capacity as trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3,** having an office at 135 South LaSalle Street, Suite 1625, Chicago, IL 60603 (**"Assignee"**), without recourse, all of the right, title and interest of Assignor in and to:

1.   That certain Deed of Trust, Fixture Filing and Security Agreement as described on Exhibit A hereto (the "Deed of Trust");

2.   The bond(s), note(s) and/or obligation(s) secured by the Deed of Trust, the moneys due and to grow due thereon, with interest as specified therein, and all rights accrued or to accrue under the Deed of Trust; and

3.   Any and all other related security instruments which secure the indebtedness and/or obligation secured by the Deed of Trust.

This Assignment is made without representation, recourse or warranty by Assignor.

**IN WITNESS WHEREOF**, the Assignor by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this Assignment.

Dated as of _July 17_, 2007

WITNESSES AS TO ALL SIGNATURES:

ASSIGNOR:

**LEHMAN BROTHERS BANK, FSB,**
a federal stock savings bank

Print Name: CATRINA CASSANOVA

By:
Name: CHARLENE THOMAS
Title: VICE PRESIDENT

Print Name: Milagros Alicea

## MULTI-STATE *CORPORATE* ACKNOWLEDGMENT (ASSIGNOR)

STATE OF _____New York_____):
                           :ss.:

COUNTY OF _____New York_____)

On this *17* day of *July*, 2007, before me, the undersigned officer, personally appeared:

1. _____Charlene Thomas_____
2. _____

personally known and acknowledged himself/herself/themselves to me (or proved to me on the basis of satisfactory evidence to be the

[a]   ✓ [Vice] President, and
[b]      (Assistant) *Secretary*

respectively of **LEHMAN BROTHERS BANK, FSB** (hereinafter, the "Corporation"),

      and that as such officer(s), being duly authorized to do so pursuant to its bylaws or a resolution of its board of directors, executed, subscribed and acknowledged the foregoing instrument for the purposes therein contained, by signing the name of the *Corporation* by himself/herself/themselves in their authorized capacity as such officer(s) as his free and voluntary act and deed and the free and voluntary act and deed of said *Corporation*.

    **IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

> EDNA LANAHAN
> NOTARY PUBLIC, State of New York
> No. 01LA6070349
> Qualified in New York County
> Commission Expires March 4, 2010

*Edna Lanahan*
Notary Public

Notarial Seal

My Commission Expires: 3/4/2010

**EXHIBIT A**

Description of the Deed of Trust

Deed of Trust, Fixture Filing and Security Agreement made by **WSG DULLES GL, LLC,** a Virginia limited liability company, to Lehman Brothers Bank, FSB, a federal stock savings bank, in the principal amount of $3,280,000.00, recorded on _7/20/07, Inst# 20070720-0054264_ _____ , _____ , of the County Recorder's office in Loudoun County, and covering the premises described on Schedule A hereto.

# LEGAL DESCRIPTION

*Schedule A*

ALL of that certain property, situate, lying and being in the County of Loudoun, Virginia, and being more particularly described as follows:

Lot PB, containing 55,794 square feet or 1.28086 acres, more or less, of Dulles Town Crossing, as shown on plat entitled "Preliminary/Record Plat on Lot A-1 Dulles Town Crossing" as recorded on December 18, 2001 in Deed Book 2070, at page 1592, among the land records of Loudoun County, Virginia.

TOGETHER WITH those certain non-exclusive easement granted in Declaration of Covenants, Conditions and Restrictions (Reciprocal Easement and Common Area Maintenance Agreement) dated July 23, 2001, and recorded in Deed Book 1867, page 1857, as supplemented by Supplement to Declaration of Covenants, Conditions, Restrictions and Easements (Reciprocal Easement and Common Area Maintenance Agreement) dated March 6, 2001, recorded in Deed Book 1888, page 1088, and amended by First Amendment to Declaration of Covenants, Conditions and Restrictions (Reciprocal Easement and Common Area Maintenance Agreement) dated September 6, 2001, recorded in Deed Book 2011, page 1594.

BEING the same property conveyed to WSG Dulles GL LLC by deed from AIG Baker Dulles, L.L.C., dated March 19, 2002, recorded March 19, 2002, in Deed Book 2135, page 396, in the Clerk's Office, Circuit Court, County of Loudoun, Virginia.

AND BEING the same property leased to WSG Dulles, L.P. by AIG Baker Dulles, L.L.C., by Deed of Ground Lease dated June 1, 2001, as evidenced by Memorandum of Deed of Ground Lease dated March 19, 2002, recorded in Deed Book 2135, page 409. By Assignment and Assumption of Lease Agreement dated March 19, 2002, between AIG Baker Dulles, L.L.C., Assignor, and WSG Dulles GL LLC, Assignee, recorded in Deed Book 2135, page 405, AIG Baker Dulles, L.L.C. assigned its interest as Landlord to WSG Dulles GL LLC.

20071127-0082481

Loudoun County, VA      Pgs: 5
11/27/2007 11:23:26AM
Gary M. Clemens , Clerk

**RECORD AND RETURN TO:**
Edison Mortgage Decisioning Solutions LLC
P.O. Box 3980
Edison, NJ 08818-3980
Attn: Edward Drahos
File # 353-2581-000

## ASSIGNMENT OF FEE AND LEASEHOLD DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT
### (hereinafter the "Assignment")

In consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801 ("**Assignor**") does hereby grant, bargain, sell, convey, assign, transfer and set over unto **LaSalle Bank National Association, in its capacity as trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3**, having an office at 135 South LaSalle Street, Suite 1625, Chicago, IL 60603 ("**Assignee**"), without recourse, all of the right, title and interest of Assignor in and to:

    1.    That certain Deed of Trust, Fixture Filing and Security Agreement as described on Exhibit A hereto (the "Deed of Trust");

    2.    The bond(s), note(s) and/or obligation(s) secured by the Deed of Trust, the moneys due and to grow due thereon, with interest as specified therein, and all rights accrued or to accrue under the Deed of Trust; and

    3.    Any and all other related security instruments which secure the indebtedness and/or obligation secured by the Deed of Trust.

This Assignment is made without representation, recourse or warranty by Assignor.

IN WITNESS WHEREOF, the Assignor by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this Assignment.

