# EXHIBIT A
# NOTE

# PROMISSORY NOTE

$2,480,000.00                                                                  July 12, 2007

**FOR VALUE RECEIVED**, the undersigned Borrower (as defined in Schedule 1 attached hereto), as maker, having its principal place of business c/o WSG Development Company, 400 Arthur Godfrey Road, Suite 200, Miami Beach, Florida 33140, hereby unconditionally promises to pay to the order of **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801 ("Lender"), or at such other place as the holder hereof may from time to time designate in writing, the Principal Sum (as defined in Schedule 1 attached hereto), in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate (defined below), and to be paid in installments as provided herein.

## 1.    CERTAIN DEFINED TERMS

As used herein the following terms shall have the meanings set forth below:

(a)    "Accrual Period" means the period commencing on the eleventh (11th) day of a calendar month and ending on the tenth (10th) day of the succeeding calendar month; provided that if this Note is dated as of any date other than the eleventh (11th) day of a month, the first Accrual Period shall (i) consist of only the date hereof, if the date hereof is the tenth (10th) day of a month, or (ii) commence on the date hereof and shall end on the next tenth (10th) day of a calendar month to occur after the date hereof.

(b)    "Applicable Interest Rate" shall mean an interest rate equal to 6.47% per annum.

(c)    "Loan" shall mean the loan evidenced by this Note.

(d)    "Loan Agreement" shall mean that certain Loan Agreement executed by Borrower and the Other Borrowers (as defined in the Security Instrument) and Lender as of the date herewith.

(e)    "Loan Documents" shall mean this Note, the Guaranty (as defined in the Security Instrument), the Security Instrument, and any other documents or instruments which now or shall hereafter wholly or partially secure or guarantee payment of this Note or which have otherwise been executed by Borrower and/or any other person in connection with the Loan.

(f)    "Lockout Period Expiration Date" shall mean the earlier of (a) the fourth (4th) anniversary of the date hereof and (b) two years and one day from the "startup day" of any "real estate mortgage investment conduit (as such terms are defined in Sections 860G and 860D, respectively, of the Internal Revenue Code of 1986, as amended or any successor statute thereto) which may acquire the Loan.

(g)    "Maturity Date" shall mean July 11, 2017.

(h)    "Monthly Payment" shall have the meaning set forth in Schedule 1 attached hereto.

(i)    "Monthly Payment Date" shall mean the eleventh (11th) day of each calendar month prior to the Maturity Date commencing on (i) the eleventh (11th) day of the next succeeding calendar month after the date hereof if this Note is dated on or prior to the eleventh (11th) day of a month, or (ii) the eleventh (11th) day of the second succeeding calendar month after the date hereof if this Note is dated after the eleventh (11th) day of a month.

(j)    "Security Instrument" shall have the meaning set forth in Schedule 1 attached hereto.

2.    **PAYMENT TERMS**

(a)    If this Note is dated as of a date other than the eleventh (11th) day of a calendar month, a payment shall be due from Borrower to Lender on the date hereof on account of all interest scheduled to accrue on the principal sum from and after the date hereof through and including the last day of the current Accrual Period. The Monthly Payment shall be due from Borrower to Lender on each Monthly Payment Date, with each Monthly Payment to be applied as follows: (i) first, to the payment of interest which has accrued during the preceding Accrual Period computed at the Applicable Interest Rate, and (ii) the balance toward the reduction of the principal sum. The balance of the principal sum and all interest thereon shall be due and payable on the Maturity Date. Interest on the principal sum of this Note shall be calculated by multiplying the actual number of days elapsed in the period for which interest is being calculated by a daily rate based on a 360-day year.

(b)    Unless payments are made in the required amount in immediately available funds at the place where this Note is payable, remittances in payment of all or any part of the Debt (defined below) shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where this Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.

3.    **DEFAULT AND ACCELERATION**

(a)    The whole of the principal sum of this Note, (b) interest, default interest, late charges and other sums, as provided in this Note, the Security Instrument or the other Loan Documents, (c) all other monies agreed or provided to be paid by Borrower in this Note, the Security Instrument or the other Loan Documents, (d) all sums advanced pursuant to the Security Instrument to protect and preserve the Property and the lien and the security interest created thereby, and (e) all sums advanced and costs and expenses incurred by Lender in connection with the Debt (defined below) or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender (all the sums referred to in (a) through (e) above shall collectively be referred to as the "Debt") shall without notice become immediately due and payable at the option of Lender if any payment required in this Note prior to the Maturity Date is not paid on the date when due or on the happening of any other default, after the expiration of any applicable notice and grace periods herein or under the terms of the Security Instrument or any of the other Loan Documents (collectively, an "Event of Default").

4.    **DEFAULT INTEREST**

Borrower does hereby agree that upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum at a rate (the "Default Rate") equal to (i) the greater of (a) the Applicable Interest Rate plus three percent (3%) and (b) the Prime Rate (as hereinafter defined) plus four percent (4%) or (ii) the maximum interest rate that Borrower may by law pay, whichever is lower. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full. Interest calculated at the Default Rate shall be added to the Debt, and shall be deemed secured by the Security Instrument. This provision, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

The "Prime Rate" shall mean the annual rate of interest publicly announced by Citibank, N.A. in New York, New York, as its base rate, as such rate shall change from time to time. If Citibank, N.A. ceases to announce a base rate, Prime Rate shall mean the rate of interest published in The Wall Street Journal from time to time as the Prime Rate. If more than one Prime Rate is published in The Wall Street Journal for a day, the average of the Prime Rates shall be used, and such average shall be rounded up to the nearest one-quarter of one percent (.25%). If The Wall Street Journal ceases to publish the "Prime

SSL-MIA1 30156840v3

Rate", the Lender shall select an equivalent publication that publishes such "Prime Rate", and if such prime rates are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index.

## 5.   PREPAYMENT; DEFEASANCE

(a)    Borrower shall not have the right or privilege to prepay all or any portion of the principal amount of this Note prior to the Maturity Date.

(b)    Simultaneously with each Default Repayment (defined herein) occurring prior to the Maturity Date, Borrower shall pay to Lender an amount equal to the greater of: (A) three (3%) percent of the principal amount of this Note being prepaid; and (B) the present value of a series of payments each equal to the Payment Differential (hereinafter defined) and payable on each Monthly Payment Date over the remaining original term of this Note and on the Maturity Date discounted at the Reinvestment Yield (hereinafter defined) for the number of months remaining from the date of the Default Repayment (the "Repayment Date") to each such Monthly Payment Date and the Maturity Date. The term "Reinvestment Yield" as used herein shall be equal to the lesser of (a) the (i) yield on the U.S. Treasury issue (primary issue) with the same maturity date as the Maturity Date; or (ii) if no such U.S. Treasury issue is available, then the interpolated yield on the two U.S. Treasury issues (primary issues) with maturity dates (one prior to and one following) that are closest to the Maturity Date; or (b) the (i) yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the Debt, or (ii) if no such U.S. Treasury issue is available, then the interpolated yield on the two U.S. Treasury issues (primary issues) with terms (one prior to and one following) that are closest to the remaining average life of the Debt, with each such yield being based on the bid price for such issue as published in The Wall Street Journal on the date that is 14 days prior to the Repayment Date (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield. The term "Payment Differential" as used herein shall be equal to (x) the Applicable Interest Rate minus the Reinvestment Yield, divided by (y) 12 and multiplied by (z) the principal sum being repaid on such Repayment Date after application of the Monthly Payment (if any) due on the date of the Default Repayment, provided that the Payment Differential shall in no event be less than zero. In no event, however, shall Lender be required to reinvest any repayment proceeds in U.S. Treasury obligations or otherwise.

For purposes of this Note, the term "Default Repayment" shall mean a repayment of all or any portion of the principal amount of this Note made during the continuance of any Event of Default or after an acceleration of the Maturity Date under any circumstances, including, without limitation, a repayment occurring in connection with reinstatement of the Security Instrument provided by statute under foreclosure proceedings or exercise of a power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or prevent foreclosure, any sale in foreclosure or under exercise of a power of sale or otherwise.

## 6.   SECURITY

This Note is secured by the Security Instrument and the other Loan Documents. The Security Instrument is intended to be duly recorded in the public records of the county where the Property is located. All of the terms, covenants and conditions contained in the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

## 7.   SAVINGS CLAUSE

This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance due hereunder at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a

3

rate in excess of such maximum rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.

## 8.    LATE CHARGE

If any sum payable under this Note is not paid within a period of seven (7) calendar days after the date on which it is due, regardless of whether such failure shall constitute an Event of Default, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of the unpaid sum or the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing the delinquent payment and to compensate Lender for the loss of the use of the delinquent payment and the amount shall be secured by the Security Instrument and the other Loan Documents.

## 9.    NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## 10.   JOINT AND SEVERAL LIABILITY

If Borrower consists of more than one person or party, the obligations and liabilities of each person or party shall be joint and several.

## 11.   WAIVERS, ETC.

All payments required hereunder shall be made irrespective of, and without any deduction for, any setoff, defense or counterclaim. Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, other than notices specifically required by the terms of this Note, the Security Instrument and the other Loan Documents. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Security Instrument or the other Loan Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the Debt, under this Note, the Security Instrument or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Security Instrument or the other Loan Documents. In addition, acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default. If Borrower is a partnership, the agreements herein contained shall remain in force and applicable, notwithstanding any changes in the individuals comprising the partnership, and the term "Borrower," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If Borrower is a corporation or limited liability company, the agreements contained herein shall remain in full force and applicable notwithstanding any changes in the shareholders or members comprising, or the officers and directors or managers relating to, the corporation or limited liability company, and the term "Borrower" as used herein, shall include any alternative or successor corporation or limited liability company, but any predecessor corporation or limited liability company

4

shall not be relieved of liability hereunder. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in a partnership, corporation or limited liability company which may be set forth in the Security Instrument or any other Loan Document.)

## 12.    TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Security Instrument and the other Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## 13.    WAIVER OF TRIAL BY JURY

**BORROWER AND LENDER, BY ITS ACCEPTANCE HEREOF, HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

## 14.    EXCULPATION

(a)    Except as otherwise provided herein, in the Security Instrument or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note or the Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may sell the Property under any power of sale or right of non-judicial foreclosure or bring a foreclosure action, confirmation action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents (as defined in the Security Instrument) and any other collateral given to Lender created by this Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting this Note and the Security Instrument, agrees that it shall not, except as otherwise provided in Section 10.10 of the Security Instrument, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Note, the other Loan Documents or the Security Instrument. The provisions of this Article shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Note, the other Loan Documents or the Security Instrument; (ii) impair the right of Lender to enforce any of its rights or remedies under the Other Security Instruments, Other Notes or any documents or instruments executed and delivered to Lender in connection with the Other Loans (collectively, the "Other Properties' Loan Documents"); (iii) without limiting the provisions of clause (ii) immediately above, impair the right of Lender to obtain a deficiency judgment in any action or proceeding with respect to the Loan Documents in order to preserve its rights and remedies, including, without limitation, foreclosure, non-judicial foreclosure, or the exercise of a power of sale, under the Other Guarantees or the Other Security Instruments; however, Lender agrees that it shall not enforce such deficiency judgment against any assets of Borrower other than in connection with the exercise of its rights and remedies under the Other Guarantees or the Other Security Instruments; (iv) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (v) affect the validity or enforceability of the Guaranty, any Other Guaranty or any indemnity, master lease or similar instrument made in connection with this Note, the Security Instrument, or the other Loan

Documents; (vi) impair the right of Lender to obtain the appointment of a receiver; (vii) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (viii) impair the right of Lender to obtain a deficiency judgment or judgment on the Note against Borrower if necessary to obtain any insurance proceeds or condemnation awards to which Lender would otherwise be entitled under the Security Instrument; provided however, Lender shall only enforce such judgment against the insurance proceeds and/or condemnation awards; or (ix) impair the right of Lender to enforce the provisions of Sections 10.10, 11.2 and 11.3 of the Security Instrument.

(b)     Notwithstanding the provisions of this Article 14 to the contrary, Borrower shall be personally liable to Lender for the Losses (as defined in the Security Instrument) it incurs due to: (i) fraud or intentional misrepresentation by Borrower, its agents or principals, (ii) Borrower's misapplication or misappropriation of (A) Rents received by Borrower after the occurrence of an Event of Default, (B) tenant security deposits or Rents collected in advance, or (C) insurance proceeds or condemnation awards, (iii) Borrower's failure to pay Taxes (as defined in the Security Instrument), Insurance Premiums (as defined in the Security Instrument), Other Charges (as defined in the Security Instrument) (except to the extent that sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms of the Security Instrument), charges for labor or materials or other charges that can create liens on the Property, provided that Borrower's liability under this clause (iii) shall not exceed an amount equal to the net operating income of the Property for the twelve (12) month period preceding the related failure to pay, less the amount of all Monthly Payments and required reserve payments made by Borrower in accordance with this Note, the Security Instrument and the other Loan Documents during such twelve (12) month period, (iv) Borrower's failure to comply with the provisions of Sections 3.10, 5.9 or 16.1 of the Security Instrument, or (v) Borrower's or any other Indemnitor's failure to comply with the provisions of the Environmental Indemnity (as defined in the Security Instrument).

(c)     Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) in the event of Borrower's default under Section 4.2, in any material respect, or Article 8 of the Security Instrument, (ii) if the Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding, or (2) an involuntary bankruptcy or insolvency proceeding (A) which is commenced by any party controlling, controlled by or under common control with Borrower (which shall include, but not be limited to, any creditor or claimant acting in concert with Borrower or any of the foregoing parties) (the "Borrowing Group") or (B) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of the Security Instrument or any other remedial action permitted hereunder or under the Security Instrument or the other Loan Documents or (iii) if a court of competent jurisdiction holds that the granting, execution or delivery of the Security Instrument or any other Loan Documents is or constitutes a fraudulent conveyance under any bankruptcy, insolvency or fraudulent conveyance law or is otherwise voidable under any such laws.

(d)     Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with this Note, the Security Instrument and the other Loan Documents.

## 15.   AUTHORITY

Borrower (and the undersigned representative of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note, the Security Instrument and the other Loan Documents and that this Note, the Security Instrument and the other Loan Documents constitute valid and binding obligations of Borrower.

## 16.   APPLICABLE LAW

This Note shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and the applicable laws of the United States of America.

6

**17.    COUNSEL FEES**

In the event that it should become necessary to employ counsel to collect the Debt or to protect or foreclose the security therefor, Borrower also agrees to pay all reasonable fees and expenses of Lender, including, without limitation, reasonable attorney's fees for the services of such counsel whether or not suit be brought.

**18.    NOTICES**

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | Borrower<br>c/o WSG Development Company<br>400 Arthur Godfrey Road, Suite 200<br>Miami Beach, Florida 33140<br>Attention: Jeffrey Graff |
| With a copy to: | Berman Rennert Vogel & Mandler<br>100 S.E. 2nd Avenue, 2900 Floor<br>Miami, Florida 33131<br>Attention: Wendy Beck, Esq. |
| If to Lender: | Lehman Brothers Bank, FSB<br>399 Park Avenue, 8th Floor<br>New York, New York 10022<br>Attention: John Herman |
| With a copy to: | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038-4982<br>Attention: William Campbell, Esq. |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

"Business Day" shall mean a day upon which commercial banks are not authorized or required by law to close in New York, New York.

**19.    MISCELLANEOUS**

(a)    Wherever pursuant to this Note (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

7

(b)     Whenever used, the singular shall include the plural, the plural shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors and administrators.

(c)     Borrower hereby represents and warrants that the Loan secured by the Security Instrument was made and transacted solely for the purpose of carrying on business or investment activity, and that the proceeds of the Loan were not used for personal, family or household purposes.

*[Remainder of Page Intentionally Left Blank]*

SSL-MIA1 30156840v3

**IN WITNESS WHEREOF,** Borrower has duly executed this Note as of the day and year first above written.

**BORROWER:**

**WSG CHARLOTTESVILLE, LLC,**
a Virginia limited liability company

By: _____
     Philip Wolman, Manager

## SCHEDULE 1
## TO PROMISSORY NOTE

As used in the foregoing document, each of the following terms shall have the corresponding meaning:

1. "Borrower" shall mean **WSG CHARLOTTESVILLE, LLC**, a Virginia limited liability company

2. "Principal Sum" shall mean $2,480,000.00

3. "Monthly Payment" shall mean (i) for each Monthly Payment Date through and including July 11, 2009, a payment equal to all interest that has accrued on the principal sum of this Note during the preceding Accrual Period, and (ii) for each Monthly Payment Date thereafter, a payment equal to $15,626.39.

4. "Security Instrument" shall mean the Deed of Trust, Fixture Filing and Security Agreement dated the date hereof in the principal sum of $16,620,000.00 given by Borrower to (or for the benefit of) Lender covering the fee estate of Borrower in certain premises located in Albemarle County, Commonwealth of Virginia, and other property, as more particularly described therein (collectively, the "Property").

**EXHIBIT B**
**GUARANTY**

## GUARANTY OF PAYMENT

**THIS GUARANTY OF PAYMENT** ("this Guaranty") dated as of July *12*, 2007, made by Borrower (as defined in Schedule 1 attached hereto) (the "Guarantor") in favor of **LEHMAN BROTHERS BANK, FSB,** a federal stock savings bank (the "Lender").

<u>PRELIMINARY STATEMENT</u>

A.      Pursuant to that certain Loan Agreement (the "Loan Agreement") dated the date hereof, by and among the Lender, as lender, Guarantor, as a borrower, and certain other borrowers (the "Other Borrowers"), Lender has agreed to make a loan (the "Loan") to Guarantor. The Loan is to be evidenced by, a certain promissory note dated the date hereof made by Guarantor to Lender in the principal amount of the Loan (the "Note") and secured by, among other things, a first priority mortgage, deed of trust or deed to secure debt and security agreement (the "Security Instrument") encumbering the Property.

B.      Pursuant to the Loan Agreement, Lender has also agreed to make certain other loans (the "Other Loans") to the Other Borrowers as more particularly described on **Schedule A** attached hereto and by this reference made a part hereof, each evidenced by a separate promissory note (the "Other Notes").

C.      Lender has required, as a condition precedent to making the Loan and the Other Loans, that Guarantor execute and deliver this Guaranty with respect to the Other Loans.

D.      It is intended that the liens and Security interests provided by the Security Instrument and the other Loan Documents (as defined in the Security Instrument) shall also secure the Guarantor's obligations under this Guaranty.

**NOW THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor covenants as follows:

1.      Any capitalized terms not defined herein shall have the meanings ascribed to them in the Security Instrument.

2.      Guarantor, as a primary obligor and not merely as a surety, for consideration received, and at the request of the Other Borrowers,  hereby absolutely, unconditionally and irrevocably guarantees to the Lender, the prompt, unconditional and complete payment when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"): (i) the principal sum evidenced by the Other Notes, or so much thereof as may be outstanding from time to time, together with interest thereon at the rate of interest specified in the Other Notes and the Loan Agreement and all other sums, other than principal or interest, which may or shall become due and payable pursuant to the provisions of the Other Notes and the Loan Agreement and (ii) all other obligations and liabilities of the Other Borrowers under the Other Properties' Loan Documents.

3.      It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Other Properties' Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

4.    Any indebtedness of the Other Borrowers to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Guaranteed Obligations.  Until payment in full of the Guaranteed Obligations (and including interest accruing on the Other Notes after the commencement of a proceeding by or against any of the Other Borrowers under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the "Bankruptcy Code") which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of the Other Borrowers to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization.  Further, if Guarantor shall comprise more than one person, firm or corporation, Guarantor agrees that until such payment in full of the Guaranteed Obligations, (a) Guarantor shall not accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) Guarantor will not take any action to exercise or enforce any rights to such contribution, and (c) if Guarantor should receive any payment, satisfaction or security for any indebtedness of the Other Borrowers to Guarantor or for any contribution by the others of Guarantor for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Guaranteed Obligations and until so delivered, shall be held in trust for Lender as security for the Guaranteed Obligations.

5.    Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by the Other Borrowers, for all expenses (including counsel fees) incurred by Lender in connection with the collection against the Other Borrowers of the Guaranteed Obligations or any portion thereof or with the enforcement of this Guaranty.

6.    All moneys available to Lender for application in payment or reduction of the Guaranteed Obligations may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Guaranteed Obligations as Lender may elect.

7.    Guarantor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor.

8.    Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to the Loan Documents or the Other Properties' Loan Documents, against any person obligated thereunder or against the owner of the Property or any of the Other Properties, or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release or discharge of any Other Borrower or other party of any of its obligations under the Other Properties' Loan Documents or (d) by reason of the release or exchange of any of the Property covered by the Security

-2-

Instrument, other collateral for this Guaranty, or collateral for the Other Loans, or (e) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (f) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Loan Documents or the Other Properties' Loan Documents, or (g) by reason of any payment made on the Guaranteed Obligations or any other indebtedness arising under the Loan Documents or the Other Properties' Loan Documents, whether made by the Other Borrowers or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Guaranteed Obligations, nor shall it have the effect of reducing the liability of Guarantor hereunder. It is further understood, that if any of the Other Borrowers shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against any of the Other Borrowers, including the exercise of any option Lender has to declare the Guaranteed Obligations due and payable on the happening of any default or event by which, under the terms of the Loan Documents, the Guaranteed Obligations shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Guaranteed Obligations due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

9.      Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of any of the Other Properties' Loan Documents, that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the other Security Instruments or other such collateral, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

10.     This Agreement shall be governed by, and construed in accordance with, the internal laws of the state in which the Property is located, without regard to choice of law rules.

11.     This is a guaranty of payment and not of collection and upon any default of any of the Other Borrowers under any of the Other Properties' Loan Documents, Lender may, at its option, proceed directly and at once, without notice, against the Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against the Other Borrowers or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against any of the other Properties or other collateral for the Other Loans. Guarantor hereby waives the pleading of any statute of limitations as a defense to its obligations hereunder.

12.     Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

13.     If Guarantor is a partnership, the agreements herein contained shall remain in force and applicable, notwithstanding any changes in the individuals comprising the partnership, and the term "Guarantor," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If Guarantor is a corporation or limited liability company, the agreements

-3-

contained herein shall remain in full force and applicable notwithstanding any changes in the shareholders or members comprising, or the officers and directors or managers relating to, the corporation or limited liability company, and the term "Guarantor" as used herein, shall include any alternative or successor corporation or limited liability company, but any predecessor corporation or limited liability company shall not be relieved of liability hereunder.

14.    Notwithstanding anything to the contrary contained herein, (a) following a transfer of the Property approved by Lender, other than in connection with a Portfolio Transfer (as defined in the Security Instrument), and the satisfaction of all of the requirements set forth in Section 8.3 or 8.4 of the Security Instrument with respect to such transfer, as applicable, or (b) following a defeasance of the Loan pursuant to the terms of the Loan Agreement and satisfaction of all of the requirements set forth in the Loan Agreement, Guarantor shall be released from all liability accruing after said transfer.  The terms of this Section 14 shall not be release Guarantor from any liability under this Guaranty in connection with a Portfolio Transfer.

15.    Guarantor and its representative executing below has full power, authority and legal right to execute this Guaranty and to perform all its obligations under this Guaranty.

16.    All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

17.    This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall constitute a single agreement of Guaranty.  The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

18.    This Guaranty may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Other Borrowers, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

19.    This Guaranty shall be secured by the liens, assignments and security interests granted under the Security Instrument and the other Loan Documents.

20.    The obligations of Guarantor hereunder are subject to the Article 13 of the Security Instrument.

*[Remainder of Page Intentionally Left Blank]*

SSL-MIA1 30154474v5

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the date first above set forth.

**BORROWER:**

**WSG CHARLOTTESVILLE, LLC,**
a Virginia limited liability company

By: _____

Eric D. Sheppard, Manager

GtyP

## SCHEDULE A

1.     Loan from Lender to WSG MONROE, LLC, in the original principal amount of $1,240,000.00 evidenced by that certain promissory note executed by WSG MONROE, LLC in favor of Lender as of even date herewith in such original principal amount.

2.     Loan from Lender to WSG DULLES GL, LLC, in the original principal amount of $3,280,000.00 evidenced by that certain promissory note executed by WSG DULLES GL, LLC in favor of Lender as of even date herewith in such original principal amount.

3.     Loan from Lender to WSG SHORT PUMP, LLC, in the original principal amount of $2,160,000.00 evidenced by that certain promissory note executed by WSG SHORT PUMP, LLC in favor of Lender as of even date herewith in such original principal amount.

4.     Loan from Lender to WSG TRACE FORK L.P., in the original principal amount of $2,160,000.00 evidenced by that certain promissory note executed by WSG TRACE FORK L.P. in favor of Lender as of even date herewith in such original principal amount.

5.     Loan from Lender to ATL2130 LIMITED PARTNERSHIP, in the original principal amount of $2,860,000.00 evidenced by that certain promissory note executed by ATL2130 LIMITED PARTNERSHIP in favor of Lender as of even date herewith in such original principal amount.

6.     Loan from Lender to WSG SNELLVILLE LP, in the original principal amount of $2,440,000.00 evidenced by that certain promissory note executed by WSG SNELLVILLE LP in favor of Lender as of even date herewith in such original principal amount.

## SCHEDULE 1
## TO GUARANTY OF PAYMENT

As used in the foregoing document, each of the following terms shall have the corresponding meaning:

1. "Borrower" shall mean **WSG CHARLOTTESVILLE, LLC**, a Virginia limited liability company.

# EXHIBIT C
# DEED OF TRUST

Instrument Control Number

012704

**Commonwealth of Virginia**
**Land Record Instruments**
**Cover Sheet - Form A**

[ILS VLR Cover Sheet Agent 1.0.87]

Doc ID: 004635050060 Type: DEE
Recorded: 08/07/2007 at 01:03:22 PM
Fee Amt: $2,111.00 Page 1 of 56
Albemarle County, VA
Shelby Marshall Clerk Circuit Court
File# 2007-00012704
BK 3471 PG 177-232

| | | | |
|---|---|---|---|
| T A X | C O R P | Date of Instrument: [7/12/2007  ] | |
| | | Instrument Type: [DOT  ] | |
| E X E M P T | | Number of Parcels  [  1] | |
| | | Number of Pages  [  52] | |
| [X] | [X] | City [ ] County [X]  [Albemarle County  ] | (Box for Deed Stamp Only) |

**First and Second Grantors**

| | Last Name | First Name | Middle Name or Initial | Suffix |
|---|---|---|---|---|
| | [WSG Charlottesville, LLC] [ | ] [ | ] [ | ] |
| | [ | ] [ | ] [ | ] |

**First and Second Grantees**

| | | Last Name | First Name | Middle Name or Initial | Suffix |
|---|---|---|---|---|---|
| [ ] | [ ] | [Mcarver | ] [R | ] [Dennis | ] [TR |
| [ ] | [ ] | [ | ] [ | ] [ | ] [ |

Grantee Address     (Name)      [n/a
             (Address 1)    [
             (Address 2)    [
             (City, State, Zip)  [            ] [   ] [   ]
Consideration [7,920,000.00    ] Existing Debt [0.00      ] Assumption Balance [0.00

Prior Instr. Recorded at: City [ ]  County [X]  [Albemarle County     ] Percent. in this Juris.    [    31]
Book    [    ]      Page    [    ]          Instr. No  [
Parcel Identification No (PIN)    [081000000120U0
Tax Map Num.    (if different than PIN)    [
Short Property Description    [See Instrument

Current Property Address (Address 1)   [
             (Address 2)  [
             (City, State, Zip)  [           ] [   ] [

Instrument Prepared By    [Outside of the Commonwealth
Recording Paid for By    [Fidelity National Title Insurance Company
Return Recording To (Name)   [Betty B. Sears
             (Address 1)  [Fidelity National Title Insurance Company
             (Address 2)  [7130 Glen Forest Drive, Suite 403
             (City, State, Zip)  [Richmond         ] [VA ] [23226
Customer Case ID    [WSG Charlottesville ] [       ] [

Cover Sheet Page # 1 of 1

3471-177

TAX PARCEL NO: 06100-00-00-120U0

**WSG CHARLOTTESVILLE, LLC**, as trustor
(Borrower)
(Grantor)

To

**R. DENNIS MCARVER**, as trustee
(Trustee)
(Grantee)

for the benefit of

**LEHMAN BROTHERS BANK, FSB**, as beneficiary
(Lender)
(Grantee)

DEED OF TRUST, FIXTURE FILING
AND SECURITY AGREEMENT

Dated:         July 12, 2007

Location:      Charlottesville, Virginia

UPON RECORDATION RETURN TO:

WHEN RECORDED RETURN TO:
MARGIE POOLE/NTS NO. Loh Man
FIDELITY NATIONAL TITLE
1800 PARKWAY PLACE, STE 700
MARIETTA, GA 30067

This document prepared outside the Commonwealth of Virginia.