Dated as of _July 17_, 2007

WITNESSES AS TO ALL SIGNATURES:                    ASSIGNOR:

LEHMAN BROTHERS BANK, FSB,
a federal stock savings bank

Print Name: _CATRINA CASSANOVA_

By: _____
Name: _CHARLENE THOMAS_
Title: _VICE PRESIDENT_

Print Name: _Milagros Alicea_

**MULTI-STATE *CORPORATE* ACKNOWLEDGMENT (ASSIGNOR)**

STATE OF _____ New York _____ ):
                                            :ss.:
COUNTY OF _____ New York _____ )

On this _17_ day of _July_, 2007, before me, the undersigned officer, personally appeared:

1. _____ Charlene Thomas _____

2. _____

personally known and acknowledged himself/herself/themselves to me (or proved to me on the basis of satisfactory evidence to be the

[a]    ✓ [Vice] President, and
[b]      (Assistant) *Secretary*

respectively of **LEHMAN BROTHERS BANK, FSB** (hereinafter, the "Corporation"),

and that as such officer(s), being duly authorized to do so pursuant to its bylaws or a resolution of its board of directors, executed, subscribed and acknowledged the foregoing instrument for the purposes therein contained, by signing the name of the *Corporation* by himself/herself/themselves in their authorized capacity as such officer(s) as his free and voluntary act and deed and the free and voluntary act and deed of said *Corporation*.

**IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

```
EDNA LANAHAN
NOTARY PUBLIC, State of New York
No. 01LA6070349
Qualified in New York County
Commission Expires March 4, 2010
```

_Edna Lanahan_
Notary Public

Notarial Seal

My Commission Expires: 3/4/2010

## EXHIBIT A

Description of the Deed of Trust

    Deed of Trust, Fixture Filing and Security Agreement made by **WSG DULLES GL, LLC**, a Virginia limited liability company, to Lehman Brothers Bank, FSB, a federal stock savings bank, in the principal amount of $3,280,000.00, recorded on *7/20/07, Inst# 20070720-0054264* _____ . _____ , of the County Recorder's office in Loudoun County, and covering the premises described on Schedule A hereto.

## LEGAL DESCRIPTION

*Schedule A*

ALL of that certain property, situate, lying and being in the County of Loudoun, Virginia, and being more particularly described as follows:

Lot PB, containing 55,794 square feet or 1.28086 acres, more or less, of Dulles Town Crossing, as shown on plat entitled "Preliminary/Record Plat on Lot A-1 Dulles Town Crossing" as recorded on December 18, 2001 in Deed Book 2070, at page 1592, among the land records of Loudoun County, Virginia.

TOGETHER WITH those certain non-exclusive easement granted in Declaration of Covenants, Conditions and Restrictions (Reciprocal Easement and Common Area Maintenance Agreement) dated July 23, 2001, and recorded in Deed Book 1867, page 1857, as supplemented by Supplement to Declaration of Covenants, Conditions, Restrictions and Easements (Reciprocal Easement and Common Area Maintenance Agreement) dated March 6, 2001, recorded in Deed Book 1888, page 1088, and amended by First Amendment to Declaration of Covenants, Conditions and Restrictions (Reciprocal Easement and Common Area Maintenance Agreement) dated September 6, 2001, recorded in Deed Book 2011, page 1594.

BEING the same property conveyed to WSG Dulles GL LLC by deed from AIG Baker Dulles, L.L.C., dated March 19, 2002, recorded March 19, 2002, in Deed Book 2135, page 396, in the Clerk's Office, Circuit Court, County of Loudoun, Virginia.

AND BEING the same property leased to WSG Dulles, L.P. by AIG Baker Dulles, L.L.C., by Deed of Ground Lease dated June 1, 2001, as evidenced by Memorandum of Deed of Ground Lease dated March 19, 2002, recorded in Deed Book 2135, page 409. By Assignment and Assumption of Lease Agreement dated March 19, 2002, between AIG Baker Dulles, L.L.C., Assignor, and WSG Dulles GL LLC, Assignee, recorded in Deed Book 2135, page 405, AIG Baker Dulles, L.L.C. assigned its interest as Landlord to WSG Dulles GL LLC.

**EXHIBIT F**
**ALLONGE**
**(Assignee #1 to Assignee #2)**

## ALLONGE

THIS ALLONGE IS TO BE ATTACHED to that certain Promissory Note dated July 12, 2007, payable by **WSG Dulles GL, LLC, a Virginia limited liability company**, to the order of **Lehman Brothers Bank, FSB, a federal stock savings bank**, in the original principal amount of Three Million Two Hundred Eighty Thousand and 00/100 Dollars ($3,280,000.00).

PAY TO THE ORDER OF U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3,

WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.

BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3

[NO CORPORATE SEAL]

By: _____

Printed Name: Steve Orlandino
                Vice President and trust officer of U.S. Bank
                National Association - Attorney-in-Fact
                under Limited Power of Attorney dated
                January 27, 2011

Attest: _____

Printed Name: Thais Hayum
                Vice President and trust officer of U.S. Bank
                National Association - Attorney-in-Fact
                under Limited Power of Attorney dated
                January 27, 2011

# EXHIBIT G
## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS
### (Assignee #1 to Assignee #2)

## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS

BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("Assignor"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, is the current owner and holder of that certain loan made on July 12, 2007 (the "Loan"), in the original principal amount of Three Million Two Hundred Eighty Thousand and 00/100 Dollars ($3,280,000.00) (the "Original Loan Amount"), by Lehman Brothers Bank, FSB, a federal stock savings bank ("Original Lender"), to WSG Dulles GL, LLC, a Virginia limited liability company ("Original Borrower"). The Loan is evidenced by a Promissory Note dated July 12, 2007, executed by Original Borrower and payable to the order of Original Lender, in the Original Loan Amount (as the same may from time to time have been amended, consolidated, renewed and/or endorsed, the "Note"), and secured by a Fee and Leasehold Deed of Trust, Fixture Filing and Security Agreement made by Original Borrower, in favor of R. Dennis McArver, as Trustee, for the benefit of Original Lender ("Security Instrument"), and by other documents and instruments that evidence and secure the Loan (the Note, the Security Instrument and such other documents and instruments evidencing and securing the Loan, as the same may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as the "Loan Documents").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, assign, deliver, convey, transfer and set over unto U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("Assignee"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, all of Assignor's right, title and interest in and to the Loan and obligations with respect to the Loan, together with all rights, remedies, collateral, instruments or other documents made or granted in favor of Assignor or its predecessors in interest in connection with the Loan, including, without limitation: (i) all right, title and interest in and to the Note; (ii) all guaranties, pledges, security interests, mortgages, deeds of trust, or other rights, interests, or other collateral securing or guaranteeing repayment of the Loan; and (iii) all other rights, remedies and obligations of Assignor in connection with the Loan, whether provided by contract or otherwise available under applicable law or in equity, including, without limitation, all rights and remedies provided, and obligations arising, under any loan agreements, indemnities or other instruments or documents made, issued or delivered to or in favor of Assignor or its predecessors in interest in connection with the Loan, all

as the same may have been amended from time to time, but specifically excluding from all of the foregoing the "Retained Rights" (as such term is defined below).