SSL-MIA1 30156838v2

## TABLE OF CONTENTS

1 - GRANTS OF SECURITY ..................................................................................................... 1
    1.1       PROPERTY GRANTED ............................................................................................ 1
    1.2       ASSIGNMENT OF RENTS ..................................................................................... 3
    1.3       SECURITY AGREEMENT ....................................................................................... 3
    1.4       PLEDGE OF MONIES HELD .................................................................................. 3

2 - DEBT AND OBLIGATIONS SECURED ....................................................................... 3
    2.1       DEBT AND OBLIGATIONS SECURED .............................................................. 3

3 - BORROWER COVENANTS ............................................................................................ 4
    3.1       PAYMENT OF DEBT .............................................................................................. 4
    3.2       INSURANCE .............................................................................................................. 4
    3.3       PAYMENT OF TAXES, ETC .................................................................................. 7
    3.4       RESERVES ................................................................................................................ 7
    3.5       CONDEMNATION ................................................................................................... 7
    3.6       LEASES AND RENTS .............................................................................................. 8
    3.7       MAINTENANCE OF PROPERTY ........................................................................ 9
    3.8       WASTE ...................................................................................................................... 10
    3.9       COMPLIANCE WITH LAWS ............................................................................... 10
    3.10    BOOKS AND RECORDS ...................................................................................... 10
    3.11    PAYMENT FOR LABOR AND MATERIALS .................................................... 11
    3.12    MANAGEMENT ..................................................................................................... 11
    3.13    PERFORMANCE OF OTHER AGREEMENTS .................................................. 11
    3.14    CHANGE OF NAME, IDENTITY OR STRUCTURE ........................................ 11
    3.15    EXISTENCE ............................................................................................................. 11
    3.16    OFAC ........................................................................................................................ 12

4 - SPECIAL COVENANTS ................................................................................................ 12
    4.1       PROPERTY USE ..................................................................................................... 12
    4.2       SINGLE PURPOSE ENTITY ................................................................................ 12
    4.3       RESTORATION ....................................................................................................... 13
    4.4       LOCK BOX ACCOUNT ........................................................................................ 15

5 - REPRESENTATIONS AND WARRANTIES ............................................................. 16
    5.1       WARRANTY OF TITLE ....................................................................................... 16
    5.2       AUTHORITY ........................................................................................................... 16
    5.3       LEGAL STATUS AND AUTHORITY ................................................................. 17
    5.4       VALIDITY OF DOCUMENTS .............................................................................. 17
    5.5       LITIGATION ........................................................................................................... 17
    5.6       STATUS OF PROPERTY ...................................................................................... 17
    5.7       NO FOREIGN PERSON ........................................................................................ 17
    5.8       SEPARATE TAX LOT .......................................................................................... 18
    5.9       ERISA COMPLIANCE ........................................................................................... 18
    5.10    LEASES ................................................................................................................... 18
    5.11    FINANCIAL CONDITION .................................................................................... 18
    5.12    BUSINESS PURPOSES ......................................................................................... 18
    5.13    TAXES ..................................................................................................................... 18
    5.14    MAILING ADDRESS ............................................................................................ 18
    5.15    NO CHANGE IN FACTS OR CIRCUMSTANCES ............................................ 18

SSL-MIA1 30156838v2

5.16    DISCLOSURE ........................................................................... 18
5.17    THIRD PARTY REPRESENTATIONS ........................................ 18
5.18    ILLEGAL ACTIVITY ................................................................ 18
5.19    OFAC ........................................................................................ 19

6 - OBLIGATIONS AND RELIANCES ................................................ 19
6.1    RELATIONSHIP OF BORROWER AND LENDER ..................... 19
6.2    NO LENDER OBLIGATIONS .................................................... 19

7 - FURTHER ASSURANCES ............................................................ 19
7.1    RECORDING OF SECURITY INSTRUMENT, ETC. .................. 19
7.2    FURTHER ACTS, ETC. ............................................................. 19
7.3    CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS ............ 20
7.4    ESTOPPEL CERTIFICATES ...................................................... 20
7.5    REPLACEMENT DOCUMENTS ................................................. 20

8 - DUE ON SALE/ENCUMBRANCE .................................................. 20
8.1    LENDER RELIANCE ................................................................. 20
8.2    NO SALE/ENCUMBRANCE ...................................................... 21
8.3    SALE/ENCUMBRANCE DEFINED ............................................ 21
8.4    LENDER'S RIGHTS .................................................................. 24

9 - DEFAULT .................................................................................... 24
9.1    EVENTS OF DEFAULT ............................................................. 24

10 - RIGHTS AND REMEDIES ........................................................... 25
10.1    REMEDIES ............................................................................. 25
10.2    APPLICATION OF PROCEEDS ............................................... 26
10.3    RIGHT TO CURE DEFAULTS ................................................. 26
10.4    ACTIONS AND PROCEEDINGS ............................................. 27
10.5    RECOVERY OF SUMS REQUIRED TO BE PAID ................... 27
10.6    EXAMINATION OF BOOKS AND RECORDS .......................... 27
10.7    OTHER RIGHTS, ETC. ........................................................... 27
10.8    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY ....... 27
10.9    VIOLATION OF LAWS ........................................................... 28
10.10    RECOURSE AND CHOICE OF REMEDIES ........................... 28
10.11    RIGHT OF ENTRY ............................................................... 28
10.12    DEFAULT INTEREST AND LATE CHARGES ....................... 28

11 - INDEMNIFICATION ................................................................... 28
11.1    GENERAL INDEMNIFICATION .............................................. 28
11.2    MORTGAGE AND/OR INTANGIBLE TAX .............................. 29
11.3    ERISA INDEMNIFICATION ................................................... 29
11.4    DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES ........ 29

12 - WAIVERS ................................................................................. 29
12.1    WAIVER OF COUNTERCLAIM .............................................. 29
12.2    MARSHALLING AND OTHER MATTERS ............................... 29
12.3    WAIVER OF NOTICE ............................................................. 30
12.4    SOLE DISCRETION OF LENDER ........................................... 30
12.5    SURVIVAL ............................................................................. 30

ii

12.6    WAIVER OF TRIAL BY JURY ...................................................... 30

13 - EXCULPATION ............................................................................ 30
    13.1    EXCULPATION ............................................................... 30
    13.2    RESERVATION OF CERTAIN RIGHTS ............................... 30
    13.3    EXCEPTIONS TO EXCULPATION .................................... 31
    13.4    RECOURSE ...................................................................... 31
    13.5    BANKRUPTCY CLAIMS ................................................... 31

14 - NOTICES .................................................................................... 31
    14.1    NOTICES ......................................................................... 31

15 - APPLICABLE LAW ....................................................................... 32
    15.1    CHOICE OF LAW ............................................................. 32
    15.2    USURY LAWS .................................................................. 32
    15.3    PROVISIONS SUBJECT TO APPLICABLE LAW ................. 33

16 - SECONDARY MARKET ................................................................. 33
    16.1    TRANSFER OF LOAN ....................................................... 33

17 - COSTS ....................................................................................... 33
    17.1    PERFORMANCE AT BORROWER'S EXPENSE ................... 33
    17.2    ATTORNEY'S FEES FOR ENFORCEMENT ........................ 33

18 - DEFINITIONS ............................................................................. 34
    18.1    GENERAL DEFINITIONS ................................................. 34

19 - MISCELLANEOUS PROVISIONS .................................................... 34
    19.1    NO ORAL CHANGE .......................................................... 34
    19.2    LIABILITY ...................................................................... 34
    19.3    INAPPLICABLE PROVISIONS ......................................... 34
    19.4    HEADINGS, ETC. ............................................................ 34
    19.5    DUPLICATE ORIGINALS; COUNTERPARTS ..................... 34
    19.6    NUMBER AND GENDER ................................................... 35
    19.7    SUBROGATION ............................................................... 35
    19.8    BROKERS ....................................................................... 35
    19.9    ENTIRE AGREEMENT ..................................................... 35
    19.10   SUBSTITUTION OF TRUSTEE .......................................... 35
    19.11   THE TRUSTEE'S FEES ..................................................... 35
    19.12   CERTAIN RIGHTS ........................................................... 35
    19.13   RETENTION OF MONEY .................................................. 36
    19.14   PERFECTION OF APPOINTMENT ................................... 36
    19.15   SUCCESSION INSTRUMENTS ......................................... 36
    19.16   RELIANCE OF TRUSTEE ................................................. 36

20 - CROSS-COLLATERALIZATION ..................................................... 36
    20.1    CROSS-COLLATERALIZATION ....................................... 36

21 - STATE SPECIFIC PROVISIONS ..................................................... 37
    21.1    CONSTRUCTION OF THIS SECURITY INSTRUMENT ......... 37
    21.2    CONFLICTING PROVISIONS ........................................... 37

iii

21.3    PURPOSE OF LOAN ....................................................................................................37

iv

THIS DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT (this "Security Instrument") is made as of the 12th day of July, 2007, by Borrower (as defined in Schedule 1 attached hereto), having its principal place of business c/o WSG Development Company, 400 Arthur Godfrey Road, Suite 200, Miami Beach, Florida 33140, as trustor (to be indexed as "Grantor") to R. DENNIS MCARVER, having an address at 1750 Tysons Boulevard, Suite 1800, McLean, Virginia 22102, as trustee ("Trustee") (to be indexed as "Grantee") for the benefit of LEHMAN BROTHERS BANK, FSB, a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801, as beneficiary ("Lender") (to be indexed as "Grantee").

### RECITALS:

Pursuant to a Loan Agreement (the "Loan Agreement") of even date herewith between Borrower, certain other parties (individually an "Other Borrower" and collectively, the "Other Borrowers") and Lender, Lender has agreed to make a loan to Borrower in the Principal Sum (as defined in Schedule 1 attached hereto) (the "Loan"), which Loan is evidenced by that certain promissory note of even date herewith given by Borrower to Lender in such amount in lawful money of the United States of America (the note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note".)

Pursuant to the Loan Agreement, Lender has also agreed to make certain additional loans in the Additional Aggregate Principal Sum (as defined in Schedule 1 attached hereto) to the Other Borrowers (each, an "Other Loan" and collectively, the "Other Loans"). Each Other Borrower has evidenced its respective Other Loan by a promissory note in the principal amount thereof (each, an "Other Note" and collectively, the "Other Notes"). Each Other Note is secured by, among other things, a first priority lien pursuant to a mortgage and security agreement, a deed of trust and security agreement, or two or more mortgages or deeds of trust which have been consolidated and restated pursuant to a consolidation, modification, spreader and extension agreement, as the case may be (each, an "Other Security Instrument" and collectively, the "Other Security Instruments"), on certain real property and improvements owned by the related Other Borrower (each, an "Other Property" and collectively, the "Other Properties").

Pursuant to the Loan Agreement, Borrower has guaranteed the prompt payment in full of the principal sum, interest and other sums due on each of the Other Loans pursuant to a Guaranty of Payment of even date herewith made by Borrower to Lender (the "Guaranty"), and each Other Borrower has guaranteed the prompt payment in full of the Loan and each Other Loan not made to such Other Borrower pursuant to a separate Guaranty of Payment of such Other Borrower of even date herewith to the Lender (each, an "Other Guaranty" and collectively, the "Other Guarantees").

Borrower desires to secure the payment of the Debt (as defined in Article 2), the performance of all Other Obligations (as defined in Article 2), and the Guaranty, in the Aggregate Principal Sum (as defined in Schedule 1 attached hereto).

All capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Agreement.

### 1 - GRANTS OF SECURITY

1.1    PROPERTY GRANTED. Borrower, for and in consideration of the sum of Ten ($10.00) Dollars and other valuable consideration in hand paid, the receipt of which hereby is acknowledged, and the further consideration, uses, purposes and trusts herein set forth and declared, has granted, bargained, transferred, assigned, set-over and conveyed and by these presents does grant, bargain, transfer, assign, set over and convey unto Trustee, and unto his or its successors in the trust hereby created and his or its assigns, forever, all of the Borrower's right, title and interest in and to the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "Property"):  (a) the real property described in Exhibit A attached hereto and made a part hereof (the "Land"); (b) all additional lands, estates and development rights

hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument; (c) the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements"); (d) all easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto; (e) all furnishings, machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above; (f) all leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. § 101 et seq., as the same may be amended from time to time (the "Bankruptcy Code") (the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues (including, but not limited to, any payments made by tenants under the Leases in connection with the termination of any Lease), issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt (as hereinafter defined); (g) any and all lease guaranties, letters of credit and any other credit support (individually, a "Lease Guaranty" and collectively, the "Lease Guaranties") given by any guarantor in connection with any of the Leases (individually, a "Lease Guarantor" and collectively, the "Lease Guarantors"); (h) all rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases and beneficiary under all Lease Guaranties; (i) all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property; (j) all proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property; (k) all refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction; (l) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims; (m) the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property; (n) all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder; (o) all

2

tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property; and (p) any and all other rights of Borrower in and to the items set forth in Subsections (a) through (o) above.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto Trustee, as trustee for the benefit of Lender, to its successors in the trust created by this Security Instrument and to its or their respective assigns, forever, in trust, upon the terms and conditions set forth herein;

IN TRUST, WITH THE POWER OF SALE, to secure payment to Lender of the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall well and truly perform the Other Obligations (as defined in Section 2.1 hereof) as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note and, except in the case of any Other Borrower who shall have received a release of its Property from the cross-default and cross-collateralization provisions of the Loan Documents in connection with (i) a Transfer (as hereinafter defined) of the Property (other than in connection with a Portfolio Transfer (as hereinafter defined)) pursuant to Article 8 hereof, or (ii) a Release (as defined in the Loan Agreement) pursuant to the terms of the Loan Agreement, each Other Borrower shall well and truly pay to Lender the Debt (as defined in each Other Security Instrument) at the time and in the manner provided in each Other Note and each Other Security Instrument, shall well and truly perform the Other Obligations (as defined in each Other Security Instrument) and shall well and truly abide by and comply with each and every covenant set forth in each Other Note and each Other Security Instrument, these presents and the estate hereby granted shall cease, terminate and be void.

1.2     ASSIGNMENT OF RENTS. Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 1.2 and Section 3.6, Lender grants to Borrower a revocable license to collect and receive the Rents, which license shall be automatically revoked upon the occurrence and during the continuance of an Event of Default (as hereinafter defined). Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

1.3     SECURITY AGREEMENT. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations, a security interest in the Property to the full extent that the Property may be subject to the Uniform Commercial Code.

1.4     PLEDGE OF MONIES HELD. Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (as defined in Section 3.4), the Deferred Maintenance Deposit (as defined on Exhibit B attached hereto and made a part hereof), the Reserve (as defined on Exhibit B), Net Proceeds (as defined in Section 4.3), the Lock-Box Account (as defined in Section 4.4) and condemnation awards or payments described in Section 3.5 (collectively, "Deposits"), as additional security for the Obligations until expended or applied as provided in this Security Instrument.

## 2 - DEBT AND OBLIGATIONS SECURED

2.1     DEBT AND OBLIGATIONS SECURED. This Security Instrument and the grants, assignments and transfers made in Article 1 hereof are given for the purpose of securing the payment of the Debt

3

SSL-MIA\ 30155838v2

and the performance of the Other Obligations, in such order of priority as Lender may determine in its sole discretion. For purposes hereof, the term "Debt" shall mean the aggregate of the indebtedness evidenced by the Note in lawful money of the United States of America, interest, default interest, late charges, prepayment premiums and other sums, as provided in the Note, this Security Instrument or the other Loan Documents (defined below), all moneys agreed or provided to be paid by Borrower in the Guaranty, all other moneys agreed or provided to be paid by Borrower in the Note, this Security Instrument or the other Loan Documents, all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby. For purposes hereof, the term "Other Obligations" shall mean the obligations of Borrower (other than the obligation to repay the Debt) contained in this Security Instrument, the Note and the other Loan Documents (as hereinafter defined). For purposes hereof, the term "Loan Documents" shall mean the Note, this Security Instrument, the Loan Agreement and any other documents or instruments which now or shall hereafter wholly or partially secure or guarantee payment of the Note or which have otherwise been executed or are hereafter executed by Borrower and/or any other person or entity in connection with the Loan, the Guaranty and any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of any of the foregoing. Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively below as the "Obligations." All the covenants, conditions and agreements contained in the Note and the other Loan Documents are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. Anything to the contrary herein or in any other Loan Document notwithstanding, the obligations of any guarantor under the Guaranty of Recourse Obligations of Borrower or any Guarantor or Indemnitor under any other separate guaranty or indemnity accepted by Lender shall not be secured by this Security Instrument, any separate assignment of leases or assignment of rents, or any other lien encumbering the Property; provided however that (i) this sentence shall not apply to Borrower's obligations under the Guaranty and (ii) the obligations of Borrower under the Environmental Indemnity Agreement and under any separate indemnity of Borrower shall be so secured, subject to the rights of Lender to proceed on an unsecured basis thereunder pursuant to applicable law.

## 3 - BORROWER COVENANTS

Borrower covenants and agrees that:

3.1    PAYMENT OF DEBT. Borrower will pay the Debt at the time and in the manner provided in the Note, the Loan Agreement, the Guaranty, this Security Instrument and the other Loan Documents.

3.2    INSURANCE.

(a)    Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the coverages set forth herein:

(i)    comprehensive all risk insurance on the Improvements and the Personal Property, in each case (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Security Instrument shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing either an agreed amount endorsement or a waiver of all co-insurance provisions; (C) providing for a deductible of not greater than $25,000; and (D) if any of the Improvements or the use of the Property shall at any time constitute a legal non-conforming structure or use, Borrower shall obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement, which shall include sufficient coverage for (1) costs to comply with building and zoning codes and ordinances, (2) demolition costs, and (3) increased costs of construction. If any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", Borrower shall obtain flood hazard insurance in such an amount as Lender shall require, but in no event less than the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended. In addition, in the event the Property is located in the State of California or in a "seismic zone" 3 or 4 (as defined in the Uniform Building Code published by the International Conference of Building Officials), Borrower shall obtain earthquake insurance in amounts and in form and substance satisfactory to Lender;

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the "occurrence" form with a combined single limit (including "umbrella" coverage in place) of not less than (1) $3,000,000 and a general aggregate limit of not less than $4,000,000; or (2) if any of the Improvements contain elevators, a combined single limit of not less than $5,000,000 and a general aggregate limit of $6,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all written and oral contracts, to the extent the same is available;

(iii)    business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Subsection 3.2(a)(i); (C) on an agreed value actual loss sustained basis in an amount equal to 100% of the projected gross income from the Property for a period of twelve (12) months; and (D) if the Borrower is required to obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement pursuant to Subsection 3.2(a)(i)(D), coverage for the increased period of restoration. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twelve (12) month period. All insurance proceeds payable to Lender pursuant to this Subsection shall be held by Lender and shall be applied to the obligations secured hereunder from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)    (A) at all times during which structural construction, material repairs or alterations are being made with respect to the Improvements, owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) during new construction, the insurance provided for in Subsection 3.2(a)(i) written in a so-called builder's risk completed value form on a non-reporting basis;

(v)    if Borrower has employees, workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 aggregate coverage for disease in respect of any work or operations on or about the Property, or in connection with the Property or its operation;

(vi)    if the Property contains HVAC or other equipment not covered by the comprehensive all risk insurance, comprehensive boiler and machinery insurance, in amounts as shall be reasonably required by Lender;

(vii)    if Borrower owns or operates motor vehicles, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits reasonably acceptable to Lender; and

(viii)    such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)    All insurance provided for in Subsection 3.2(a) hereof shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), and shall be subject to the reasonable approval of Lender as to insurance companies, policy limits and any sub-limits thereof, forms (including exclusions and exceptions), deductibles, loss payees and insureds. Whether or not covered by the express terms of any Policy, Borrower shall not decline, elect not to accept, allow to lapse or fail to pay the required premium for any insurance coverage required to be extended or offered by any insurer by applicable law, rule or regulation without Lender's prior written consent. The insurance companies must be approved, authorized or licensed to

5

provide insurance in the state in which the Property is located and have a rating of "A" or better for claims paying ability assigned by Moody's Investors Service, Inc. and Standard & Poor's Rating Group or a general policy rating of "A-" or better and a financial class of VIII or better assigned by A.M. Best Company, Inc. Each such insurer shall be referred to herein as a "Qualified Insurer".

(c)    Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Security Instrument and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Subsection 3.2(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Subsection 3.2(e). Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Subsection 3.2(a).

(d)    All Policies of insurance provided for or contemplated by Subsection 3.2(a), except for the Policy referenced in Subsection 3.2(a)(v), shall name Lender and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a "mortgagee clause" in form acceptable to Lender providing, among other things, that Lender shall receive at least thirty (30) days prior written notification of any termination, cancellation or reduction of insurance and that the loss thereunder shall be payable to Lender.

(e)    If not previously delivered to Lender, Borrower shall deliver to Lender no later than thirty (30) days after the date hereof certified copies of the existing Policies providing the insurance coverage required under Section 3.2(a) marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums") annually in advance. In addition, no later than thirty (30) days prior to the expiration dates of the Policies which Borrower is now or hereafter required to maintain hereunder, Borrower shall deliver to Lender certified copies of new or renewal Policies (also marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the Insurance Premiums due thereunder annually in advance), together with certificates of insurance therefor, setting forth, among other things, the amounts of insurance maintained, the risks covered by such insurance and the insurance company or companies which carry such insurance. If requested by Lender, Borrower shall furnish verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender. Under no circumstances shall Borrower be permitted to finance the payment of any portion of the Insurance Premiums.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems reasonably necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by this Security Instrument and shall bear interest in accordance with Section 10.3 hereof. Lender shall exercise good faith, commercially reasonable efforts to provide five (5) days prior written notice to Borrower of any action proposed to be taken by Lender pursuant to this Section 3.2(f), during which period Borrower may cure any failure to comply with the provisions of this Section 3.2, except that Lender shall not be under any obligation to provide any prior written notice to Borrower of any proposed action to the extent that Lender reasonably determines that immediate action is necessary to avoid an actual lapse in coverage.

(g)    If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such fire or other casualty, with such alterations as may be approved by Lender (the "Restoration") and otherwise in accordance with Section 4.3 of this Security Instrument, except in instances where Lender has failed or elected not to disburse Net Proceeds to Borrower under such Section 4.3 (provided that such exception shall not apply if the failure to disburse is attributable to Borrower's

6

failure to comply with the conditions set forth in Clauses (A), (D) or (I) of Subsection 4.3(b)(i) or in Subsection 4.3(b)(ii) or any other conditions set forth in Section 4.3 which Borrower has the practical ability to satisfy). Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.

(h)    In the event of foreclosure of this Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to such policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

3.3    PAYMENT OF TAXES, ETC.   Borrower shall promptly pay all taxes, assessments, water rates, sewer rents, governmental impositions, and other charges, including without limitation vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes"), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges"), and all charges for utility services provided to the Property prior to the time same become delinquent. Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property. Except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument, Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.

3.4    RESERVES.   (a) Borrower shall pay to Lender on each date that a regularly scheduled payment of principal or interest is due under the Note (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has obtained knowledge and authorizes Lender or its agent to obtain the bills for Taxes and Other Charges directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 3.2 and 3.3 hereof. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.2 and 3.3 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall estimate as sufficient to make up the deficiency. The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. No earnings or interest on the Escrow Fund shall be payable to Borrower.

(a)    Borrower shall comply with the Replacement and Leasing Reserve Requirements set forth on Exhibit "B" attached hereto and made a part hereof.

3.5    CONDEMNATION.   Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding promptly following Borrower becoming aware of any such proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note, the Loan Agreement, the Guaranty and in this

7

Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note and Other Notes. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 4.3 of this Security Instrument, except in instances where Lender has failed or elected not to disburse Net Proceeds to Borrower under such Section 4.3 (provided that such exception shall not apply if the failure to disburse is attributable to Borrower's failure to comply with the conditions set forth in Clauses (A), (D) or (I) of Subsection 4.3(b)(i) or in Subsection 4.3(b)(ii) or any other conditions set forth in Section 4.3 which Borrower has the practical ability to satisfy). If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt. Lender shall apply Net Proceeds to the Debt promptly following the final determination that such Net Proceeds shall not be applied to the cost of Restoration as hereinafter defined.

      3.6    LEASES AND RENTS.  (a) All Leases shall be written on the standard form of lease which shall have been approved by Lender, which approval shall not be unreasonably withheld, or another commercially reasonable form reasonably acceptable to Lender. Upon request, Borrower shall furnish Lender with executed copies of all Leases. No material changes may be made to the Lender-approved standard lease without the prior written consent of Lender, which approval shall not be unreasonably withheld, conditioned or delayed. In addition, all renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and terms and shall be arms-length transactions with bona fide, independent third party tenants, except as otherwise approved by Lender. All proposed leases and renewals of existing Leases, other than Minor Leases (hereinafter defined), shall be subject to the prior approval of Lender and its counsel, at Borrower's expense, which approval shall not be unreasonably withheld or delayed if the proposed Lease or renewal Lease (i) is on the Lender-approved form, subject only to commercially reasonable variations therefrom, (ii) is negotiated in an arms-length transaction with an independent third party tenant and (iii) provides for rental rates and terms comparable to existing local market terms. All Leases entered into after the date hereof shall provide that they are subordinate to this Security Instrument and that the lessee agrees to attorn to Lender. Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Obligations; (ii) shall promptly send copies to Lender of all notices of default which Borrower shall send or receive thereunder; (iii) shall enforce all of the material terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; Borrower may terminate, however, Minor Leases as the result of a default by lessee thereunder; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents; (vi) shall not alter, modify or change the material terms of the Leases without the prior written consent of Lender, or cancel or terminate the Leases or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the Land or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder; (vii) shall not alter, modify or change the material terms of any guaranty, letter of credit or other credit support with respect to the Leases (the "Lease Guaranty") or cancel or terminate such Lease Guaranty without the prior written consent of Lender; and (viii) shall not consent to any assignment of or subletting under the Leases not in accordance with their terms, without the prior written consent of Lender. For purposes of this Subsection 3.6(a), any failure of Lender to respond to Borrower's written request for consent or approval within thirty (30) days of the date of said request shall be deemed to constitute Lender's consent or approval, provided that Borrower's request (i) is made in accordance with the notice provisions of this Security Instrument; (ii) is accompanied by a copy of the lease, memorandum, modification or other document or instrument for which consent is being requested together with Borrower's certification to Lender that the same constitutes a true and complete copy thereof; and (iii) states prominently in bold capital letters on the face thereof: **WE HEREBY NOTIFY YOU THAT, PURSUANT TO SUBSECTION 3.6(a) OF THE DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT, IF WSG CHARLOTTESVILLE, LLC DOES NOT RECEIVE A RESPONSE FROM LENDER TO THIS REQUEST FOR CONSENT WITHIN THIRTY (30) DAYS AFTER RECEIPT BY LENDER OF THIS REQUEST, THE REQUEST REFERRED TO HEREIN SHALL BE DEEMED APPROVED.** Notwithstanding anything contained herein to the contrary, Borrower may amend the provisions of any Lease

8

without Lender's prior written consent, provided such amendment does not reduce the amount or change the timing of payment of rent, change the term of the Lease (except for renewals or extensions otherwise permitted hereunder), release any party responsible for the obligations of the lessee under the lease, or materially increase the lessor's or materially decrease the lessee's financial obligations with respect to the Property. Borrower shall deliver to Lender a copy of all such amendments entered into pursuant to the foregoing together with Borrower's certification that the amendment satisfies the requirements of the preceding sentence within thirty (30) days after the execution of such amendment

(b)    Notwithstanding the provisions of Subsection 3.6(a) above, renewals of existing commercial Leases and proposed leases for commercial space covering less than twenty percent (20%) of the total rentable space for the Property and accounting for rental income which in the aggregate is less than twenty percent (20%) of the total rental income for the Property shall not be subject to the prior approval of Lender provided that (i) the renewal Lease or proposed lease shall have a lease term not to exceed ten (10) years excluding options to renew, (ii) the renewal Lease or proposed lease shall provide for rental rates and terms comparable to existing local market rates and terms, and (iii) the renewal Lease or proposed lease shall be an arms-length transaction with a bona fide, independent third party tenant (leases meeting the foregoing requirements shall be referred to herein as "Minor Leases"). Borrower shall deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within thirty (30) days after the execution of the Lease.

(c)    Any payment payable by a tenant under a Lease in connection with the termination of said Lease (hereafter, a "Termination Payment") shall be deposited in the Leasing Account. Simultaneously herewith, Borrower and Lender have entered into the Reserve Letter (as defined in Exhibit B) which, among other things, sets forth an amount (the "Leasing Account Cap") which serves as a limit to further contributions to the Leasing Account from Monthly Deposits. Termination Payments contributed to the Leasing Account shall not be counted towards the calculation of the balance in the Leasing Account subject to the Leasing Account Cap. Termination Payments so contributed to the Leasing Account shall be disbursed to Borrower subject to and in accordance with the terms of Exhibit B attached hereto.

(d)    All security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited at such commercial or savings bank or banks as may be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

3.7    MAINTENANCE OF PROPERTY. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property and tenant improvements made in connection with a Lease which has been entered into by Borrower in accordance with the terms hereof) without the consent of Lender, such consent not to be unreasonably withheld or delayed, provided that (1) the making of such alterations or additions shall not adversely affect the use, value or cash flow of the Property and (2) Borrower shall at all times during the course of such addition or alteration for which the cost of completion as reasonably determined by Lender shall exceed $100,000 maintain on deposit with Lender cash or a letter of credit (in form and from an issuer acceptable to Lender) in the amount reasonably estimated by Lender to equal the cost of completing such alteration or addition. Such cash or letter of credit shall constitute additional security for the Debt. Provided no Event of Default or event which, with the passage of time, the provision of notice, or both shall give rise to an Event of Default shall have occurred and be continuing, Lender shall return such cash or letter of credit to Borrower upon the lien-free completion of such additions or alterations in accordance with the terms of this Security Instrument. Lender shall be entitled to draw upon any such letter of credit if a replacement or extension thereof is not received by Lender at least thirty (30) days prior to its expiration date and hold the proceeds of such draw in accordance with the above provisions. The expiration of any letter of credit delivered to Lender in accordance with this Section 3.7 shall constitute an Event of Default. Lender shall not be obligated to draw upon any letter of credit in order to prevent such Event of Default from occurring, and

9

shall not have any liability to Borrower or any other party due to its failure or delay in making any draw thereon, including as a result of the insolvency of the issuer of the letter of credit.  Subject to the provisions of Subsection 3.2(g) and Section 3.5, Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 3.5 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Land.  Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender.

3.8     WASTE.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument.

3.9     COMPLIANCE WITH LAWS.  Borrower shall (i) promptly comply, in all material respects, with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, or the use thereof including, but not limited to, the Americans with Disabilities Act ("ADA") (collectively, the "Applicable Laws"), (ii) from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws, (iii) give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Applicable Laws and of the commencement of any proceedings or investigations which relate to compliance with Applicable Laws, and (iv) take commercially reasonable and appropriate measures to prevent and will not engage in or knowingly permit any illegal activities at the Property.

3.10    BOOKS AND RECORDS.  (a) Borrower shall keep adequate books and records of account in accordance with methods of accounting reasonably acceptable to Lender and furnish to Lender:

(i)     quarterly operating statements of the Property, prepared and certified by Borrower in the form required by Lender, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and major capital improvements for that quarter and containing appropriate year to date information, within thirty (30) days after the end of each fiscal quarter;

(ii)    certified rent rolls for the last month of each fiscal quarter signed and dated by Borrower, detailing the names of all tenants of the Improvements, the portion of Improvements occupied by each tenant, the base rent and any other charges payable under each Lease and the term of each Lease, including the expiration date, and any other information as is reasonably required by Lender, within sixty (60) days after the end of each fiscal quarter;

(iii)   an annual operating statement of the Property detailing the total revenues received, total expenses incurred, total cost of all capital improvements, total debt service and total cash flow, to be prepared and certified by Borrower in the form required by Lender, within ninety (90) days after the close of each fiscal year of Borrower and if available, any operating statements prepared by an independent certified public accountant within thirty (30) days of the date the same are made available to Borrower;

(iv)    an annual balance sheet and profit and loss statement of Borrower in the form required by Lender, to be prepared and certified by Borrower within ninety (90) days after the close of each fiscal year of Borrower, and, if available, any financial statement prepared by an independent certified public accountant with respect to Borrower within sixty (60) days of the date the same are made available to any such persons; and

10

(v)    copies of Borrower's federal income tax returns within thirty (30) days of the date such returns are filed.

(b)    Upon Lender's request, Borrower shall cause each Guarantor (as hereinafter defined) and each Indemnitor other than Borrower (an "Indemnitor") under the Environmental Indemnity (as hereinafter defined) to furnish to Lender, no later September 30 of each year, a financial statement, for the preceding fiscal year for the applicable Guarantor or Indemnitor, certified to Lender and prepared on a form reasonably acceptable to Lender.

(c)    Borrower, its affiliates, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information as may, from time to time, be reasonably required by Lender in form and substance reasonably satisfactory to Lender. Lender may commission new or updated appraisals, phase I and phase II environmental reports, property condition surveys and (if the Property is located in an area with a high degree of seismic activity) seismic risk assessments of the Property to be prepared by third parties (each a "Third Party") designated by Lender after the date hereof (each, a "Third Party Report"). Borrower shall cooperate with each Third Party and Lender in the preparation of the Third Party Reports and shall reimburse Lender within ten (10) days of Lender's demand for all costs incurred by Lender in connection with such Third Party Reports, provided that Borrower shall not be obligated to reimburse Lender for more than the cost of one appraisal, one phase I environmental report, one phase II environmental report, one property condition survey and one seismic risk assessment following the date hereof.

3.11    PAYMENT FOR LABOR AND MATERIALS. Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below).

3.12    MANAGEMENT. [If the Debt Service Coverage Ratio (as hereinafter defined) shall fall below 1.20:1.00, then Lender, at its option, may require Borrower to engage a bona-fide, independent third party management agent approved by Lender in its reasonable discretion (the "New Manager") to manage the Property. The New Manager shall be engaged by Borrower pursuant to a written management agreement that complies with the terms hereof and is otherwise satisfactory to Lender in all material respects.

3.13    PERFORMANCE OF OTHER AGREEMENTS. Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an obligation secured hereby and any amendments, modifications or changes thereto.

3.14    CHANGE OF NAME, IDENTITY OR STRUCTURE. Borrower will not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, limited liability company, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, which consent shall not be unreasonably withheld by Lender so long as Borrower shall at all times comply with the requirements of Section 4.2 and Section 5.9 of this Security Instrument. Borrower will execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein, and to the extent permitted by applicable law, hereby authorizes Lender to file any such financing statement on Borrower's behalf. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

3.15    EXISTENCE. Borrower will continuously maintain its existence and its rights to do business in the state where the Property is located together with its franchises and trade names.

11

3.16    OFAC. At all times throughout the term of the Loan, Borrower and all of its respective Affiliates shall (i) not be a Prohibited Person (defined below) and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury.

The term "Prohibited Person" shall mean any person or entity;

(a)    listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order.

(c)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate of or affiliated with a person or entity listed above.