This assignment is an agreement between the parties hereto and no other party shall be deemed to be a third party beneficiary hereof.

"Retained Rights" shall mean those rights provided to Assignor under indemnification provisions or agreements or other terms and conditions of the above-described loan documents and collateral property pertaining to the Loan (including, without limitation, environmental indemnification provisions or agreements and insurance policies), or arising from Assignor's reliance upon a representation, warranty or other statement contained within any of the above-described loan documents and other collateral property pertaining to the Loan (including, without limitation, affidavits, certifications, environmental reports and opinions of counsel), which are available to be exercised by Assignor as a prior holder of such Loan. Assignor's retention of the Retained Rights shall not be to the exclusion of any rights of Assignee under such provisions or agreements to the extent that such provisions or agreements or terms or conditions are exercisable by Assignee as the assignee of such Loan.

To have and to hold the same unto the Assignee and to the successors and assigns of the Assignee forever.

**THIS ASSIGNMENT IS MADE WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.**

IN WITNESS WHEREOF, this Omnibus Assignment of Loan Documents has been duly executed and sealed on behalf of Assignor on April 29, 2011.

*[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]*

ASSIGNOR:

BANK OF AMERICA, N.A., A NATIONAL
BANKING ASSOCIATION (SUCCESSOR BY
MERGER TO LASALLE BANK NATIONAL
ASSOCIATION, A NATIONAL BANKING
ASSOCIATION), AS TRUSTEE FOR THE
REGISTERED HOLDERS OF LB COMMERCIAL
MORTGAGE TRUST 2007-C3, COMMERCIAL
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2007-C3

[NO CORPORATE SEAL]

By: _____
Printed Name: Steve Orlandino
            Vice President and trust officer of U.S. Bank
            National Association - Attorney-in-Fact
            under Limited Power of Attorney dated
            January 27, 2011


Attest: _____
Printed Name: Thais Hayum
            Vice President and trust officer of U.S. Bank
            National Association - Attorney-in-Fact
            under Limited Power of Attorney dated
            January 27, 2011


Signed, Sealed and Delivered
in the presence of:

_____
Printed Name: Nicholas C. Xeros
Witness #1

_____
Printed Name: Paul D. Robinson
Witness #2

    [Witnesses as to both signatures]

STATE OF ILLINOIS     )
                       ) ss:
COUNTY OF COOK    )

    The foregoing instrument was acknowledged before me, a notary public, this 29th day of April, 2011, by Steve Orlandino, and Thais Hayum, as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, and as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, respectively, as Attorney-in-Fact on behalf of **BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3.** Each is personally known to me.

                                       _Jonathan J. Vacca_

                                       Notary Public, State of Illinois

                                       Print Name: _Jonathan J. Vacca_

                                       My Commission Expires: _03/11/2013_

[AFFIX NOTARY SEAL/STAMP ABOVE]

# EXHIBIT H
# CERTIFICATE OF TRANSFER
## (Assignee #1 to Assignee #2)



20110916-0056566
Loudoun County, VA    Pgs: 7
09/16/2011 9:35:17AM
Gary M. Clemens , Clerk

This instrument was prepared by
and after recording return to:

Manuel R. Gonzalez, Esquire
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131

Tax Parcel No.:    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-000

## CERTIFICATE OF TRANSFER

| | |
|---|---|
| Place of Record: | Clerk's Office of the Circuit Court of the County of Loudoun, Virginia |
| Date of Deed of Trust: | July 12, 2007 |
| Recorded: | July 20, 2007 |
| Instrument No.: | 20070720-0054264 (as assigned by Instrument No. 20071127-0082481, re-recorded as Instrument No. 20080509-0028073) |
| Name of Obligor or Maker: | WSG Dulles GL, LLC, a Virginia limited liability company; and WSG Dulles, L.P., a Delaware limited partnership |
| Name of Trustee: | R. Dennis McArver |
| Name of Original Payee or Obligee: | Lehman Brothers Bank, FSB, a federal stock savings bank ("**Original Lender**") |
| Name(s) of Subsequent Payee(s) or Obligee(s): | The Note, described below, was endorsed by Original Lender to the order of LaSalle Bank National Association, as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3. The Deed of Trust and the Additional Collateral Assignment of Leases and Rents, described below, were assigned by the Original Lender to LaSalle Bank National Association, in its capacity as |

Trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3, which assignee is more correctly described as LaSalle Bank National Association, as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3.

| | |
|---|---|
| Date of Note Secured: | July 12, 2007 |
| Original Amount Secured: | THREE MILLION TWO HUNDRED EIGHTY THOUSAND AND 00/100 DOLLARS ($3,280,000.00) |
| Additional Security: | Additional Collateral Assignment of Leases and Rents |
| Date of Assignment of Leases and Rents: | July 12, 2007 |
| Recorded: | July 20, 2007 |
| Instrument Number: | 20070720-0054265 (as assigned by Instrument Number 20071127-0082482, re-recorded as Instrument No. 20080509-0028075). |
| Name of Assignor: | WSG Dulles GL, LLC, a Virginia limited liability company |
| Name of Assignee: | Lehman Brothers Bank, FSB, a federal stock savings bank |

The undersigned, the payee of the above-mentioned Note secured by the above-mentioned Deed of Trust and Additional Collateral Assignment of Leases and Rents, hereby certifies that the Note (and the obligations secured by the above-mentioned Deed of Trust and Additional Collateral Assignment of Leases and Rents) has been assigned, transferred and endorsed to **U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("Noteholder").**

The name and address to which notice may be mailed or delivered to the Noteholder as provided by Virginia Code Section 55-58.2 is as follows:

U.S. Bank National Association,
not in its individual capacity but solely
in its capacity as Trustee for the registered
holders of LB Commercial Mortgage Trust
2007-C3, Commercial Mortgage Pass-Through
Certificates, Series 2007-C3
c/o LNR Partners, LLC
1601 Washington Avenue
Suite 700
Miami Beach, Florida 33139

Given under my/our hand(s) this 2a^th day of April, 2011.