The term "Affiliate", as used herein, shall mean, as to any person or entity, any other person or entity that, directly or indirectly, is in control of, is controlled by or is under common control with such person or entity or is a director or officer of such person or entity or of an Affiliate of such person or entity. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.

## 4 - SPECIAL COVENANTS

Borrower covenants and agrees that:

4.1    PROPERTY USE. The Property shall be used only for a shopping center and retail uses, and for no other use without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

4.2    SINGLE PURPOSE ENTITY. It has not and shall not: (a) engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property; (c) merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent; (d) fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's partnership agreement, articles or certificate of incorporation , articles of organization, operating agreement, or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations hereunder, under the Note or under the other Loan Documents; (e) own any subsidiary or make any investment in, any person or entity without the consent of Lender; (f) commingle its assets with the assets of any of its general partners, managing members, shareholders, affiliates, principals or of any other person or entity; (g) incur any debt, secured or unsecured, direct or contingent

12

(including guaranteeing any obligation, except pursuant to the Guaranty), other than the Debt, except with respect to trade payables incurred in the ordinary course of its business of owning and operating the Property, provided that such debt is paid when due; (h) fail to maintain its records, books of account and bank accounts separate and apart from those of the general partners, managing members, shareholders, principals and affiliates of Borrower, the affiliates of a general partner or managing member of Borrower, and any other person or entity; (i) enter into any contract or agreement with any general partner, managing member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, managing member, shareholder, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any general partner, managing member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, managing member, shareholder, principal or affiliate thereof; (j) seek the dissolution or winding up in whole, or in part, of Borrower; (k) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof or any other person; (l) hold itself out to be responsible for the debts of another person; (m) make any loans to any third party; (n) fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof, except pursuant to the Guaranty); (o) intentionally deleted; or (p) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors.

        4.3    RESTORATION.   The following provisions shall apply in connection with the Restoration of the Property:

        (a)    If the Net Proceeds shall be less than the Net Proceeds Disbursement Threshold (as defined in Schedule I attached hereto) and the costs of completing the Restoration shall be less than the Net Proceeds Disbursement Threshold, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Subsection 4.3(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Security Instrument.

        (b)    If the Net Proceeds are equal to or greater than the Net Proceeds Disbursement Threshold or the costs of completing the Restoration is equal to or greater than the Net Proceeds Disbursement Threshold, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Subsection 4.3(b). The term "Net Proceeds" for purposes of this Section 4.3 shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Subsections 3.2(a)(i), (iv), (vi) and (viii) of this Security Instrument as a result of such damage or destruction (or any proceeds of self-insurance maintained in lieu of such insurance policies), after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Insurance Proceeds"), or (ii) the net amount of all awards and payments received by Lender with respect to a taking referenced in Section 3.5 of this Security Instrument, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Condemnation Proceeds"), whichever the case may be.

        (i)    The Net Proceeds shall be made available to Borrower for the Restoration provided that each of the following conditions are met: (A) no Event of Default shall have occurred and be continuing under the Note, this Security Instrument or any of the other Loan Documents; (B) (1) in the event of the Net Proceeds are Insurance Proceeds, less than fifty percent (50%) of the total floor area of the Improvements has been damaged, destroyed, or rendered unusable as a result of such fire or other casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than twenty percent (20%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property; (C) Leases demising in the aggregate a percentage amount equal to or greater than fifty percent (50%) (with respect to casualties) or eighty percent (80%) (with respect to condemnation) of the total net rentable space in the Property which has been demised under executed and delivered Leases in

13

effect as of the date of the occurrence of such fire or other casualty, as the case may be, shall remain in full force and effect during and after the completion of the Restoration; (D) Borrower shall have commenced the Restoration as soon as reasonably practicable (but in no event later than ninety (90) days after such damage or destruction or taking, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion; (E) Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note at the Applicable Interest Rate (as defined in the Note), which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Subsection 3.2(a)(iii), if applicable, or (3) by other funds of Borrower; (F) Lender shall be satisfied that following the completion of the Restoration, the ratio of sustainable net cash flow for the Property (after deduction for underwritten reserves) to debt service payable under the Note shall be at least 1.20 to 1.00; (G) Lender shall be reasonably satisfied that the Restoration will be completed on or before the earliest to occur of (1) twelve (12) months prior to the Maturity Date (as defined in the Note), (2) twelve (12) months after the occurrence of such fire or other casualty or taking, whichever the case may be, (3) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Subsection 4.3(b) to remain in effect subsequent to the occurrence of such fire or other casualty or taking, whichever the case may be, and the completion of the Restoration or (4) such time as may be required under any applicable zoning laws, ordinances, rules or regulations in order to repair and restore the Property to the condition it was in immediately prior to such fire or other casualty or to as nearly as possible the condition it was in immediately prior to such taking, as applicable; (H) the Property and the use thereof after the Restoration will be in compliance, in all material respects, with and permitted under all applicable zoning laws, ordinances, rules and regulations; (I) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable laws, rules and regulations; and (J) such fire or other casualty or taking, as applicable, does not result in the loss of access to the Property or the Improvements.

(ii)    The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Subsection 4.3(b), shall constitute additional security for the Obligations. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company insuring the lien of this Security Instrument.

(iii)    All plans and specifications required in connection with the Restoration shall be subject to prior review and approval in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant"), which approval shall not be unreasonably withheld or delayed. Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which approval shall not be unreasonably withheld or delayed. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "Casualty Retainage" as used in this Subsection 4.3(b) shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything

14

to the contrary set forth above in this Subsection 4.3(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.3(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage, provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of this Security Instrument. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)   Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)   If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Subsection 4.3(b) shall constitute additional security for the Obligations. With respect to Restorations following a casualty in which the Improvements are restored to substantially the same condition as they existed prior to the casualty, the excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.3(b), and the receipt by Lender of evidence reasonably satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Security Instrument or any of the other Loan Documents.

(c)   All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 4.3(b)(vi) may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its discretion. Provided no Event of Default exists under the Note, this Security Instrument or the other Loan Documents, Borrower shall not be obligated to pay any prepayment premium or other prepayment consideration in connection with a prepayment resulting from the application of Net Proceeds to the Debt pursuant to the preceding sentence. Any such prepayment shall be applied to the principal last due under the Note and shall not release Borrower from the obligation to pay the Monthly Payments (as defined in the Note) next becoming due under the Note and the Monthly Payment shall not be adjusted or recalculated as a result of such partial prepayment. If Lender shall receive and retain Net Proceeds, the lien of this Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

4.4   LOCK BOX ACCOUNT.  (a) (i) Upon the occurrence of an Event of Default, or (ii) during any period that the Debt Service Coverage Ratio (as defined in Exhibit C attached hereto and made a part hereof) for the Property shall be below 1.0:1.0, provided a lock box procedure has not otherwise been instituted under any other provision of the Loan Documents, Lender shall have the right, upon written notice to Borrower to

15

require that, from and after the next succeeding date of payment of an installment of principal and interest under the Note, all Rents with respect to the Property, at Lender's discretion, be paid directly to the property manager for the Property (the "Manager") and deposited daily by the Manager in the name designated by Lender directly to a designated lock-box account (the "Look-Box Account"), opened by Lender at a bank (the "Lock-Box Bank"), which account shall be within the exclusive control of Lender.

(b)    Upon receipt of notice from Lender as set forth in Subsection (a) above, Borrower shall enter into and shall cause Manager to enter into a lock-box agreement with Lender in a form reasonably satisfactory to Lender, which form shall substantially reflect the provisions of this Section (provided, however, that Borrower's obligations under this Section 4.4 (including Borrower's obligation to cause Manager to deposit Rents in the Lock-Box Account in accordance with Section 4.4(a) above) shall not be dependent upon the execution of any such lock-box agreement). If, in Lender's judgment, the Manager's performance in collecting Rents shall decline, Borrower shall irrevocably instruct and otherwise cause each party paying such Rents (including each tenant under any Lease) to make all payments (A) if by wire transfer, to the Lock Box Account, and (B) if by check, money order or similar manner of payment, by mail to a designated lock box (the "Lock Box") within the exclusive control of Lender. Amounts deposited into the Lock-Box shall be collected and deposited daily by the Lock-Box Bank into the Lock-Box Account. Borrower agrees that if any Rents required to be deposited in the Lock Box Account shall be received by it or any affiliate or any manager of all or any portion of the Property, Borrower shall deposit or cause such Rents to be deposited in the Lock Box Account within one (1) Business Day of the receipt of such Rents by Borrower, any affiliate or any manager.

(c)    Amounts on deposit in the Lock-Box Account on any date of payment of an installment of principal and interest under the Note shall be applied in the following order of priority: (i) to pay any Taxes, Other Charges or Insurance Premiums then due and payable; (ii) to pay the Lock-Box Bank's fees; (iii) to pay interest and principal due on such date with respect to the Note; (iv) to replenish all reserves and escrow funds required to be paid by Borrower to Lender under the Note, this Security Instrument and the other Loan Documents; (v) to pay normal and customary operating expenses of the Property which have been approved by Lender (which approval, if no Event of Default shall exist at the time, shall not be unreasonably withheld); and (vi) unless the Property is a multi-family, hotel, self-storage facility or nursing home property, provided no Event of Default shall exist at the time, to the Leasing Account (as defined in Exhibit B). None of the sums contributed to the Leasing Account in accordance with (vi) above shall be counted towards any balance in the Leasing Account which serves to limit future contributions to the Leasing Account from Monthly Deposits.

(d)    In the event that Lender shall have the right to institute lock box procedures pursuant to any other provision of the Loan Documents, the terms and provisions of such provision shall supersede the provisions of this Section 4.4.

## 5 - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

5.1    WARRANTY OF TITLE. Borrower has paid for and has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, set over, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions"). Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

5.2    AUTHORITY. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, set-over, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

16

5.3    LEGAL STATUS AND AUTHORITY. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the State where the Property is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, this Security Instrument and the other Loan Documents.

5.4    VALIDITY OF DOCUMENTS. (a) The execution, delivery and performance of the Note, this Security Instrument and the other Loan Documents and the borrowing evidenced by the Note (i) are within the corporate, partnership, trust or limited liability company (as the case may be) power of Borrower; (ii) have been authorized by all requisite corporate, partnership, trust or limited liability company (as the case may be) action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership, trust, operating agreement or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby); and (b) the Note, this Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower.

5.5    LITIGATION. There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against, or affecting, Borrower, a Guarantor, if any, an Indemnitor, if any, or the Property that has not been disclosed to Lender or is not adequately covered by insurance, as determined by Lender in its sole and absolute discretion.

5.6    STATUS OF PROPERTY. (a) No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, or any successor law, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in Section 3.2 hereof; (b) Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification; (c) the Property and the present and contemplated use and occupancy thereof are in full compliance with all Applicable Laws, including, without limitation, zoning ordinances, building codes, land use and environmental laws, laws relating to the disabled (including, but not limited to, the ADA) and other similar laws; (d) the Property is served by all utilities (including, but not limited to, public water and sewer systems) required for the current or contemplated use thereof; (e) all utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service; (f) all public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public; (g) the Property is, to the best of Borrower's knowledge, free from damage caused by fire or other casualty; (h) all costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full; (i) all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws; and (j) all Improvements lie within the boundary of the Land.

5.7    NO FOREIGN PERSON. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

17

SSL-MIAI 30156838v2

5.8   SEPARATE TAX LOT. The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements are assessed and taxed together with the Property or any portion thereof.

5.9   ERISA COMPLIANCE. As of the date hereof and throughout the term of this Security Instrument, (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA; (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans. Borrower shall deliver to Lender such certifications or other evidence as requested by Lender from time to time of Borrower's compliance with the foregoing representations and covenants.

5.10   LEASES. (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable; (c) the material terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (d) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (e) none of the Rents have been collected for more than one (1) month in advance; (f) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (g) there exist no offsets or defenses to the payment of any portion of the Rents; (h) no Lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; and (i) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease.

5.11   FINANCIAL CONDITION. (a) Borrower is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated, and (b) it has received reasonably equivalent value for the granting of this Security Instrument.

5.12   BUSINESS PURPOSES. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

5.13   TAXES. Borrower has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

5.14   MAILING ADDRESS. Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

5.15   NO CHANGE IN FACTS OR CIRCUMSTANCES. All information submitted in connection with Borrower's application for the loan and Lender's issuance of a commitment for the Loan (collectively, the "Loan Application") and the satisfaction of the conditions thereof, including, but not limited to, all financial statements, rent rolls, reports, certificates and other documents, are accurate, complete and correct in all respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

5.16   DISCLOSURE. To Borrower's best knowledge, Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

5.17   THIRD PARTY REPRESENTATIONS. Each of the representations and the warranties made by each Guarantor and Indemnitor herein or in any other Loan Document(s) is true and correct in all material respects.

5.18   ILLEGAL ACTIVITY. No portion of the Property has been or will be purchased with proceeds of any illegal activity.

18

5.19    OFAC. Borrower represents and warrants that neither Borrower or any of its respective Affiliates is a Prohibited Person and Borrower and all of its respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

Borrower acknowledges that in accepting the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth above notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in making the Loan and that Lender would not make the Loan in the absence of such warranties.

## 6 - OBLIGATIONS AND RELIANCES

6.1    RELATIONSHIP OF BORROWER AND LENDER. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower and no term or condition of any of the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor. Borrower is not relying on Lender's expertise business acumen or advice in connection with the Property.

6.2    NO LENDER OBLIGATIONS. (a) Notwithstanding the provisions of Subsections 1.1(f) and (l) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the other Loan Documents, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

## 7 - FURTHER ASSURANCES

7.1    RECORDING OF SECURITY INSTRUMENT, ETC. Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Except where prohibited by law, Borrower will pay all taxes, duties, imposts, assessments, filing, registration and recording fees, and any and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Loan Documents and any amendment or supplement thereto.

7.2    FURTHER ACTS, ETC. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, deeds to secure debt and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Applicable Laws. Borrower, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, and to file in the appropriate filing or recording offices, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property.

19

SSL-MIAI 30156838v2

Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this Section 7.2.

7.3    CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS. (a) If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable, without prepayment premium or penalty.

(b)    Borrower will not claim or demand or be entitled to any credit or credits against the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable, without prepayment premium or penalty.

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

7.4    ESTOPPEL CERTIFICATES. (a) After request by Lender, Borrower, within fifteen (15) Business Days, shall furnish Lender or any proposed assignee an estoppel certificate in form and content as may be requested by Lender with respect to the status of the Loan and/or the Loan Documents.

(b)    Borrower shall use good faith and diligent commercially reasonable efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees as required by Lender attesting to such facts regarding the Lease as Lender may reasonably require, provided that (i) Borrower shall not be required to honor more than one request made by Lender in any twelve month period and (ii) in no event shall Borrower be required to obtain estoppel certificates from lessees containing more information than that required to be certified pursuant to the terms of the related Lease.

7.5    REPLACEMENT DOCUMENTS. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## 8 - DUE ON SALE/ENCUMBRANCE

8.1    LENDER RELIANCE. Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, managing members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for payment and performance of the Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the payment or the performance of the Obligations, Lender can recover the Debt by a sale of the Property. NOTICE - THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

SSL-MIA1 3015683v2

8.2    NO SALE/ENCUMBRANCE.  Borrower agrees that Borrower shall not, without the prior written consent of Lender, sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or otherwise transfer the Property or any part thereof or permit the Property or any part thereof to be sold, conveyed, mortgaged, granted, bargained, encumbered, pledged, assigned, or otherwise transferred.

8.3    SALE/ENCUMBRANCE DEFINED.  (a) A sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Article 8 shall be deemed to include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower, any Guarantor, any Indemnitor, or any general partner or managing member of Borrower, Guarantor or Indemnitor is a corporation, the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock by which an aggregate of more than 49% of such corporation's stock shall become vested in another party; (iv) if Borrower, any Guarantor or Indemnitor or any general partner or managing member of Borrower, any Guarantor or Indemnitor is a limited or general partnership or joint venture, the change, removal or resignation of a general partner or managing partner, or the transfer or pledge of the partnership interest of any general partner or managing partner of such partnership or any profits or proceeds relating to such partnership interest or the transfer or pledge of more than 49% in the aggregate of any limited partnership interests in such partnership or any profits or proceeds related to such interests whether in one transfer or pledge or a series of transfers or pledges; (v) if Borrower, any Guarantor or Indemnitor or any general partner or managing member of Borrower, any Guarantor or Indemnitor is a limited liability company, the change, removal or resignation of the managing member of such company, or the transfer or pledge of the membership interest of the managing member of such company or any profits or proceeds relating to such membership interest or the transfer or pledge of more than 49% in the aggregate of any membership interests in such company or any profits or proceeds related to such interests whether in one transfer or pledge or a series of transfers or pledges; and (vi) without limitation to the foregoing, any voluntary or involuntary sale, transfer, conveyance or pledge by any person or entity which directly or indirectly controls Borrower (by operation of law or otherwise) (a "Principal") of its direct or indirect controlling interest in Borrower.  Notwithstanding the foregoing, the following transfers shall not be deemed to be a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer within the meaning of this Article 8: (A) transfer by devise or descent or by operation of law upon the death of a partner, member or stockholder of Borrower or any general partner thereof, and (B) a sale, transfer or hypothecation of a partnership, shareholder or membership interest in Borrower, whichever the case may be, by the current partner(s), shareholder(s) or member(s), as applicable, to an immediate family member (i.e., parents, spouses, siblings, children or grandchildren) of such partner, shareholder or member (or a trust for the benefit of any such persons).

(b)    Subject to the provisions of Section 8.3(c), following the sale of the Loan in a securitization, Lender's consent to a one-time sale, assignment, or other transfer of the Property shall not be withheld provided that Lender receives sixty (60) days prior written notice of such transfer and no Event of Default has occurred and is continuing, and further provided that, the following additional requirements are satisfied:

(i)    Borrower shall pay Lender a transfer fee equal to 0.5% of the outstanding principal balance of the Loan at the time of such transfer;

(ii)    Borrower shall pay any and all out-of-pocket costs actually incurred in connection with the transfer of the Property (including, without limitation, Lender's reasonable counsel fees and disbursements and all recording fees, title insurance premiums and mortgage and intangible taxes and the fees and expenses of the Rating Agencies pursuant to clause (x) below);

(iii)    The proposed transferee (the "Transferee") or Transferee's Principals (hereinafter defined) must have demonstrated expertise in owning and operating properties similar in location, size and operation to the Property, which expertise shall be reasonably determined by Lender.  The term

21

"Transferee's Principals" shall include Transferee's (A) managing members, general partners or principal shareholders and (B) such other members, partners or shareholders which directly or indirectly shall own a 15% or greater interest in Transferee;

(iv)    Transferee and Transferee's Principals shall, as of the date of such transfer, have an aggregate net worth and liquidity reasonably acceptable to Lender;

(v)    Transferee, Transferee's Principals and all other entities which may be owned or controlled directly or indirectly by Transferee's Principals ("Related Entities") must not have been a party to any bankruptcy proceedings, voluntary or involuntary, made an assignment for the benefit of creditors or taken advantage of any insolvency act, or any act for the benefit of debtors within seven (7) years prior to the date of the proposed transfer of the Property;

(vi)    Transferee shall assume all of the obligations of Borrower under the Loan Documents in a manner satisfactory to Lender in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender and one or more Transferee's Principals having an aggregated net worth and liquidity reasonably acceptable to Lender shall execute in favor of Lender a Guaranty of Recourse Obligations and Environmental Indemnity Agreement in form acceptable to Lender;

(vii)    There shall be no material litigation or regulatory action pending or threatened against Transferee, Transferee's Principals or Related Entities which is not reasonably acceptable to Lender;

(viii)    Transferee, Transferee's Principals and Related Entities shall not have defaulted under its or their obligations with respect to any other indebtedness in a manner which is not reasonably acceptable to Lender;

(ix)    Transferee and Transferee's Principals must be able to satisfy all the covenants set forth in Sections 4.2 and 5.9 hereof. Without limiting the generality of the foregoing, (A) the Property shall be conveyed to the Transferee pursuant to a deed of conveyance delivered in connection with an arms-length transaction and (B) Borrower shall furnish Lender with a letter countersigned by a title insurance company acknowledging receipt of such deed and agreeing to record such deed in the real estate records for the county in which the Property is located;

(x)    No Event of Default or event which, with the giving of notice, passage of time or both, shall constitute an Event of Default, shall otherwise occur as a result of such transfer, and Transferee and Transferee's Principals shall deliver (A) all organizational documentation reasonably requested by Lender, which shall be reasonably satisfactory to Lender, and (B) all certificates, agreements and covenants reasonably required by Lender;

(xi)    The Rating Agencies selected by Lender shall confirm in a manner acceptable to Lender that such transfer shall not result in the downgrade, qualification or withdrawal of any ratings then assigned by such Rating Agencies to any class of Securities; and

(xii)    Borrower shall deliver, at its sole cost and expense, an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any additional exceptions or liens other than those contained in the title policy issued on the date hereof.

22

Immediately upon a transfer of the Property to such Transferee and the satisfaction of all of the above requirements and the Additional Assumption Conditions (as hereinafter defined), if applicable, (A) the named Borrower herein shall be released from all liability under this Security Instrument, the Note, the Guaranty and the other Loan Documents accruing after such transfer, (B) the Loan and any Other Loan(s) with respect to which the Other Loan Assumption Conditions (as hereinafter defined) are satisfied, shall be released from the effect of the cross-default and cross-collateralization provisions of the Loan Documents and the Other Properties' Loan Documents (as hereinafter defined), and (C) each Guarantor and Indemnitor shall be released from all liability under this Security Instrument, the Note, the Guaranty and the other Loan Documents accruing after such transfer. The foregoing releases shall be effective upon the date of such transfer, but Lender agrees to provide written evidence thereof reasonably requested by Borrower.

(c)    Notwithstanding anything to the contrary contained herein, Lender shall not be obligated to consent to any Transfer of the Property (other than a Portfolio Transfer) pursuant to Section 8.3(b) unless the following conditions (the "Additional Assumption Conditions") are satisfied in connection with such Transfer:

(i)    After giving effect to the Transfer, (A) the aggregate Adjusted Debt Service Coverage Ratio with respect to the Other Loans shall be equal to or greater than 1.20 to 1.00, (B) the Adjusted Debt Service Coverage Ratio with respect to the Loan shall be equal to or greater than 1.30 to 1.00, (C) the LTV with respect to the Other Loans shall be no greater than 80% and (D) the LTV with respect to the Loan shall be no greater than 70%.

(ii)    Borrower and Lender shall enter into such modifications, releases and replacements of Loan Documents that are reasonably required to effectuate the Transfer and the termination of the cross-collateralization and cross-defaulting between the Loan and the Other Loans; and

(iii)    The transactions contemplated by this Section shall not constitute a prohibited transaction for or a contribution after the start up day to a "REMIC Trust" which shall own the Loan and will not disqualify such REMIC Trust as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code, and the Loan shall continue to constitute a "qualified mortgage" within the meaning of Sections 860D and 860G(a)(3) of the Code and Lender shall have received an opinion in form and from counsel acceptable to Lender with respect to the matters described in this clause (15).

(d)    As used herein, the following terms shall have the following meanings:

(i)    "Adjusted Debt Service Coverage Ratio" shall mean the Debt Service Coverage Ratio, adjusted as follows: (A) "Gross Income" shall not include (1) the Rents paid by any tenant that is a debtor in bankruptcy or in default under its Lease, that is not conducting normal business operations at its leased premises (or has notified Borrower of its intent to discontinue operations) or whose Lease has expired on or prior to, or is scheduled to expire within six (6) months after, the date of calculation or (2) Rents that are in excess of market rents for comparable space at the time of the Transfer (but only to the extent of such excess), as reasonably determined by Lender, or (3) reimbursements in excess of Expenses for the previous (12) month period, or (4) a vacancy and credit loss allowance equal to the greater of (y) actual in place vacancy, and (z) 5% of Gross Income, or (5) Rents payable by month to month tenants or that Lender otherwise determines are not sustainable income; and (B) "Gross Income" shall include the annualized Rents of any tenant who commenced the payment of full base rent within twelve (12) months prior to the date of calculation or who is conducting normal business operations.

(ii)    "Appraisal" shall mean an appraisal of the Property and/or any of the Other Properties, as applicable, prepared in accordance with the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended ("FIRREA"), prepared by an independent third party appraiser

23

selected by Lender holding a MAI designation, who is state licensed or state certified if required under the laws of the state where the Property is located, who meets the requirements of FIRREA.

(iii)   "LTV" shall mean the ratio of the outstanding principal balance of the Loan, and/or the Other Loans, as applicable, to the then current fair market value of the Property and/or the Other Properties, as applicable, as determined by an Appraisal acceptable to Lender, dated within sixty (60) days prior to the Transfer, and performed by an appraiser acceptable to Lender.

(iv)   "Other Loan Assumption Conditions" shall mean the Additional Assumption Conditions, as defined in the Other Security Instruments.

(v)   "Portfolio Transfer" shall mean a transfer of the Property and all of the Other Properties encumbered by Other Security Instruments securing Other Loans that are cross-collateralized and cross-defaulted with the Loan.

(vi)   "Property Transfer" shall mean the transfer of the Property or any Other Property other than in connection with a Portfolio Transfer.

8.4   **LENDER'S RIGHTS**.   Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of the Note, this Security Instrument and the other Loan Documents as so modified by the proposed transferee, payment of a transfer fee of one-half percent (0.5%) of the principal balance of the Note and all of Lender's reasonable and actual expenses incurred in connection with such transfer, the approval by Lender of the proposed transferee, the proposed transferee's continued compliance with the representations, warranties and covenants set forth in Sections 4.2 and 5.9 hereof, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property without Lender's consent. This provision shall apply to every sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property.

## 9 - DEFAULT

9.1   **EVENTS OF DEFAULT**.   The occurrence of any one or more of the following events shall constitute an "Event of Default": (a) if any portion of the Debt is not paid on the date the same is due or if the entire Debt is not paid on or before the Maturity Date; (b) if any of the Taxes or Other Charges is not paid prior to the date the same becomes delinquent except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument; (c) if (i) the Policies are not kept in full force and effect, or (ii) the Policies are not delivered to Lender upon request or Borrower has not delivered evidence of the renewal of the Policies thirty (30) days prior to their expiration as provided in Section 3.2(e), and such failure remains uncured beyond five (5) days after Lender delivers notice of Borrower's failure to Borrower; (d) if Borrower violates or does not comply with any of the provisions of Sections 3.6 or 4.2 or Articles 8 or 11; (e) if any representation or warranty of Borrower, Indemnitor or any person guaranteeing payment or performance of the Obligations or any portion thereof (a "Guarantor"), or any general partner, principal or beneficial owner of any of the foregoing, made herein or in the Environmental Indemnity (defined below) or any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made; (f) if (i) Borrower or any general partner or managing member of Borrower shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, adjustment, liquidation, dissolution or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Borrower or any general partner or managing member of

24

Borrower shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any general partner or managing member of Borrower any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of ninety (90) days; or (iii) there shall be commenced against Borrower or any general partner or managing member of Borrower any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or (iv) Borrower or any general partner or managing member of Borrower shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or any general partner or managing member of Borrower shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (g) if Borrower shall be in default beyond any applicable notice or cure period under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument; (h) if the Property becomes subject to any mechanic's, materialmen's or other lien other than a lien for local real estate taxes and assessments not then delinquent and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower has first received notice thereof; (i) if any federal tax lien is filed against the Property and same is not discharged of record within thirty (30) days after Borrower has first received notice thereof; (j) if within ten (10) days of Lender's demand therefor Borrower fails to provide Lender with the written certification and evidence referred to in Section 5.9 hereof or Borrower fails to comply with its obligations under Section 16.1; (k) if Borrower or any other Indemnitor shall fail to perform any of its obligations under that certain environmental indemnity agreement of even date herewith (the "Environmental Indemnity") after the expiration of applicable notice and grace periods, if any; (l) if any default beyond any applicable notice or cure period occurs under any guaranty or indemnity executed in connection herewith and such default continues after the expiration of applicable grace periods, if any; (m) if for more than ten (10) days after notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Security Instrument or the other Loan Documents in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of ninety (90) days; or (n) if an Event of Default (as defined in each Other Security Instrument) occurs under any such Other Security Instrument.

## 10 - RIGHTS AND REMEDIES

10.1    REMEDIES.  Upon the occurrence of any Event of Default, Borrower agrees that Trustee or Lender may take such action, without notice or demand, as Lender deems advisable to protect and enforce Trustee's or Lender's rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Trustee or Lender: (a) declare the entire unpaid Debt to be immediately due and payable; (b) with or without entry, institute proceedings, judicial or otherwise, for the complete or partial foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner, any partial foreclosure to be subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority; (c) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale, judicial decree or otherwise, at one or more sales, as an entirety or in one or more parcels; (d) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the other Loan Documents; (e) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents; (f) apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Indemnitor or of any person, firm or other entity

25

liable for the payment of the Debt; (g) enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may exercise all rights and powers of Borrower with respect to the Property including, without limitation, (1) the right to use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (2) the right to make or complete any construction, alterations, additions, renewals, replacements and improvements to or on the Property as Lender deems advisable; (3) the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (h) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (i) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; (j) apply the receipts from the Property, any Deposits and interest thereon and/or any unearned Insurance Premiums paid to Lender upon the surrender of any Policies maintained pursuant to Article 3 hereof (it being agreed that Lender shall have the right to surrender such Policies upon the occurrence of an Event of Default), to the payment of the Obligations, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion; (k) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (1) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (2) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender; or (l) require a Lock-Box Account pursuant to Section 4.4 and apply all sums in the Lock-Box Account to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its discretion. Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower. Upon any foreclosure or other sale of the Property pursuant to the terms hereof, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the secured indebtedness as a credit against the purchase price.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section 10.1 to the contrary, if any Event of Default as described in clause (i) or (ii) of Subsection 9.1(f) shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

10.2    APPLICATION OF PROCEEDS.    The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

10.3    RIGHT TO CURE DEFAULTS.    Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or curing or being deemed to have cured any default hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 10.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate (as defined in the Note), for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this

26

Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

10.4    ACTIONS AND PROCEEDINGS.    Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

10.5    RECOVERY OF SUMS REQUIRED TO BE PAID.    Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

10.6    EXAMINATION OF BOOKS AND RECORDS.    Lender, its agents, accountants and attorneys shall have the right, upon reasonable notice, to examine the records, books, management and other papers of Borrower and its affiliates or of any Guarantor or Indemnitor which reflect upon their financial condition, at the Property or at any office regularly maintained by Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located. Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers. In addition, upon reasonable notice, Lender, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Borrower and its affiliates or of any Guarantor or Indemnitor pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located. This Section 10.6 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing, provided that, prior to the occurrence of an Event of Default, Lender agrees not to exercise its rights hereunder more than once in any consecutive 12 month period.

10.7    OTHER RIGHTS, ETC.    (a)  The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)    Trustee or Lender may resort for the payment of the Debt to any other security for the debt held by Trustee or Lender in such order and manner as Trustee or Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Trustee or Lender thereafter to foreclose this Security Instrument. The rights of Lender and Trustee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Trustee or Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender and Trustee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

10.8    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY.    Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any

27

subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

10.9    VIOLATION OF LAWS. If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

10.10    RECOURSE AND CHOICE OF REMEDIES. Notwithstanding any other provision of this Security Instrument, including but not limited to Article 13 hereof, Lender and other Indemnified Parties (defined in Section 11.1 below) are entitled to enforce the obligations of Borrower contained in Sections 11.2 and 11.3 without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower. The provisions of Sections 11.2 and 11.3 are exceptions to any non-recourse or exculpation provisions in the Note, this Security Instrument or the other Loan Documents, and Borrower is fully and personally liable for the obligations pursuant to Sections 11.2 and 11.3. The liability of Borrower is not limited to the original principal amount of the Note. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing pursuant to this Security Instrument or exercising any other rights and remedies pursuant to the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Borrower, whether or not action is brought against any other person or entity or whether or not any other person or entity is joined in the action or actions.