*[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]*

3

**ASSIGNOR:**

**BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3**

[NO CORPORATE SEAL]

By: _____

Printed Name: Steve Orlandino

        Vice President and trust officer of U.S. Bank National Association - Attorney-in-Fact under Limited Power of Attorney dated January 27, 2011

Attest: _____

Printed Name: Thais Hayum

        Vice President and trust officer of U.S. Bank National Association - Attorney-in-Fact under Limited Power of Attorney dated January 27, 2011

Signed, Sealed and Delivered
in the presence of:

_____

Printed Name: Nicholas C. Xeros
Witness #1

_____

Printed Name: Paul D. Robinson
Witness #2

    [Witnesses as to both signatures]

STATE OF ILLINOIS         )
                          ) ss:
COUNTY OF COOK            )


     The foregoing instrument was acknowledged before me, a notary public, this 29ᵗʰ day of April , 2011, by Steve Orlandino and Thais Hayum, as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, and as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, respectively, as Attorney-in-Fact on behalf of **BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3.** Each is personally known to me.


_____
Notary Public, State of Illinois
Print Name: _Jonathan T Vacca_
My Commission Expires: _03/11/2013_


[AFFIX NOTARY SEAL/STAMP ABOVE]

## AFFIDAVIT AS TO POWER OF ATTORNEY

STATE OF ILLINOIS     )
                     ) ss:

COUNTY OF COOK    )

Before me, _____, a Notary Public in and for the County and State aforesaid, came Steve Orlandino and Thais Hayum, as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, and as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, respectively, who being first duly sworn, made oath and says: that each has not, or had not, at the time of executing the document to which this affidavit is attached, pursuant to Limited Power of Attorney dated January 27, 2011, made by Bank of America, N.A. and Bank of America National Trust Delaware, which was recorded in the Clerk's Office of Loudoun County, Virginia, immediately prior to this Certificate of Transfer, received actual knowledge or actual notice of the revocation or termination of said Power of Attorney, or notice of any facts indicating the same.

> **BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3**
>
> By: _____
> Printed Name: Steve Orlandino
>                  Vice President and trust officer of U.S. Bank National Association

**[NO CORPORATE SEAL]**

> Attest: _____
> Printed Name: Thais Hayum
>                  Vice President and trust officer of U.S. Bank National Association

Subscribed and sworn to before me in the County and State aforesaid this 20th day of April , 2011.

_Jonathan D Vacca_
Notary Public, State of Illinois

Printed Name: _Jonathan D Vacca_
My Commission Expires: _03/11/2013_

[AFFIX NOTARY SEAL/STAMP ABOVE]

**EXHIBIT I**
**ALLONGE**
**(Assignee #2 to Lender)**

## ALLONGE

**THIS ALLONGE IS TO BE ATTACHED** to that certain Promissory Note dated July 12, 2007, payable by **WSG Dulles GL, LLC, a Virginia limited liability company**, to the order of **Lehman Brothers Bank, FSB, a federal stock savings bank**, in the original principal amount of Three Million Two Hundred Eighty Thousand and 00/100 Dollars ($3,280,000.00).

**PAY TO THE ORDER OF LBCMT 2007-C3 STERLING RETAIL, LLC, A VIRGINIA LIMITED LIABILITY COMPANY,**

**WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.**

Dated: October  13 , 2011.

U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3

By: LNR Partners, LLC, a Florida limited liability company, its Attorney-in-Fact under Limited Power of Attorney dated March 15, 2011

By:  _____
Name:  Isaac  Pesin
Title:  Co - President

**EXHIBIT J**
**OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS**
**(Assignee #2 to Lender)**

## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS

U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("Assignor"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 800, Miami Beach, Florida 33139, is the current owner and holder of that certain loan made on July 12, 2007 (the "Loan"), in the original principal amount of Three Million Two Hundred Eighty Thousand and 00/100 Dollars ($3,280,000.00) (the "**Original Loan Amount**"), by Lehman Brothers Bank, FSB, a federal stock savings bank ("**Original Lender**"), to WSG Dulles GL, LLC, a Virginia limited liability company ("**Original Borrower**"). The Loan is evidenced by a Promissory Note dated July 12, 2007, executed by Original Borrower and payable to the order of Original Lender, in the Original Loan Amount (as the same may from time to time have been amended, consolidated, renewed, replaced and/or endorsed, the "**Note**"), and secured by a Fee and Leasehold Deed of Trust, Fixture Filing and Security Agreement made by Original Borrower, in favor of R. Dennis McArver, as Trustee, for the benefit of Original Lender ("**Security Instrument**"), and by other documents and instruments that evidence and secure the Loan (the Note, the Security Instrument and such other documents and instruments evidencing and securing the Loan, as the same may from time to time be amended, consolidated, renewed or replaced, including, without limitation, the documents and instruments described on **Exhibit A** attached hereto and incorporated herein by reference, being collectively referred to herein as the "**Loan Documents**").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, assign, deliver, convey, transfer and set over unto **LBCMT 2007-C3 STERLING RETAIL, LLC, a Virginia limited liability company** ("**Assignee**"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, all of Assignor's right, title and interest in and to the Loan and obligations with respect to the Loan, together with all rights, remedies, collateral, instruments or other documents made or granted in favor of Assignor or its predecessors in interest in connection with the Loan, including, without limitation: (i) all right, title and interest in and to the Note; (ii) all guaranties, pledges, security interests, mortgages, deeds of trust, or other rights, interests, or other collateral securing or guaranteeing repayment of the Loan, including, without limitation, the documents and instruments relating to the Loan described on **Exhibit A** attached hereto and incorporated herein; and (iii) all other rights, remedies and obligations of Assignor in connection with the Loan, whether provided by contract or otherwise available under applicable law or in equity, including, without limitation, all rights and remedies provided, and obligations arising, under any loan agreements, indemnities or other instruments or documents made, issued or delivered to or in favor of Assignor or its predecessors in interest in connection with the Loan, all as the same may have been amended from time to time, but specifically excluding from all of the foregoing the "**Retained Rights**" (as such term is defined below).

This assignment is an agreement between the parties hereto and no other party shall be deemed to be a third party beneficiary hereof.