10.11    RIGHT OF ENTRY. Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

10.12    DEFAULT INTEREST AND LATE CHARGES. Borrower acknowledges that, without limitation to any of Lender's rights or remedies set forth in this Security Instrument, Lender has the right following an Event of Default to demand interest on the principal amount of the Note at the Default Rate and late payment charges in accordance with the terms of the Note.

## 11 - INDEMNIFICATION

11.1    GENERAL INDEMNIFICATION. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties for, from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense) (the "Losses") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following, except to the extent the following relate solely to an Indemnified Party's gross negligence or willful misconduct: (a) any Event of Default; (b) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Security Instrument or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, any Guarantor or Indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (c) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any use, nonuse or condition in, on or about the Property or any part thereof; (e) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Security Instrument; (f) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with the Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the

proceeds of the transaction in connection with which this Security Instrument is made; (g) any failure of the Property to be in compliance with any Applicable Laws; (h) the enforcement by any Indemnified Party of the provisions of this Article 11; (i) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan; (j) any misrepresentation made by Borrower in this Security Instrument or any other Loan Document; or (k) any other transaction arising out of or in any way connected with the Property or the Loan. Any amounts payable to Lender by reason of the application of this Section 11.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. For purposes of this Article 11, the term "Indemnified Parties" means Trustee or Lender and any person or entity who is or will have been involved in the origination of the Loan, any person or entity who is or will have been involved in the servicing of the Loan, any person or entity in whose name the encumbrance created by this Security Instrument is or will have been recorded and persons and entities who may hold or acquire or will have held a full or partial interest in the Loan, including, but not limited to, custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan.

    11.2   MORTGAGE AND/OR INTANGIBLE TAX.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents.

    11.3   ERISA INDEMNIFICATION.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 5.9.

    11.4   DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

## 12 - WAIVERS

    12.1   WAIVER OF COUNTERCLAIM.  Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the other Loan Documents, or the Obligations. Any assignee of Lender's interest in this Security Instrument and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such rights to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

    12.2   MARSHALLING AND OTHER MATTERS.  Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law.

29

12.3    WAIVER OF NOTICE. Borrower shall not be entitled to any notices of any nature whatsoever from Trustee or Lender except with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Trustee or Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Trustee or Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Trustee or Lender to Borrower.

12.4    SOLE DISCRETION OF LENDER. Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the reasonable discretion of Lender. Notwithstanding the foregoing, all decisions or determinations made by Lender pursuant to this Security Instrument (1) following an Event of Default; or (2) under Sections 3.2, 3.7 or 4.2 or Article 8 of this Security Instrument, shall be made in the sole and absolute discretion of Lender and shall be final and conclusive.

12.5    SURVIVAL. The indemnifications made pursuant to Article 11 shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by: any satisfaction or other termination of this Security Instrument, any assignment or other transfer of all or any portion of this Security Instrument or Lender's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto including but not limited to foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Security Instrument, the Note or the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Borrower from the obligations pursuant hereto.

12.6    WAIVER OF TRIAL BY JURY. BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

13 - EXCULPATION

13.1    EXCULPATION. Except as otherwise provided herein, in the Note or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note or this Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may sell the Property under any power of sale or right of non-judicial foreclosure or bring a foreclosure action, confirmation action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon the Note, this Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by the Note, this Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting the Note and this Security Instrument, agrees that it shall not, except as otherwise provided in Section 10.10, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with the Note, the other Loan Documents or this Security Instrument.

13.2    RESERVATION OF CERTAIN RIGHTS. The provisions of Section 13.1 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by the Note, the other Loan Documents or this Security Instrument; (b) impair the right of Lender to enforce any of its rights or remedies under any Other Security Instruments, Other Notes or any documents or instruments executed and delivered to Lender in connection with the Other Loans (collectively, the "Other Properties' Loan Documents");

30

(c) without limiting the provisions of clause (b) immediately above, impair the right of Lender to obtain a deficiency judgment in any action or proceeding with respect to the Loan Documents in order to preserve its rights and remedies, including, without limitation, foreclosure, non-judicial foreclosure, or the exercise of a power of sale, under the Other Guarantees or the Other Security Instruments; however, Lender agrees that it shall not enforce such deficiency judgment against any assets of Borrower other than in connection with the exercise of its rights and remedies under the Other Guarantees or the Other Security Instruments; (d) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under this Security Instrument; (e) affect the validity or enforceability of the Guaranty, any Other Guaranty or any indemnity, master lease or similar instrument made in connection with the Note, this Security Instrument, or the other Loan Documents; (f) impair the right of Lender to obtain the appointment of a receiver; (g) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (h) impair the right of Lender to obtain a deficiency judgment or judgment on the Note against Borrower if necessary to obtain any insurance proceeds or condemnation awards to which Lender would otherwise be entitled under this Security Instrument, provided, however, Lender shall only enforce such judgment against the insurance proceeds and/or condemnation awards; or (i) impair the right of Lender to enforce the provisions of Sections 10.10, 11.2 and 11.3 of this Security Instrument.

13.3   EXCEPTIONS TO EXCULPATION. Notwithstanding the provisions of this Article to the contrary, Borrower shall be personally liable to Lender for the Losses it incurs due to: (i) fraud or intentional misrepresentation by Borrower, its agents or principals; (ii) Borrower's misapplication or misappropriation of (A) Rents received by Borrower after the occurrence of an Event of Default, (B) tenant security deposits or Rents collected in advance, or (C) insurance proceeds or condemnation awards; (iii) Borrower's failure to pay Taxes, Insurance Premiums, Other Charges (except to the extent that sums sufficient to pay such amounts have been deposited in escrow with Lender pursuant to the terms of this Security Instrument), charges for labor or materials or other charges that can create liens on the Property, provided that Borrower's liability under this clause (iii) shall not exceed an amount equal to the net operating income of the Property for the twelve (12) month period preceding the related failure to pay, less the amount of all  Monthly Payments (as defined in the Note) and required reserve payments made by Borrower in accordance with the Note, this Security Instrument and the other Loan Documents during such twelve (12) month period; (iv) Borrower's failure to comply with the provisions of Sections 3.10, 5.9, or 16.1 of this Security Instrument; or (v) Borrower's or any other Indemnitor's failure to comply with the provisions of the Environmental Indemnity.

13.4   RECOURSE. Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Section 13.1 above SHALL BECOME NULL AND VOID and shall be of no further force and effect (i) in the event of Borrower's default under Section 4.2, in any material respect, or Section 8.2 of this Security Instrument, (ii) if the Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding, or (2) an involuntary bankruptcy or insolvency proceeding (A) which is commenced by any party controlling, controlled by or under common control with Borrower (which shall include, but not be limited to, any creditor or claimant acting in concert with Borrower or any the foregoing parties) (the "Borrowing Group") or (B) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of this Security Instrument or any other remedial action permitted hereunder or under the Note or the other Loan Documents or (iii) if a court of competent jurisdiction holds that the granting, execution or delivery of this Security Instrument or any other Loan Documents is or constitutes a fraudulent conveyance under any bankruptcy, insolvency or fraudulent conveyance law or is otherwise voidable under any such laws.

13.5   BANKRUPTCY CLAIMS. Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Note, this Security Instrument and the other Loan Documents.

## 14 - NOTICES

14.1   NOTICES. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3)

31

Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | Borrower<br>c/o WSG Development Company<br>400 Arthur Godfrey Road, Suite 200<br>Miami Beach, Florida 33140<br>Attention: Jeffrey Graff |
| With a copy to: | Berman Rennert Vogel & Mandler<br>100 S.E. 2nd Avenue, 2900 Floor<br>Miami, Florida 33131<br>Attention: Wendy Beck, Esq. |
| If to Trustee: | R. Dennis McArver<br>1750 Tysons Boulevard, Suite 1800<br>McLean, Virginia 22102 |
| If to Lender: | Lehman Brothers Bank, FSB<br>399 Park Avenue, 8th Floor<br>New York, New York 10022<br>Attention: John Herman |
| With a copy to: | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038-4982<br>Attention: William Campbell, Esq. |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## 15 - APPLICABLE LAW

15.1    CHOICE OF LAW. This Security Instrument shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and the applicable laws of the United States of America.

15.2    USURY LAWS. This Security Instrument and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Debt at a rate which could subject the holder of the Note to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Security Instrument or the Note, Borrower is at any time required or obligated to pay interest on the Debt at a rate in excess of such maximum rate, the rate of interest under the Security Instrument and the Note shall be deemed to be immediately reduced to such maximum rate and the interest payable shall be computed at such maximum rate and all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Note. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.

32

SSL-MIA1 30156838v2

15.3    PROVISIONS SUBJECT TO APPLICABLE LAW.  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## 16 - SECONDARY MARKET

16.1    TRANSFER OF LOAN.  Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities").  Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any rating agency (a "Rating Agency") rating such Securities (all of the foregoing entities collectively referred to as the "Investor") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor or otherwise, as Lender determines necessary or desirable.  Borrower, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section, provided, however, Borrower shall not be responsible for any costs of Lender in connection with such cooperation, and shall only be obligated to incur minor administrative costs associated with providing information (i.e., reproduction, telecopy, overnight courier, etc.).  Borrower shall also promptly furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or Rating Agency any and all available information concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be requested by Lender, any Investor or any prospective Investor or Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any sale, transfer or participation interest.  In addition to any other obligations Borrower may have under this Section 16.1, Borrower shall execute such amendments to the Loan Documents and Borrower's organizational documents as may be requested by the holder of the Note or any Investor to effect the assignment of the Note and the other Loan Documents and/or issuance of Securities including (i) bifurcating the Note into two or more notes and/or splitting this Security Instrument into two or more mortgages, deeds of trust or deeds to secure debt (as the case may be) of the same or different priorities or otherwise as determined by and acceptable to Lender or (ii) dividing the Note into multiple components corresponding to tranches of certificates to be issued in a Securitization each having a notional balance and an interest rate determined by Lender; provided, however, that Borrower shall not be required to modify or amend any Loan Document if the overall effect of such modification or amendment would (y) change the initial weighted average interest rate, the maturity or the amortization of principal set forth in the Note, or (z) modify or amend any other material economic term of the Note or the other Loan Documents or otherwise increase Borrower's obligations or decrease Borrower's rights in any material respect.

## 17 - COSTS

17.1    PERFORMANCE AT BORROWER'S EXPENSE.  Borrower acknowledges and confirms that Lender shall be entitled to impose certain administrative processing and/or commitment fees in connection with:  (a) extensions, renewals, modifications, amendments and terminations of the Loan Documents requested by Borrower, and (b) the release or substitution of collateral for the Loan requested by Borrower, and that Lender shall be entitled to reimbursement for its reasonable out-of-pocket costs and expenses associated with its provision of consents, waivers and approvals under the Loan Documents (the occurrence of any of the above shall be called an "Event").  Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, which are required by law, regulation or any governmental or quasi-governmental authority.  Borrower hereby acknowledges and agrees to pay, immediately, upon demand, all such fees, costs and expenses.

17.2    ATTORNEY'S FEES FOR ENFORCEMENT.  (a) Borrower shall pay all reasonable legal fees incurred by Lender in connection with the preparation of the Note, this Security Instrument and the

33

other Loan Documents, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal expenses and reasonable attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## 18 - DEFINITIONS

18.1    GENERAL DEFINITIONS. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender, its servicer and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder. The terms "include(s)" and "including" shall mean "include(s), without limitation" and "including, without limitation", respectively. The use of the phrase "upon and during the continuance of an Event of Default" and similar phrases in this Security Instrument shall not be deemed to grant Borrower any right to cure an Event of Default (provided that nothing contained herein shall be deemed to limit Borrower's right to cure defaults prior to the expiration of applicable notice and cure periods) and each Event of Default shall continue unless and until the same is waived by Lender in writing in accordance with the requirements of the Loan Documents.

## 19 - MISCELLANEOUS PROVISIONS

19.1    NO ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

19.2    LIABILITY. If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

19.3    INAPPLICABLE PROVISIONS. If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

19.4    HEADINGS, ETC. The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

19.5    DUPLICATE ORIGINALS; COUNTERPARTS. This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

34

19.6    NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

19.7    SUBROGATION.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the payment and performance of the Obligations.

19.8    BROKERS.  Borrower agrees to pay and to indemnify and hold Lender harmless from any all loss, cost or expense (including attorneys' fees and expenses) arising from the claims of any brokers or anyone claiming a right to any fees in connection with the financing of the Property, to the extent claiming by, through or under Borrower.  Notwithstanding the foregoing, Borrower acknowledges that Lender or its affiliates may have a contractual relationship with the broker, if any, that arranged the Loan on Borrower's behalf, and that such broker may be entitled to fees from Lender or its affiliates in connection with the origination, closing or servicing of the Loan, which fees shall be in addition to any brokerage fees owed by Borrower to such broker.  Borrower shall not be responsible for any such additional fees.  Borrower acknowledges and agrees that it has made and will make such inquiries of the broker, if any, that arranged the Loan with respect to the nature or existence of such arrangement.  No agreement by Lender to pay any such fees or compensation to such broker (if any) shall be binding upon Lender unless it is set forth in separate written instrument that has been duly executed by Lender and such broker.

19.9    ENTIRE AGREEMENT.  The Note, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto.  Borrower hereby acknowledges that, except as incorporated in writing in the Note, this Security Instrument and the other Loan Documents, there are not, and were not, and no persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, this Security Instrument and the other Loan Documents.

19.10    SUBSTITUTION OF TRUSTEE.  Lender shall have, and is hereby granted by Borrower with warranty of further assurances, the irrevocable power to appoint one or more persons or entities as a substitute Trustee hereunder, to be exercised at any time hereafter without specifying any reason therefor, by filing for record in the office where this Security Instrument is recorded a deed of appointment.  Said power of appointment of one or more successor Trustees may be exercised as often and whenever Lender deems it advisable.  The exercise of said power of appointment, no matter how often, shall not be an exhaustion thereof.  Upon the recordation of such deed of appointment, the Trustee so appointed shall thereupon, without any further act or deed of conveyance, become fully vested with identically the same title and estate in and to the Property and with all the rights, powers, trusts and duties of their, his, hers or its predecessor in the trust hereunder with like effect as if originally named as Trustee.  Whenever in this Security Instrument reference is made to Trustee, it shall be construed to mean each person or entity appointed as Trustee for the time being, whether original or successors or successor in trust.  All title, estate, rights, powers, trusts and duties hereunder given or appertaining to or devolving upon Trustee shall be in each of the persons or entities appointed as Trustee so that any action hereunder or purporting to be hereunder of any one of the persons or entities appointed as Trustee shall for all purposes be considered to be, and as effective as, the action of Trustee.

19.11    THE TRUSTEE'S FEES.  Borrower shall pay all reasonable costs, fees and expenses incurred by the Trustee and the Trustee's agents and counsel in connection with the performance by the Trustee of the Trustee's duties hereunder and all costs, fees and expenses shall be secured by this Security Instrument.

19.12    CERTAIN RIGHTS.  With the approval of Lender, the Trustee shall have the right to take any and all of the following actions: i) to select, employ, and advise with counsel (who may be, but need not

35

be, counsel for Lender) upon any matters arising hereunder, including the interpretation of the Note, this Security Instrument or the Other Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his agents or attorneys, iii) to select and employ, in and about the execution of his duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of the Trustee, and the Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for the Trustee's gross negligence or bad faith, and iv) any and all other lawful action as Lender may instruct the Trustee to take to protect or enforce Lender's rights hereunder. The Trustee shall not be personally liable in case of entry by the Trustee, or anyone entering by virtue of the powers herein granted to the Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. The Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by the Trustee hereunder, believed by the Trustee in good faith to be genuine. The Trustee shall be entitled to reimbursement for actual expenses incurred by the Trustee in the performance of the Trustee's duties hereunder and to reasonable compensation for such of the Trustees services hereunder as shall be rendered.

19.13    RETENTION OF MONEY. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder.

19.14    PERFECTION OF APPOINTMENT. Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

19.15    SUCCESSION INSTRUMENTS. Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his predecessor in the rights hereunder with like effect as if originally named as the Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

19.16    RELIANCE OF TRUSTEE. As to all matters concerning the existence of defaults hereunder and the amount of indebtedness subject to the Note and secured hereby, as well as similar or related matters, the Trustee is hereby authorized by Borrower to rely conclusively upon, without further inquiry, the affidavit of any officer of Lender.

20 - CROSS-COLLATERALIZATION

20.1    CROSS-COLLATERALIZATION. Upon the occurrence of an Event of Default, Lender shall have the right to institute a proceeding or proceedings for the total or partial foreclosure of this Security Instrument and/or the Other Security Instruments whether by court action, power of sale or otherwise, under any applicable provision of law, for all or any portion of the Debt, or any other indebtedness secured by the Other Security Instruments, and this Security Instrument shall continue in full force and effect without loss of priority as a lien and security interest securing the payment of that portion of the Debt then due and payable but still outstanding. Borrower acknowledges and agrees that the Lender shall be permitted to enforce payment of the Debt and the performance of any term, covenant or condition of the Note, the Guaranty, the Other Security Instruments, the Other Properties' Loan Documents and exercise any and all rights and remedies under the Note, the Guaranty, this Security Instrument, the Other Security Instruments, or the Other Properties' Loan Documents, or as provided by law or at equity, by one or more proceedings, whether contemporaneous,

36

consecutive or both, to be determined by Lender, in its sole discretion, in any one or more of the States or counties in which the Property or any Other Property or Properties is or are located. Neither the acceptance of the Loan Documents or the Other Properties' Loan Documents nor the enforcement thereof in any one State or county, whether by court action, foreclosure, power of sale or otherwise, shall prejudice or in any way limit or preclude enforcement by court action, foreclosure, power of sale or otherwise, of any of the Loan Documents through one or more additional proceedings in that State or county or in any other State or county. Without limiting any of the foregoing, Borrower and Lender hereby agree that Lender may, in its sole and absolute discretion, elect to have the portion of the liens, claims and security interests provided for hereunder which secure the Primary Indebtedness (hereinafter defined) to constitute a first lien on the Property and the portion of the liens, claims and security interests provided for hereunder which secure the Guaranty Indebtedness (hereinafter defined) to constitute a second lien on the Property, subordinate to, and separate and distinct from, the first lien securing the Primary Indebtedness. Borrower shall, promptly following Lender's request, at no cost or expense to Borrower prior to the occurrence of an Event of Default other than minor administrative costs associated with providing information (i.e., reproduction, telecopy, overnight courier, etc.) and Borrower's own attorney's fees, execute and deliver such documents, in recordable form, as may be reasonably requested by Lender to reflect such lien severance and priority arrangement, including substitute or replacement notes and mortgages or deeds of trust, which shall be effective as of the date hereof and enjoy the same priority as this Security Instrument notwithstanding the actual date of execution and delivery thereof; provided, however, that Borrower's failure to do so shall not limit, affect or impair the provisions of the immediately preceding sentence. As used herein, "Guaranty Indebtedness" shall mean that portion of the Debt which is agreed to, or provided to, be paid under the Guaranty, and "Primary Indebtedness" shall mean the entire Debt and the Other Obligations, other than the Guaranty Indebtedness.

## 21 - STATE SPECIFIC PROVISIONS

21.1    CONSTRUCTION OF THIS SECURITY INSTRUMENT. Sections 55-59, 55-59.1, 55-59.2, 55-59.3, and 55-59.4 of the Code of Virginia, 1950, as amended, as they exist as of the date hereof, (the "Sections") are expressly incorporated herein by reference as if fully set forth and stated in the body of this Security Instrument, and shall be construed to impose and confer upon all parties all right, duties, and obligations prescribed therein, except as otherwise expanded or restricted herein (and to the extent that any term of this Security Instrument conflicts with any provision of the Sections, such that it would render the term ambiguous or unenforceable, then the applicable provision of the Section shall be deemed to control). The following complete provisions of Section 55-60 of the Code of Virginia, 1950, as amended, are expressly incorporated herein by reference to them in "short form":

Exemptions Waived;
Subject to all upon default;
Any Trustee may act;
Renewal, Extension or Reinstatement permitted;
Insurance Required - $2,480,000.00;
Substitution of Trustee Permitted - for any reason and without prior notice to the Grantor; and
Bidder's deposit required of not more than ten percent (10%) of the sale price.

21.2    CONFLICTING PROVISIONS.    The provisions of this Article are intended to supplement, and not limit, the other provisions of this Security Instrument; provided, however, that in the event the provisions of this Article contradict any other provision of this Security Instrument, the provisions of this Article shall govern.

21.3    PURPOSE OF LOAN.    Borrower hereby represents and warrants that the Loan secured by this Security Instrument was made and transacted solely for the purpose of carrying on a business or investment activity, and that the proceeds of the Loan were not used for personal, family or household purposes.

*[Remainder of Page Intentionally Left Blank]*

SSL-MIA1 30156838v2

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower as of the day and year first above written.

**BORROWER:**

**WSG CHARLOTTESVILLE, LLC,**
a Virginia limited liability company

By: _____
Eric D. Sheppard, Manager

STATE OF _Florida_ )
                            )ss:
COUNTY OF _Dade_ )

The foregoing instrument was acknowledged before me this _29_ day of June, 2007 by Eric D. Sheppard, as Manager of **WSG CHARLOTTESVILLE, LLC,** a Virginia limited liability company, on behalf of said limited liability company.   He is personally known to me or has produced a _____ as identification.

Print Name: _____
Title: _____
Commission No. _____
                            (if any)

My Commission Expires: _5-4-2009_

Mtg

**EXHIBIT A**

(Description of Land)

ALL of that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate, lying and being in Albermarle County, Virginia and being more particularly described as follows:

**WSG Charlottesville, LLC**
**LEGAL DESCRIPTION**

ALL that certain lot or parcel of land in Albemarle County, Virginia, on the west side of U.S. Route 29 North, near its intersection with Rio Road (State Road 631), containing 37,795 square feet, more or less, more particularly described as Parcel C on a physical survey of William S. Roudabush, Inc., dated May 31, 1983, containing two sheets, and recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia, in Deed Book 786, pages 639 and 640.

TOGETHER WITH AND SUBJECT TO the non-exclusive easements for ingress and egress to and from U.S. Route 29 North and Rio Road (State Route 631) along or over Parcel A, Parcel B and Parcel D shown on a plat by William S. Roudabush, Inc., dated August 23, 1977, revised November 3, 1977, and recorded in said Clerk's Office in Deed Book 636, page 500, and on a plat by William S. Roudabush, Inc., dated May 18, 1979, and recorded in said Clerk's Office in Deed Book 680, page 478.

BEING the same premises as conveyed to WSG Charlottesville, LLC, a Virginia limited liability company from Everette H. Newman, Trustee No. 7, by Deed dated August 9, 2002, recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia in Deed Book 2249, page 655.

**EXHIBIT B**

**REPLACEMENT RESERVE AND LEASING RESERVE REQUIREMENTS**

1.    Defined Terms.

All capitalized terms used herein and not defined in this Security Instrument shall have the meanings set forth in Section 7 of this Exhibit B.  To the extent any Reserve Deposit is assigned the meaning "none" in the Reserve Letter, the provisions set forth in this Exhibit B specifically relating to the making or application of such Reserve Deposits shall be disregarded.

2.    Reserve Deposits.

(a)    Concurrently with the execution of this Security Instrument, Borrower shall deposit with Lender the Deferred Maintenance Deposit.  The Deferred Maintenance Deposit shall be applied as provided in Section 4.1 of this Exhibit B.

(b)    On each date that a regularly scheduled payment of principal or interest is due under the Note, Borrower shall be required to make a Monthly Deposit.

(c)    Lender shall deposit each Monthly Deposit, as received, in an escrow account (the "Reserve").  Out of each Monthly Deposit, the Monthly Replacement Account Deposit shall be allocated to an account (the "Replacement Account") for the payment of Replacements and the Monthly Leasing Account Deposit shall be allocated to an account (the "Leasing Account") for the payment of Tenant Improvements and Leasing Commissions (as defined below) in conjunction with Leases (as hereinafter defined).

(d)    Lender shall maintain a record of all deposits into and withdrawals from the Reserve and their allocation to the Replacement Account and the Leasing Account.  Lender or a designated representative of Lender shall have the sole right to make withdrawals from such account.

(e)    No interest shall be paid on the Deferred Maintenance Deposit.  Provided Borrower pays the account fees set forth below, the Reserve shall be held in an interest bearing account.  Lender shall have no responsibility or liability for the amount of interest earned on the Reserve.  All interest earned on funds in the Reserve shall be added to and become part of the Reserve, shall be allocated pro rata to the Replacement Account and the Leasing Account, and shall be for the benefit of Borrower, subject to Lender's rights pursuant to the terms of this Security Instrument.  In order for the Reserve to bear interest, Borrower shall be required to pay the following fees: a one-time set-up fee on the date hereof of $250 and an additional fee of $200 on January 2 of each calendar year after the date hereof.

3.    Disbursements.

(a)    Provided no Event of Default exists, Lender shall make disbursements of funds available in the Replacement Account to reimburse Borrower for Replacements.

(b)    Provided no Event of Default exists, Lender shall make disbursements of funds in the Leasing Account to reimburse Borrower for the cost of (i) tenant improvements required under any Lease (collectively, the "Tenant Improvements"); and (ii) leasing commissions incurred by Borrower in connection with any Lease, provided that (x) such leasing commissions are reasonable and customary for properties similar to the Property and the portion of the Property for which such leasing commission is due, (y) the amount of such leasing commissions are determined pursuant to arms length transactions between Borrower and any leasing agent to which a leasing commission is due, and excluding any leasing commissions which shall be due any general partner, or shareholder of Borrower or any affiliate of Borrower and (z) the Tenant under the related Lease shall have taken occupancy of its entire leased premises and commenced the payment of its entire base minimum rent (collectively, "Leasing Commissions").

SSL-MIA1 30156838v2

(c)    Lender shall, upon written request from Borrower and satisfaction of the requirements set forth in this Section 3, disburse to Borrower amounts from the Reserve necessary to reimburse Borrower for the actual costs of (i) any Leasing Commissions and (ii) any work relating to Replacements or Tenant Improvements (collectively, "Work"). Notwithstanding the foregoing, provided no Event of Default shall exist at the time of Borrower's request for disbursement of the applicable funds, any Termination Payment paid in connection with the termination of a Lease and deposited in the Leasing Account shall be returned to Borrower once all of the space with respect to which the Termination Payment was paid has been re-leased pursuant to Lease(s) entered into in accordance with the terms of the Security Instrument and Lender has received an estoppel letter with respect to each new Lease confirming (i) the tenant thereunder has taken possession of all of its space and commenced payment of its full base minimum rent and (ii) all obligations of Borrower with respect to the construction of Tenant Improvements, and the payment of tenant improvement allowances and Leasing Commissions have been fully performed. There shall be deducted from the amount of any such Termination Payment returned to Borrower a sum equal to the aggregate amount of disbursements from the Leasing Account in connection with the re-leasing of the space with respect to which such Termination Payment was paid.

(d)    Each request for disbursement from the Reserve shall be in a form specified or approved by Lender, and shall be accompanied by evidence of the full performance of the obligations of the leasing agent or satisfactory completion of the Work, as the case may be, and such bills, invoices and other evidence of the incurrence of the related costs and expenses as Lender may reasonably request.

(e)    Borrower shall not make a request for disbursement from the Reserve more frequently than once in any calendar quarter.

(f)    Borrower shall not make a request for disbursement from the Reserve in an amount less than the lesser of (i) $5,000, and (ii) the total cost of the Replacement, Tenant Improvement or Leasing Commission for which the disbursement is requested.

4.    Performance of Replacements.

4.1.    Deferred Maintenance.  Notwithstanding anything contained herein to the contrary, Borrower agrees to perform all of the Scheduled Repairs within sixty (60) days after the date hereof or such other period of time, if any, set forth in the Reserve Letter. The Deferred Maintenance Deposit shall be used solely for the payment of the actual costs of the Scheduled Repairs. Upon completion of the Scheduled Repairs in accordance with the requirements hereof, the portion of the Deferred Maintenance Deposit remaining undisbursed, if any, shall be disbursed to Borrower. All conditions, covenants and agreements set forth herein with respect to a disbursement from the Replacement Account shall apply to the disbursements from the Deferred Maintenance Deposit.

4.2.    Entry Onto Property: Inspections.  Lender may inspect the Property in connection with any Work prior to disbursing funds from the Reserve with respect thereto. In connection with any Work that is (i) a structural repair or improvement, (ii) a replacement or repair of a major component or element of any part of the Property or (ii) Scheduled Repairs, Lender may require, at Borrower's expense, one or more inspections and/or certificates of completion by an appropriate independent, qualified professional (e.g., architect, engineer, consultant) approved by Lender. In addition to Lender's costs and expenses, Borrower shall pay Lender a reasonable inspection fee, provided, however, such fees shall not exceed $500, in the aggregate, in any calendar year.

5.    Borrower's Records.  Borrower shall furnish such financial statements, invoices, records, papers and documents relating to the Property as Lender may reasonably require from time to time to make the determinations permitted or required to be made by Lender with respect to disbursements of the Deferred Maintenance Deposit and/or the Reserve.

6.    Insufficiency of Reserve Balances, Temporary Deferral of Monthly Deposits.  The insufficiency of any balance in the Reserve or the Deferred Maintenance Deposit shall not abrogate Borrower's agreement to fulfill its obligations contained in this Security Instrument. In the event Lender determines that (i) the balance in the Reserve, plus the amount required to be deposited therein during the succeeding twenty-four (24) months, is

2

SSL-MIA1 30156838v2

less than the current estimated cost to complete the Work and pay the Leasing Commissions which Borrower, in the prudent operation of the Property can reasonably be anticipated to incur during the succeeding twenty four (24) months, or (ii) the balance of the Deferred Maintenance Deposit is less than the amount necessary to complete the Scheduled Repairs, Borrower shall deposit the shortage within ten (10) days of request by Lender. In the event Lender reasonably determines from time to time based on Lender's inspections that the amount of the Monthly Deposit, plus the amount required to be deposited therein prior to the anticipated date on which a such shortfall shall arise, is insufficient to fund the cost of likely Work and Leasing Commissions and related contingencies that may arise during the remaining term of the Loan, Lender may require an increase in the amount of the Monthly Deposits upon thirty (30) days prior written notice to Borrower. Lender may approve a temporary deferral or a reduction in the amount of the Monthly Deposit; provided, however, that if Lender approves either a temporary deferral or reduction in the amount of the Monthly Deposit, such action by Lender shall not prevent Lender from requiring Borrower to resume payment of the Monthly Deposits on any date that Lender may deem appropriate.

7.    <u>Certain Defined Terms</u>. The following terms shall have the meanings assigned to them below:

(a)    "Deferred Maintenance Deposit" means the Deferred Maintenance Deposit set forth in the Reserve Letter, if any.

(b)    "Leasing Account Cap" means the Leasing Account Cap set forth in the Reserve Letter.

(c)    "Monthly Deposit" means the sum of the Monthly Leasing Account Deposit and the Monthly Replacement Account Deposit.

(d)    "Monthly Leasing Account Deposit" means the Monthly Leasing Account Deposit set forth in the Reserve Letter, if any.

(e)    "Monthly Replacement Account Deposit" means the Monthly Replacement Account Deposit set forth in the Reserve Letter. If there is no Monthly Leasing Account Deposit, the Monthly Replacement Account Deposit shall have the same meaning as the Monthly Deposit.

(f)    "Replacements" means the costs of any repairs, improvements, equipment, alterations, additions, changes, replacements and other items which, under generally accepted accounting principles, consistently applied, are properly classified as capital expenditures or capital improvements (and, in the case of multifamily projects only shall include the costs of window treatments and carpeting, blinds, equipment and appliances, and painting of the exterior of the Property), but excluding (i) costs of routine maintenance to the Property; (ii) the costs of salaries, benefits and administrative expenses related to the employment of (A) officers and executives of Borrower, and of employees of Borrower above the level of building manager, and (B) employees of Borrower at or below the level of building manager, except in the case of those costs which Borrower can demonstrate to Lender's satisfaction to be properly allocable to the work performed by such employees in connection with Replacements; (iii) the cost of any items for which Borrower is reimbursed by insurance or otherwise; (iv) the cost of any landscaping work to the Property; (v) the cost of any material additions or material alterations to the Property after the date hereof; and (vi) Tenant Improvements.