"**Retained Rights**" shall mean those rights provided to Assignor under indemnification provisions or agreements or other terms and conditions of the above-described loan documents and collateral property pertaining to the Loan (including, without limitation, environmental indemnification provisions or agreements and insurance policies), or arising from Assignor's reliance upon a representation, warranty or other statement contained within any of the above-described loan documents and other collateral property pertaining to the Loan (including, without limitation, affidavits, certifications, environmental reports and opinions of counsel), which are available to be exercised by Assignor as a prior holder of such Loan. Assignor's retention of the Retained Rights shall not be to the exclusion of any rights of Assignee under such provisions or agreements to the extent that such provisions or agreements or terms or conditions are exercisable by Assignee as the assignee of such Loan.

To have and to hold the same unto the Assignee and to the successors and assigns of the Assignee forever.

**THIS ASSIGNMENT IS MADE WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.**

IN WITNESS WHEREOF, this Omnibus Assignment of Loan Documents has been duly executed and sealed on behalf of Assignor on October 13, 2011.

*[END OF TEXT – SIGNATURE PAGE FOLLOWS]*

ASSIGNOR:

U.S. BANK NATIONAL ASSOCIATION, A
NATIONAL BANKING ASSOCIATION
ORGANIZED AND EXISTING UNDER THE
LAWS OF THE UNITED STATES OF
AMERICA, NOT IN ITS INDIVIDUAL
CAPACITY BUT SOLELY IN ITS CAPACITY
AS TRUSTEE FOR THE REGISTERED
HOLDERS OF LB COMMERCIAL
MORTGAGE TRUST 2007-C3,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2007-C3

By:   LNR Partners, LLC, a Florida limited liability
      company, its Attorney-in-Fact under Limited
      Power of Attorney dated March 15, 2011

By:
Name:   Isaac Pesin
Title:   Co - President

# EXHIBIT A

## SCHEDULE OF LOAN DOCUMENTS

1.   Guaranty of Recourse Obligations of Borrower dated July 12, 2007, made by Eric D. Sheppard and Philip Wolman for the benefit of Lehman Brothers Bank, FSB

2.   Assignment of Agreements, Permits and Contracts dated July 12, 2007, made by WSG Dulles GL, LLC to Lehman Brothers Bank, FSB

3.   Loan Agreement among WSG Dulles GL, LLC, the other Borrower Parties thereto and Lehman Brothers Bank, FSB dated July 12, 2007

4.   Guaranty of Payment dated July 12, 2007, made by WSG Dulles GL, LLC in favor of Lehman Brothers Bank, FSB

5.   Assignment of Management Agreement and Subordination of Management Fees dated July 12, 2007, made by WSG Dulles, LLC and WSG Development Co. for the benefit of Lehman Brothers Bank, FSB

6.   Environmental Indemnity Agreement made as of July 12, 2007, by Eric D. Sheppard and Philip Wolman in favor of Lehman Brothers Bank, FSB

7.   Assignment of Mortgage Loan Documents made by Lehman Brothers Bank, FSB, to LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust Series 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3

8.   Omnibus Assignment of Loan Documents made by BANK OF AMERICA, NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION, SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 (ALSO KNOWN AS LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3) in favor of U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3

# EXHIBIT K
# CERTIFICATE OF TRANSFER
## (Assignee #2 to Lender)



20111028-0066661
Loudoun County, VA        .Pgs: 6
10/28/2011 9:25:25AM
Gary M. Clemens , Clerk

**Prepared Out of State By:**

Manuel R. Gonzalez, Esquire
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456

**After recording
return to:**

LNR Partners, LLC
1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139
Attn.: Foreclosure Manager

Tax Parcel No.:        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-000

## CERTIFICATE OF TRANSFER

| | |
|---|---|
| Place of Record: | Clerk's Office of the Circuit Court of the County of Loudoun, Virginia |
| Date of Deed of Trust: | July 12, 2007 |
| Recorded: | July 20, 2007 |
| Instrument No.: | 20070720-0054264 (as assigned by: (i) Instrument No. 20071127-0082481, re-recorded as Instrument No. 20080509-0028073; and (ii) Instrument No. 20110916-0056566) |
| Name of Obligor or Maker: | WSG Dulles GL, LLC, a Virginia limited liability company and WSG Dulles, L.P., a Delaware limited partnership |
| Name of Trustee: | R. Dennis McArver |
| Name of Original Payee or Obligee: | Lehman Brothers Bank, FSB, a federal stock savings bank (**"Original Lender"**) |

Name(s) of Subsequent

Payee(s) or Obligee(s):

The Note, defined below, was endorsed by: (i) Original Lender to the order of LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3; and (ii) Bank of America, National Association, a national banking association (successor by merger to Lasalle Bank National Association, a national banking association), as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3, to U.S. Bank National Association, a national banking association, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely in its capacity as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3.

Date of Note
Secured:

July 12, 2007

Original Amount
Secured:

Three Million Two Hundred Eighty Thousand and 00/100 Dollars ($3,280,000.00)

Additional Security:

Additional Collateral Assignment of Leases and Rents

Date of Assignment
of Leases and Rents:

July 12, 2007

Recorded:

July 20, 2007

Instrument Number:

20070720-0054265 (as assigned by: (i) Instrument Number 20071127- 0082482, re-recorded as Instrument No. 20080509-0028075; and (ii) Instrument No. 20110916-0056566)

Name of Assignor:

WSG Dulles GL, LLC, a Virginia limited liability company

Name of Assignee:

Lehman Brothers Bank, FSB, a federal stock savings bank

The undersigned, the payee of the above-mentioned Note secured by the above-mentioned Deed of Trust and Additional Collateral Assignment of Leases and Rents, hereby certifies that the Note (and the obligations secured by the above-mentioned Deed of Trust and Additional Collateral Assignment of Leases and Rents) has been assigned, transferred or

endorsed to **LBCMT 2007-C3 STERLING RETAIL, LLC**, a Virginia limited liability company (**"Noteholder"**).

The name and address to which notice may be mailed or delivered to the Noteholder as provided by Virginia Code Section 55-58.2 is as follows:

**LBCMT 2007-C3 STERLING RETAIL, LLC,**
c/o LNR Partners, LLC
1601 Washington Avenue
Suite 700
Miami Beach, Florida 33139

*[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]*

Given under my/our hand(s) this 13 day of October, 2011.