(g)    "Reserve Deposits" shall mean the Deferred Maintenance Deposit and the Monthly Deposit.

(h)    "Reserve Letter" means a letter from Borrower to Lender of even date herewith confirming the amount of the Monthly Replacement Account Deposit, the Monthly Leasing Deposit Account (if any) and the Deferred Maintenance Deposit, if any, and the Scheduled Repairs, if any.

3

(i)   *"Scheduled Repairs"* means the Scheduled Repairs described in the Reserve letter, if any.

4

## EXHIBIT C

The term "Debt Service Coverage Ratio" shall mean the ratio of (a) the NOI (hereinafter defined) produced by the operation of the Property during the twelve (12) calendar month period immediately preceding the calculation to (b) the Annual Debt Service.

The Term "NOI" shall mean the Gross Income (as hereinafter defined) derived from the operation of the Property, less Expenses (hereinafter defined).

The term "Annual Debt Service" shall mean an amount equal to twelve (12) times the Monthly Payment payable under the Note.

The term "Gross Income" means (and includes only) Rents (as defined in the Security Instruments) and such other income, including any rent loss or business interruption insurance proceeds, laundry, parking, vending or concession income, which are actually received by the Borrower or its agents or representatives. Notwithstanding the foregoing, Gross Income shall not include (a) condemnation or insurance proceeds (excluding rent or business interruption insurance proceeds); (b) any proceeds from the sale, exchange, transfer, financing or refinancing of all or any portion of the Property; (c) amounts received from tenants as a security deposit; (d) any other type of income otherwise includable in NOI but paid directly by any tenant to a person or entity other than Borrower or its agents or representatives; or (e) interest income.

The term "Expenses" shall mean the aggregate of the following items: (a) real estate taxes, general and special assessments or similar charges; (b) sales, use and personal property taxes; (c) management fees of not less than five percent (5%) of the gross income derived from the operation of the Property and disbursements for management services whether such services are performed at the Property or off-site; (d) wages, salaries, pension costs and all fringe and other employee-related benefits and expenses, up to and including (but not above) the level of the on-site manager, engaged in the repair, operation and maintenance of the Property and service to tenants and on-site personnel engaged in audit and accounting functions performed by Borrower; (e) insurance premiums including, but not limited to, casualty, liability, rent and fidelity insurance premiums; (f) cost of all electricity, oil, gas, water, steam, HVAC and any other energy, utility or similar item and overtime services, the cost of building and cleaning supplies, and all other administrative, management, ownership, operating, advertising, marketing and maintenance expenses incurred in connection with the operation of Property; (g) cost of necessary cleaning, repair, replacement, maintenance, decoration or painting of existing improvements on the Property (including, without limitation, parking lots and roadways), of like kind and quality or such kind or quality which is necessary to maintain the Property to the same standards as competitive properties of similar size and location of the Property, together with adequate reserves for the repair and replacement of capital improvements on the Property acceptable to Lender; (h) the cost of such other maintenance materials, HVAC repairs, parts and supplies, and all equipment to be used in the ordinary course of business, which is not capitalized in accordance with generally accepted accounting principles ("GAAP"); (i) cost of leasing commissions and tenants concessions payable by Borrower pursuant to Leases in effect for the Property; (j) legal, accounting and other professional expenses incurred in connection with the Property; (k) casualty losses to the extent not reimbursed by a third party; and (l) all amounts that should be reserved, as reasonably determined by the Borrower with approval by the Lender in its reasonable discretion, for repair or maintenance of the Property and to maintain the value of the Property including replacement reserves in amounts not less than those required in Exhibit B of this Security Instrument. The Expenses shall be based on the above-described items actually incurred or payable on an accrual basis in accordance with GAAP by Borrower during the twelve (12) month period ending one month prior to the date on which the NOI is to be calculated (except the capital expenses and reserves set forth in subsection (g) above), with customary adjustments for items such as taxes and insurance which accrue but are paid periodically, as adjusted by Lender to reflect projected adjustments for the subsequent twelve (12) month period beginning on the date on which the NOI is to be calculated.

Notwithstanding the foregoing, the term "Expenses" shall not include (i) depreciation, amortization or any other non-cash item of expense unless approved by Lender; (ii) interest, principal, fees, costs and expense reimbursements of Lender in administrating the Loan or exercising remedies under the Loan Documents; or (iii) any expenditure (other than leasing commissions and tenant concessions) properly treated as a

capital item under GAAP and such expenditure is treated by Borrower as a capital item in Borrower's financial statements.

2

**SCHEDULE 1**
**TO DEED OF TRUST, FIXTURE FILING AND SECURITY AGREEMENT**

As used in the foregoing document, each of the following terms shall have the corresponding meaning:

1. "Borrower" shall mean **WSG CHARLOTTESVILLE, LLC**, a Virginia limited liability company

2. "Principal Sum" shall mean $2,480,000.00

3. "Aggregate Additional Principal Sum" shall mean $14,140,000.00

4. "Aggregate Principal Sum" shall mean $16,620,000.00

5. "Net Proceeds Disbursement Threshold" shall mean $124,000

*all state tax*
*Paid in Loudoun*
*Co. See receipt*
*attached*

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

On this the ___12___ day of July, 2007, before me appeared, ERIC D. SHEPPARD, as Manager of WSG Charlottesville, LLC, a Virginia limited liability company, and as Manager of WSG Dulles, GP, LLC, a Florida limited liability company, the sole general partner of WSG Dulles, L.P., and as Manager of WSG Short Pump, LLC, a Virginia limited liability company, having first been duly sworn, hereby states that the following is true and correct:

1. The total amount of indebtedness secured by various credit line deeds of trust to be recorded in other clerk's offices in Virginia (the "Virginia Deeds of Trust"), and various other mortgages and deeds of trust to be recorded in various other states (the "Out of State Deed of Trust"), is $16,620,000.00. A portion of the indebtedness is secured by, inter alia, mortgage liens on properties situate in Virginia located in Albemarle County, Fairfax County and Henrico County.

2. The amount of indebtedness allocated to the properties encumbered my mortgage liens is as follows:

| Location | Allocated Debt | Overall % | VA % |
|----------|----------------|-----------|------|
| Albemarle Co. | $2,480,000.00 | 15% | 31% |
| Loudoun Co. | $3,280,000.00 | 20% | 42% |
| Henrico Co. | $2,160,000.00 | 13% | 27% |
| TOTAL AMOUNT | $7,920,000.00 | 48% | 100% |

Pursuant to Section 58.1-803(B) of the Code of Virginia (1950), as amended, recordation tax is due on the Deed of Trust based only of the proportion of percentage of the Indebtedness that is equal to the portion or percentage that the value of the property located in Virginia bears to the value of the property secured collectively by the Virginia Deed of Trust and the Out of State Deeds of Trust. The properties described in the Virginia Deeds of Trust are valued at 48% of the total value of the properties secured by the Virginia Deeds of Trust and the Out of State Deeds of Trust, thus the recordation tax due is based upon 48% of the indebtedness, which is $7,920,000.00. (continued)

3. State recording fees have been paid at locality where deed of trust first recorded.

   Further affiant sayeth not.

_____

ERIC D. SHEPPARD Manager of WSG
Charlottesville, LLC, a Virginia limited
liability company, and as Manager of WSG
Dulles, GP, LLC, a Florida limited liability
company, the sole general partner of WSG
Dulles, L.P., and as Manager of WSG Short
Pump, LLC, a Virginia limited liability
company

The foregoing instrument was subscribed and sworn to before me this,
_____ day of July, 2007 by Eric D. Sheppard as Manager of WSG Charlottesville, LLC,
a Virginia limited liability company, and as Manager of WSG Dulles, GP, LLC, a Florida
limited liability company, the sole general partner of WSG Dulles, L.P., and as Manager
of WSG Short Pump, LLC, a Virginia limited liability company, who is personally
known to me.

_____
Notary Public

My Commission Expires:  11/2/10

NOTARY SEAL



LISSETTE VARGAS
Comm# DD0511563
Expires 11/2/2010
Florida Notary Assn., Inc



COMMONWEALTH OF VIRGINIA
## COUNTY OF LOUDOUN
### OFFICE OF THE CLERK OF CIRCUIT COURT

Brenda S. Butler
Chief Deputy

Gary M. Clemens
Clerk

William L. Loy
Assistant Chief Deputy

## OFFICIAL RECEIPT

Receipt Number:    T20070037225
Date/Time:    07/20/2007  12:56:26    Clerk:    JHAYES

Customer Name :
FIDELITY NATIONAL
TITLE INS

**Transaction Detail**

| Instrument Number | Instrument Type | Grantor Consideration | Assumption Value | Grantee Consideration |
|---|---|---|---|---|
| 2007072000054264 | DOT | $0.00 | $0.00 | $7,920,000.00 |

First Party Name
WSG DULLES GL LLC

Second Party Name
WSG DULLES L P TR

| Code | Description | Paid | Code | Description | Paid |
|---|---|---|---|---|---|
| 036 | PROCESSING FEE | $10.00 | 039 | STATE RECORD TAX | $19,800.00 |
| 106 | TECHNOLOGY FUND | $5.00 | 145 | VLSF | $1.50 |
| 213 | COUNTY RECORD TAX | $2,772.00 | 035 | OPEN-SPACE PRESERVA | $1.00 |
| 301 | CLERK'S FEE | $48.50 | | | |
| | Subtotal: | $22,638.00 | | | |

| Instrument Number | Instrument Type | Grantor Consideration | Assumption Value | Grantee Consideration |
|---|---|---|---|---|
| 2007072000054265 | ASGMT | | | |

First Party Name
WSG DULLES GL LLC

Second Party Name
LEHMAN BROTHERS BANK

| Code | Description | Paid | Code | Description | Paid |
|---|---|---|---|---|---|
| 106 | TECHNOLOGY FUND | $5.00 | 145 | VLSF | $1.50 |
| 301 | CLERK'S FEE | $28.50 | | | |
| | Subtotal: | $35.00 | | | |

| Instrument Number | Instrument Type | Grantor Consideration | Assumption Value | Grantee Consideration |
|---|---|---|---|---|
| 2007072000054266 | UCCTERM | | | |

First Party Name
WSG DULLES GL LLC

Second Party Name
WELLS FARGO

| Code | Description | Paid | Code | Description | Paid |
|---|---|---|---|---|---|
| 317 | FINANCING STATEMEN | $20.00 | | | |
| | Subtotal: | $20.00 | | | |

RECORDED IN CLERKS OFFICE OF
ALBEMARLE ON
August 07,2007 AT  1:03:22 PM
$0.00 GRANTOR TAX PD
AS REQUIRED BY VA CODE §58.1-802
STATE: $0.00 LOCAL: $0.00
ALBEMARLE COUNTY, VA
SHELBY MARSHALL CLERK CIRCUIT COURT

7/20/2007  12:57PM

18 N. King Street- 2nd Floor - Leesburg, VA  20176

**EXHIBIT D**
**ASSIGNMENT OF RENTS AND LEASES**

Instrument Control Number

,012705

## Commonwealth of Virginia
## Land Record Instruments
## Cover Sheet - Form A

[ILS VLR Cover Sheet Agent 1.0.87]

Doc ID: 004695960013 Type: DEE
Recorded: 08/07/2007 at 01:09:04 PM
Fee Amt: $35.00 Page 1 of 13
Albemarle County, VA
Shelby Marshall Clerk Circuit Court
File# 2007-00012705
BK 3471 PG 233-245

| | | | |
|---|---|---|---|
| Date of Instrument: | [7/12/2007 ] | | |
| Instrument Type: | [ASGMTLR ] | | |
| Number of Parcels | [ 1] | | |
| Number of Pages | [ 12] | | |
| City ☐ County ☒ | [Albemarle County | | (Box for Deed Stamp Only) |

**First and Second Grantors**

| | Last Name | First Name | Middle Name or Initial | Suffix |
|---|---|---|---|---|
| ☐ ☒ | [WSG Charlottesville LLC] [ | ] [ | ] [ | ] |
| ☐ ☐ | [ ] [ | ] [ | ] [ | ] |

**First and Second Grantees**

| | Last Name | First Name | Middle Name or Initial | Suffix |
|---|---|---|---|---|
| ☐ ☒ | [Lehman Brothers Bank ] [ | ] [ | ] [ | ] |
| ☐ ☐ | [ ] [ | ] [ | ] [ | ] |

Grantee Address     (Name)     [n/a                    ]
                    (Address 1)  [                      ]
                    (Address 2)  [                      ]
                    (City, State, Zip) [          ] [   ] [          ]

Consideration [0.00          ] Existing Debt [0.00    ] Assumption Balance [0.00          ]

Prior Instr. Recorded at: City ☐ County ☒ [Albemarle County    ] Percent. in this Juris. [ 100]
Book [    ]     Page [    ]                                 Instr. No [          ]
Parcel Identification No (PIN)      [061000000120U0                        ]
Tax Map Num.   (if different than PIN)  [                                  ]
Short Property Description          [See Instrument                        ]
                                    [                                      ]
Current Property Address (Address 1) [                                     ]
                        (Address 2)  [                                     ]
                        (City, State, Zip) [          ] [    ] [           ]

Instrument Prepared By              [Outside of the Commonwealth            ]
Recording Paid for By               [Fidelity National Title Insurance Company ]
Return Recording To  (Name)         [Betty B. Sears                         ]
                     (Address 1)    [Fidelity National Title Insurance Company ]
                     (Address 2)    [7130 Glen Forest Drive, Suite 403      ]
                     (City, State, Zip) [Richmond              ] [VA ] [23226  ]
Customer Case ID                    [WSG Charlottesville ] [    ] [          ]

Cover Sheet Page # 1 of 1

3471-233

Exempt from recording tax under Section 58.1-807 of the Virginia Code.

**WSG CHARLOTTESVILLE, LLC**, as assignor
(Borrower)

To

**LEHMAN BROTHERS BANK, FSB**, as assignee
(Lender)

---

**ADDITIONAL COLLATERAL
ASSIGNMENT OF LEASES AND RENTS**

Dated:                  July 12, 2007

Location:            Charlottesville, Virginia

County:              Albermarle

UPON RECORDATION RETURN TO:

WHEN RECORDED RETURN TO:
MARGIE POOLE/NTS NO. Lehman
FIDELITY NATIONAL TITLE
1800 PARKWAY PLACE, STE 700
MARIETTA, GA 30067

Tax Parcel No.: 06100-00-00-120U0.

This document prepared outside the Commonwealth of Virginia.

SSL-MIAI 30156839v2

THIS ADDITIONAL COLLATERAL ASSIGNMENT OF LEASES AND RENTS ("Assignment") is made as of the 12 day of July, 2007, by Borrower (as defined in Schedule 1 attached hereto), as assignor, having its principal place of business c/o WSG Development Company, 400 Arthur Godfrey Road, Suite 200, Miami Beach, Florida 33140 to LEHMAN BROTHERS BANK, FSB, a federal stock savings bank, as assignee, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801 ("Lender").

### RECITALS:

Borrower has as of this date received from Lender a loan (the "Loan") in the Principal Sum (as defined in Schedule 1 attached hereto). The principal sum of the Loan, together with interest thereon, is payable to Lender in accordance with the terms of a certain promissory note of even date herewith made by Borrower to Lender (together with all renewals, extensions, modifications and substitutions thereof, the "Note").

Pursuant to a certain Guaranty of Payment of even date herewith (the "Guaranty"), Borrower has guaranteed to Lender the repayment of certain other loans (the "Other Loans") to certain other borrowers affiliated with Borrower (the "Other Borrowers"), which Other Loans have an aggregate principal amount as of the date hereof of the Aggregate Additional Principal Sum (as defined in Schedule 1 attached hereto).

The Borrower's obligations under the Note and the Guaranty are secured by, among other things, the Security Instrument (as defined in the Note). The Security Instrument is intended to be recorded in the public records of the county where the Property (defined below) is located.

Borrower desires to secure the payment of the Debt (defined below) and performance of all of its obligations under the Note, the Guaranty and the Other Obligations as defined in Article 2 of the Security Instrument.

1.    ASSIGNMENT

1.1    PROPERTY ASSIGNED.  Borrower hereby absolutely and unconditionally assigns and grants to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by Borrower:

(a)    Leases.  All existing and future leases affecting the use, enjoyment, or occupancy of all or any part of that certain lot or piece of land, more particularly described in Exhibit A annexed hereto and made a part hereof, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (collectively, the "Property") and the right, title and interest of Borrower, its successors and assigns, therein and thereunder.

(b)    Other Leases and Agreements.  All other leases and other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Property or any portion thereof now or hereafter made, whether made before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "Bankruptcy Code"), together with any extension, renewal or replacement of the same, this Assignment of other present and future leases and present and future agreements being effective without further or supplemental assignment. The leases described in Subsection 1.1(a) and the leases and other agreements described in this Subsection 1.1(b), together with all other present and future leases and present and future agreements and any extension or renewal of the same are collectively referred to as the "Leases".

(c)    Rents.  All rents, additional rents, revenues, income, issues and profits arising from the Leases and renewals and replacements thereof and any cash or security deposited in connection therewith and together with all rents, revenues, income, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the use, enjoyment and occupancy of the Property whether paid

SSL-MIA1 30156839v2

or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "Rents").

(d)    Bankruptcy Claims.  All of Borrower's claims and rights (the "Bankruptcy Claims") to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code, 11 U.S.C. §101 et seq., as the same may be amended (the "Bankruptcy Code").

(e)    Lease Guaranties.  All of Borrower's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support given by any guarantor in connection with any of the Leases (individually, a "Lease Guarantor" and collectively, the "Lease Guarantors") to Borrower (individually, a "Lease Guaranty" and collectively, the "Lease Guaranties").

(f)    Proceeds.  All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

(g)    Other.  All rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive, collect and receipt for all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt (as hereinafter defined)), and to do all other things which Borrower or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

(h)    Entry.  The right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents.

(i)    Power of Attorney.  Borrower's irrevocable power of attorney, coupled with an interest, to take, upon the occurrence of and during the continuance of an Event of Default (as defined in the Security Instrument), any and all of the actions set forth in Section 3.1 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

(j)    Other Rights and Agreements.  Any and all other rights of Borrower in and to the items set forth in subsections (a) through (i) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

1.2    CONSIDERATION.  This Assignment is made in consideration of the Loan and Lender's making of the Other Loans to the Other Borrowers.  The principal sum, interest and all other sums due and payable or provided to be paid under the Note, the Guaranty, the Security Instrument, this Assignment and the other Loan Documents (as defined in the Security Instrument) are collectively referred to as the "Debt".

2.    TERMS OF ASSIGNMENT

2.1    PRESENT ASSIGNMENT AND LICENSE BACK.  It is intended by Borrower that this Assignment constitute a present, absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims, and not an assignment for additional security only.  Nevertheless, subject to the terms of this Section 2.1, Lender grants to Borrower a revocable license to collect and receive the Rents and other sums due under the Lease Guaranties.  Borrower shall hold the Rents and all sums received pursuant to any Lease Guaranty, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Lender for use in the payment of such sums.

2.2    NOTICE TO LESSEES.  Borrower hereby agrees to authorize and direct the lessees named in the Leases or any other or future lessees or occupants of the Property and all Lease Guarantors to pay over to Lender or to such other party as Lender directs all Rents and all sums due under any Lease Guaranties upon receipt from Lender of written notice to the effect that Lender is then the holder of the Security Instrument and that an Event of Default (as defined in the Security Instrument) exists, and to continue so to do until otherwise notified by Lender.

2.3    INCORPORATION BY REFERENCE. All representations, warranties, covenants, conditions and agreements contained in the Security Instrument as same may be modified, renewed, substituted or extended are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

3.    REMEDIES

3.1    REMEDIES OF LENDER. Upon the occurrence and during the continuance of an Event of Default, the license granted to Borrower in Section 2.1 of this Assignment shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property. In addition, Lender may, at its option, without waiving such Event of Default, without notice and without regard to the adequacy of the security for the Debt, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and sums due under all Lease Guaranties, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as may seem proper to Lender and may apply the Rents and sums received pursuant to any Lease Guaranties to the payment of the following in such order and proportion as Lender in its sole discretion may determine, any law, custom or use to the contrary notwithstanding: (a) all expenses of managing and securing the Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Lender may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property; and (b) the Debt, together with all costs and reasonable attorneys' fees. In addition, upon the continuance of an Event of Default, Lender, at its option, may (1) complete any construction on the Property in such manner and form as Lender deems advisable, (2) exercise all rights and powers of Borrower, including, without limitation, the right to negotiate, execute, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any Lease Guaranties, (3) either require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of Borrower or (4) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise.

3.2    OTHER REMEDIES. Lender shall have the right to have all Rents paid to a Lock-Box Account (as defined in the Security Instrument) pursuant to the terms and conditions of Section 4.4 of the Security Instrument. Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Note, the Security Instrument, or the other Loan Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof. The right of Lender to collect the Debt and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder. Borrower hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the obligations of Borrower under this Assignment, the Note, the Security Instrument, the other Loan Documents or otherwise with respect to the Loan in any action or proceeding brought by Lender to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Note, the Security Instrument, or any of the other Loan Documents (provided, however, that the foregoing shall not be deemed a waiver of Borrower's right to assert any compulsory

3

counterclaim *if such counterclaim is compelled under local law or rule of procedure*, nor shall the foregoing be deemed a waiver of Borrower's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Lender in any separate action or proceeding),

3.3    OTHER SECURITY. Lender may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the reduction or satisfaction of the Debt without prejudice to any of its rights under this Assignment.

3.4    NON-WAIVER. The exercise by Lender of the option granted it in Section 3.1 of this Assignment and the collection of the Rents and sums due under the Lease Guaranties and the application thereof as herein provided shall not be considered a waiver of any *default by Borrower under the Note*, the Security Instrument, the Leases, this Assignment or the other Loan Documents. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the *failure of Lender to comply with any request of Borrower or any other party to take any action to enforce* any of the provisions hereof or of the Security Instrument, the Note or the other Loan Documents, (b) the release regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Note, the Security Instrument or the other Loan Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take any action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to enforce its rights under this Assignment. The rights of Lender under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

3.5    BANKRUPTCY. *(a) Upon the continuance of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, in the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.*

(b)    If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand *provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.*

4.    NO LIABILITY, FURTHER ASSURANCES

4.1    NO LIABILITY OF LENDER. This Assignment shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon Lender. Lender shall not be liable for any loss *sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or* from any other act or omission of Lender in managing the Property after an Event of Default unless such loss is caused by the willful misconduct and bad faith or gross negligence of Lender. Lender shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or any Lease

4

Guaranties or under or by reason of this Assignment and Borrower shall, and hereby agrees, to indemnify Lender for, and to hold Lender harmless from, any and all liability, loss or damage which may or might be incurred under the Leases, any Lease Guaranties or under or by reason of this Assignment and from any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against Lender by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases or any Lease Guaranties (collectively, "Losses"), except to the extent the same relate solely to Lender's gross negligence or willful misconduct or which relate solely to Losses arising after Borrower no longer has possession or control of the Property following foreclosure, exercise of any power of sale or deed in lieu of foreclosure and the delivery of possession of the Property to the purchaser acquiring the Property by virtue of such foreclosure, exercise of power of sale or deed in lieu of foreclosure. Should Lender incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by this Assignment and by the Security Instrument and the other Loan Documents and Borrower shall reimburse Lender therefor immediately upon demand and upon the failure of Borrower so to do Lender may, at its option, declare all sums secured by this Assignment and by the Security Instrument and the other Loan Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor for the carrying out of any of the terms and conditions of the Leases or any Lease Guaranties; nor shall it operate to make Lender responsible or liable for any waste committed on the Property by any lessee or any other parties, or for any dangerous or defective condition of the Property, including without limitation the presence of any Hazardous Substances (as defined in that certain Environmental Indemnity Agreement executed by Borrower in favor of Lender as of even date herewith), or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

4.2    NO MORTGAGEE IN POSSESSION. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender. In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower.

4.3    FURTHER ASSURANCES. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, conveyances, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Lender the property and rights hereby assigned or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

5.    MISCELLANEOUS PROVISIONS

5.1    CONFLICT OF TERMS. In case of any conflict between the terms of this Assignment and the terms of the Security Instrument, the terms of the Security Instrument shall prevail.

5.2    NO ORAL CHANGE. This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

5.3    CERTAIN DEFINITIONS. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Borrower " shall mean "each Borrower and any

5

SSL-MIA1 30156#39v2

subsequent owner or owners of the Property or any part thereof or interest therein," the word "Lender" shall mean "Lender, its servicer, and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Security Instrument," the word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder; whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. The use of the phrase "upon and during the continuance of an Event of Default" and similar phrases in this Assignment shall not be deemed to grant Borrower any right to cure an Event of Default (provided that nothing contained herein shall be deemed to limit Borrower's right to cure defaults prior to the expiration of applicable notice and cure periods) and each Event of Default shall continue unless and until the same is waived by Lender in writing in accordance with the requirements of the Loan Documents.

5.4    AUTHORITY.  Borrower represents and warrants that it has full power and authority to execute and deliver this Assignment and the execution and delivery of this Assignment has been duly authorized and does not conflict with or constitute a default under any law, judicial order or other agreement affecting Borrower or the Property.

5.5    INAPPLICABLE PROVISIONS.  If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

5.6    DUPLICATE ORIGINALS; COUNTERPARTS.  This Assignment may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment.  The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

5.7    CHOICE OF LAW.  This Assignment shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and the applicable laws of the United States of America.

5.8    TERMINATION OF ASSIGNMENT.  Upon payment in full of the Debt and the delivery and recording of a satisfaction or discharge of Security Instrument duly executed by Lender, this Assignment shall become and be void and of no effect.

5.9    NOTICES.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (hereinafter defined) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to Borrower or Lender at their addresses set forth in the Security Instrument or addressed as such party may from time to time designate by written notice to the other parties.  For purposes of this Section 5.9, the term "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

6

5.10    WAIVER OF TRIAL BY JURY.  BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THE NOTE, THIS ASSIGNMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

5.11    SUBMISSION TO JURISDICTION.  With respect to any claim or action arising hereunder, Borrower (a) irrevocably submits to the nonexclusive jurisdiction of the courts of the State in which the Property is located and the United States District Court located in the county in which the Property is located, and appellate courts from any thereof, and (b) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Assignment brought in any such court, irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

5.12    LIABILITY.  If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

5.13    HEADINGS, ETC. The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

5.14    NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

5.15    SOLE DISCRETION OF LENDER.  Wherever pursuant to this Assignment (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the reasonable discretion of Lender. Notwithstanding the foregoing, all decisions or determinations made by Lender pursuant to this Assignment following an Event of Default shall be made in the sole and absolute discretion of Lender and shall be final and conclusive.

5.16    EXCULPATION.  Borrower's obligations under this Assignment are subject to the provisions of Article 13 of the Security Instrument.

THIS ASSIGNMENT, together with the covenants and warranties therein contained, shall inure to the benefit of Lender and any subsequent holder of the Security Instrument and shall be binding upon Borrower, its heirs, executors, administrators, successors and assigns and any subsequent owner of the Property.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, Borrower has executed this instrument the day and year first above written.

BORROWER:

WSG CHARLOTTESVILLE, LLC,
a Virginia limited liability company

By: _____
Eric D. Sheppard, Manager

STATE OF Florida )
                          )ss:
COUNTY OF Dade )

The foregoing instrument was acknowledged before me this 29 day of June, 2007 by Eric D. Sheppard, as Manager of WSG CHARLOTTESVILLE, LLC, a Virginia limited liability company, on behalf of said limited liability company. He is personally known to me or has produced a _____ as identification.

KELLIE RICHTER
Comm# DD0602042
Expires 5/4/2009
Florida Notary Assn., Inc

Print Name: Kellie Richter
Title: Admin
Commission No. DD060242
(if any)

My Commission Expires: 5.4.2009

ALR

EXHIBIT A

Legal Description of Property

All of that certain lot, piece or parcel of land situate, lying and being in Albermarle County, Virginia and being more particularly described as follows:

**WSG Charlottesville, LLC**
**LEGAL DESCRIPTION**

ALL that certain lot or parcel of land in Albemarle County, Virginia, on the west side of U.S. Route 29 North, near its intersection with Rio Road (State Road 631), containing 37,795 square feet, more or less, more particularly described as Parcel C on a physical survey of William S. Roudabush, Inc., dated May 31, 1983, containing two sheets, and recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia, in Deed Book 786, pages 639 and 640.

TOGETHER WITH AND SUBJECT TO the non-exclusive easements for ingress and egress to and from U.S. Route 29 North and Rio Road (State Route 631) along or over Parcel A, Parcel B and Parcel D shown on a plat by William S. Roudabush, Inc., dated August 23, 1977, revised November 3, 1977, and recorded in said Clerk's Office in Deed Book 636, page 500, and on a plat by William S. Roudabush, Inc., dated May 18, 1979, and recorded in said Clerk's Office in Deed Book 680, page 478.

BEING the same premises as conveyed to WSG Charlottesville, LLC, a Virginia limited liability company from Everette H. Newman, Trustee No. 7, by Deed dated August 9, 2002, recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia in Deed Book 2249, page 655.

**SCHEDULE 1**
**TO ASSIGNMENT OF LEASES AND RENTS**

As used in the foregoing document, each of the following terms shall have the corresponding meaning:

1. "Borrower" shall mean **WSG CHARLOTTESVILLE, LLC**, a Virginia limited liability company

2. "Principal Sum" shall mean $2,480,000.00

3. "Aggregate Additional Principal Sum" shall mean $14,140,000.00

RECORDED IN CLERKS OFFICE OF
ALBEMARLE ON
August 07,2007 AT 1:09:04 PM
$0.00 GRANTOR TAX PD
AS REQUIRED BY VA CODE §56.1-802
STATE: $0.00 LOCAL: $0.00
ALBEMARLE COUNTY, VA
SHELBY MARSHALL, CLERK CIRCUIT COURT
BC

**EXHIBIT E**
**UCC FINANCING STATEMENTS**

33145

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Stroock & Stroock & Lavan LLP
200 S. Biscayne Blvd., Suite 3100
Miami, Florida 33131
Attn: Albert J. Delgado, Esq.

PARASEC
P.O. BOX 160568
SACRAMENTO, CA 95816-0568

Doc ID: 004584089007 Type: FIN
Recorded: 08/31/2007 at 12:26:24 PM
Fee Amt: $29.00 Page 1 of 7
Albemarle County, VA
Shelby Marshall Clerk Circuit Court
File 2007-33145

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| WSG CHARLOTTESVILLE, LLC | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| c/o WSG, 400 Arthur Godfrey Road, Suite 200 | MIAMI BEACH | FL | 33140 | USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Limited Liability Company | 1f. JURISDICTION OF ORGANIZATION VIRGINIA | 1g. ORGANIZATIONAL ID #, if any S079562-7 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| Lehman Brothers Bank, FSB | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1000 West Street, Suite 200 | WILMINGTON | DE | 19801 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See Schedule A and Exhibit A attached hereto and made a part hereof.

*TM 06100-00-00-12000*

FILED
07 AUG 31 PM12:37
CIRCUIT COURT CLERK'S OFF'N.
ALBEMARLE COUNTY VA
SHELBY J MARSHALL CLERK

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

ALBEMARLE COUNTY, COMMONWEALTH OF VIRGINIA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

*2007-33145*

**UCC FINANCING STATEMENT ADDENDUM**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR **WSG CHARLOTTESVILLE, LLC** | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX | |

10. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | | NONE |

12. | | ADDITIONAL SECURED PARTY'S or | | ASSIGNOR S/P'S | NAME - insert only one name (12a or 12b)

| 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing.

14. Description of real estate:

See Schedule A and Exhibit A attached hereto and made a part hereof.