ASSIGNOR:

U.S. BANK NATIONAL ASSOCIATION, A
NATIONAL BANKING ASSOCIATION
ORGANIZED AND EXISTING UNDER THE
LAWS OF THE UNITED STATES OF
AMERICA, NOT IN ITS INDIVIDUAL
CAPACITY BUT SOLELY IN ITS CAPACITY
AS TRUSTEE FOR THE REGISTERED
HOLDERS OF LB COMMERCIAL
MORTGAGE TRUST 2007-C3,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2007-C3

By: LNR Partners, LLC, a Florida limited liability
company, its Attorney-in-Fact under Limited
Power of Attorney dated March 15, 2011

By: _____
Name: _____Isaac Resin_____
Title: _____Co-President_____

STATE OF FLORIDA                    }
                                   }
COUNTY OF MIAMI-DADE               }

On this the 13 day of October 2011, before me, Dan~d Serna , a Notary Public, personally appeared _Isaac Pesin_ , a _Co-President_ of LNR Partners, LLC, a Florida limited liability company, on behalf of said limited liability company, as attorney-in-fact for **U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person executed the instrument on behalf of the entity.

DAVID A. SERNA
MY COMMISSION # DD 746779
EXPIRES: January 8, 2012
Bonded Thru Notary Public Underwriters


Notary Public

[AFFIX NOTARY STAMP ABOVE]     My commission expires: _1|8|12_

## AFFIDAVIT AS TO POWER OF ATTORNEY

STATE OF FLORIDA                )
                                )
COUNTY OF MIAMI-DADE            )

      Before me, _David Serna_, a Notary Public in and for the County and State aforesaid, came _Isaac Resin_, a _Co-President_ of LNR Partners, LLC, a Florida limited liability company, on behalf of the said limited liability company, who being first duly sworn, made oath and says: that he has not, or had not, at the time of executing the document to which this affidavit is attached, pursuant to Limited Power of Attorney dated March 15, 2011 and recorded in the Clerk's Office of the Circuit Court of Loudoun County, Virginia immediately prior to this Certificate of Transfer, received actual knowledge or actual notice of the revocation or termination of said Limited Power of Attorney, or notice of any facts indicating the same.

LNR Partners, LLC, a Florida limited liability company

By: _____

Name: _Isaac Resin_

Title: _Co-President_

      Subscribed and sworn to before me in the County and State aforesaid this _13_ day of October, 2011.

_____
Notary Public

Printed Name: _DAVID SERNA_

My Commission Expires: _1|8|12_

[AFFIX NOTARY STAMP ABOVE]

DAVID A. SERNA
MY COMMISSION # DD 746779
EXPIRES: January 8, 2012
Bonded Thru Notary Public Underwriters

**EXHIBIT L
DEFAULT LETTER**



**VIA OVERNIGHT MAIL**

March 31, 2011

WSG Dulles GL, LLC
400 Arthur Godfrey Road, Suite 200
Miami Beach, FL 33140
Attention: Jeffrey Graff

Re:   **Notice of Default**: Loan ("Loan") made to WSG Dulles GL, LLC ("Borrower"), evidenced by a note in the original principal amount of $3,280,000.00, dated 07/12/07 ("Note"), now held by U.S. Bank National Association, as successor-in-interest to Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3 ("Lender") and specially serviced by LNR Partners, LLC ("Special Servicer"), and secured by a mortgage or deed of trust ("Mortgage") of property known as Dulles Town Crossing Out, located at 45450 Dulles Crossing Plaza, Sterling, VA 20166 ("Property"), and certain other documents (collectively, "Loan Documents")
Loan No.: M010039562

Dear Borrower:

As the Special Servicer of the above referenced Loan, we are empowered to act on behalf of Lender in connection with the Loan.

This is to provide you with notice of your breach of the Loan Documents by your failure to make Monthly Payments within the time required under the Note in two (2) or more months in the 2011 calendar year. The aggregate amount due and payable by Borrower under the Loan Documents will be calculated for you upon request made to the undersigned at LNR Partners, 1601 Washington Avenue, Suite 700, Miami Beach, FL 33139 (Fax - 305-695-5601). Lender will take all such actions as it deems appropriate to protect its interest in the Loan and to collect the debt thereunder, including, without limitation, seeking foreclosure and/or reconveyance of its security under the Loan Documents without further notice or demand except as required pursuant to state law and the Loan Documents. In the event any such actions are taken, Lender will also seek to recover its additional costs and expenses, including attorney's fees and court costs, incurred in any collection efforts.

Further, in the event Borrower makes any subsequent payment of any amount less than all of the indebtedness due under the Loan ("Partial Payment"), Lender will apply such Partial Payment to the indebtedness owing under the Loan Documents as a partial payment. No such Partial Payment or the acceptance thereof by Lender shall constitute

or be deemed or construed as a waiver of any default under the Loan Documents. In addition, any Partial Payment or the acceptance of any Partial Payment of Lender shall not constitute or be deemed or construed as a cure of any existing default under the Loan Documents, a modification of the Loan Documents or the terms of this letter, a reinstatement or satisfaction of the Loan, an election of remedies by Lender, or a waiver, modification, relinquishment or forbearance by Lender of any of Lender's rights or remedies under the Loan Documents or at law or in equity, all of which rights and remedies Lender hereby expressly reserves.

Neither this notice, any discussions by Lender or Special Servicer with Borrower or its representatives, nor Lender's acceptance of payment of less than the full amount due and payable under the Loan Documents, constitutes (a) a waiver by Lender or Special Servicer of any other default by Borrower under the Loan Documents, whether or not referred to herein or in any prior notice of default, (b) an election of remedies with respect to any such default by Special Servicer or Lender, each of which reserves all rights and remedies under law and under the Loan Documents, (c) a waiver, modification, relinquishment or forbearance by Lender or Special Servicer of any right or remedy under the Loan Documents or under law, all of which are reserved by Lender and Special Servicer, (d) a reinstatement of the Loan, or (e) a modification of any of the Loan Documents.

No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender or Special Servicer unless and until Lender and Borrower have reached agreement on all issues, and such entire agreement shall have been reduced to a written document that expressly states that it modifies the Loan Documents and is duly executed by Lender, Borrower and any guarantor of the Loan. Oral agreements, emails, memoranda of meetings, summaries of proposed terms, etc., shall have no effect whatsoever and shall not be binding on Lender or Special Servicer.