16. Additional collateral description:

16. Name and Address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years

THE SECURED PARTY DESIRES THE FINANCING STATEMENT TO BE INDEXED
AGAINST THE RECORD OWNER OF THE REAL ESTATE    NO ( )    YES (X)

NAME OF RECORD OWNER: WSG CHARLOTTESVILLE, LLC

SCHEDULE A TO UCC-1 FINANCING STATEMENT

WSG CHARLOTTESVILLE, LLC,
as Debtor
and
LEHMAN BROTHERS BANK, FSB,
as Secured Party

All of Debtor's right, title and interest in and to the following property (the "Property") located
upon or used in connection with the real property described on Exhibit A to this Schedule A (the
"Land"):

a. buildings, structures, fixtures, additions, enlargements, extensions, modifications,
repairs, replacements and improvements now or hereafter erected or located on the Land (the
"Improvements");

b. all easements, rights-of-way or use, rights, strips and gores of land, streets, ways,
alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and
development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes,
tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or
hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion
and reversions, remainder and remainders, and all land lying in the bed of any street, road or
avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all
the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy,
property, possession, claim and demand whatsoever, both at law and in equity, of Debtor of, in
and to the Land and the Improvements and every part and parcel thereof, with the appurtenances
thereto;

c. all furnishings, machinery, equipment, fixtures (including, but not limited to, all
heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other
property of every kind and nature whatsoever owned by Debtor, or in which Debtor has or shall
have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant
thereto, and usable in connection with the present or future operation and occupancy of the Land
and the Improvements and all building equipment, materials and supplies of any nature
whatsoever owned by Debtor, or in which Debtor has or shall have an interest, now or hereafter
located upon the Land and the Improvements, or appurtenant thereto, or usable in connection
with the present or future operation and occupancy of the Land and the Improvements
(collectively, the "Personal Property"), the right, title and interest of Debtor in and to any of the
Personal Property which may be subject to any security interests, as defined in the Uniform
Commercial Code as adopted and enacted by the State or States where any of the Property is
located (the "Uniform Commercial Code") and all proceeds and products of the above;

d. All leases and other agreements affecting the use, enjoyment or occupancy of the
Land and the Improvements heretofore or hereafter entered into, whether before or after the
filing by or against Borrower of any petition for relief under 11 U.S.C. § 101 et seq., as the same
may be amended from time to time (the "Bankruptcy Code") (a "Lease" or "Leases") and all
right, title and interest of Debtor, its successors and assigns therein and thereunder, including,

UCCATTACH
SSL-MIAI 30158850v1

without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues (including, but not limited to, any payments made by tenants under the Leases in connection with the termination of any Lease, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Debtor of any petition for relief under the Bankruptcy Code (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt (as defined in the Security Instrument);

e. any and all lease guaranties, letters of credit and any other credit support (individually, a "Lease Guaranty" and collectively, the "Lease Guaranties") given by any guarantor in connection with any of the Leases (individually, a "Lease Guarantor" and collectively, the "Lease Guarantors");

f. all rights, powers, privileges, options and other benefits of Debtor as lessor under the Leases and beneficiary under the Lease Guaranties including without limitation the immediate and continuing right to make claim for, receive, collect and receipt for all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt (as defined in the Security Instrument), and to do other things which Debtor or any lessor is or may become entitled to do under the Leases or the Lease Guaranties;

g. all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

h. all proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

i. all refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

j. all proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

k. the right, in the name and on behalf of Debtor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Secured Party in the Property;

l. all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Debtor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Debtor thereunder;

m. all tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property.

n.   Any and all other rights of the Debtor in and to the terms set forth in items (a) through (m) above.

Initially capitalized terms used herein and not otherwise defined have the meanings assigned in the Deed of Trust, Fixture Filing and Security Agreement, dated as of July 12, 2007 (the "Security Instrument") by the Debtor to the Secured Party.  Interested parties may contact the Secured Party during normal business hours to view a copy of the Security Instrument and specific records describing the above-described collateral.

3

UCCATTACH
SSL-MIA1 30156850v1

# EXHIBIT A

## (LEGAL DESCRIPTION OF PROPERTY)

## LEGAL DESCRIPTION

## EXHIBIT "A"

ALL that certain lot or parcel of land in Albemarle County, Virginia, on the west side of U.S. Route 29 North, near its intersection with Rio Road (State Road 631), containing 37,795 square feet, more or less, more particularly described as Parcel C on a physical survey of William S. Roudabush, Inc., dated May 31, 1983, containing two sheets, and recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia, in Deed Book 786, pages 639 and 640.

TOGETHER WITH AND SUBJECT TO the non-exclusive easements for ingress and egress to and from U.S. Route 29 North and Rio Road (State Route 631) along or over Parcel A, Parcel B and Parcel D shown on a plat by William S. Roudabush, Inc., dated August 23, 1977, revised November 3, 1977, and recorded in said Clerk's Office in Deed Book 636, page 500, and on a plat by William S. Roudabush, Inc., dated May 18, 1979, and recorded in said Clerk's Office in Deed Book 680, page 478.

BEING the same premises as conveyed to WSG Charlottesville, LLC, a Virginia limited liability company from Everette H. Newman, Trustee No. 7, by Deed dated August 9, 2002, recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia in Deed Book 2249, page 655.

**EXHIBIT F**
**ALLONGE**
**(Original Lender to Assignee #1)**

## ALLONGE

This Allonge forms a part of that certain Promissory Note dated July *12*, 2007, made by **WSG CHARLOTTESVILLE, LLC**, a Virginia limited liability company to **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank.

Pay  to  the  order  of  \*  _____

_____

_____ , its successors and/or assigns.

This endorsement is made without representation, recourse or warranty by the undersigned.

**LEHMAN BROTHERS BANK, FSB,**
a federal stock savings bank

By: _____
Name: _____CHARLENE THOMAS_____
Title: _____VICE PRESIDENT_____

\*

LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3.

**EXHIBIT G**
**ASSIGNMENT OF FEE AND LEASEHOLD DEED OF TRUST,**
**FIXTURE FILING AND SECURITY AGREEMENT**
**(Original Lender to Assignee #1)**

353-2583-000

Instrument Control Number

017944

# Commonwealth of Virginia
## Land Record Instruments
## Cover Sheet - Form A

[ILS VLR Cover Sheet Agent 1.0.93]

Doc ID: 004740320006 Type: DEE
Recorded: 11/26/2007 at 02:48:41 PM
Fee Amt: $21.00 Page 1 of 6
Albemarle County, VA
Shelby Marshall Clerk Circuit Court
File# 2007-00017944
BK 3519 PG 580-585

| T A X | C O R P | | | |
|---|---|---|---|---|
| E X E M P T | | Date of Instrument: | [11/20/2007 ] | |
| | | Instrument Type: | [ASGMT       ] | |
| | | | | |
| | | Number of Parcels | [    1] | |
| | | Number of Pages | [    5] | |
| x | | City ☐ County ☒ | [Albemarle County | ] |

(Box for Deed Stamp Only)

### First and Second Grantors

| | | Last Name | First Name | Middle Name or Initial | Suffix |
|---|---|---|---|---|---|
| x | x | [Lehman Brothers Bank, ] [ | ] [ | ] [ | ] |
| ☐ | ☐ | [ | ] [ | ] [ | ] |

### First and Second Grantees

| | | Last Name | First Name | Middle Name or Initial | Suffix |
|---|---|---|---|---|---|
| x | x | [LaSalle Bank National ] [ | ] [ | ] [ | ] |
| ☐ | ☐ | [ | ] [ | ] [ | ] |

| Grantee Address | (Name) | [LaSalle Bank National Association | ] |
|---|---|---|---|
| | (Address 1) | [135 South LaSalle Street, Suite 1625 | ] |
| | (Address 2) | [ | ] |
| | (City, State, Zip) | [Chicago | ] [IL ] [60603 ] |

Consideration [0.00            ] Existing Debt [0.00            ] Assumption Balance [0.00            ]

Prior Instr. Recorded at: City ☐ County ☒ [Albemarle County        ] Percent. in this Juris. [    100]
Book [3471 ]                Page        [177  ]                Instr. No [00012704        ]
Parcel Identification No (PIN)        [                                ]
Tax Map Num.    (if different than PIN)        [                        ]
Short Property Description        [All that certain lot or parcel or land in Albemarle County, Virginia ]
                                 [29 North, near its intersection with Rio Road (State Road 631),        ]
Current Property Address (Address 1)        [                                ]
                         (Address 2)        [                                ]
                         (City, State, Zip)        [                        ] [    ] [                ]

| Instrument Prepared By | | [Edison Mortgage Decisioning So | ] |
|---|---|---|---|
| Recording Paid for By | | [Edison Mortgage Decisioning Solutions, LLC | ] |
| Return Recording To | (Name) | [Edison Mortgage Decisioning Solutions, LLC | ] |
| | (Address 1) | [200 Metroplex Drive, Suite 102 | ] |
| | (Address 2) | [ | ] |
| | (City, State, Zip) | [Edison | ] [NJ ] [08818 ] |
| Customer Case ID | | [            ] [            ] [            ] |



Cover Sheet Page # 1 of 1

**RECORD AND RETURN TO:**
Edison Mortgage Decisioning Solutions LLC
P.O. Box 3980
Edison, NJ 08818-3980
Attn: Edward Drahos
File # 353-2583-000

## ASSIGNMENT OF DEED OF TRUST,
### FIXTURE FILING AND SECURITY AGREEMENT
### (hereinafter the "Assignment")

In consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801 ("**Assignor**") does hereby grant, bargain, sell, convey, assign, transfer and set over unto **LaSalle Bank National Association, in its capacity as trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3,** having an office at 135 South LaSalle Street, Suite 1625, Chicago, IL 60603 ("**Assignee**"), without recourse, all of the right, title and interest of Assignor in and to:

1.  That certain Deed of Trust, Fixture Filing and Security Agreement as described on Exhibit A hereto (the "Deed of Trust");

2.  The bond(s), note(s) and/or obligation(s) secured by the Deed of Trust, the moneys due and to grow due thereon, with interest as specified therein, and all rights accrued or to accrue under the Deed of Trust; and

3.  Any and all other related security instruments which secure the indebtedness and/or obligation secured by the Deed of Trust.

This Assignment is made without representation, recourse or warranty by Assignor.

**IN WITNESS WHEREOF**, the Assignor by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this Assignment.

Dated as of _July 17_, 2007

**WITNESSES AS TO ALL SIGNATURES:**

**ASSIGNOR:**

**LEHMAN BROTHERS BANK, FSB,**
a federal stock savings bank

Print Name: ~~CATRINA CASSANOVA~~

By: _____
Name: ~~CHARLENE THOMAS~~
Title: _____
VICE PRESIDENT

Print Name: _Milagros Ancea_

## MULTI-STATE *CORPORATE* ACKNOWLEDGMENT (ASSIGNOR)

STATE OF _____New York_____ ):
                         :ss.:
COUNTY OF _____New York_____ )

On this 17 day of July, 2007, before me, the undersigned officer, personally appeared:

1. _____Charlene Thomas_____
2. _____

personally known and acknowledged himself/herself/themselves to me (or proved to me on the basis of satisfactory evidence to be the

[a]    ✓  [Vice] President, and
[b]       (Assistant) *Secretary*

respectively of **LEHMAN BROTHERS BANK, FSB** (hereinafter, the "Corporation"),

and that as such officer(s), being duly authorized to do so pursuant to its bylaws or a resolution of its board of directors, executed, subscribed and acknowledged the foregoing instrument for the purposes therein contained, by signing the name of the *Corporation* by himself/herself/themselves in their authorized capacity as such officer(s) as his free and voluntary act and deed and the free and voluntary act and deed of said *Corporation*.

**IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

EDNA LANAHAN
NOTARY PUBLIC, State of New York
No. 01LA6070349
Qualified in New York County
Commission Expires March 4, 2010

*Edna Lanahan*
Notary Public

Notarial Seal

My Commission Expires: 3/4/2010

**EXHIBIT A**

Description of the Deed of Trust

Deed of Trust, Fixture Filing and Security Agreement made by **WSG CHARLOTTESVILLE, LLC**, a Virginia limited liability company, to Lehman Brothers Bank, FSB, a federal stock savings bank, in the principal amount of $2,480,000.00, recorded on _8/07/2007, Inst # 2007-0001270+_ _BK: 3471_____, Page _177_____, of the County Recorder's office in Albermarle County, and covering the premises described on Schedule A hereto.

## LEGAL DESCRIPTION

*Schedule A*

ALL that certain lot or parcel of land in Albemarle County, Virginia, on the west side of U.S. Route 29 North, near its intersection with Rio Road (State Road 631), containing 37,795 square feet, more or less, more particularly described as Parcel C on a physical survey of William S. Roudabush, Inc., dated May 31, 1983, containing two sheets, and recorded in the Clerk's Office of the Circuit·Court of Albemarle County, Virginia, in Deed Book 786, pages 639 and 640.

TOGETHER WITH AND SUBJECT TO the non-exclusive easements for ingress and egress to and from U.S. Route 29 North and Rio Road (State Route 631) along or over Parcel A, Parcel B and Parcel D shown on a plat by William S. Roudabush, Inc., dated August 23, 1977, revised November 3, 1977, and recorded in said Clerk's Office in Deed Book 636, page 500, and on a plat by William S. Roudabush, Inc., dated May 18, 1979, and recorded in said Clerk's Office in Deed Book 680, page 478.

BEING the same premises as conveyed to WSG Charlottesville, LLC, a Virginia limited liability company from Everette H. Newman, Trustee No. 7, by Deed dated August 9, 2002, recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia in Deed Book 2249, page 655.

RECORDED IN CLERKS OFFICE OF
ALBEMARLE ON
November 26,2007 AT 2:48:41 PM
$0.00 GRANTOR TAX PD
AS REQUIRED BY VA CODE §58.1-802
STATE: $0.00 LOCAL: $0.00
ALBEMARLE COUNTY, VA
SHELBY MARSHALL CLERK CIRCUIT COURT

**EXHIBIT H**
**ALLONGE**
**(Assignee #1 to Assignee #2)**

## ALLONGE

ALLONGE to that certain Promissory Note dated July 12, 2007, payable by **WSG Charlottesville, LLC, a Virginia limited liability company**, to the order of **Lehman Brothers Bank, FSB, a federal stock savings bank**, in the original principal amount of Two Million Four Hundred Eighty Thousand and 00/100 Dollars ($2,480,000.00).

PAY TO THE ORDER OF U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3,

WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.

BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3

[NO CORPORATE SEAL]

By: _____
Printed Name: Paul D. Robinson
Vice President and trust officer of U.S. Bank National Association - Attorney-in-Fact under Limited Power of Attorney dated October 24, 2011

Attest: _____
Printed Name: Thais Hayum
Vice President and trust officer of U.S. Bank National Association - Attorney-in-Fact under Limited Power of Attorney dated October 24, 2011

# EXHIBIT I
## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS
### (Assignee #1 to Assignee #2)

## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS

BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("Assignor"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 800, Miami Beach, Florida 33139, is the current owner and holder of that certain loan made on July 12, 2007 (the "Loan"), in the original principal amount of Two Million Four Hundred Eighty Thousand and 00/100 Dollars ($2,480,000.00) (the "Original Loan Amount"), by Lehman Brothers Bank, FSB, a federal stock savings bank ("Original Lender"), to WSG Charlottesville, LLC, a Virginia limited liability company ("Original Borrower"). The Loan is evidenced by a Promissory Note dated July 12, 2007, executed by Original Borrower and payable to the order of Original Lender, in the Original Loan Amount (as the same may from time to time have been amended, consolidated, renewed, replaced and/or endorsed, the "Note"), and secured by a Deed of Trust, Fixture Filing and Security Agreement made by Original Borrower, in favor of R. Dennis McArver, as Trustee, for the benefit of Original Lender ("Security Instrument"), and by other documents and instruments that evidence and secure the Loan (the Note, the Security Instrument and such other documents and instruments evidencing and securing the Loan, as the same may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as the "Loan Documents").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, assign, deliver, convey, transfer and set over unto U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("Assignee"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, all of Assignor's right, title and interest in and to the Loan and obligations with respect to the Loan, together with all rights, remedies, collateral, instruments or other documents made or granted in favor of Assignor or its predecessors in interest in connection with the Loan, including, without limitation: (i) all right, title and interest in and to the Note; (ii) all guaranties, pledges, security interests, mortgages, deeds of trust, or other rights, interests, or other collateral securing or guaranteeing repayment of the Loan; and (iii) all other rights, remedies and obligations of Assignor in connection with the Loan, whether provided by contract or otherwise available under applicable law or in equity, including, without limitation, all rights and remedies provided, and obligations arising, under any loan agreements, indemnities or other instruments or documents made, issued or delivered to or in favor of Assignor or its predecessors in interest in connection with the Loan, all

as the same may have been amended from time to time, but specifically excluding from all of the foregoing the **"Retained Rights"** (as such term is defined below).

This assignment is an agreement between the parties hereto and no other party shall be deemed to be a third party beneficiary hereof.

**"Retained Rights"** shall mean those rights provided to Assignor under indemnification provisions or agreements or other terms and conditions of the above-described loan documents and collateral property pertaining to the Loan (including, without limitation, environmental indemnification provisions or agreements and insurance policies), or arising from Assignor's reliance upon a representation, warranty or other statement contained within any of the above-described loan documents and other collateral property pertaining to the Loan (including, without limitation, affidavits, certifications, environmental reports and opinions of counsel), which are available to be exercised by Assignor as a prior holder of such Loan. Assignor's retention of the Retained Rights shall not be to the exclusion of any rights of Assignee under such provisions or agreements to the extent that such provisions or agreements or terms or conditions are exercisable by Assignee as the assignee of such Loan.

To have and to hold the same unto the Assignee and to the successors and assigns of the Assignee forever.

**THIS ASSIGNMENT IS MADE WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.**

IN WITNESS WHEREOF, this Omnibus Assignment of Loan Documents has been duly executed and sealed on behalf of Assignor on January 10, 2012.

*[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]*

**ASSIGNOR:**

BANK OF AMERICA, N.A., A NATIONAL
BANKING ASSOCIATION (SUCCESSOR BY
MERGER TO LASALLE BANK NATIONAL
ASSOCIATION, A NATIONAL BANKING
ASSOCIATION), AS TRUSTEE FOR THE
REGISTERED HOLDERS OF LB COMMERCIAL
MORTGAGE TRUST 2007-C3, COMMERCIAL
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2007-C3

[NO CORPORATE SEAL]

By: _____
Printed Name: Paul D. Robinson
           Vice President and trust officer of U.S. Bank
           National Association - Attorney-in-Fact
           under Limited Power of Attorney dated
           October 24, 2011

Attest: _____
Printed Name: Thais Hayum
           Vice President and trust officer of U.S. Bank
           National Association - Attorney-in-Fact
           under Limited Power of Attorney dated
           October 24, 2011

Signed, Sealed and Delivered
in the presence of:

_____
Printed Name: Dilyana Y. Vlashka
Witness #1

_____
Printed Name: Deanna F. Degnan
Witness #2

      [Witnesses as to both signatures]

STATE OF ILLINOIS    )
                     ) ss:
COUNTY OF COOK       )

    The foregoing instrument was acknowledged before me, a notary public, this 10TH day of January, 2012, by Paul D. Robinson and Thais Hayum, as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, and as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, respectively, as Attorney-in-Fact on behalf of **BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3.** Each is personally known to me.

Notary Public, State of Illinois
Print Name: Christopher J. Nuxoll
My Commission Expires: 4/15/2014

[AFFIX NOTARY SEAL/STAMP ABOVE]

# EXHIBIT J
## CERTIFICATE OF TRANSFER
### (Assignee #1 to Assignee #2)

Albemarle County, VA
Debra M. Shipp Clerk
501 East Jefferson St.
Charlottesville, VA 22902
Phone Number: (434)972-4083
Fax Number: (434)293-0298
DEEDS Receipt
Official Receipt: 2012-00002170
Printed on 02/07/2012 at 11:15:33 AM
RECEIVED OF MCGUIREWOODS, LLP
Date Recorded: 02/07/2012

| Instrument ID | Recorded Time | | Amount |
|---|---|---|---|
| BK 4130 Pg 606 | 11:15:18 AM | | $36.0 |

Instrument:20120002171
CT- CERTIFICATE OF TRANSFER
GRANTOR:BANK OF AMERICA, N.A. EX:N
GRANTEE:U. S. BANK NATIONAL
ASSOCIATION EX:N
Address1:C/O LNR PARTNERS, LLC
Address2:1601 WASHINGTON AVENUE,
SUITE
City/State/Zip:MIAMI BEACH FL 33139
Description: N/A
Consideration:$0.00
Assumption:$0.00
Locality:CO                    Percent:100.00
Pages:18
Names:1
Accounts
Amount
035 - OPEN SPACE PRESERVATION         $1.0
106- TECHNOLOGY TRUST FUND FEE        $5.0
145- VSLF                             $1.5
301 -DEEDS                           $28.5

Itemized Check Listing
Check # 468901                        $36.0

Total Due:                            $36.0
Paid By Check:                        $36.0
Change Tendered:                      $0.0

Cashier:MARGARET BROWN Reg:CIRCOURT_0447

Instrument Control Number

001551

# Commonwealth of Virginia

## Land Record Instruments

## Cover Sheet - Form A

[ILS Cover Sheet Agent Online 1.1.6]

Doc ID: 006625400019 Type: DEE
Recorded: 02/07/2012 at 11:15:18 AM
Fee Amt: $36.00 Page 1 of 20
Albemarle County, VA
Debra M. Shipp Clerk
File# 2012-00001551

BK 4130 PG 606-624

| T A X | C O R P | | | | | |
|---|---|---|---|---|---|---|
| | | Date of Instrument | [ 01/10/2012 ] | | | |
| | | Instrument Type | [ CT ] | | | |
| E X E M P T | | Number of Parcels | [ 1 ] | | | |
| | | Number of Pages | [ 18 ] | | | |
| | | City ☐ County ☒ [ Albemarle County ] | | | | |

(Box for Deed Stamp Only)

### First and Second Grantors

| | | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|---|
| ☐ | ☒ | [ Bank of America, N.A. | | ] | [ Trustee |
| ☐ | ☒ | [ LaSalle Bank National Association | | ] | [ Trustee |

### First and Second Grantees

| | | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|---|
| ☐ | ☒ | [ U. S. Bank National Association | | ] | [ Trustee |
| ☐ | ☐ | [ ] | [ ] | [ ] | [ |

Grantee Address  (Name)         [ U.S. Bank National Association, Trustee
                 (Address 1)     [ c/o LNR Partners, LLC
                 (Address 2)     [ 1601 Washington Avenue, Suite
                 (City, State, Zip) [ Miami Beach                    ] [ FL ] [ 33139

Consideration  [ 0.00 ]    Existing Debt [ 0.00 ]    Assumption Balance [ 0.00

Prior Instr. Recorded at: City ☐ County ☒ [ Albemarle County    Percent. in this Juris.(%)[ 100 ]
Book [ 3519 ] Page [ 580 ] Instr. No [ ]
Parcel Identification No (PIN)      [ 06100-00-00-120U0
Tax Map Num. (if different than PIN) [
Short Property Description          [ N/A

Current Property Addr(Address 1)    [
                (Address 2)         [
                (City, State, Zip)  [ Albemarle                   ] [ VA ] [

Instrument Prepared by      [ McGuireWoods, LLP
Recording Paid for by       [ McGuireWoods, LLP
Return Recording to (Name)  [ Matthew Rash
                (Address 1) [ One James Center
                (Address 2) [ 901 E. Cary Street
                (City, State, Zip) [ Richmond              ] [ VA ] [ 23218
Customer Case ID   [ 2050636          ] [ 0098          ] [ CS-509809



Cover Sheet Page # 1 of 2

Instrument Control Number

# Commonwealth of Virginia

## Land Record Instruments

## Cover Sheet - Form B

[ILS Cover Sheet Agent Online 1.1.6]

| T A X E X E M P T | G R A N T O R | G R A N T E E | C O R P | |
|---|---|---|---|---|

Date of Instrument    [ 01/10/2012        ]
Instrument Type       [ CT                ]

Number of Parcels     [ 1      ]

Number of Pages       [ 18     ]

City ☐  County ☒   [ Albemarle County                    ]

(Box for Deed Stamp Only)

Grantors/Grantees/Parcels Continuation Form B

| | | | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|---|---|
| ☐ | ☒ | ☒ | [ Lehman Brothers Bank, FSB | [ | [ | ] [ |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |
| ☐ | ☐ | ☐ | [ | [ | [ | ] |

Prior Instr. Recorded at: City ☐  County ☒  [               Percent. in this Juris.(%) [            ]
Book [        ] Page [        ] Instr. No [                    ]
Parcel Identification No (PIN)              [
Tax Map Num. (if different than PIN)        [
Short Property Description                  [

Current Property Addr (Address 1)           [
              (Address 2)                    [
              (City, State, Zip)   [                    ] [        ] [        ]



Cover Sheet Page # 2 of 2

**This instrument was prepared by**
~~and after recording return to:~~

Manuel R. Gonzalez, Esquire
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131

Tax Parcel No.:        06100-00-00-120U0

## CERTIFICATE OF TRANSFER

| | |
|---|---|
| Place of Record: | Clerk's Office of the Circuit Court of the County of Albemarle, Virginia |
| Date of Deed of Trust: | July 12, 2007 |
| Recorded: | August 7, 2007 |
| Deed Book and Page Number: | Book 3471, Page 177 (as assigned by Instrument recorded in Book 3519, Page 580) |
| Name of Obligor or Maker: | WSG Charlottesville, LLC, a Virginia limited liability company |
| Name of Trustee: | R. Dennis McArver |
| Name of Original Payee or Obligee: | Lehman Brothers Bank, FSB, a federal stock savings bank (**"Original Lender"**) |
| Name(s) of Subsequent Payee(s) or Obligee(s): | The Promissory Note, defined below, was endorsed by Original Lender to the order of LaSalle Bank National Association, as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3. The Deed of Trust and the Additional Collateral Assignment of Leases and Rents, described below, were assigned by the Original Lender to LaSalle Bank National Association, in its capacity as Trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage |

Pass-Through Certificates, Series 2007-C3, which assignee is more correctly described as LaSalle Bank National Association, as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3.

Date of Note
Secured:                    July 12, 2007

Original Amount
Secured:                    Two Million Four Hundred Eighty Thousand and 00/100 Dollars
                            ($2,480,000.00)

Additional Security:        Additional Collateral Assignment of Leases and Rents

Date of Assignment
of Leases and Rents:        July 12, 2007

Recorded:                   August 7, 2007

Instrument Number:          Book 3471, Page 233 (as assigned by Instrument recorded in Book
                            3519, Page 574)

Name of Assignor:           WSG Charlottesville, LLC, a Virginia limited liability company

Name of Assignee:           Lehman Brothers Bank, FSB, a federal stock savings bank

The undersigned, the payee of the above-mentioned Note secured by the above-mentioned Deed of Trust and Additional Collateral Assignment of Leases and Rents, hereby certifies that the Note (and the obligations secured by the above-mentioned Deed of Trust and Additional Collateral Assignment of Leases and Rents) has been assigned, transferred or endorsed to **U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("Noteholder").**

The name and address to which notice may be mailed or delivered to the Noteholder as provided by Virginia Code Section 55-58.2 is as follows:

> U.S. Bank National Association, as Trustee for the registered
> holders of LB Commercial Mortgage Trust 2007-C3,
> Commercial Mortgage Pass-Through Certificates,
> Series 2007-C3
> c/o LNR Partners, LLC
> 1601 Washington Avenue
> Suite 700
> Miami Beach, Florida 33139

Given under my/our hand(s) this 10TH day of January, 2012.

**[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]**

**ASSIGNOR:**

**BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3**

[NO CORPORATE SEAL]

By: _____
Printed Name: Paul D. Robinson
    Vice President and trust officer of U.S. Bank
    National Association - Attorney-in-Fact
    under Limited Power of Attorney dated
    October 24, 2011

Attest: _____
Printed Name: Thais Hayum
    Vice President and trust officer of U.S. Bank
    National Association - Attorney-in-Fact
    under Limited Power of Attorney dated
    October 24, 2011

Signed, Sealed and Delivered
in the presence of:

_____
Printed Name: Dilyana Y. Vlashka
Witness #1

_____
Printed Name: Deanna F. Degnan
Witness #2

[Witnesses as to both signatures]

STATE OF ILLINOIS )
) ss:
COUNTY OF COOK )

    The foregoing instrument was acknowledged before me, a notary public, this 10TH day of January, 2012, by Paul D. Robinson and Thais Hayum, as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, and as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, respectively, as Attorney-in-Fact on behalf of **BANK OF AMERICA, N.A., A NATIONAL BANKING ASSOCIATION (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION), AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3.** Each is personally known to me.

Notary Public, State of Illinois
Print Name: Christopher J. Nuxoll
My Commission Expires: 4/15/2014

[AFFIX NOTARY SEAL/STAMP ABOVE]

## AFFIDAVIT AS TO POWER OF ATTORNEY

STATE OF ILLINOIS     )
                      ) ss:
COUNTY OF COOK     )

      Before me, Christopher J. Nuxoll, a Notary Public in and for the County and State aforesaid, came Paul D. Robinson and Thais Hayum, as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, and as Vice President and trust officer of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, respectively, who being first duly sworn, made oath and says: that each has not, or had not, at the time of executing the document to which this affidavit is attached, pursuant to Limited Power of Attorney dated October 24, 2011, made by Bank of America, National Association and Bank of America National Trust Delaware, which Limited Power of Attorney is being recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia, contemporaneously herewith, a copy of which is attached hereto as Exhibit A, received actual knowledge or actual notice of the revocation, termination or amendment of such Limited Power of Attorney, or notice of any facts indicating the same.

_____
Printed Name: Paul D. Robinson
                Vice President and trust officer of U.S. Bank
                National Association

_____
Printed Name: Thais Hayum
                Vice President and trust officer of U.S. Bank
                National Association

      Subscribed and sworn to before me in the County and State aforesaid this _10TH_ day of January, 2012.

_____
      Notary Public, State of Illinois
      Print Name: Christopher J. Nuxoll
      My Commission Expires: 4/15/2014

*"OFFICIAL SEAL"*
*CHRISTOPHER J NUXOLL*
*NOTARY PUBLIC, STATE OF ILLINOIS*
*MY COMMISSION EXPIRES APR. 15, 2014*

**[AFFIX NOTARY STAMP ABOVE]**

# EXHIBIT A - LIMITED POWER OF ATTORNEY

CFN 2011R0763761
OR Bk 27892 Pgs 1140 - 1143; (4pgs)
RECORDED 11/14/2011 11:02:11
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This instrument was prepared for:

Suzanne Cress Williams, Esquire
Senior Corporate Counsel - Corporate Trust Services
U.S. Bank Trust Legal
214 N. Tryon St
Charlotte, NC  28202-1078

After recording return to:

Edward A. Kalish, Esquire
Bilzin Sumberg Baena Price
 & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida  33131

*LIMITED POWER OF ATTORNEY DATED OCTOBER 24, 2011*

*BY*

*BANK OF AMERICA, NATIONAL ASSOCIATION*
*(ALSO KNOWN AS BANK OF AMERICA, N.A.)*
*AND*
*BANK OF AMERICA NATIONAL TRUST DELAWARE*

*IN FAVOR OF*

*U.S. BANK NATIONAL ASSOCIATION*
*AND*
*U.S. BANK TRUST NATIONAL ASSOCIATION*

7

BANK OF AMERICA, NATIONAL ASSOCIATION
BANK OF AMERICA NATIONAL TRUST DELAWARE

————————————LIMITED POWER OF ATTORNEY————————————

COUNTY OF COOK
STATE OF ILLINOIS

KNOW ALL PERSONS BY THESE PRESENTS:

THAT, pursuant to the Purchase Agreement, dated as of November 11, 2010 (the "Purchase Agreement"), by and among (i) Bank of America, NA ("BANA"), Bank of America (GSS) Limited and Bank of America National Trust Delaware ("BA National Trust") (collectively referred to herein as "Sellers"), and, solely with respect to Sections 6.2 and 12.10 thereof, Bank of America Corporation, and (ii) U.S. Bank National Association ("USB"), U.S. Bank Trust National Association ("USB Trust") and Elavon Financial Services Limited (collectively referred to herein as "Buyers"), Buyers purchased corporate trust appointments (the "Appointments") of Sellers constituting substantially all of the Securitization Trust, Administration Business (as defined in the Purchase Agreement) of Sellers,

THAT, each of BANA and BA National Trust has this day made, constituted and appointed, and by these presents does make, constitute and appoint trust officers of USB and USB Trust (the "Officers"), acting individually, its true and lawful agents and attorneys in fact ("Attorneys in Fact"), to the extent provided herein.