Very truly yours,

By: _____
    Name: Urosh Tomovich
    Title:   Asset Manager
         Real Estate Finance and Servicing Group

cc:    KeyBank Real Estate Capital Portfolio Services
      Larry Golinsky -- LNR Partners/Director of Asset Management
      LNR Partners/Loan Servicing

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR ANY DEBTOR WHO
HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE
PAID OR SETTLED, OR OTHERWISE NOT BE OBLIGATED UNDER, THE
LOAN: Please be advised that this letter constitutes neither a demand for payment
of the Loan nor a notice of personal liability to nor action against any recipient
hereof who might have received a discharge of the Loan in accordance with
applicable bankruptcy laws or who might be subject to the automatic stay of Section
362 of the United States Bankruptcy Code, or who has paid or settled or is otherwise
not obligated by law for the Loan.

Page 1 of 1

From: (305) 695-5168
Urosh Tomovich
LNR Partners LLC
1601 Washington Avenue
Suite 700
Miami Beach, FL 33139

Origin ID: MPBA



Ship Date: 31MAR11
ActWgt: 1.0 LB
CAD: 8989868/INET3130

J11151102250225

SHIP TO: (305) 673-3707          BILL SENDER

**Jeffrey Graff**
**WSG Development Company**
**400 W 41ST ST STE 200**

**MIAMI BEACH, FL 33140**

Delivery Address Bar Code

Ref #          Revised NODLs - WSG Portfolio
Invoice #
PO #
Dept #

**FRI - 01 APR   A1**
**STANDARD OVERNIGHT**

TRK#   **7969 3847 5210**
0201

**32 TMBA**

**33140**
FL-US
**FLL**



50DG3/26A8/7EFB

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT M
# DEMAND LETTER

McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

# |McGuireWoods

January 17, 2012

**By FEDERAL EXPRESS**

WSG Dulles GL, LLC
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention Jeffrey Graff

and

WSG Dulles, L.P.
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention: Jeffrey Graff

Re:   **Demand Letter:**
Loan made to WSG Dulles GL, LLC, a Virginia limited liability company (the
**"Borrower"**), evidenced by a Promissory Note in the original principal amount of
$3,280,000.00 dated July 12, 2007 (the **"Note"**), now held by LBCMT 2007-C3
Sterling Retail, LLC (the **"Noteholder"**) as successor by endorsement to the Note
by U.S. Bank National Association, as successor-in-interest to Bank of America,
National Association, as successor by merger to LaSalle Bank National
Association, as trustee for the registered holders of LB Commercial Mortgage
Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3
(the **"Lender"**), and secured by a Fee and Leasehold Deed of Trust, Fixture Filing
and Security Agreement (the **"Deed of Trust"**) dated July 12, 2007, encumbering
property located at 45450 Dulles Crossing Plaza, Sterling, Virginia 20166 (the
**"Property"**), and certain other documents executed in connection with the Loan
(collectively, the **"Loan Documents"**)

Loan No.:  M010039562

Dear Borrower and Co-Mortgagor:

We represent Lender and LNR Partners, LLC (the **"Servicer"**) in its capacity as special
servicer for Lender of the Loan originally made by Lehman Brothers Bank, FSB to the Borrower
as referenced in the Note.  The Original Lender assigned the Note, by endorsement, to LaSalle

WSG Dulles
January 17, 2012
Page 2

Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3, which further assigned the Note, by separate endorsement, to U.S. Bank National Association, which subsequently assigned the Note by separate endorsement to the Noteholder. Borrower's obligations under the Note are secured by, among other documents, the above-described Deed of Trust, a Collateral Assignment of Leases and Rents dated July 12, 2007, made by the Borrower to the Original Lender (the "**Assignment of Rents**"), and the Guaranty of Recourse Obligations of Borrower dated July 12, 2007 (the "**Guaranty**"), made by Eric D. Sheppard and Philip Wolman (collectively, the "**Guarantors**") for the benefit of the Original Lender.

By letter dated March 31, 2011, the Servicer notified the Borrower of its default under the terms of the Loan Documents after the Borrower failed to pay the amounts due under the Note (as described in the default letter) and the other Loan Documents (the "**Payment Default**"). The Borrower is in default pursuant to the terms of the Note and the Deed of Trust, and this letter is to advise you that the Noteholder *does hereby accelerate the Maturity Date* (as defined in the Note) *and immediately demands payment in full of the balance due under the Note and all amounts due under all (or any) of the other Loan Documents*. You are directed to contact the Servicer immediately for a statement of the total amount due and payable, including all interest, penalties and fees. The Servicer may be contacted at the following address or by facsimile: LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, Attention: Urosh Tomovich (Fax: (305) 695-5601).

This demand and acceleration letter shall also serve as notice that in addition to the Borrower's default under the Note and Deed of Trust as described above, the Borrower is also in default for its failure to comply with the other terms of the Loan Documents including, without limitation, the misappropriation of Rents, as that term is defined in the Assignment of Rents, which constitutes a default under the Guaranty and for which the Guarantors are personally liable. The Payment Default resulted in the automatic termination of Borrower's license to collect the Rents under the Assignment of Rents. Any Rents collected by the Borrower after the Payment Default are to be (and to have been) held in trust for the benefit of the Noteholder and should have been, and now must be, paid over to the Noteholder promptly, but no later than within three (3) business days, after receipt by the Borrower or its affiliates. The Borrower's failure to turn over all Rents (less Property related expenses) collected after the Payment Default, and to properly account for the same, has resulted in Losses (as that term is defined in the Guaranty) for which the Guarantors are personally liable.

**You are hereby directed to immediately pay all such amounts due under the Loan Documents to the Noteholder and to pay, and to continue to pay, any Rents or other revenues received from the Property to the Noteholder.** In addition, you are required to remit to the Noteholder all tenant security deposits given to the Borrower under all existing leases. The Noteholder reserves all of its other rights and remedies against the Borrower and the Guarantors.

WSG Dulles
January 17, 2012
Page 3

Please be advised that the Noteholder intends to diligently enforce all of its rights and exercise all of its remedies under the Deed of Trust, the Guaranty and any other Loan Documents, including, but not limited to, the commencement of foreclosure proceedings and the collection of Rents.   Should you have any questions regarding this demand and acceleration letter, please contact me directly at the above telephone number or email address.