THEREFORE, each of BANA and BA National Trust does hereby authorize and empower each of the Officers individually, in its name, place and stead, subject to the limitations set forth below, to execute and deliver any and all instruments of transfer and assignment as USB or USB Trust deems to be necessary to assign, or evidence the assignment of, pursuant to and in furtherance of the Purchase Agreement and the Assignment and Assumption Agreements (as defined in the Purchase Agreement), any Appointments to USB and USB Trust, respectively, including without limitation the following: instruments of resignation, and/or appointment; amendments to UCC financing statements; assignments (or other documents of transfer) of security interests or ownership interests in real or personal property (including without limitation the assignment of same of record in the office of any federal agency or state, county or city responsible for the recording of security interests or ownership interests in real or personal property) whether or not evidenced by mortgages, security agreements, collateral assignments or leases; forms of UCC financing statements and assignments thereof; notices, directions and other communications to loan servicers; instruments necessary to draw upon letters of credit or make claims under insurance policies; and any and all documents presented to USB or USB Trust by the applicable loan servicer as necessary to release, in whole or in part, any mortgage, encumbrance, lien, assignment, UCC financing statement, lease, or other claim to real or personal property which exists, or is claimed to exist, in favor of BANA or BA National Trust in connection with the Appointments.

Notwithstanding any provision of the foregoing authorizations, solely for purposes of the indemnification provisions set forth in the Purchase Agreement, nothing herein, or the interim

any action (including without limitation execution of any instrument or other document) has been taken hereunder, shall be deemed to effect in any manner whatsoever any allocation of liability, or indemnification obligation, set forth in the Purchase Agreement (including without limitation, in Article 12 thereof), in taking any action authorized hereby, including without limitation executing any instrument or other document, the Attorneys in Fact shall be deemed to be acting by and on behalf of USB or USB Trust, as the case may be.

All third parties may rely completely, unconditionally and conclusively on the authority of the Attorneys in Fact, and need not inquire as to whether their authority has been validly exercised.

This Limited Power of Attorney shall be effective immediately and shall continue until terminated in writing by any officers of BANA and BA National Trust and received by USB and USB Trust, which termination shall be effective only for matters occurring after receipt of such notice terminating this Limited Power of Attorney. This Limited Power of Attorney shall supersede and replace the Limited Power of Attorney executed by BANA and BA National Trust on January 27, 2011 (the "Prior LPOA") in favor of the Attorneys in Fact, it being understood that any actions taken by the Attorneys in Fact pursuant to the authority given them under the Prior LPOA shall remain authorized as if taken pursuant to this Limited Power of Attorney.

This Limited Power of Attorney (any non-contractual obligations arising out of or in connection with it) shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS OF WHICH, each of the BANA and BA National Trust has caused this Limited Power of Attorney to be executed by a duly authorized person on the 24th day of October 2011.

BANK OF AMERICA, N.A.

By: _____
Name: Thomas Lehmann
Title: Senior Vice President

BANK OF AMERICA NATIONAL
TRUST DELAWARE

By: _____
Name: Thomas Lehmann
Title: Senior Vice President

OR BK 27892 PG 1143
LAST PAGE

COUNTY OF COOK

STATE OF ILLINOIS

Before me, personally appeared Thomas Lehmann, who is an officer of Bank of America, National Association and BA National Trust, who acknowledged to me this instrument as the free act and deed of said companies.

GIVEN UNDER my hand and seal of office this 24th day of October, 2011.

Notary Public

My commission expires: March 11, 2013

"OFFICIAL SEAL"
MARIA KOTSIOVOS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES MAR. 11, 2013

STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that this is a true copy of the
original filed in this office on _____ day of
NOV 1 2 2011 _____ A.D., 20_____
WITNESS my hand and Official Seal.
HARVEY RUVIN, CLERK of Circuit and County Courts
By_____ D.C.

CFN 2011R0763762
OR Bk 27892 Pgs 1144 - 1151; (8pgs)
RECORDED 11/14/2011 11:02:11
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Prepared by and after recording
Please return to:

Edward A. Kalish, Esquire
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131

# U.S. BANK NATIONAL ASSOCIATION
## GENERAL COUNSEL - CORPORATE TRUST SERVICES CERTIFICATE

I, Michael A. DeBois, General Counsel - Corporate Trust Services, of U.S. Bank National Association, hereby certify that the following is a true and exact extract from the Bylaws of U.S. Bank National Association, a national banking association organized under the laws of the United State of America (the "**Association**"):

### ARTICLE VI.
### CONVEYANCES, CONTRACTS, ETC.

All transfers and conveyances of real estate, mortgages, and transfers, endorsements or assignments of stock, bonds, notes, debentures or other negotiable instruments, securities or personal property shall be signed by any elected or appointed officer.

All checks, drafts, certificates of deposit and all funds of the Association held in its own or in fiduciary capacity may be paid out by an order, draft or check bearing the manual or facsimile signature of any elected or appointed officer of the Association.

All mortgage satisfactions, releases, all types of loan agreements, all routine transactional documents of the Association, and all other instruments not specifically provided for, whether to be executed in a fiduciary capacity or otherwise, may be signed on behalf of the Association by any elected or appointed officer thereof.

I further certify that each of the individuals listed on Exhibit "A" attached hereto and incorporated herein by this reference are duly appointed and qualified officers of the Association, are authorized to act under Article VI of the Bylaws of the Association, and are duly authorized and empowered to act as "trust officers" of the Association (as such term is used in the second paragraph of that certain Limited Power of Attorney dated October 24, 2011, executed by Bank of America, N.A., and Bank of America National Trust Delaware, a true and correct copy of which is attached hereto as Exhibit "B" and incorporated herein by this reference).

I further certify that I am a proper officer of the Association who can execute and certify that the required action or authority has been given or has taken place by resolution of the Board of

1

Directors of the Association under the above-cited Bylaw without the necessity of further action by such Board.

IN WITNESS WHEREOF, I have set my hand this 2nd day of November, 2011.

**[NO CORPORATE SEAL]**

_____
Michael A. DeBois
General Counsel - Corporate Trust Services

## CORPORATE ACKNOWLEDGMENT

STATE OF MINNESOTA    )
                      ) SS:
COUNTY OF RAMSEY      )

On this 2 day of November, 2011, before me, the undersigned, a Notary Public in and for said County and State, personally appeared MICHAEL A. DeBOIS, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed the within instrument as General Counsel - Corporate Trust Services of U.S. Bank National Association, a national banking association, and acknowledged to me that he executed the within instrument as the act and deed of such national banking association pursuant to its by-laws or a resolution of the Board of Directors.

WITNESS my hand and official seal.

Signature: _____

Printed Name: _____
              Notary Public, State of Minnesota

My Commission expires: 1/31/15

LAURIE E SWANSEN
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2015

2

## EXHIBIT "A"

| | |
|---|---|
| Eve D. Kaplan | Senior Vice President |
| Syed I. Ali | Vice President |
| Nancie J. Arvin | Vice President |
| Patricia M. Child | Vice President |
| Sheryl Christopherson | Vice President |
| Matthew D. Clarkin | Vice President |
| Jeffrey J. Emerson | Vice President |
| Matthew Garvis | Vice President |
| Beth A. Gloppen | Vice President |
| Janet Haack | Vice President |
| Christopher M. Hagen | Vice President |
| April E. Haley | Vice President |
| Thais Hayum | Vice President |
| Bryan J. Hill | Vice President |
| Steven D. Illingworth | Vice President |
| Adam R. Jacobs | Vice President |
| Kimberly O. Jacobs | Vice President |
| Edwin J. Janis | Vice President |
| David A. Jason | Vice President |
| John L. Linssen | Vice President |
| Matthew Massier | Vice President |
| Michael S. Mateja | Vice President |
| Michelle Moeller | Vice President |
| Marcia Moore-Allen | Vice President |
| Michelle H. Morgan | Vice President |
| Russell D. Mosley | Vice President |
| Sashico J. Nishida | Vice President |
| Christopher J. Nuxoll | Vice President |
| Michael W. Oliver | Vice President |
| Steven E. Orlandino | Vice President |
| Charles F. Pedersen | Vice President |
| Daniel R. Radick | Vice President |
| Shannon M. Rantz | Vice President |
| Patrick Reichart | Vice President |
| Diane L. Reynolds | Vice President |
| Toby Robillard | Vice President |
| Paul D. Robinson | Vice President |
| Melissa A. Rosal | Vice President |
| Jason Ross | Vice President |
| Roxanne Rouleau | Vice President |
| Timothy J. Ruxton | Vice President |
| Tamara Schultz-Fugh | Vice President |
| Mamta D. Kamal Scott | Vice President |

3

13

| | |
|---|---|
| Matthew S. Scott | Vice President |
| Jonathan M. Schaller | Vice President |
| Peter Thanoukos | Vice President |
| Kirill Y. Titomir | Vice President |
| Brian C. Tri | Vice President |
| Nicolas A. Valaperta | Vice President |
| Erich J. Vanravenswaay | Vice President |
| Diane Swanson Wahl | Vice President |
| Becky Warren | Vice President |
| Judith M. Zuzek | Vice President |
| Brad R. Zwetzig | Vice President |
| Brandon A. Bashkin | Asst. Vice President |
| Malia A. Baynes | Asst. Vice President |
| Michael D. Benstson | Asst. Vice President |
| Dan M. Domzalski | Asst. Vice President |
| Brian Giel | Asst. Vice President |
| Sara P. Goos | Asst. Vice President |
| Rendena R. Larsen | Asst. Vice President |
| Julia Linian | Asst. Vice President |
| Mark Macesich | Asst. Vice President |
| William R. Mader | Asst. Vice President |
| Lou J. Marucheau | Asst. Vice President |
| Patrick J. Mitchell | Asst. Vice President |
| Mitchell R. Post | Asst. Vice President |
| Brian Schott | Asst. Vice President |
| Zuzana Timkova | Asst. Vice President |
| Molly Walter | Asst. Vice President |
| Steven Ziolkowski | Asst. Vice President |
| Kari Anderson | Trust Officer |
| Tanveer Ashraf | Trust Officer |
| Jesse J. Barkdull | Trust Officer |
| Erin Folsom | Trust Officer |
| Erika Forshtay | Trust Officer |
| Alex Fuentes | Trust Officer |
| Susan Kranz | Trust Officer |
| Peter Mooses | Trust Officer |
| Michael P. Speltz | Trust Officer |
| Mary Ann Turbak | Trust Officer |
| Alberto Venzor | Trust Officer |
| Joseph P. Wagner | Trust Officer |
| Trisha Willett | Trust Officer |

4

EXHIBIT "B"

LIMITED POWER OF ATTORNEY DATED OCTOBER 24, 2011,
EXECUTED BY BANK OF AMERICA, N.A., AND
BANK OF AMERICA NATIONAL TRUST DELAWARE

5

BANK OF AMERICA, NATIONAL ASSOCIATION
BANK OF AMERICA NATIONAL TRUST DELAWARE

LIMITED POWER OF ATTORNEY

COUNTY OF COOK
STATE OF ILLINOIS

KNOW ALL PERSONS BY THESE PRESENTS:

THAT, pursuant to the Purchase Agreement, dated as of November 11, 2010 (the
"Purchase Agreement"), by and among (i) Bank of America, NA ("BANA"), Bank of America
(GSS) Limited and Bank of America National Trust Delaware ("BA National Trust")
(collectively referred to herein as "Sellers"), and, solely with respect to Sections 6.2 and 12.10
thereof, Bank of America Corporation, and (ii) U.S. Bank National Association ("USB"), U.S.
Bank Trust National Association ("USB Trust") and Elavon Financial Services Limited
(collectively referred to herein as "Buyers"), Buyers purchased corporate trust appointments (the
"Appointments") of Sellers constituting substantially all of the Securitization Trust
Administration Business (as defined in the Purchase Agreement) of Sellers.

THAT, each of BANA and BA National Trust has this day made, constituted and
appointed, and by these presents does make, constitute and appoint trust officers of USB and
USB Trust (the "Officers"), acting individually, its true and lawful agents and attorneys in fact
("Attorneys in Fact"), to the extent provided herein.

THEREFORE, each of BANA and BA National Trust does hereby authorize and
empower each of the Officers individually, in its name, place and stead, subject to the limitations
set forth below, to execute and deliver any and all instruments of transfer and assignment as USB
or USB Trust deems to be necessary to assign, or evidence the assignment of, pursuant to and in
furtherance of the Purchase Agreement and the Assignment and Assumption Agreements (as
defined in the Purchase Agreement), any Appointments to USB and USB Trust, respectively,
including without limitation the following: instruments of resignation, and/or appointment;
amendments to UCC financing statements; assignments (or other documents of transfer) of
security interests or ownership interests in real or personal property (including without limitation
the assignment of same of record in the office of any federal agency or state, county or city
responsible for the recording of security interests or ownership interests in real or personal
property) whether or not evidenced by mortgages, security agreements, collateral assignments or
leases; forms of UCC financing statements and assignments thereof; notices, directions and other
communications to loan servicers; instruments necessary to draw upon letters of credit or make
claims under insurance policies; and any and all documents presented to USB or USB Trust by
the applicable loan servicer as necessary to release, in whole or in part, any mortgage,
encumbrance, lien, assignment, UCC financing statement, lease, or other claim to real or
personal property which exists, or is claimed to exist, in favor of BANA or BA National Trust in
connection with the Appointments.

Notwithstanding any provision of the foregoing authorizations, solely for purposes of the
indemnification provisions set forth in the Purchase Agreement, nothing herein, or the fact that

6

any action (including without limitation execution of any instrument or other document) has been taken hereunder, shall be deemed to effect in any manner whatsoever any allocation of liability, or indemnification obligation, set forth in the Purchase Agreement (including without limitation, in Article 12 thereof), in taking any action authorized hereby, including without limitation executing any instrument or other document, the Attorneys in Fact shall be deemed to be acting by and on behalf of USB or USB Trust, as the case may be.

All third parties may rely completely, unconditionally and conclusively on the authority of the Attorneys in Fact, and need not inquire as to whether their authority has been validly exercised.

This Limited Power of Attorney shall be effective immediately and shall continue until terminated in writing by any officers of BANA and BA National Trust and received by USB and USB Trust, which termination shall be effective only for matters occurring after receipt of such notice terminating this Limited Power of Attorney. This Limited Power of Attorney shall supersede and replace the Limited Power of Attorney executed by BANA and BA National Trust on January 27, 2011 (the "Prior LPOA") in favor of the Attorneys in Fact, it being understood that any actions taken by the Attorneys in Fact pursuant to the authority given them under the Prior LPOA shall remain authorized as if taken pursuant to this Limited Power of Attorney.

This Limited Power of Attorney (any non-contractual obligations arising out of or in connection with it) shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS OF WHICH, each of the BANA and BA National Trust has caused this Limited Power of Attorney to be executed by a duly authorized person on the 24th day of October 2011.

BANK OF AMERICA, N.A.

By: _____
Name: Thomas Lehmann
Title: Senior Vice President

BANK OF AMERICA NATIONAL
TRUST DELAWARE

By: _____
Name: Thomas Lehmann
Title: Senior Vice President

7

OR BK 27892 PG 1151
LAST PAGE

COUNTY OF COOK

STATE OF ILLINOIS

Before me, personally appeared Thomas Lehmann, who is an officer of Bank of America, National Association and BA National Trust, who acknowledged to me this instrument as the free act and deed of said companies.

GIVEN UNDER my hand and seal of office this 24th day of October, 2011.

Notary Public
My commission expires: March 11, 2013

"OFFICIAL SEAL"
MARIA KOTSOVOS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES MAR. 11, 2013

STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the original on file in this office. 12-10 AD 20 11
HARVEY RUVIN, CLERK, of Circuit and County Courts
Deputy Clerk
Guetry Jean   II-7325

RECORDED IN CLERKS OFFICE OF
ALBEMARLE COUNTY ON
February 07,2012 AT 11:15:18 AM
$0.00 GRANTOR TAX PD
AS REQUIRED BY VA CODE §58.1-802
STATE: $0.00 LOCAL: $0.00
ALBEMARLE COUNTY, VA
DEBRA M. SHIPP CLERK
DC

8

**EXHIBIT K**
**ALLONGE**
**(Assignee #2 to Lender)**

<u>ALLONGE</u>

ALLONGE to that certain Promissory Note dated July 12, 2007, payable by **WSG Charlottesville, LLC, a Virginia limited liability company,** to the order of **Lehman Brothers Bank, FSB, a federal stock savings bank,** in the original principal amount of Two Million Four Hundred Eighty Thousand and 00/100 Dollars ($2,480,000.00).

PAY TO THE ORDER OF LBCMT 2007-C3 SEMINOLE TRAIL, LLC, A VIRGINIA LIMITED LIABILITY COMPANY,

WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.

U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3

By:    LNR Partners, LLC, a Florida limited liability company, its Attorney-in-Fact under Limited Power of Attorney dated March 15, 2011

By:    _____
Name:  _____
Title: _____

**EXHIBIT L**
**OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS**
**(Assignee #2 to Lender)**

## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS

U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3 ("**Assignor**"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 800, Miami Beach, Florida 33139, is the current owner and holder of that certain loan made on July 12, 2007 (the "**Loan**"), in the original principal amount of Two Million Four Hundred Eighty Thousand and 00/100 Dollars ($2,480,000.00) (the "**Original Loan Amount**"), by Lehman Brothers Bank, FSB, a federal stock savings bank ("**Original Lender**"), to WSG Charlottesville, LLC, a Virginia limited liability company ("**Original Borrower**"). The Loan is evidenced by a Promissory Note dated July 12, 2007, executed by Original Borrower and payable to the order of Original Lender, in the Original Loan Amount (as the same may from time to time have been amended, consolidated, renewed, replaced and/or endorsed, the "**Note**"), and secured by a Deed of Trust, Fixture Filing and Security Agreement made by Original Borrower, in favor of R. Dennis McArver, as Trustee, for the benefit of Original Lender ("**Security Instrument**"), and by other documents and instruments that evidence and secure the Loan (the Note, the Security Instrument and such other documents and instruments evidencing and securing the Loan, as the same may from time to time be amended, consolidated, renewed or replaced, including, without limitation, the documents and instruments described on **Exhibit A** attached hereto and incorporated herein by reference, being collectively referred to herein as the "**Loan Documents**").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, assign, deliver, convey, transfer and set over unto **LBCMT 2007-C3 SEMINOLE TRAIL, LLC, a Virginia limited liability company** ("**Assignee**"), having a mailing address of c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, all of Assignor's right, title and interest in and to the Loan and obligations with respect to the Loan, together with all rights, remedies, collateral, instruments or other documents made or granted in favor of Assignor or its predecessors in interest in connection with the Loan, including, without limitation: (i) all right, title and interest in and to the Note; (ii) all guaranties, pledges, security interests, mortgages, deeds of trust, or other rights, interests, or other collateral securing or guaranteeing repayment of the Loan, including, without limitation, the documents and instruments relating to the Loan described on **Exhibit A** attached hereto and incorporated herein; and (iii) all other rights, remedies and obligations of Assignor in connection with the Loan, whether provided by contract or otherwise available under applicable law or in equity, including, without limitation, all rights and remedies provided, and obligations arising under any loan agreements, indemnities or other instruments or documents made, issued or delivered to or in favor of Assignor or its predecessors in interest in connection with the Loan, all

as the same may have been amended from time to time, but specifically excluding from all of the foregoing the "**Retained Rights**" (as such term is defined below).

This assignment is an agreement between the parties hereto and no other party shall be deemed to be a third party beneficiary hereof.

"**Retained Rights**" shall mean those rights provided to Assignor under indemnification provisions or agreements or other terms and conditions of the above-described loan documents and collateral property pertaining to the Loan (including, without limitation, environmental indemnification provisions or agreements and insurance policies), or arising from Assignor's reliance upon a representation, warranty or other statement contained within any of the above-described loan documents and other collateral property pertaining to the Loan (including, without limitation, affidavits, certifications, environmental reports and opinions of counsel), which are available to be exercised by Assignor as a prior holder of such Loan. Assignor's retention of the Retained Rights shall not be to the exclusion of any rights of Assignee under such provisions or agreements to the extent that such provisions or agreements or terms or conditions are exercisable by Assignee as the assignee of such Loan.

To have and to hold the same unto the Assignee and to the successors and assigns of the Assignee forever.

**THIS ASSIGNMENT IS MADE WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR BY OPERATION OF LAW, OF ANY KIND AND NATURE WHATSOEVER.**

IN WITNESS WHEREOF, this Omnibus Assignment of Loan Documents has been duly executed and sealed on behalf of Assignor on March _____, 2012.

*[END OF TEXT – SIGNATURE PAGE FOLLOWS]*

ASSIGNOR:

U.S. BANK NATIONAL ASSOCIATION, A
NATIONAL BANKING ASSOCIATION
ORGANIZED AND EXISTING UNDER THE
LAWS OF THE UNITED STATES OF
AMERICA, NOT IN ITS INDIVIDUAL
CAPACITY BUT SOLELY IN ITS CAPACITY
AS TRUSTEE FOR THE REGISTERED
HOLDERS OF LB COMMERCIAL
MORTGAGE TRUST 2007-C3,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2007-C3

By:   LNR Partners, LLC, a Florida limited
liability company, its Attorney-in-Fact
under Limited Power of Attorney dated
March 15, 2011

By:
Name: Isaac Pesin
Title: vo-president

## EXHIBIT A

## SCHEDULE OF LOAN DOCUMENTS

1.  Guaranty of Recourse Obligations of Borrower dated July 12, 2007, made by Eric D. Sheppard and Philip Wolman for the benefit of Lehman Brothers Bank, FSB

2.  Assignment of Agreements, Permits and Contracts dated July 12, 2007, made by WSG Charlottesville, LLC to Lehman Brothers Bank, FSB

3.  Loan Agreement among WSG Charlottesville, LLC, the other Borrower Parties thereto and Lehman Brothers Bank, FSB dated July 12, 2007

4.  Guaranty of Payment dated July 12, 2007, made by WSG Charlottesville, LLC in favor of Lehman Brothers Bank, FSB

5.  Each other Guaranty of Payment dated on or about July 12, 2007, made by WSG Monroe, LLC; WSG Dulles GL, LLC; WSG Short Pump, LLC; WSG Trace Forke L.P., ATL2130 Limited Partnership; and WSG Snellville LP

6.  Assignment of Management Agreement and Subordination of Management Fees dated July 12, 2007, made by WSG Charlottesville, LLC and WSG Development Co. for the benefit of Lehman Brothers Bank, FSB

7.  Environmental Indemnity Agreement made as of July 12, 2007, by Eric D. Sheppard and Philip Wolman in favor of Lehman Brothers Bank, FSB

8.  Assignment of Mortgage Loan Documents made as of July 26, 2007, by Lehman Brothers Bank, FSB to LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3

**EXHIBIT M**
**CERTIFICATE OF TRANSFER**
**(Assignee #2 to Lender)**

Albemarle County, VA
Debra M. Shipp Clerk
501 East Jefferson St.
Charlottesville, VA 22902
Phone Number: (434)972-4083
Fax Number: (434)293-0298
DEEDS Receipt

Official Receipt: 2012-00003993
Printed on 03/13/2012 at 10:58:44 AM
RECEIVED OF MCGUIREWOODS, LLP
Date Recorded: 03/13/2012

| Instrument ID | Recorded Time | Amoun |
|---|---|---|
| Bk 4145 Pg 412 | 10:58:29 AM | $21.0 |

Instrument:201200003994
CT- CERTIFICATE OF TRANSFER
GRANTOR:U.S. BANK NATIONAL
    ASSOCIATION EX:N
GRANTEE:LBCMT 2007-C3 SEMINOLE
    TRAIL, LLC EX:N
Address1:C/O LNR PARTNERS, LLC
Address2:1601 WASHINGTON AVENUE,
    SUITE
City/State/Zip:MIAMI BEACH FL 33139
Description: N/A
Consideration:$0.00
Assumption:$0.00

| Locality:CO | Percent:100.00 |
| Pages:6 | Names: |

| Accounts | Amount |
|---|---|
| 035 - OPEN SPACE PRESERVATION | $0.0 |
| 106- TECHNOLOGY TRUST FUND FEE | $5.0 |
| 145- VSLF | $1.5 |
| 301- DEEDS | $14.5 |

Itemized Check Listing

| Check # 472377 | $21.0 |

| Total Due: | $21.0 |
| Paid By Check: | $21.0 |
| Change Tendered: | $0.0 |

Cashier:MARGARET BROWN Reg:CIRCOURT_00447

Instrument Control Number

*002993*

# Commonwealth of Virginia

## Land Record Instruments

## Cover Sheet - Form A

[ILS Cover Sheet Agent Online 1.1.6]

Doc ID: 006646010007 Type: DEE
Recorded: 03/13/2012 at 10:58:29 AM
Fee Amt: $21.00 Page 1 of 7
Albemarle County, VA
Debra M. Shipp Clerk
File# 2012-00002993
BK 4145 PG 412-418

(Box for Deed Stamp Only)

**TAX EXEMPT** | **COR P**

Date of Instrument [ 03/01/2012 ]
Instrument Type [ CT ]
Number of Parcels [ 1 ]
Number of Pages [ 6 ]
City ☐ County ☒ [ Albemarle County ]

### First and Second Grantors

| | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|
| ☐☒ | U.S. Bank National Association | | | [ Trustee |
| ☐☐ | [ ] [ | | ] [ | ] [ |

### First and Second Grantees

| | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|
| ☐☒ | LBCMT 2007-C3 Seminole Trail, LLC | | ] [ | |
| ☐☐ | [ ] [ | | ] [ | ] [ |

Grantee Address (Name) [ LBCMT 2007-C3 Seminole Trail, LLC
(Address 1) [ c/o LNR Partners, LLC
(Address 2) [ 1601 Washington Avenue, Suite
(City, State, Zip) [ Miami Beach ] [ FL ] [ 33139

Consideration [ 0.00 ] Existing Debt [ 0.00 ] Assumption Balance [ 0.00

Prior Instr. Recorded at: City ☐ County ☒ [ Albemarle County ] Percent. in this Juris.(%)[ 100 ]
Book [ 4130 ] Page [ 606 ] Instr. No [ ]

Parcel Identification No (PIN) [ 06100-00-00-120U0
Tax Map Num. (if different than PIN) [
Short Property Description [ N/A

Current Property Addr(Address 1) [
(Address 2) [
(City, State, Zip) [ Albemarle ] [ VA ] [

Instrument Prepared by [ Blizin Sumbert Baena Price & A
Recording Paid for by [ McGuireWoods, LLP
Return Recording to (Name) [ Matthew Rash
(Address 1) [ One James Center
(Address 2) [ 901 E. Cary Street
(City, State, Zip) [ Richmond ] [ VA ] [ 23218
Customer Case ID [ 2050636 ] [ 0098 ] [ CS-523942 ]



Cover Sheet Page # 1 of 1

**This Instrument was prepared by:**

Manuel R. Gonzalez, Esquire
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456

Tax Parcel No.:        06100-00-00-120U0

## CERTIFICATE OF TRANSFER

| | |
|---|---|
| Place of Record: | Clerk's Office of the Circuit Court of the County of Albemarle, Virginia |
| Date of Deed of Trust: | July 12, 2007 |
| Recorded: | August 7, 2007 |
| Deed Book and Page Number: | Book 3471, Page 177 (as assigned by Instrument recorded in Book 3519, Page 580) |
| Name of Obligor or Maker: | WSG Charlottesville, LLC, a Virginia limited liability company |
| Name of Trustee: | R. Dennis McArver |
| Name of Original Payee or Obligee: | Lehman Brothers Bank, FSB, a federal stock savings bank (**"Original Lender"**) |
| Name(s) of Subsequent Payee(s) or Obligee(s): | The Note, described below, was endorsed by: (i) Original Lender to the order of LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, |

1.

Commercial Mortgage Pass-Through Certificates, Series 2007-C3; and (ii) Bank of America, N.A., a national banking association (successor by merger to Lasalle Bank National Association, a national banking association), as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3, to the order of U.S. Bank National Association, a national banking association organized and existing under the laws of the United States of America, not in its individual capacity but solely in its capacity as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3.

|  |  |
|---|---|
| Date of Note Secured: | July 12, 2007 |
| Original Amount Secured: | Two Million Four Hundred Eighty Thousand and 00/100 Dollars ($2,480,000.00)) |
| Additional Security: | Additional Collateral Assignment of Leases and Rents |
| Date of Assignment of Leases and Rents: | July 12, 2007 |
| Recorded: | August 7, 2007 |
| Instrument Number: | Book 3471, Page 233 (as assigned by: (i) Instrument recorded in Book 3519, Page 574; and (ii) Instrument recorded in Book 4130, Page 606) |
| Name of Assignor: | WSG Charlottesville, LLC, a Virginia limited liability company |
| Name of Assignee: | Lehman Brothers Bank, FSB, a federal stock savings bank |

The undersigned, the payee of the above-mentioned Note secured by the above-mentioned Deed of Trust and Assignment of Additional Collateral Assignment of Leases and Rents, hereby certifies that the Note (and the obligations secured by the above-mentioned Deed of Trust and Assignment of Additional Collateral Assignment of Leases and Rents) has been assigned, transferred or endorsed to **LBCMT 2007-C3 SEMINOLE TRAIL, LLC**, a Virginia limited liability company (**"Noteholder"**).

The name and address to which notice may be mailed or delivered to the Noteholder as provided by Virginia Code Section 55-58.2 is as follows:

**LBCMT 2007-C3 SEMINOLE TRAIL, LLC**
c/o LNR Partners, LLC
1601 Washington Avenue
Suite 700
Miami Beach, Florida 33139

Given under my/our hand(s) this __|__ day of March, 2012.


*[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]*

3

**ASSIGNOR:**

**U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3**

By:   LNR Partners, LLC, a Florida limited liability company, its Attorney-in-Fact under Limited Power of Attorney dated March 15, 2011

Signed, sealed and delivered
in the presence of:

By: _____
Name: _____
Title: _____

Print Name: ~~Andrelaborton~~

Print Name: ~~JORGE ISAIAS DIAZ~~

4

STATE OF FLORIDA                      }
                                     }
COUNTY OF MIAMI-DADE                  }

On this the 1 day of March 2012, before me, *Suleica Martinez*, a Notary Public, personally appeared *Isaac Perin*, a *VP-president* of LNR Partners, LLC, a Florida limited liability company, on behalf of said limited liability company, as attorney-in-fact for **U.S. BANK NATIONAL ASSOCIATION, A NATIONAL BANKING ASSOCIATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE REGISTERED HOLDERS OF LB COMMERCIAL MORTGAGE TRUST 2007-C3, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C3,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person executed the instrument on behalf of the entity.