Very truly yours,

Matthew P. Rash
*Counsel to the Servicer on behalf of the*
*Servicer and the Noteholder*

cc.   Mr. Urosh Tomovich (by electronic mail)
Charles R. Swartz, Esquire

Berman Rennert Vogel & Mandler
100 S.E. 2nd Avenue, 2900 Floor
Miami, Florida 33131
Attention: Wendy Beck, Esq.
Phone: (305) 577-4164

\36430956.1

**EXHIBIT N
FORECLOSURE NOTICE**

WALTON & ADAMS, P.C.

ATTORNEYS AND COUNSELORS AT LAW

1925 ISAAC NEWTON SQUARE, SUITE 250
RESTON, VIRGINIA 20190

RICHARD V.W. ADAMS, III
MICHAEL J. HOLLERAN
JEFFREY A. HUBER
SCOTT D. HELSEL*

ROBIN W. BAXTER
EVAN M. STEPANICK

*ALSO ADMITTED TO D.C. BAR

TELEPHONE
(703) 790-8000
FACSIMILE
(703) 790-8016

www.walton-adams.com

OF COUNSEL
ROBERT L. HOWELL

EDMUND L. WALTON, JR. (RETIRED)

*Writer's Direct Dial Telephone Number (703) 748-9580*
*Writer's E-mail Address: radams@walton-adams.com*

January 31, 2012

CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO.  7010 1870 0002 4533 8801
WSG Dulles GL, LLC
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention Jeffrey Graff

CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO.  7010 1870 0002 4533 8795
WSG Dulles, L.P.
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention: Jeffrey Graff

> Re:   *Foreclosure sale of certain real property consisting of*
> *approximately 1.28 acres of land known as Dulles Town Crossing,*
> *Loudoun County, Virginia*

Dear Mr. Graff:

LBCMT 2007-C3 Sterling Retail, LLC ("Noteholder") is the owner and holder of a note dated July 12, 2007, made by WSG Dulles GL, LLC ("Maker"), in the original principal amount of Three Million Two Hundred Eighty Thousand Dollars ($3,280,000.00) ("Note"), which is secured by the lien of a Fee and Leasehold Deed of Trust, Fixture Filing and Security Agreement dated July 12, 2007 and recorded on July 20, 2007 as Instrument No. 20070720-0054264 among the land records of Loudoun County, Virginia ("Deed of Trust"), which encumbers the above-described real estate.  I have been appointed Substitute Trustee under the Deed of Trust.  In that capacity, the Noteholder has instructed me to inform you of the following:

(a)     the Note is in default because of the Maker's failure to pay according to its terms;

WSG Dulles GL, LLC
WSG Dulles, L.P.
January 31, 2012
Page 2

     (b)    the entire outstanding principal balance and all accrued interest, late charges, costs and expenses, and attorneys' fees due under the Note are hereby declared immediately due and payable; and

     (c)    the property described in the copy of the Notice of Substitute Trustee's Sale enclosed with this letter, which property secures repayment of the Note, will be sold at public auction in accordance with the terms of said notice.

In order to avoid foreclosure, the Note must be paid in full, including all accrued and unpaid interest as well as costs and expenses of the sale and all other amounts due under the Note and Deed of Trust. Under the terms of the Note and Deed of Trust, the Maker is also responsible for the payment of all costs and expenses of sale incurred through the date of payment. Because the amount required to repay the loan changes daily, you must contact the undersigned to obtain an exact payoff figure.

The sale will take place on Thursday, February 23, 2012, at 11:30 a.m., as specified in the Notice of Sale, by the front steps of the Circuit Court Courthouse of Loudoun County, Virginia, located at 18 East Market Street, Leesburg, Virginia 20176.

If you have any questions with regard to this sale, you may contact the undersigned directly.

Very truly yours,

Richard V.W. Adams, III
Substitute Trustee

RVWA/bhm
Enclosures

cc:    CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO. 7010 1870 0002 4533 8788
AND FIRST CLASS MAIL
Berman, Rennert, Vogel & Mandler
100 S.E. 2nd Avenue, 2900 Floor
Miami, Florida 33131
Attention: Wendy Beck, Esq.    (w/enc.)

WSG Dulles GL, LLC
WSG Dulles, L.P.
January 31, 2012
Page 3

CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO.   7010 1870 0002 4533 8771
AND FIRST CLASS MAIL
WSG Dulles GL, LLC
c/o George P. Yeonas, Registered Agent
8221 Old Courthouse Road, Suite 300
Vienna, Virginia 22182                    (w/enc.)

CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO.  7010 1870 0002 4533 8764
AND FIRST CLASS MAIL
WSG Dulles, L.P.
c/o Corporation Service Company, Registered Agent
Bank of America Center, 16th Floor
1111 East Main Street
Richmond, Virginia 23219                  (w/enc.)

CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO.  7010 1870 0002 4533 8757
AND FIRST CLASS MAIL
WSG Development Company
c/o Lamont Neiman Interian & Bellet, P.A.
Registered Agent
New World Tower, Suite 801
100 North Biscayne Boulevard
Miami, Florida 33132                      (w/enc.)

CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO.  7010 1870 0002 4533 8740
AND FIRST CLASS MAIL
WSG Dulles GL, LLC
c/o Corporation Service Company, Registered Agent
1201 Hays Street
Tallahassee, Florida 32301                (w/enc.)

WSG Dulles GL, LLC
WSG Dulles, L.P.
January 31, 2012
Page 4

CERTIFIED MAIL/RETURN RECEIPT REQUESTED
NO.  7010 1870 0002 4533 8733
AND FIRST CLASS MAIL
WSG Dulles, L.P.
c/o Corporation Service Company, Registered Agent
1201 Hays Street
Tallahassee, Florida 32301                    (w/enc.)

FIRST CLASS MAIL
WSG Dulles GL, LLC
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention Jeffrey Graff                    (w/enc.)

FIRST CLASS MAIL
WSG Dulles, L.P.
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention: Jeffrey Graff                    (w/enc.)

WSG Dulles GL, LLC
WSG Dulles, L.P.
January 31, 2012
Page 5

bcc:   FIRST CLASS MAIL
       Mr. Matthew P. Rash
       McGuireWoods, LLP
       One James Center
       901 East Cary Street
       Richmond, Virginia 23219-4030      (w/enc.)

       FIRST CLASS MAIL
       Mr. Charles R. Swartz
       McGuireWoods, LLP
       One James Center
       901 East Cary Street
       Richmond, Virginia 23219-4030      (w/enc.)