Notary Public State of Florida
Suleica Martinez
My Commission DD916751
Expires 10/23/2013

_____
Notary Public

[AFFIX NOTARY STAMP ABOVE]   My commission expires: *10/23/13*

5

## AFFIDAVIT AS TO POWER OF ATTORNEY

STATE OF FLORIDA                    )
                                    )
COUNTY OF MIAMI-DADE                )

Before me, _Suleica Martinez_____, a Notary Public in and for the County and State aforesaid, came _Isaac Pesin_____, as _Co-President_____ of LNR Partners, LLC, a Florida limited liability company, on behalf of the said limited liability company, who being first duly sworn, made oath and says: that he has not, or had not, at the time of executing the document to which this affidavit is attached, pursuant to Limited Power of Attorney dated March 15, 2011, made by U.S. Bank National Association, a national banking association, which Limited Power of Attorney was recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia on December 14, 2011, in Book 4108, Page 198, received actual knowledge or actual notice of the revocation, termination or amendment of such Limited Power of Attorney, or notice of any facts indicating the same.

LNR Partners, LLC, a Florida limited liability company

By: _____
Name: _Isaac Pesin_____
Title: _Co-President_____

Subscribed and sworn to before me in the County and State aforesaid this _1_ day of March, 2012.

Notary Public State of Florida
Suleica Martinez
My Commission DD916751
Expires 10/23/2013

_____
Notary Public

Printed Name: _Suleica Martinez_
My Commission Expires: _10/23/13_

[AFFIX NOTARY STAMP ABOVE]

RECORDED IN CLERKS OFFICE OF
ALBEMARLE COUNTY ON
March 13,2012 AT 10:58:29 AM
$0.00 GRANTOR TAX PD
AS REQUIRED BY VA CODE §58.1-802
STATE: $0.00 LOCAL: $0.00
ALBEMARLE COUNTY, VA
DEBRA M. SHIPP CLERK

MIAMI 2452783.1 7249639427

**EXHIBIT N**
**DEFAULT LETTER**

McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

matthew palmer rash
Direct: 804.775.4300

## McGuireWoods

mrash@mcguirewoods.com
Direct Fax: 804.698.2121

April 9, 2012

**By Certified Mail, Return Receipt Requested**
**(Certified Mail Receipt # 7160 3901 3632 8510          )**

WSG Charlottesville, LLC
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention: Jeffrey Graff

Re:   **Demand Letter:**
Loan made to WSG Charlottesville, LLC, a Virginia limited liability company (the "**Borrower**"), evidenced by a Promissory Note in the original principal amount of $2,480,000.00 dated July 12, 2007 (the "**Note**"), now held by LBCMT 2007-C3 Seminole Trail, LLC (the "**Noteholder**") as successor by endorsement to the Note by U.S. Bank National Association, a National Banking Association organized and existing under the laws of the United States of America, not in its individual capacity but solely in its capacity as Trustee for the Registered Holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3 (the "**Lender**"), and secured by a Deed of Trust, Fixture Filing and Security Agreement (the "**Deed of Trust**") dated July 12, 2007, encumbering property known as the Charlottesville Center located at 1646 Seminole Trail, Charlottesville, Virginia 22901 (the "**Property**"), and certain other documents executed in connection with the Loan (collectively, the "**Loan Documents**")
**Loan No.:** M010039571

Dear Borrower:

We represent the Noteholder and LNR Partners, LLC (the "**Servicer**") in its capacity as special servicer for the Noteholder of the Loan originally made by Lehman Brothers bank, FSB (the "**Original Lender**") to the Borrower as referenced in the Note. The Original Lender assigned the Note, by endorsement, to LaSalle Bank National Association, as trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3, which assigned the Note, by endorsement, to Bank of America, National Association, a national banking association, successor by merger to Lasalle Bank National Association, as Trustee for the registered holders of LB Commercial Mortgage

WSG Charlottesville
April 9, 2012
Page 2

Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3 (also known as Bank of America, National Association, a national banking association, successor by merger to Lasalle Bank National Association, in its capacity as Trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3), which assigned the Note, by endorsement, to the Lender, which further assigned the Note, by separate endorsement, to the Noteholder. Borrower's obligations under the Note are secured by, among other documents, the above-described Deed of Trust, an Assignment of Leases and Rents dated July 12, 2007, made by the Borrower to the Original Lender (the "**Assignment of Rents**"), and the Guaranty of Recourse Obligations of Borrower dated July 12, 2007 (the "**Guaranty**"), made by Eric D. Sheppard and Philip Wolman (collectively, the "**Guarantors**") for the benefit of the Original Lender, which loan documents have been assigned to the Noteholder.

By letter dated March 31, 2011, the Servicer notified the Borrower of its default under the terms of the Loan Documents after the Borrower failed to pay the amounts due under the Note (as described in the default letter) and the other Loan Documents (the "**Payment Default**"). The Borrower is in default pursuant to the terms of the Note and the Deed of Trust, and this letter is to advise you that the Noteholder *does hereby accelerate the Maturity Date* (as defined in the Note) *and immediately demands payment in full of the balance due under the Note and all amounts due under all (or any) of the other Loan Documents.* You are directed to contact the Servicer immediately for a statement of the total amount due and payable, including all interest, penalties and fees. The Servicer may be contacted at the following address or by facsimile: LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, Attention: Urosh Tomovich (Fax: (305) 695-5601).

This demand and acceleration letter shall also serve as notice that the Payment Default resulted in the automatic termination of Borrower's license to collect the Rents under the Assignment of Rents and the Deed of Trust. Any Rents collected by the Borrower after the Payment Default are to be (and to have been) held in trust for the benefit of the Noteholder and should have been, and now must be, paid over to the Noteholder promptly, but no later than within one (1) business day, after receipt by the Borrower or its affiliates. The Borrower's failure to turn over all excess Rents after payment of Property related expenses collected after the Payment Default, and to properly account for the same, has resulted and will continue to result in Losses (as that term is defined in the Guaranty) for which the Guarantors are personally liable under the Guaranty. In addition to remitting the excess Rents, you are directed to provide a complete accounting of the revenues received from the Property, a complete and accurate rent roll and a statement of accounts payable all from the date of the Payment Default and to continue to update the same on a monthly basis.

*You are hereby directed to immediately pay all such amounts due under the Loan Documents to the Noteholder and to pay, and to continue to pay, any Rents or other revenues received from the Property to the Noteholder after applying the Rents received to the ordinary and necessary expenses of owning and operating the Property.* In addition, you are required to remit to the Noteholder all tenant security deposits given to the Borrower under all existing

WSG Charlottesville
April 9, 2012
Page 3

leases. The Noteholder reserves all of its other rights and remedies against the Borrower and the Guarantors.

Please be advised that the Noteholder intends to diligently enforce all of its rights and exercise all of its remedies under the Deed of Trust, the Guaranty and any other Loan Documents, including, but not limited to, the commencement of foreclosure proceedings and the collection of Rents. Should you have any questions regarding this demand and acceleration letter, please contact me directly at the above telephone number or email address.

Very truly yours,

Matthew P. Rash
*Counsel to the Noteholder and on behalf of the Servicer*

cc.    Urosh Tomovich (by electronic mail)
Eric Major (by electronic mail)
Charles R. Swartz, Esquire (by electronic mail)

WSG Charlottesville, LLC
P.O. Box 546918
Miami Beach, Florida 33154
Attention: Eric Sheppard
(by First Class Mail)

Berman Rennert Vogel & Mandler
100 S.E. 2nd Avenue, 2900 Floor
Miami, Florida 33131
Attention: Wendy Beck, Esq.
(by First Class Mail)

\37708304.2

**EXHIBIT O**
**DEMAND LETTER**



**VIA OVENRIGHT MAIL**

March 31, 2011

WSG Charlottesville, LLC
400 Arthur Godfrey Road, Suite 200
Miami Beach, FL 33140
Attention: Jeffrey Graff

Re:     **Notice of Default**:    Loan ("Loan") made to WSG Charlottesville, LLC
("Borrower"), evidenced by a note in the original principal amount of
$2,480,000.00, dated 07/12/07 ("Note"), now held by U.S. Bank National
Association, as successor-in-interest to Bank of America, National Association, as
successor by merger to LaSalle Bank National Association, as trustee for the
registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial
Mortgage Pass-Through Certificates, Series 2007-C3 ( "Lender") and specially
serviced by LNR Partners, LLC ("Special Servicer"), and secured by a mortgage
or deed of trust ("Mortgage") of property known as Charlottesville Center, located
at 1646 Seminole Trail, Charlottesville, VA 22901 ("Property"), and certain other
documents (collectively, "Loan Documents")
Loan No.: M010039571

Dear Borrower:

As the Special Servicer of the above referenced Loan, we are empowered to act on behalf
of Lender in connection with the Loan.

This is to provide you with notice of your breach of the Loan Documents by your failure
to make Monthly Payments within the time required under the Note in two (2) or more
months in the 2011 calendar year. The aggregate amount due and payable by Borrower
under the Loan Documents will be calculated for you upon request made to the
undersigned at LNR Partners, 1601 Washington Avenue, Suite 700, Miami Beach, FL
33139 (Fax - 305-695-5601). Lender will take all such actions as it deems appropriate to
protect its interest in the Loan and to collect the debt thereunder, including, without
limitation, seeking foreclosure and/or reconveyance of its security under the Loan
Documents without further notice or demand except as required pursuant to state law and
the Loan Documents. In the event any such actions are taken, Lender will also seek to
recover its additional costs and expenses, including attorney's fees and court costs,
incurred in any collection efforts.

Further, in the event Borrower makes any subsequent payment of any amount less than
all of the indebtedness due under the Loan ("Partial Payment"), Lender will apply such
Partial Payment to the indebtedness owing under the Loan Documents as a partial
payment. No such Partial Payment or the acceptance thereof by Lender shall constitute

or be deemed or construed as a waiver of any default under the Loan Documents.  In addition, any Partial Payment or the acceptance of any Partial Payment of Lender shall not constitute or be deemed or construed as a cure of any existing default under the Loan Documents, a modification of the Loan Documents or the terms of this letter, a reinstatement or satisfaction of the Loan, an election of remedies by Lender, or a waiver, modification, relinquishment or forbearance by Lender of any of Lender's rights or remedies under the Loan Documents or at law or in equity, all of which rights and remedies Lender hereby expressly reserves.

Neither this notice, any discussions by Lender or Special Servicer with Borrower or its representatives, nor Lender's acceptance of payment of less than the full amount due and payable under the Loan Documents, constitutes (a) a waiver by Lender or Special Servicer of any other default by Borrower under the Loan Documents, whether or not referred to herein or in any prior notice of default, (b) an election of remedies with respect to any such default by Special Servicer or Lender, each of which reserves all rights and remedies under law and under the Loan Documents, (c) a waiver, modification, relinquishment or forbearance by Lender or Special Servicer of any right or remedy under the Loan Documents or under law, all of which are reserved by Lender and Special Servicer, (d) a reinstatement of the Loan, or (e) a modification of any of the Loan Documents.

No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender or Special Servicer unless and until Lender and Borrower have reached agreement on all issues, and such entire agreement shall have been reduced to a written document that expressly states that it modifies the Loan Documents and is duly executed by Lender, Borrower and any guarantor of the Loan.  Oral agreements, emails, memoranda of meetings, summaries of proposed terms, etc., shall have no effect whatsoever and shall not be binding on Lender or Special Servicer.

Very truly yours,

By: _____
      Name:  Urosh Tomovich
      Title:   Asset Manager
            Real Estate Finance and Servicing Group

cc:    KeyBank Real Estate Capital Portfolio Services
       Larry Golinsky – LNR Partners/Director of Asset Management
       LNR Partners/Loan Servicing

**ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR ANY DEBTOR WHO
HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE
PAID OR SETTLED, OR OTHERWISE NOT BE OBLIGATED UNDER, THE
LOAN:** Please be advised that this letter constitutes neither a demand for payment
of the Loan nor a notice of personal liability to nor action against any recipient
hereof who might have received a discharge of the Loan in accordance with
applicable bankruptcy laws or who might be subject to the automatic stay of Section
362 of the United States Bankruptcy Code, or who has paid or settled or is otherwise
not obligated by law for the Loan.

Page 1 of 1

From: (305) 695-5188    Origin ID: MPBA    

Urosh Tomovich
LNR Partners LLC
1601 Washington Avenue
Suite 700
Miami Beach, FL 33139

J11151102250225

SHIP TO: (305) 673-3707          BILL SENDER

**Jeffrey Graff**
**WSG Development Company**
**400 W 41ST ST STE 200**

**MIAMI BEACH, FL 33140**

Ship Date: 31MAR11
ActWgt: 1.0 LB
CAD: 8989868/INET3130

Delivery Address Bar Code



Ref #        Revised NODLs - WSG Portfolio
Invoice #
PO #
Dept #

**FRI - 01 APR  A1**
**STANDARD OVERNIGHT**

TRK# 7969 3847 5210
0201

**32 TMBA**

33140
FL-US
**FLL**





50DG3/26A8//EFB

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**EXHIBIT P**
**FORECLOSURE NOTICE**

# THE —
# STUART SIMON
## — LAW FIRM —

4900 Cutshaw Avenue at Staples Mill Road
Richmond, Virginia 23230
www.simonlawva.com

Phone: 804.257.7233

Fax: 804.257.7396

April 12, 2012

**CERTIFIED MAIL**

George P. Yeonas, Registered Agent
WSG Charlottesville, LLC
8221 Old Courthouse Road
Suite 300
Vienna, Virginia 22182

WSG Charlottesville, LLC
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention: Jeffrey Graff

## FORECLOSURE NOTICE – 1646 SEMINOLE TRAIL, CHARLOTTESVILLE

Dear Gentlemen:

Reference is made to that certain Deed of Trust, Fixture Filing and Securing Agreement dated July 12, 2007, made and executed by WSG Charlottesville, LLC and duly recorded in the Clerk's Office, Circuit Court, Albemarle County, Virginia (the "Clerk's Office"), in Deed Book 3471, page 177 (the "Deed of Trust"), as assigned to LaSalle Bank National Association, in its capacity as trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates Series 2007-C3 by Assignment of Deed of Trust, Fixture Filing and Security Agreement dated July 17, 2007 and recorded in Deed Book 3519, page 580, further assigned to U.S. Bank National Association, as Trustee for the registered holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3 by Certificate of Transfer recorded February 7, 2012, in Deed Book 4130, page 606, and further assigned to LBCMT 2007-C3 Seminole Trail, LLC by Certificate of Transfer recorded March 13, 2012, in Deed Book 4145, page 412. The Deed of Trust conveyed to R. Dennis Mcarver, as Trustee, property more particularly described in the Deed of Trust (the "Property"), to secure the payment of certain indebtedness secured by the Deed of Trust in the principal amount of Two Million Four Hundred Eighty Thousand Dollars ($2,480,000.00) (the "Indebtedness").

By that certain Deed of Appointment of Substitute Trustee dated March 1, 2012 and duly recorded in the Clerk's Office, in Deed Book 4145, page 419, the Stuart A. Simon and Paul S. Kellinger, either of whom may act, were appointed as Substitute Trustee (the "Substitute Trustee") in the place and stead of the Trustees originally named under the Deed of Trust.

Default having occurred in the payment of the Indebtedness evidenced by the lien of the Deed of Trust, which default, as you are aware, has not been cured, LBCMT 2007-C3 Seminole Trail, LLC, the assigned Noteholder, has directed the Substitute Trustee to institute appropriate foreclosure proceedings against the Property pursuant to the Deed of Trust and the laws of the Commonwealth of Virginia.

Accordingly, the Substitute Trustee hereby declares all debts and obligations secured by the Deed of Trust to be at once due and payable and, pursuant to the terms of the Deed of Trust and the provisions of Section 55-59.1 of the Code of Virginia, 1950, as amended, you are hereby notified that foreclosure proceedings are being instituted against the Property and that the Substitute Trustee will hold a foreclosure sale of the Property on the front steps of the building housing the Circuit Court of Albemarle County, Virginia, having a street address of 501 East Jefferson Street, Charlottesville, Virginia 22902 at 11:30 a.m. on May 1, 2012, in accordance with the enclosed notice of Substitute Trustee's sale.

**THIS COMMUNICATION CONSTITUTES AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Yours truly,

Paul S. Kellinger

Enclosure
PSK:alw
cc:  (VIA First Class Mail)

George P. Yeonas, Registered Agent
WSG Charlottesville, LLC
8221 Old Courthouse Road
Suite 300
Vienna, Virginia  22182

WSG Charlottesville, LLC
c/o WSG Development Company
400 Arthur Godfrey Road, Suite 200
Miami Beach, Florida 33140
Attention: Jeffrey Graff

Matthew P. Rash, Esquire
McGuireWoods LLP
901 East Cary Street
Richmond, Virginia  23219

## NOTICE

This communication is from a debt collector. Federal law may require that we provide you with the following information:

> THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

If this is the initial communication you have received from us concerning this debt, the following may apply:

> The letter with which this notice is enclosed contains written notice to you of the amount of the debt and the name of the creditor to whom the debt is owed, and the name of the original creditor if it is different from the current creditor

> If you do not dispute the validity of this debt or any portion thereof within 30 days after your receipt of this notice, we will assume that the debt is valid.

> If you notify us in writing within the 30 day period that the debt, or any portion thereof, is disputed, we will cease collection of the debt or any disputed portion of the debt until we obtain verification of the debt and mail a copy of that verification to you. The law does not require that we wait until the end of the 30 day period before taking action to collect this debt.

<u>Notice of Substitute Trustee's Sale</u>
Charlottesville Center
1646 Seminole Trail
Charlottesville, Virginia 22901
Tax ID Number: 06100-00-00-120U0

In execution of a Deed of Trust, Fixture Filing and Security Agreement from WSG Charlottesville, LLC, a Virginia limited liability company (the "**Borrower**"), dated July 12, 2007, recorded July 7, 2007, in the Clerk's Office of the Circuit Court of Albemarle County, Virginia (the "**Clerk's Office**") at Deed Book 3471, at Page 177 (as amended and/or assigned, the "**Deed of Trust**"), the undersigned Substitute Trustees, at the direction of the Noteholder (as hereinafter defined), will offer for sale at public auction at the front entrance of the Courthouse of the Circuit Court for Albemarle County, Virginia located at 501 East Jefferson Street, Charlottesville, Virginia 22902 on **Tuesday, May 1, 2012, at 11:30 a.m.** (the "**Date of Sale**"), the Property (as defined in the Deed of Trust), including the one single-story building located thereon containing a total of approximately 9,114 square feet of gross leasable area located on an approximately 0.87 acre lot and more particularly described as:

> All that certain lot or parcel of land in Albemarle County, Virginia, on the west side of U.S. Route 29 North, near its intersection with Rio Road (State Route 631), containing 37,795 square feet, more or less, more particularly described as Parcel C on a physical survey of William S. Roudabush, Inc., dated May 31, 1983, containing two sheets, and recorded in the Clerk's Office of the Circuit Court of Albemarle County, Virginia, in Deed Book 786, pages 639 and 640;

and all other rights, easements and appurtenances benefiting and\or burdening the Property (collectively, the "**Real Estate**"), and together with all of the Substitute Trustees' right, title and interest, in and to, all items of tangible and intangible property described in the Deed of Trust, including, without limitation, machinery, equipment and furnishings and all other personal property of the Borrower used on or in connection with the Real Estate and described as "Collateral" under Financing Statements perfecting the Noteholder's interest therein filed with the Virginia State Corporation Commission on August 27, 2007, as File Number 070827-7344-1 and recorded in the Clerk's Office on August 31, 2007, as File No. 2007-33145 (collectively, the "**Personal Property**"); provided, however, that fixtures and other personal property of any tenants-in-possession are not included in this sale. The Real Estate and the Personal Property are hereinafter referred to collectively as the "**Property**."

Terms:  ALL CASH except that, subject to the requirements of Section 55-59.4 of the Code of Virginia, 1950, as amended, the holder of the note secured by the Deed of Trust (the "**Noteholder**") shall be entitled to apply any of the debt secured by the Deed of Trust as a credit to the successful bid for the Property (the "**Sales Price**").  To participate in the bidding, a bidder's deposit in the amount of **$100,000** (the "**Deposit**") will be required at the Date of Sale in cash or by certified or cashier's check payable to the Substitute Trustees (or to the bidder and endorsed to the Substitute Trustees). The Noteholder shall not be required to provide a Deposit. The balance of the Sales Price shall be paid in cash, wired funds or by certified or cashier's check, at settlement, to be held no later than twenty-one (21) days after the Date of Sale at the

office of the Substitute Trustee (the "**Date of Settlement**"), TIME BEING OF THE ESSENCE. To those who provide the Deposit to the Substitute Trustee but are not the successful bidder, the Substitute Trustee will return the Deposits promptly after completion of the bidding.

The Substitute Trustee reserves the unilateral right, at any time, to: (i) waive or reduce the Deposit requirement as to any bidder; (ii) withdraw the Property from sale at any time before the termination of the bidding; (iii) keep the bidding open for any length of time (which the Substitute Trustee intends to do as the Substitute Trustee determines the highest sales price); (iv) reject any and all bids; (v) require any and all bidders to substantiate their ability to produce the required Deposit <u>before</u> either allowing them to bid or accepting their bid; (vi) extend the time to knock down a bid while the successful bidder obtains the required Deposit; and (vii) extend the Date of Settlement.

In the event that the successful bidder fails to complete settlement on the Date of Settlement as required, its Deposit shall be delivered to, and retained by, the Noteholder and applied, in part, to the costs of the foreclosure sale (including the Substitute Trustee's fees and expenses and fees of the Noteholder's counsel), and the Property shall be resold at the risk and expense of the defaulting bidder. Such retention of the Deposit shall not limit any rights or remedies of the Substitute Trustee or the Noteholder with respect to such default by the successful bidder. All closing costs, other than preparation of the deed and the grantor's tax (which shall be paid out of the proceeds of sale), shall be borne by the successful bidder. Real estate taxes shall be prorated to the Date of Sale and the successful bidder will be obligated to add to its successful bid amount on the Date of Settlement any real estate taxes paid for the period after the Date of Settlement. Income and expenses of the Property shall <u>not</u> be prorated.

The Real Property shall be conveyed by special warranty deed and the Personal Property shall be conveyed by bill of sale, without warranty. All of the Property shall be sold "as is," "where is" without representation or warranty of any kind (except as described in the deed) including, without limitation, zoning, structural integrity, physical condition, extent of construction, construction materials, workmanship, habitability, environmental condition, fitness for a particular purpose or merchantability of all or any part of the Property, and any information a survey or inspection of the Property would disclose, and subject to, if any, conditions, restrictions, right-of-ways, easements, reservations, agreements, liens and other conditions and matters of record taking priority over the lien of the Deed of Trust. The risk of loss or damage to the Property by condemnation, fire or other casualty shall be borne by the successful bidder from the moment the Substitute Trustee accepts the successful bidder's final bid. Delivery of physical possession of the Property will **not** be performed by the Substitute Trustee but will be the responsibility of the successful bidder.

Upon information and belief, the Borrower, as landlord, is a party to certain leases affecting the Property with the following tenants (the "**Existing Leases**"): Electronics Boutique of America, Inc. and Mattress Warehouse of Charlottesville, LLC. No representation or warranty is made as to the accuracy of the total number of retail units at the Property, square footages, the type of units, the existence or condition of the buildings or structures on the Property or any other property amenities, the occupancy of any tenants, the names or identities of any specific tenants, the existence of leases or occupancy agreements or the effect, if any, of the

foreclosure sale on the rights of any tenants pursuant to the Existing Leases or other parties in possession, if any.

The successful bidder will be required to execute a Memorandum of Sale and Deposit Receipt (the "**Memo of Sale**") concerning the purchase of the Property, a copy of which will be made available upon request to the information contact person below or immediately before announcing the sale of the Property on the Date of Sale.  The Substitute Trustee was substituted by Deed of Appointment of Substitute Trustee dated March 1, 2012, and recorded in the Clerk's Office on March 13, 2012, at Deed Book 4145, page 419.

> Stuart A. Simon, Esquire
> Paul S. Kellinger, Esquire
> Substitute Trustees
> c/o The Stuart A. Simon Law Firm
> 4900 Cutshaw Avenue
> Richmond, Virginia 23230
> Telephone:  (804) 257-7233

FOR INFORMATION CONTACT:

Charles R. Swartz, Esquire
McGuireWoods LLP
901 East Cary Street
Richmond, Virginia 23219
Telephone Number:  (804) 775-4351

\37708784.2

Instrument Control Number

002994

# Commonwealth of Virginia

## Land Record Instruments

## Cover Sheet - Form A

[ILS Cover Sheet Agent Online 1.1.6]

Doc ID: 008846020004 Type: DEE
Recorded: 03/13/2012 at 11:00:32 AM
Fee Amt: $21.00 Page 1 of 4
Albemarle County, VA
Debra M. Shipp Clerk
File# 2012-00002994
BK 4145 PG 419-422

(Box for Deed Stamp Only)

| | | | |
|---|---|---|---|
| T<br>A<br>X<br>E<br>X<br>E<br>M<br>P<br>T | C<br>O<br>R<br>P | Date of Instrument [ 03/01/2012 ] | |
| | | Instrument Type [ ST ] | |
| | | Number of Parcels [ 1 ] | |
| | | Number of Pages [ 2 ] | |
| | | City ☐  County ☒ [ Albemarle County ] | |

### First and Second Grantors

| | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|
| ☐☒ | [ LBCMT 2007-C3 Seminole Trail, LLC | ] [ | ] [ | ] |
| ☐☒ | [ WSG Charlottesville, LLC | ] [ | ] [ | ] |

### First and Second Grantees

| | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|
| ☐☐ | [ Simon | ] [ Stuart | ] [ A | ] Substitute Trustee |
| ☐☐ | [ Kellinger | ] [ Paul | ] [ S | ] Substitute Trustee |

Grantee Address (Name) [ Stuart A. Simon ]
(Address 1) [ 4900 Cutshaw Avenue ]
(Address 2) [ ]
(City, State, Zip) [ Richmond ] [ VA ] [ 23230 ]

Consideration [ 0.00 ]  Existing Debt [ 0.00 ]  Assumption Balance [ 0.00 ]

Prior Instr. Recorded at: City ☐  County ☒ [ Albemarle County ]  Percent. in this Juris.(%) [ 100 ]
Book [ 3471 ] Page [ 177 ] Instr. No [ ]
Parcel Identification No (PIN) [ 06100-00-00-120U0 ]
Tax Map Num. (if different than PIN) [ ]
Short Property Description [ .868 Acres ]
Current Property Addr (Address 1) [ 1646 Seminole Trail ]
(Address 2) [ ]
(City, State, Zip) [ Charlottesville ] [ VA ] [ ]

Instrument Prepared by [ McGuireWoods LLP ]
Recording Paid for by [ McGuireWoods LLP ]
Return Recording to (Name) [ Mathew Rash ]
(Address 1) [ 901 East Cary Street ]
(Address 2) [ ]
(City, State, Zip) [ Richmond ] [ VA ] [ 23219 ]
Customer Case ID [ 2050636 ] [ 0098 ] [ CS-523973 ]



Cover Sheet Page # 1 of 2

Instrument Control Number

# Commonwealth of Virginia

## Land Record Instruments

## Cover Sheet - Form B

**[ILS Cover Sheet Agent Online 1.1.6]**

|   |   |   |   |   |
|---|---|---|---|---|
| **T** | **G** | **G** | **C** |   |
| **A** | **R** | **R** | **O** |   |
| **X** | **A** | **A** | **R** |   |
| **E** | **N** | **N** | **P** |   |
| **X** | **T** | **T** |   |   |
| **E** | **O** | **E** |   |   |
| **M** | **R** | **E** |   |   |
| **P** |   |   |   |   |
| **T** |   |   |   |   |

Date of Instrument          [ 03/01/2012      ]
Instrument Type             [ ST

Number of Parcels         [ 1        ]

Number of Pages           [ 2        ]

City ☐  County ☒  [ Albemarle County                    ]

(Box for Deed Stamp Only)

### Grantors/Grantees/Parcels Continuation Form B

| ☐☒ | Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|---|
| ☐☐ | [ McArver | [ R | [ Dennis | [ Trustee |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |
| ☐☐ | [ | [ | [ | [ |

Prior Instr. Recorded at: City ☐  County ☒  [                              Percent. in this Juris.(%)[          ]
Book [          ] Page [          ] Instr. No [                      ]
Parcel Identification No (PIN)                    [                                              ]
Tax Map Num. (if different than PIN)
Short Property Description

Current Property Addr(Address 1)      [
                    (Address 2)       [
                    (City, State, Zip) [                          ] [        ] [                ]



Cover Sheet Page # 2 of 2

Prepared by:
Charles R. Swartz, Esquire
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219

Tax Parcel No.:      06100-00-00-120U0
(Albemarle County, Virginia)

## DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE

THIS DEED OF APPOINTMENT OF SUBSTITUTE TRUSTEE is made as of this 1st day of March, 2012, by LBCMT 2007-C3 SEMINOLE TRAIL, LLC, a Virginia limited liability company (the "**Beneficiary**"; index as "**grantor**"), on behalf of WSG CHARLOTTESVILLE, LLC, a Virginia limited liability company (referred to as "**Grantor**"; index as "**grantor**"), R. DENNIS MCARVER (the "**Trustee**"; index as "**grantor**"), to STUART A. SIMON, a resident of Henrico County, Virginia, and PAUL S. KELLINGER, a resident of Chesterfield County, Virginia, as Trustees (collectively, the "**Substitute Trustees**"; index each as "**grantee**"), either of whom may act, with a business address at c/o The Stuart Simon Law Firm, 4900 Cutshaw Avenue, Richmond, Virginia 23230.

### RECITALS

A.      Pursuant to that certain Deed of Trust, Fixture Filing and Security Agreement dated as of July 12, 2007, and recorded in the Albemarle County Circuit Court Clerk's Office (the "**Clerk's Office**") on August 7, 2007, at Book 3471, Page 177-232 (as the same may be amended, modified or assigned from time to time, the "**Deed of Trust**"), Grantor conveyed certain property more particularly described therein lying and being in Albemarle County, Virginia, containing 0.868 acres, more or less, located at 1646 Seminole Trail, Charlottesville, Virginia, and identified by the parcel identification number mentioned above (the "**Property**") to R. Dennis McArver, as the original trustee, in trust, to secure an indebtedness from the Grantor in the principal amount of $2,480,000.00 (the "**Note**").

B.      The Beneficiary, as the current holder of the Note secured by the Deed of Trust, desires to appoint a new substitute trustee in place of the Trustee under the Deed of Trust.

### AGREEMENT

NOW, THEREFORE, pursuant to the authority granted to the Beneficiary under Section 21.1 of the Deed of Trust and by applicable law, the Beneficiary hereby substitutes and appoints the Substitute Trustee as Trustee under the Deed of Trust in the place and stead of the Trustee, and grants to the Substitute Trustee all of the rights, powers, trusts and duties of the Trustee under the Deed of Trust as if the Substitute Trustee was named as the original Trustee under the Deed of Trust.

WITNESS the signature of the Beneficiary on the following page.

1

(Signature page to Deed of Appointment of Substitute Trustee)

**BENEFICIARY:**

**LBCMT 2007-C3 SEMINOLE TRAIL, LLC,**
a Virginia limited liability company

By:    LNR Partners, LLC, a Florida limited liability
company, its Manager

By:    _____
Name:    _____
Title:    _____

STATE OF FLORIDA

CITY/COUNTY OF MIAMI-DADE

    The foregoing Deed of Appointment of Substitute Trustee was acknowledged before me this ___ day of March, 2012, by _____, as a _____ of LNR Partners, LLC, a Florida limited liability company, on behalf of said limited liability company, as Manager of LBCMT 2007-C3 SEMINOLE TRAIL, LLC, on behalf of the limited liability company.

Notary Public State of Florida
Suleica Martinez
My Commission DD916751
Expires 10/23/2013

[Affix notarial seal]

Notary Public
Printed Name: _____
My Commission Expires: 10/23/13

RECORDED IN CLERKS OFFICE OF
ALBEMARLE COUNTY ON
March 13,2012 AT 11:00:32 AM
$0.00 GRANTOR TAX PD
AS REQUIRED BY VA CODE §58.1-802
STATE: $0.00 LOCAL: $0.00
ALBEMARLE COUNTY, VA
DEBRA M. SHIPP CLERK

\30161614.1

2